IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MICROSOFT CORPORATION,

Plaintiff,

v.

ALCATEL BUSINESS SYSTEMS and
GENESYS TELECOMMUNICATIONS
LABORATORIES, INC.,

Defendant.

C.A. No. 07-90-SLR

**PLAINTIFF MICROSOFT CORPORATION'S OPPOSITION
TO DEFENDANT ALCATEL BUSINESS SYSTEMS' MOTION TO
DISQUALIFY FISH & RICHARDSON P.C., AND FOR OTHER SANCTIONS**

FISH & RICHARDSON P.C.
Thomas L. Halkowski (#4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
Fax: (302) 652-0607
E-Mail: halkowski@fr.com

Ruffin B. Cordell
Linda Liu Kordziel
1425 K Street N.W., Suite 1100
Washington D.C. 20005
Tel: (202) 783-5070
Fax: (202) 783-2331
E-Mail: cordell@fr.com
E-Mail: kordziel@fr.com

John E. Gartman
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099
E-Mail: gartman@fr.com

DATED: September 17, 2007        *Attorneys for Plaintiff Microsoft Corporation*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND ................................................................................3

    A.    The Acquisition Of The OXE System .....................................................3

    B.    Initial Installation and Training on The Purchased OXE System...........6

    C.    Mr. Lin Returned the Following Week to Complete His
          Installation of The Purchased OXE System.............................................8

III.  ARGUMENT .......................................................................................................10

    A.    Applicable Law ......................................................................................10

    B.    Rule 4.2 Does Not Apply to Communications with Mr. Lin..............11

          1.    Mr. Lin is not an employee of a "represented party"
                under Rule 4.2.....................................................................11

          2.    Even if there is no corporate distinction between ABS
                and Alcatel USA, Mr. Lin is not a protected employee of
                a represented party under Rule 4.2 ......................................14

          3.    F&R Did Not Seek Admissable Evidence from Mr. Lin,
                and Mr. Lin's Statements Will Not Be Used as
                Admissions against ABS......................................................16

          4.    Rule 4.2 requires actual knowledge that Mr. Lin is
                represented by counsel..........................................................18

    C.    F&R Did Not Violate Model Rule 4.3....................................................19

          1.    Rule 4.3 Is Not Applicable To The Facts at Hand..................19

                a.    Rule 4.3 Is Not Implicated Here .................................19

                b.    Rule 4.3 Does Not Require Unnecessary
                      Disclosure Here............................................................20

           2.    Rule 4.3 Does Not Apply To Commercial Transactions .........21

    D.    F&R Did Not Make any Misrepresentations Under Rules 8.4(c)
          and 4.1.....................................................................................................22

## <u>TABLE OF CONTENTS (cont'd)</u>

<u>Page</u>

1.   ABS Misinterprets The Requirements of Rules 8.4(c) and 4.1.................................................................22

     a.   There Is No Heightened Duty to Third Parties ...........................22

     b.   Courts Have Recognized The Propriety Of Purchasing Accused Goods In The Open Market......................23

2.   F&R complied with Rules 8.4(c) and 4.1 ................................................25

     a.   F&R made no misrepresentations.................................................25

     b.   F&R's communications with Mr. Lin were typical customer-trainer interactions............................................28

E.   Rule 4.4 Does Not Apply in This Case.................................................................29

F.   ABS's Request for Sanctions Is Unfounded......................................................30

   1.   There Is No Proper Grounds For Disqualification...................................30

     a.   Disqualification of Counsel is a Severe Sanction that is Not Warranted under the Circumstances Present Here ..................................................................................30

     b.   ABS's Arguments Based On the Model Rules Do Not Warrant Disqualification..................................................31

   2.   Disqualification of Microsoft's Expert is a Drastic and Unnecessary measure and ABS Has Not Proven That Mr. Jack Chang Should Be Disqualified...................................................33

   3.   F&R's Notes And Other Materials Regarding The Installation Of The OXE System Are Protected Work Product That It Should Not Have To Turn Over To ABS ...................35

   4.   Only Egregious Conduct Warrants Monetary Sanctions, And F&R's Conduct Was Never Improper .............................................36

   5.   ABS suffers no prejudice here. ................................................................37

IV.   CONCLUSION..................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

 **Cases**

Apple Corps Ltd. v. Int'l Collectors Soc'y,
    15 F. Supp. 2d 456 (D.N.J.) ...................................................................... 21, 23, 24, 27, 32

Best Western Int'l, Inc. v. CSI Int'l Corp,
    No. 94 Civ. 0360 (LMM), 1995 U.S. Dist. LEXIS 12314, at *6
    (S.D.N.Y. Aug. 22, 1995) ............................................................................................... 30, 33

Certain Switches And Products Containing Same,
    Inv. 337-TA-589, Order No. 6, 2007 ITC LEXIS 328 at *9-11 (Mar.
    14, 2007) ........................................................................................................................ 10

Cobb Publ'n. v. Hearst Corp.,
    907 F. Supp. 1038 (E.D. Mich. 1995) ............................................................................ 31

Cordy v. The Sherwin-Williams Co.,
    156 F.R.D. 575 (D.N.J. 1994) ........................................................................................ 34

Eaton Corp. v. Rockwell Int'l Corp.,
    No. 97-421-JJF, 1998 U.S. Dist. LEXIS 9742, at *3-4 (D. Del. Jun. 18,
    1998) ............................................................................................................................... 34

EEOC v. Hora, Inc.,
    No. 05-5393, 2007 WL 1875834, at *3 (3d Cir. Jun. 29, 2007) .......................... 11, 15, 38

Elonex I.P. Holdings, Ltd., v. Apple Computer, Inc.,
    142 F. Supp. 2d 579 (D. Del. 2001) ........................................................................ 10, 31

Faison v. Thornton,
    863 F. Supp. 1204 (D. Nev. 1992) ............................................................................ 36, 37

Gidatex v. Campaniello Imports, Ltd.,
    82 F. Supp. 2d 119 (S.D.N.Y. 1999) .................................................................... 24, 27, 32

Hammond v. Junction City,
    167 F. Supp. 2d 1271 (D. Kan. 2001) ................................................................. 30, 32, 36, 37

Hansen v. Umtech Industrieservice und Spedition,
    No. 95-516 MMS, 1996 WL 622557, at *6 (D. Del. Jul. 3, 1996) ................................ 34

Havens Realty Corp. v. Coleman,
    455 U.S. 363 (1982) ...................................................................................................... 23

Hill v. Shell Oil Co.,
    209 F. Supp. 2d 876 (N.D. Ill. 2002) ......................................................................... 16, 33

iii

**TABLE OF AUTHORITIES (cont'd)**

Page(s)

In re Air Crash Disaster Near Roselawn, Indiana on October 31, 1994,
    909 F. Supp 1116 (N.D. Ill. 1995) ...................................................................... 36

Kleiner v. First Nat'l Bank of Atlanta,
    751 F.2d 1193 (11th Cir. 1985) ......................................................................... 37

Michelson v. Merrill Lynch Pierce Fenner & Smith, Inc.,
    1989 U.S. Dist. LEXIS 3013 at *1-2 (S.D.N.Y. Mar. 28, 1989) ....................... 35

Midwest Motor Sports v. Arctic Cat Sales, Inc.,
    347 F.2d 693(8th Cir. 2003) .............................................................................. 27

Monsanto Co. v. Aetna Casualty & Surety Co.,
    593 A.2d 1013 (Del. Super. Ct. 1990) ............................................................... 32

Niesig v. Team I,
    558 N.E.2d 493 (N.Y. 1990) ........................................................................ 17, 25

Owen v. Wangerin,
    985 F.2d 312 (7th Cir. 1993) ............................................................................. 34

Panduit Corp. v. AllStates Plastic Mfg, Co., Inc.,
    744 F.2d 1564 (Fed. Cir. 1984) ......................................................................... 10

Papanicolaou v. Chase Manhattan Bank,
    720 F. Supp. 1080 (S.D.N.Y. 1989) .............................................................. 31, 32

Paris v. Union Pac. R.R.,
    450 F. Supp. 2d 913 (E.D. Ark. 2006) ............................................................... 15

Parker v. Pepsi-Cola,
    249 F. Supp. 2d 1006 (N.D. Ill. 2003) ............................................................... 37

Penda Corp. v. STK LLC,
    2004 U.S. Dist. LEXIS 13577 at *2, *20 n.6 (E.D. Pa. July 16, 2004) ....... 35, 37

People ex rel. Dep't of Corp. v. SpeeDee Oil Change Sys., Inc.,
    980 P.2d 371 (Cal. 1999) ................................................................................... 30

Republic Servs. v. Liberty Mut. Ins. Co.,
    2006 U.S. Dist. LEXIS 77363, at *31-32 (E.D. Ky. Oct. 20, 2006) .................. 31

Syngenta Seeds, Inc. v. Monsanto Co.,
    Civ. No. 02-1331-SLR, 2004 U.S. Dist. LEXIS 19817, at *4 (D. Del.
    Sept. 27, 2004) .................................................................................................. 34

Talecris Biotherapeutics, Inc. v. Baxter Int'l, Inc.,
    491 F. Supp. 2d 510 (D. Del. 2007) ........................................................ 10, 11, 31

iv

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Wang Labs. v. Toshiba Corp.,
        762 F. Supp. 1246 (E.D. Va. 1991) ............................................................ 34

### Statutes

ABA Model Rule 1.7 ........................................................................................... 13

ABA Model Rule 4.1 ........................................................................................... 23

ABA Model Rule 4.4 ........................................................................................... 29

D.C. Rule 4.3 ...................................................................................................... 21

D.C. Rule of Professional Conduct 4.2 ..................................................... 11, 13, 21

### OTHER AUTHORITIES

American Bar Association, A Legislative History: The Development of the
        ABA Model Rules of Professional Conduct, 1982-2005, at 542 (2006) .......... 15

Annot'd Model R. Prof.'l Conduct at 400 (6th ed. 2007) ................................... 15

David B. Isbell & Lucantonia N. Salvi, "Ethical Responsibility of Lawyers for
        Deception by Undercover Investigators and Discrimination Testers: An
        Analysis of the Provisions Prohibiting Misrepresentation Under the
        Model Rules of Professional Conduct," 8 Geo. J. Legal Ethics 791, 817
        (1995) ........................................................................................................... 23

Geoffrey C. Hazard, Jr. and W. William Hodes, The Law of Lawyering,
        § 39.2 (3d. ed. 2003) ..................................................................................... 19

Phillip Barengolts, "Ethical Issues Arising from the Investigation of Activities
        of Intellectual Property Infringers Represented by Counsel," 1 NW. J.
        Tech. & Intell. Prop. 47, 58 (2003) ......................................................... 17, 29

Restatement of the Law Governing Lawyers ...................................................... 16, 22

Pursuant to Local Rule of the United States District Court for the District of Delaware 7.1.2(b), Plaintiff Microsoft Corporation ("Microsoft") respectfully submits this opposition to Defendant Alcatel Business Systems ("ABS")'s Motion To Disqualify Fish & Richardson P.C. ("F&R"), And For Other Sanctions.  For the reasons detailed below, the evidence and the law do not support ABS's eleventh-hour motion to create a meritless and distracting collateral dispute.  ABS complains that Microsoft bought a sample of the accused system on the open market from third party suppliers.  One of these third party suppliers employed a technician that ABS now claims as an employee.  However, the facts clearly show that this technician is not an ABS employee but instead works for a distant sister company, and Microsoft did nothing other than to buy on the open market what ABS did not produce in discovery.  Accordingly, this Court should deny ABS's motion in its entirety.

## I.    INTRODUCTION

When there is no support in the facts or the law, the last resort of desperate litigants is to attack the other side's lawyers.  And that is exactly what ABS attempts to do through the present motion.

The trial in the parallel case pending in the International Trade Commission ("ITC") is scheduled to begin on October 9, 2007.  To distract Microsoft from preparing for the ITC trial, ABS filed this groundless motion in the ITC, as well as this Court, to disqualify F&R as trial counsel, disqualify Microsoft's expert, pierce Microsoft's work-product immunity, and impose other sanctions.  There is one key problem however: none of ABS's arguments supporting the motion has any merit.

As to ABS's allegation that F&R violated Rule 4.2 by improperly interacting with a party it knew to be represented by counsel in this action, there is no basis in fact or law.  Indeed, Mr. Lin is <u>not</u> an employee of ABS; as his declaration indicates, he is an employee of Alcatel USA, which is not a party in this action.  Interestingly, ABS has insisted on separating the various Alcatel-Lucent corporate entities when it suited its litigation goals, insisting on removing

1

Alcatel-Lucent from this case, and substituting ABS as the proper defendant. But even if the corporate separation between Alcatel USA and ABS were a sham, Rule 4.2 nonetheless would extend only to individuals with control or authority over the litigation, a role that Mr. Lin certainly does not play.

As to the argument that F&R violated Rule 4.3, which governs a lawyer's contacts with unrepresented persons, ABS improperly ignores that Rule 4.3 aims to prevent an unrepresented person from being deceived to his disadvantage about the lawyer's role, and that precedent excludes from the scope of the Rule any arms-length commercial transaction in which the firm acts as a customer, even if the transaction benefits a client. Rule 4.3 does not, as ABS contends, require F&R to tell the Mr. Lin that the firm was representing Microsoft in a lawsuit against ABS concerning these products. Indeed, it is undisputed that Mr. Lin treated the installation of the accused products at F&R and the training of F&R's personnel as a routine transaction in the ordinary course of his business.

ABS's accusations of dishonesty and misrepresentation in violation of Rules 8.4 and 4.1 are of course without merit. Indeed, F&R made no misrepresentations whatsoever in connection with the purchase of the accused system, but instead acted in accordance with the prevailing case law which authorizes lawyers and their agents to investigate and gather evidence informally by means of garden-variety consumer transactions. In particular, the case law establishes that F&R may accept routine training and installation services, without having to disclose that the purchase occurred in connection with litigation against ABS. The applicable ethics rules thus permit a lawyer or investigator to seek services from employees of a corporate adversary on the same basis as the general public and observe how these employees act in the ordinary course of business. There is simply no legal obligation for F&R to announce why it was buying the system. ABS misreads Rules 8.4 and 4.1 to try to impugn F&R and its actions in this context.

Because F&R did not violate any ethical rules, including Model Rules 4.1, 4.2, 4.3, 4.4 and 8.4(c), there is no basis whatsoever to disqualify F&R as counsel for Microsoft or impose any other sanction. Moreover, ABS has failed to demonstrate any prejudice resulting from

F&R's actions. To the contrary, the timing of ABS's motion – more than seven weeks after ABS became aware that F&R personnel had spoken to Mr. Lin and just three business days prior to the due date for extensive prehearing briefs in the parallel ITC Investigation – belies any suggestion that its effort to deprive Microsoft of its longstanding counsel stems from any concern about prejudice to ABS. ABS's delay, which ABS fails to explain or even acknowledge in its motion, is purely an act of gamesmanship, seeking to improperly distract this Court and the ITC from the merits of this case.

At bottom, ABS's motion is nothing more than an improper litigation tactic timed to disrupt Microsoft's preparation for the trial scheduled to begin in the ITC on October 9, 2007. Such tactics, which in this case involve serious but unfounded allegations of misconduct by attorneys, should not be condoned. For these reasons, this Court should deny ABS's motion in its entirety.

## II.    FACTUAL BACKGROUND

### A.    The Acquisition Of The OXE System

On February 16, 2007, Microsoft filed its initial Complaints in this Court and with the ITC alleging patent infringement based on four U.S. patents. After the filing of its complaints, Microsoft started the process of purchasing a complete OmniPCX Enterprise ("OXE") system in order to perform a full array of tests and thus provide this Court and the Commission with a full and complete evidentiary record. [Ex 7 at ¶ 4-5.][1]

To do so, Microsoft's counsel, Fish & Richardson P.C. ("F&R"), requested the assistance of a third party company named Miercom to expedite the purchase. [Id. ¶ 4-5.] It, however, took much longer than anticipated to purchase the latest OXE system with the latest version of its software. [Id. ¶ 6.] By the time the ITC instituted its investigation on March 20, 2007 with Alcatel-Lucent as a named Respondent, the purchase was still in progress. [Ex 7 at ¶ 4.] To

---

[1] Unless otherwise specified, "Ex __" refers to the Declaration of Thomas L. Halkowski in Support of Plaintiff Microsoft Corporation's Opposition to Defendant Alcatel Business Systems' Motion to Disqualify Fish & Richardson P.C. and for Other Sanctions.

ensure that there would be an OXE system for testing in the Investigation, Microsoft separately

requested that Alcatel-Lucent produce "[o]ne sample of each version of each Accused Product"

in its discovery requests to ABS[2]. [Ex. 1 (Mar. 23, 2007 Microsoft's 1st Set of Req. for Prod.) at

p. 6 (RFP No. 18).]

Instead of responding to either Complaint, counsel for Defendant instead informed

Microsoft that Alcatel-Lucent was not the proper named party in either this case or the ITC

investigation, and that a separate French entity called Alcatel Business Systems should be

substituted:

> As we have discussed this past week, <u>Alcatel Lucent is not the proper
> party to the action Microsoft brought in the ITC and Delaware</u> alleging
> infringement against the OmniPCX and OmniTouch Unified Communications
> Suite. <u>Alcatel Lucent is a holding company that owns stock in various
> subsidiaries</u>, but does not make any products, including those at issue in the recent
> actions filed by Microsoft. Instead, <u>Alcatel Business Systems is the entity that
> makes the OmniPCX and OmniTouch Unified Communications Suite</u>.
> To confirm the discussion we had earlier this week concerning the
> relationship between Alcatel Business Systems and Alcatel Lucent, Alcatel
> Business Systems is owned by Alcatel Participations. Alcatel Participations is
> owned by Compagnie Financiere Alcatel-Lucent, which is owned by Alcatel
> Lucent. So, you can see that <u>Alcatel Lucent, the holding company you have
> named in both actions, is three steps from the company that makes and sells the
> accused products.</u>

[Ex. 2 (Apr. 13, 2007 Ltr. fr. Mr. Nelson to Mr. Colaianni) at 1 (emphases added).]  Based on

this representation, Microsoft moved to amend its Complaint in the ITC on April 19, 2007, and

filed a proposed stipulation in this Court on April 20, 2007 that defendant need not respond to

the initial Complaint.  On May 30, 2007, Microsoft filed an amended Complaint in this Court to

reflect the correct Defendant in this case, Alcatel Business Systems.

While Microsoft's motion to amend was pending in the ITC and over a month after

service of Microsoft's requests for production in the ITC, ABS responded to Microsoft's request

for production of an OXE system by indicating that it would only produce <u>documents</u> in

---

[2] Plaintiff Microsoft and Defendant Alcatel Business Systems have agreed that discovery
obtained in the ITC shall be available for use in this case.  [D.I. 26 Scheduling Order.]

response to this request.  [Oppo. Ex. 3 (Apr. 23, 2007 Respondent's Resp. to Microsoft's 1st Set of Req. for Prod.) at 17 (Subject to and without waiving the foregoing objections, <u>Respondent will produce</u> any responsive, non-privileged <u>documents</u> in its possession, custody or control that are located after a reasonable search." (emphases added)).]

Given ABS's unilateral decision to only produce documents instead of an actual system, Microsoft proceeded with its plans to acquire an OXE system on the open market.  On April 27, 2007, Miercom forwarded to Microsoft's counsel a commercial offer for sale from Alliance Telecommunications ("Alliance"), an authorized independent reseller, willing and able to sell the latest OXE hardware and software.  [Ex 7 at ¶ 5; Ex. 4 (Apr. 20, 2007 Ltr fr. Alliance to Miercom re pricing proposal).]  Alliance's commercial sales offer covered the components of an OXE system, as well as time and labor to install the system and train someone to use the system:

| <u>Labor</u> | |
|---|---|
| Install the OXE phone switch. | |
| Program the phones and trunks. | |
| Install four (4) software packages . | |
| Train an individual on the system. | |
| **Labor** | **$3,480.00** |

[Ex 4 (Apr. 20, 2007 Ltr fr. Alliance to Miercom re pricing proposal) at 1.]  As the offer noted, the OmniTouch software suite for use with the OXE system required proper installation and training, leading Alliance to state: "Because of this additional software, I had to increase my labor cost to cover <u>my technician's time</u> to install these packages and <u>train the personnel who will be using them</u>."<sup>3</sup>  [<u>Id.</u> (emphases added).]  The Alliance offer directly stated that an Alliance technician – not an Alcatel technician – would install the system and train the system's user. [<u>Id.</u>]  Given this opportunity to acquire an OXE system on the open market, F&R placed an order on the same day it received Alliance's offer for sale, making a deposit of about a third of the

---

<sup>3</sup> Such training appears to be customary with the purchase of an OXE system, as reflected in Mr. Lin's own declaration:  "As part of the installation of OXE and OTUC, I also provide training on the administration, use and configuration of the products."  [Declaration of Poching Lin ("Lin Decl.") at ¶ 7.]

$26,387 purchase price with a check drawn on F&R's bank account.  [Ex. 7 at ¶ 5.]  Delivery
and installation of the phone system were unfortunately delayed repeatedly by Alliance.

**B.    Initial Installation and Training on The Purchased OXE System**

After repeated delays, Alliance finally confirmed that it would deliver and install the
purchased OXE system on Tuesday June 26, 2007.  On that date, Mr. Dan McGirr – one of
Alliance's technicians – came to F&R's office with the components of the OXE system.  [Ex 7 at
¶ 7.]  Without any advanced notice to F&R and upon Alliance's own initiative, another person—
Mr. PoChing Lin—accompanied Mr. McGirr.  [Id.; Mtn. at 6 (acknowledging that Alliance
requested assistance to avoid embarrassing installation problems).]  By the time they announced
themselves to the F&R receptionist, both Messrs. McGirr and Lin knew that the installation
would take place within F&R's office.  [Mtn. at 7.]

Ms. Elluru greeted Messrs. McGirr and Lin in the F&R lobby and escorted them to a
secure case room where they needed to install the OXE system.  [Ex 7 at ¶ 7.]  The door of this
secured room and the bookshelf inside were conspicuously labeled with signs stating:



Microsoft ALU ITC
10337-036LL1
See
Lydia Dean-Reese
x7702

[Ex 5 (pictures of signs).[4]]  After situating Messrs. Lin and McGirr and exchanging pleasantries
with them, Ms. Elluru provided each of them with her business card, which expressly identified
her as an attorney for a law firm specializing in "Intellectual Property \ Litigation \ Corporate":

_____

[4] "ALU" is a well-known acronym for Alcatel-Lucent, and is used as its stock ticker.

6

**FISH & RICHARDSON P.C.**

1425 K Street, N.W.
11th Floor
Washington, DC 20005

Rama G. Elluru
*Attorney*

Direct Dial 202 626-6417
Email elluru@fr.com

Telephone 202 783-5070
Facsimile 202 783-2331
www.fr.com

Intellectual Property | Litigation | Corporate

[Ex 6 (Elluru Business Card).]  To ensure that they could contact her that day in case they needed anything, Ms. Elluru further noted her direct extension on the business cards she gave them.  [Ex 7 at ¶ 10.]  In return, Messrs. McGirr and Lin gave to Ms. Elluru their respective business card, with Mr. Lin's indicating an affiliation with Alcatel Internetworking, which is not a party to this action.  [Lin Decl. Ex. C (Lin Business Card).]  After Ms. Elluru left the secured room and returned to her office, either Mr. Lin or Mr. McGirr called her direct line a number of times to ask questions, indicating that they had reviewed the card she had given them.  [Ex. 7 at ¶ 10.]

As they continued their installation, they ran into numerous technical difficulties.  [E.g., Lin Decl. ¶ 25 (noting technical problems).]  As the technicians were troubleshooting the system, Ms. Elluru periodically checked on their progress.  [Ex. 7 at ¶ 12.]  On other occasions when Ms. Elluru was unavailable, Mr. Joshua Pond, one of her colleagues, intermittently came to the secured room to assess their progress.  [Ex 8 at ¶ 4-5.][5]  On such occasions, Mr. Pond introduced himself and exchanged pleasantries with the technicians.  [Id. ¶ 4-5.]

After three and a half days of installation and technical troubleshooting, the technicians represented that the OXE system was finally operational in the afternoon of Friday June 29, 2007.  [Ex 7 at ¶ 14.]  At that point, Messrs. Lin and McGirr proceeded with some training, as is customary with such installation and as specifically provided by the purchase agreement with

---

[5] Ex. 8 Declaration of Joshua Pond In Support of Microsoft's Opposition.

Alliance.  [Lin Decl. ¶¶ 5 & 7.]  Mr. Lin began a demonstration on network administration and configuration for Ms. Elluru and Mr. Pond, with the demonstration turning into a conversation – similar to one Mr. Lin would have with any customer learning to operate the system – about the system's operations and features.  [Ex 7 at ¶ 13.]  During his demonstration, Mr. Lin realized that multiple features – such as the telephones – were not operating properly and that the installation was far from complete.  [Id. ¶ 14.]  Because both technicians stated that they had to catch flights later that afternoon, they were unable to complete the troubleshooting that day.  [Id. ¶ 14.] Because Alliance had contractually agreed to perform the installation and training, Ms. Elluru contacted Alliance to arrange for continued installation and training.  [Id. ¶ 14.]

     **C.**    **Mr. Lin Returned the Following Week to Complete His Installation of The Purchased OXE System**

     Mr. Lin's return, which Alliance apparently coordinated without consulting with F&R, occurred on Tuesday July 3, 2007, and <u>not</u> on Monday July 2, 2007 as Mr. Lin noted.  [Lin Decl. ¶ 27 (stating that he returned on July 2); Ex. 7 at ¶ 15; Ex. 8 at ¶ 7.]  Not only did Mr. Lin incorrectly recall his dates, he also mistakenly asserted that he spoke with Mr. Ahmed Davis, one of the F&R principals representing Microsoft in this litigation, "at some point, possibly on July 2, 2007."  [Lin Decl. ¶ 28-29.]  As Mr. Davis unequivocally states in his sworn declaration, he is certain that he had no contact with Mr. Lin, either on July 2 or on any other date.  [Ex 9 at ¶ 5.][6] Perhaps Mr. Lin had memory lapses, or perhaps ABS needed to implicate someone other than an associate to buttress its motion.  The fact nonetheless remains that Mr. Davis never even met or spoke with Mr. Lin.  [Id. ¶5.]

     It is also a fact that Mr. Lin returned to F&R's office on Tuesday July 3 to complete the installation of the system.  [Ex 7 at ¶ 15.]  Once the installation appeared to be completed, Mr. Lin discharged Alliance's obligations to provide training by providing instructions to Ms. Elluru and Mr. Pond about various features of the OXE system, including the functionality of OTUC software applications, the configuration of the system, and the manner in which it performed call

---

     [6] Ex. 9 Declaration of Ahmed J. Davis In Support of Microsoft's Opposition.

routing.  [Id. ¶ 13; Ex 8 at ¶ 7; Lin Decl. ¶ 30.]  The information he provided to Ms. Elluru and Mr. Pond, including the user guides, was typical information which any purchaser of the OXE system would receive after paying over $26,000 for a functioning system.

At no time did F&R personnel ask Mr. Lin about the pending lawsuit.  [Ex 7 at ¶ 18; Ex 8 at ¶ 9.]  They did not seek information covered by the attorney-client privilege or the work product doctrine, and they received none.  [Ex 7 at ¶ 18; Ex 8 at ¶ 9.]  Similarly, no one asked Mr. Lin anything about his purported role in the development or testing of the products by ABS, nor inquired about the past conduct of Mr. Lin or anyone else associated with these products. [Ex 7 at ¶ 18.]  And certainly, F&R and Microsoft do not rely on any statements or acts or omissions by Mr. Lin as evidence in these proceedings. [Ex 7 at ¶ 21; Ex 8 at ¶ 12.]

The evidence on which Microsoft relies is the independent analysis of its technical expert, Mr. Jack Chang.  When Mr. Lin returned to complete his installation and troubleshooting of the OXE system on Tuesday July 3, Mr. Chang already had arrived in Washington D.C. to work on his initial expert report, which was due to be submitted on July 11, 2007.  [Ex 7 at ¶ 15; Mtn. Ex.  (Chang Opn. Rpt.).]  Because Mr. Chang desired to perform his tests independently in order to develop his expert opinions, he had no contact with Mr. Lin.  [Id.]  For this reason, Mr. Lin had to wait in a conference room after he completed his installation, while Mr. Chang performed a number of tests on the OXE system.  [Ex 7 at ¶ 15.]  When the system required additional "debugging," Mr. Chang left the room before Mr. Lin returned to make additional adjustments to the equipment.  [Id. ¶ 15.]

The result of his own independent analysis and opinion appears in the expert report Mr. Chang submitted on July 11, 2007.  [Mtn. Ex. 4 (Chang Opn. Rpt.).]  Not only did he provide a detailed basis for his opinion, he clearly stated that he performed his tests on an OXE system located at F&R's D.C. office.  [Mtn. Ex. 4 at 24-25.]  Thus, ABS and its counsel have known for almost two months that F&R had acquired a recent version of the OXE system before July 11, and that Mr. Chang had performed tests using this system.  [See id.]  Since installation and training services are customarily provided with these products, [Lin Decl. ¶ 7], ABS and its

9

counsel were certainly on notice for more than seven weeks before filing this Motion to Disqualify that F&R personnel had received such services in connection with this litigation. ABS's motion does not explain this delay, preferring hyperboles and exaggerations to the facts and law.

## III.    ARGUMENT

### A.    Applicable Law

As a matter of policy, the Federal Circuit reviews procedural matters that are not unique to patent matters under the law of the particular regional circuit court where appeals from the district court would normally lie.  Panduit Corp. v. AllStates Plastic Mfg. Co., Inc., 744 F.2d 1564 (Fed. Cir. 1984).  Accordingly, Third Circuit law applies to the present motion for disqualification.

Disqualification of counsel is a "severe sanction"; as such, motions to disqualify are generally disfavored by the courts.  See Elonex I.P. Holdings, Ltd., v. Apple Computer, Inc., 142 F. Supp. 2d 579, 581, 583 (D. Del. 2001); see also Talecris Biotherapeutics, Inc. v. Baxter Int'l, Inc., 491 F. Supp. 2d 510, 513 (D. Del. 2007).  In fact, courts are skeptical of such motions because they are "frequently filed as dilatory tactics intended to divert the litigation from attention to the merits."  Elonex, 142 F. Supp. at 584 (citation omitted).

The moving party "must clearly show that continued representation would be impermissible" under the Model Rules of Professional Conduct, which the District of Delaware has adopted.  See Elonex, 142 F. Supp. 2d at 581; Talecris, 491 F. Supp. 2d at 513.  "[V]ague and unsupported allegations" are insufficient to carry this burden of proof.  Elonex, 142 F. Supp. 2d at 581.  The court must first determine whether the Model Rules have been violated and, if so, whether disqualification is an appropriate sanction for such a violation.  Id.  Disqualification is never automatic even if an ethical rule has been violated.  Id. at 583; Talecris, 491 F. Supp. 2d at 513.

Further, this district has embraced a balancing test announced by the Third Circuit to determine the appropriateness of disqualification of an attorney:

10

> [T]he court should disqualify an attorney only when it determines, on the facts of a particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule. It should consider the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain counsel of his choice and enabling attorneys to practice without excessive restrictions."

See Talecris, 491 F. Supp. 2d at 514. Relevant factors here are (1) the client's interest in retaining the attorney whose disqualification is sought, and (2) the court's interest in protecting the integrity of judicial process and public confidence in the judicial system.

In EEOC v. Hora, Inc., the Third Circuit called disqualification of counsel a "draconian measure" that was unwarranted in circumstances even where plaintiff's counsel had contact with a low-level employee of the opposing party, a corporation. See Hora, No. 05-5393, 2007 WL 1875834, at *3 (3d Cir. Jun. 29, 2007) (unpublished). There, the employee was the administrative assistant to a high-level manager and part-owner, and funneled plaintiff's counsel information she had access to due to her employment. Hora, 2007 WL 1875834, at *5-25. The district court had disqualified counsel for violation of Model Rule 4.2, *inter alia*, as adopted by Pennsylvania. Reversing the district court, the Third Circuit held that Rule 4.2 was not violated by such contact since (a) the employee was not a represented person per Rule 4.2 and (2) even if she were a represented person per 4.2, the company had not demonstrated prejudice because it conceded all the information that the employee gave plaintiff's counsel was produced during discovery. Id. at *1-3.

**B.      Rule 4.2 Does Not Apply to Communications with Mr. Lin**

**1.      Mr. Lin is not an employee of a "represented party" under Rule 4.2**

Rule 4.2 does not apply here for at least three reasons: (i) Mr. Lin is not an employee of a party to this litigation; (ii) ABS's counsel is not representing Mr. Lin's employer in this litigation; and (iii) ABS misrepresents D.C. Rule of Professional Conduct 4.2(b).

First, Rule 4.2 is inapplicable here because Mr. Lin is not an employee of ABS, the only named defendant in this action. Although ABS tries to obscure the identity of Mr. Lin's

employer,[7] he is <u>not</u> an employee of ABS.  As Mr. Lin admits in his declaration, he is an

employee of Alcatel USA, Inc. ("Alcatel USA"), which is not a named defendant in this action.

[D.I. 15 (First Amended Complaint).]  Certainly, Latham & Watkins, ABS's counsel, has not

entered an appearance on behalf of Alcatel USA in this case.  That Mr. Lin is an employee of

Alcatel USA (instead of ABS) is a very important distinction that completely disposes of ABS's

arguments under Rule 4.2, because this Rule only applies to a <u>represented</u> party.  [Ex 10 at ¶ 13; [8]

Ex 11 at ¶ 18(a) at 7.][9]  While ABS is indeed a defendant and party in this case, Alcatel USA is

not a defendant and party in this case.

ABS should not be allowed to blur these corporate distinctions, especially when it has

relied on these distinctions to its benefit.  For example, Microsoft identified Alcatel-Lucent as

the Defendant in the original complaint filed in this case.  Shortly after institution, Latham &

Watkins sought to substitute ABS for Alcatel-Lucent as the Defendant, representing that Alcatel-

Lucent is "three steps from the company that makes the accused products."  [Oppo. Ex. 2 (Apr.

13, 2007 Ltr. fr. Mr. Nelson to Mr. Colaianni) at 1.]  According to representations made by

Latham & Watkins, Alcatel-Lucent is a holding company that owns Compagnie Financiere

Alcatel-Lucent, which owns Alcatel Participations, which in turn owns ABS, a French

corporation.  [<u>Id.</u>]  Not only is Alcatel USA outside of this chain of ownership, it is in fact a U.S.

---

[7] ABS refers to itself in the motion papers as "Alcatel," [Mtn. at 1], and then proceeds to describe Mr. Lin as a "Alcatel engineer," [<u>See, e.g.</u>, <u>id.</u> at 2, 7, 8], and an "Alcatel employee." [<u>See, e.g.</u>, <u>id.</u> at 8.]  ABS's expert likewise adopts this usage.  [Morgan Decl. ¶ 5b.]

[8] Ex. 10 Declaration of Bruce Green In Support of Microsoft's Opposition.  Professor Green, is the Stein Professor of Law at Fordham University School of Law, where he directs the Louis Stein Center for Law and Ethics.  Among his other distinctions, Professor Green has chaired the New York State Bar Association's Committee on Professional Ethics and the American Bar Association Litigation Section's Committee on Ethics and Professionalism.

[9] Ex. 11 Declaration of W. William Hodes In Support of Microsoft's Opposition.  Prof. Hodes is Professor Emeritus of Law at the Indiana University School of Law, where he taught legal ethics for twenty years.  He is the co-author, with Professor Geoffrey C. Hazard, Jr., of a treatise on legal ethics and related subjects.  He served as a member of the Advisory Council to the Ethics 2000 Commission, a task force of the American Bar Association that proposed significant revisions to the Model Rules of Professional Conduct,

subsidiary of Alcatel-Lucent, which is, as ABS's counsel admits, at least several steps removed from ABS. [Id.]

Second, neither Alcatel USA nor Mr. Lin is deemed to be represented by Latham & Watkins merely because that firm represents ABS in this action. [Ex 10 at ¶ 13 ("The fact that one member of a corporate family is represented by counsel does not mean that other members of the same corporate family are also represented for purposes of Rule 4.2.").] It is indeed well settled that "[a] lawyer who represents a corporation or other organization does not, by virtue of that representation, necessarily represent any constituent or affiliated organization, such as a parent or subsidiary." ABA Model Rule 1.7, Comment [34].[10]

Third, ABS's expert misinterprets D.C. Rule of Professional Conduct 4.2(b) – which ABS's expert notes does not appear in the Model Rule or Delaware Rule 4.2 – when it asserts that F&R was required to inform Mr. Lin that the firm was representing Microsoft in this action. [Morgan Decl. ¶6(f).] Because Mr. Lin's employer, Alcatel USA, is not a party in the case, D.C. Rule 4.2 (b) authorized F&R to speak with him without any notice to Latham & Watkins or any disclosure whatsoever. Indeed, the Rule expressly permits a lawyer to communicate with a nonparty employee of an organization without the prior consent of the organization's counsel:

> During the course of representing a client, a lawyer may communicate about the subject of the representation with a nonparty employee of an organization without obtaining the consent of that organization's lawyer. If the organization is an adverse party, however, prior to communicating with any such nonparty employee, a lawyer must disclose to such employee both the lawyer's identity and the fact that the lawyer represents a party that is adverse to the employee's employer.

D.C. Rule 4.2 (b) (emphases added). Contrary to ABS's assertions, D.C. Rule 4.2(b) requires a lawyer to disclose his identity and the fact that his client is adverse to the employer, if, and only if, that employer is an adverse party in the matter. Since Mr. Lin's employer, Alcatel USA, is not adverse to Microsoft in the pending litigation, no such disclosure was required.

---

[10] As a result, a lawyer who represents a parent company may oppose a subsidiary of that company in an unrelated matter. Annotated Model Rules of Professional Conduct 126 (6th ed.

At bottom, ABS and Alcatel USA are separate corporate entities, organized under the laws of different countries, and located on different continents. Based on the representations made by Latham & Watkins, it was certainly F&R's understanding that ABS, Alcatel-Lucent, and Alcatel USA are separate corporate entities. ABS should not be allowed to ignore these corporate distinctions to further its litigation purposes.[11]

**2.      Even if there is no corporate distinction between ABS and Alcatel USA, Mr. Lin is not a protected employee of a represented party under Rule 4.2**

In arguing that Mr. Lin (an Alcatel USA employee) is also an ABS employee, ABS appears to be taking the position that the corporate structure between ABS and Alcatel USA is in fact a sham. If it were indeed a sham and assuming that Mr. Lin were an ABS employee (which he is not), Rule 4.2 still would not apply because he is not a protected employee under Rule 4.2.

ABA Model Rule 4.2 prohibits an attorney from communicating directly with a <u>person</u> whom the lawyer knows to be represented by counsel:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do by law or a court order.

ABA Model Rule 4.2. The issue becomes, who is the "person" for the purposes of a large corporation. The rule does not, however, bar communications with all employees of a represented corporation. In the case of a represented corporation, Rule 4.2 only bars communications with an employee of the corporation who (1) who supervises, directs or regularly consults with the organization's lawyer concerning the matter or (2) who has authority to obligate the organization with respect to the matter or (3) whose act or omission in connection

---

2007) ("The majority rule is that there is no per se prohibition against undertaking a representation that is adverse to an affiliate of a corporate client.")

[11] If ABS is indeed taking the position that ABS, Alcatel-Lucent, and Alcatel USA are not separate corporate entities for the purposes of Rule 4.2 (e.g., such that an employee of Alcatel USA is an employee of ABS), then ABS should not be allowed to argue that the acts of Alcatel USA cannot be imputed to ABS for other purposes. Stretched to its logical conclusion, ABS's argument would compel the immediate addition of Alcatel USA as a co-defendant.

with the matter may be imputed to the organization for purposes of civil or criminal liability. ABA Model Rule 4.2, cmt. 7; see Hora, 2007 WL 1875834 at *1-3 (admistrative assistant to high-level manager and part owner was not represented person of company under Rule 4.2).

Mr. Lin does not, however, fit within any of these categories. Certainly, ABS does not rely on option (1) or (3) in its motion. [Mtn. at 19-20.] ABS even tacitly concedes that Mr. Lin does not supervise, direct or consult with Latham & Watkins in this litigation, and that his acts or omissions may not be imputed to ABS for liability. [Mtn. at 7-8, 19-20; Lin Decl. ¶¶ 3-5.]

Relying instead on option (2), ABS argues that Mr. Lin has authority to obligate ABS with respect to the matter in dispute because his statements might be admissible against ABS under the hearsay rules. [Mtn. at 19-20.] ABS's argument is wholly without merit. The ABA adopted the current Comment [7] to Rule 4.2 in 2002, precisely to foreclose the overbroad interpretation now argued by ABS. [Ex 10 at ¶ 12-16; Ex 11 at ¶ 18(a) at 6-7.] The ABA's published commentary on the Model Rules confirms this fact:

> The original formulation, which included 'any other person . . . whose statements may constitute an admission on the part of the organization,' had proved too broad and potentially open-ended; it had been read to prohibit communication with anyone whose testimony would be admissible against the organization as an admission with anyone whose testimony would be admissible against the organization as an exception to the hearsay rule.

Annot'd Model R. Prof.'l Conduct at 400 (6th ed. 2007), citing American Bar Association, A Legislative History: The Development of the ABA Model Rules of Professional Conduct, 1982-2005, at 542 (2006); see also, e.g., Paris v. Union Pac. R.R., 450 F. Supp. 2d 913, 915 (E.D. Ark. 2006) (noting that, since 2002, Model Rule 4.2 no longer bars ex parte communications with an employee whose statements could be admissible against the organization).

The current test under Rule 4.2 "is not whether the employee's statements may subsequently be admissible against the company but whether they would be binding admissions—the functional equivalent of stipulations that the company may not contradict." [Ex 10 at ¶ 16.] Individuals can "obligate" ABS with respect to this matter only if they have the authority to make binding decisions regarding its the pending litigation, by, for example, entering

into a stipulation, settlement or other agreement on behalf of ABS.  [Ex 10 at ¶ 16; Ex 11 at ¶ 18(a).][12]  Even the <u>Restatement of the Law Governing Lawyers</u>, for which Professor Morgan served as Associate Reporter, [Morgan Decl. ¶ 2(b)], squarely contradicts the statement in his declaration that the authority to "obligate" a company (in the language of Comment [7]) or to "bind" a company (in the language of the Restatement) is synonymous with the ability to make an out-of-court statement that is admissible against the company.  [Morgan Decl. ¶ 6(d); Ex 10 at ¶ 17.]  Section 100 of the Restatement clearly states that there is no prohibition on contacting an employee whose statement, though admissible, may be impeached or contradicted by the employer.  <u>Restatement (Third) of the Law Governing Lawyers</u> §100, cmt. e (2000).  Thus, F&R was at liberty to communicate with Mr. Lin because he could not "obligate" ABS within the meaning of Rule. 4.2.

### 3.    F&R Did Not Seek Admissable Evidence from Mr. Lin, and Mr. Lin's Statements Will Not Be Used as Admissions against ABS

Even accepting for the sake of argument that ABS's erroneous interpretation of Rule 4.2 were correct, there is no violation of the rule here, because none of Mr. Lin's statements will be offered as evidence against ABS in the pending lawsuits.[13]  As summarized in <u>Hill v. Shell Oil Co.</u>, 209 F. Supp. 2d 876, 880 (N.D. Ill. 2002) "[i]f plaintiff does not intend to enter the

---

[12] Rejecting ABS's overbroad interpretation, the District of Columbia has adopted an even more detailed comment on the subject:  "The rule does not prohibit a lawyer from communication with employees of an organization who have the authority to bind the organization with respect to matters underlying the representation if they do not also have the authority to make binding decisions regarding the representation itself.  A lawyer may therefore communicate with such persons without first notifying the organization's lawyer."  D.C. Rule 4.2, cmt. 4.

[13] The facts here are in direct contrast to <u>Inorganic Coatings v. Falberg</u>, 926 F.Supp. 517 (E.D. Pa. 1995), cited by ABS at pages 26-27, in which plaintiff's counsel was disqualified after the defendant contacted him and spoke to him *ex parte* about "numerous matters pertinent to litigation."  <u>Id.</u> at 520.  The Pennsylvania court found that the defendant's discussion "of the merits of the impending lawsuit" with plaintiff's counsel *ex parte* would "severely prejudice" the other defendants.  <u>Id.</u>  In direct contrast, the F & R attorneys did not speak to a represented party in this matter.  Moreover, ABS neither alleges that the F & R attorneys had any discussions with Mr. Lin concerning matters pertinent to litigation nor has ABS established any prejudice, much less "severe prejudice," as a result of the customer type discussions that did take place.

employee's statements as evidence of the employer's admission, then Rule 4.2 is not implicated and plaintiff is free to have informal contact with non-managerial employees." 209 F. Supp. 2d 876, 879 (E.D. Ill. 2002).

Contrary to ABS's assertions, F&R's communications with Mr. Lin were not interviews or interrogations. [Mtn. at 8, 18.] They were for the purpose of getting the system to work, so that it could be examined and tested by Microsoft's expert and used by the attorneys themselves. The point was not to elicit evidence from Mr. Lin; it was to obtain a fully operational system, with a few trained users. Cf. Niesig v. Team I, 558 N.E.2d 493, 1034 (N.Y. 1990) (permitting communications with employees of corporate opponent and endorsing them as "off-the-record private efforts to learn and assemble, rather than perpetuate, information") (New York's analogue to Model Rule 4.2). F&R's questions would have been no different if the installer or trainer had been an Alliance employee, as F&R had been led to expect. ABS's expert concedes that it was permissible for F&R to obtain an ABS system and to "talk to a random Alcatel employee during installation." [Morgan Decl. ¶ 6b.] That is precisely what F&R did. It was Alliance – not F&R – that solicited Mr. Lin's participation in the installation and training. [Intal Decl. ¶¶ 4-6.]

Overseeing the installation of equipment and learning to use it, even by attorneys, is a far cry from seeking an improper advantage by circumventing opposing counsel and communicating directly with an adverse party. [14] The questions that F&R attorneys posed to Mr. Lin merely addressed issues any user of the system would like to know, such as how the system operates. [Ex 7 at ¶ 13.] Even Mr. Lin admits that these questions called for information that ABS

---

[14] Indeed, the very article that ABS cites for condemnation of such conduct actually concludes that it is perfectly permissible for attorneys in intellectual property infringement matter to undertake routine consumer transactions involving the infringing products. See Phillip Barengolts, "Ethical Issues Arising from the Investigation of Activities of Intellectual Property Infringers Represented by Counsel," 1 NW. J. Tech. & Intell. Prop. 47, 58 (2003) (concluding that the ethics rules permit a lawyer or investigator in an intellectual property matter to seek services from employees of a corporate adversary on the same basis as the general public and observe how these employees act in the ordinary course of business, provided that the lawyer does not trick them into doing or saying anything that they would not otherwise do or say).

provides to its customers, and he answered them accordingly. [Lin Decl. ¶ 27.] Nothing in F&R's routine customer service/tech support communications with Mr. Lin impaired the proper functioning of the justice system by intruding into ABS's attorney-client relationship or obtaining uncounselled disclosures about the representation itself or the event underlying it. [Ex 10 at ¶ 19]. Rule 4.2 draws the line as it does precisely because "there is not a sufficiently compelling public interest to justify shutting down informal access to individuals such as Mr. Lin, who may have some relevant information but who do not speak for the company." [Id.]

### 4. Rule 4.2 requires actual knowledge that Mr. Lin is represented by counsel

Furthermore, Rule 4.2 does not apply because F&R did not have actual knowledge that Mr. Lin is represented by counsel. Rule 4.2 applies only when a lawyer "knows" that the person is represented. ABA Model Rule 4.2, cmt. 8 ("The prohibition on communications with a represented person only applies in circumstances where the lawyer knows that the person is in fact represented in the matter to be discussed. This means that the lawyer has actual knowledge of the fact of the representation. . . .")

F&R had, and still has, no reason to believe – let alone the actual knowledge required by Rule 4.2 – that Mr. Lin was or is represented by counsel in connection with the pending litigation. Nothing in the submissions to date suggests that a professional services engineer responsible for installing and explaining ABS's products was consulting with ABS's counsel in the litigation, had authority to settle or otherwise bind ABS with respect to the litigation, or had undertaken acts that could result in liability for ABS in the litigation. [Ex 10 at ¶ 14.] That Mr. Lin's business card showed him to be associated with Alcatel Internetworking, which is not a party in this action, only reinforces the reasonableness of F&R's belief that he was not represented in connection with the pending dispute. Recall, as well, that Alliance had made affirmative representations to F&R that its technicians would be performing the installation. Based on Mr. Lin's declaration that he is employed by Alcatel USA, which is a third party to this

action, F&R still has neither actual knowledge nor reason to believe that prior permission from Latham & Watkins was necessary or appropriate.

### C.   F&R Did Not Violate Model Rule 4.3

Perhaps recognizing that its arguments under Rule 4.2 lack merit, ABS argues alternatively that Rule 4.3, which governs a lawyer's dealings with unrepresented persons, applies to Mr. Lin as an "unrepresented party."[15]   Again, ABS's accusations are meritless.

### 1.   Rule 4.3 Is Not Applicable To The Facts at Hand

#### a.   Rule 4.3 Is Not Implicated Here

Rule 4.3 is intended to prevent overreaching by restricting the ability of a lawyer to manipulate or take unfair advantage of a lay party.  See Geoffrey C. Hazard, Jr. and W. William Hodes, The Law of Lawyering, § 39.2 (3d. ed. 2003).

Here, however, F&R did not overreach, manipulate or take unfair advantage of Mr. Lin when it allowed him to do his job by providing the same services that he would furnish to any purchaser of the OXE/OTUC.   That these customers were lawyers did not change what he would or would not have said to another customer upon request.   An employee who is simply doing his job, as he would for any other non-lawyer customer, is by definition not being taken advantage of within the meaning of the Rule.  [Ex 10 at ¶ 30.]

Mr. Lin, of course, was in no way prejudiced by doing the job that he was paid to do. Despite ABS's dramatic references to "improper interrogations," [Mtn. at 18],  Mr. Lin's declaration takes a far more benign view: he installed and helped configure the system, did some trouble-shooting, answered questions about the system's capabilities, and provided the user manuals—exactly as he does in other installation projects.  [Lin Decl. ¶¶ 1-35.]  He has not been

---

[15] In doing so, ABS tacitly admits that Rule 4.2 does not apply to Mr. Lin as a "represented party" because Mr. Lin must be either one or the other – he cannot be both.  Moreover, ABS fails to explain how it even has standing to object to F&R's communications with an individual whom ABS does not employ.  [Ex 10 at ¶ 13 (given that Lin was not employed by ABS, it seems doubtful that ABS can have standing to complain about F&R's interactions with him or use them to justify a request for sanctions).]

sued, and there has been no suggestion that he has suffered any disadvantage. [Ex 11 at ¶ 18(b).] Not surprisingly, Mr. Lin is not the one complaining about his encounter with the F&R lawyers. Since the rule is intended for his benefit, and not for the protection of a litigant, ABS would not be entitled to any equitable relief, such as the remedies that it seeks, even if there had been a violation of the rule. [Ex 11 at ¶ 18(b).]

> **b.**     **Rule 4.3 Does Not Require Unnecessary Disclosure Here**

Despite the import of the Rule, ABS insists that Rule 4.3 requires a lawyer to make reasonable efforts to correct the misunderstanding of an unrepresented person whom the lawyer knows or reasonably should know misunderstands the lawyer's role in the matter. [Mtn. 21-23.] ABS's reliance is again misplaced.

Contrary to ABS's assertions, Rule 4.3 does not require F&R to tell the installers of the OXE system that F&R was representing Microsoft in a lawsuit against ABS concerning these products. Neither Mr. Lin nor Mr. McGirr misunderstood F&R's "role" within the meaning and intention of Rule 4.3. Mr. Lin did not believe that F&R might be acting in his interests or might be disinterested with respect to a transaction to which it was a party, that he could repose confidences in the lawyers, or that he could rely on them for legal advice or information. Instead, both appeared to know that the law firm had purchased a product, and was therefore on the "opposite side" from ABS. F&R did not present itself as "disinterested" in this transaction; it was obviously the counterparty. [Ex 10 at ¶ 27-31.]

Nor was F&R required to tell Mr. Lin that it made the purchase for the purpose of benefiting its client, Microsoft. Per Comment [2] to Rule 4.1, undertaking a transaction on behalf of an undisclosed principal does not result in a misleading statement or omission of material fact, unless it doing so would constitute fraud as a matter of substantive law. [Ex 10 at ¶ 28.]

D.C.'s version of Rule 4.3 is even more permissive than its ABA counterpart, and imposes no disclosure obligations on F&R with respect to Mr. Lin because F&R was not giving him legal advice. The purpose of the D.C. Rule is to require that a lawyer tell an unrepresented

person to whom he is giving legal advice that he represents a client in the same matter.  <u>See</u> D.C. Rule 4.3(a) and Comment [2] ("A lawyer is free to give advice to unrepresented persons whose interests are not in conflict with those of the lawyer's client, but only if it is made clear that the lawyer is acting in the interests of the client.").  The lawyer's duty to disclose is triggered only if he actually gives legal advice to the unrepresented individual.  <u>See</u> Comment [2] to D.C. Rule 4.2 ("Thus, the lawyer should not represent to <u>such persons</u>[i.e. unrepresented persons whose interests do not conflict with those of the lawyer's client and to whom the lawyer has given advice], either expressly or implicitly, that the lawyer is disinterested.")  F&R therefore had no obligation to tell Mr. Lin about its representation of Microsoft because the firm was receiving services from him, rather than giving him any legal advice.  Indeed, F&R's duty to represent Microsoft and obtain a working system would have been inconsistent with any such disclosure.

### 2.      Rule 4.3 Does Not Apply To Commercial Transactions

Moreover, Rule 4.3 does <u>not</u> apply to an arms-length commercial transaction in which the firm acts as a customer, even if the transaction benefits a client.  This is precisely the conclusion that the court reached in <u>Apple Corps Ltd. v. Int'l Collectors Soc'y</u>, 15 F. Supp. 2d 456 (D.N.J.), when it refused to impose sanctions on a law firm based on its routine consumer inquiries to unrepresented employees of its litigation adversary.  <u>See</u> 15 F. Supp 2d 456, 476 (D.N.J. 1998).  In <u>Apple Corps</u>, lawyers and employees of the firm, acting as purchasers, telephoned the company to purchase Beatles stamps in order to obtain evidence that the company was violating a court order prohibiting such sales.  The court concluded that the lawyers were not acting in their capacity as lawyers when they called the seller to inquire about ordinary consumer transactions.  <u>Id</u>. ("Plaintiffs' counsel and investigators in testing compliance were not acting in the capacity of lawyers. … RPC 4.3 does not apply to straightforward transactions undertaken solely to determine compliance in accordance with Rule 11 of the Federal Rules of Civil Procedure, the existence of a well-founded claim.")  Like their counterparts in <u>Apple Corps</u>, the F&R attorneys, although acting for the benefit of a client, were engaged in a straightforward

business transaction in order to acquire the materials needed to prepare their case.  [Ex 10 at ¶ 29.]

Even the <u>Restatement</u>, for which Professor Morgan was one of the Associate Reporters, <u>explicitly</u> states that the corresponding Restatement provision applies only if dissembling about the lawyer's status is "to the prejudice of the nonclient," and failure to correct an evident misapprehension on that score would "materially prejudice the nonclient."  <u>Restatement of the Law Governing Lawyers</u> §103.  [Ex 11 at ¶ 18(b).]  Accordingly, there is no basis for ABS or its expert to assert a violation of Rule 4.3.

### D.    F&R Did Not Make any Misrepresentations Under Rules 8.4(c) and 4.1.

Equally untenable is ABS's outrageous contention that F&R's informal customer contacts with Mr. Lin constituted "conduct involving dishonesty, fraud, deceit or misrepresentation," in violation of Rule 8.4(c), or "knowingly mak[ing] a false statement of material law or fact to a third person" in the course of a representation, in violation of Rule 4.1(a).  As discussed below, F&R followed the law in all respects and misrepresented absolutely nothing in connection with the purchase.  F&R acted in accordance with case law, which authorizes lawyers and their agents to investigate and gather evidence informally by means of garden-variety consumer transactions.  [Ex 10 at ¶ 21, 24-26; Ex 11 at ¶ 18(c) at 10.]

### 1.    ABS Misinterprets The Requirements of Rules 8.4(c) and 4.1

ABS misconstrues the purpose and effect of Rule 8.4(c) and Rule 4.1 to support its groundless claim that F&R's attorneys acted dishonestly.  To accuse a lawyer of dishonesty is a serious thing, and ABS's allegations are unfounded, irresponsible and in conflict with the authorities interpreting these rules.

### a.    There Is No Heightened Duty to Third Parties

The rules do not, as ABS contends, impose on lawyers a heightened disclosure duty to third parties.  [Ex 10 at ¶ 22.]  Rule 8.4(c) is intended to ensure that lawyers maintain the level of integrity expected of members of the profession in dealings on their own behalf of on behalf of

clients.  Conduct violates Rule 8.4(c) only if it is punishable as fraud under substantive law or is of equal seriousness, so that it casts substantial doubt on the lawyer's fitness to practice.  See, e.g., Apple Corps, 15 F. Supp. 2d 456 (noting that Rule 8.4(c) applies only to deceptive conduct of such gravity as to raise a substantial questions as to the individual's fitness to be a lawyer) (citing David B. Isbell & Lucantonia N. Salvi, "Ethical Responsibility of Lawyers for Deception by Undercover Investigators and Discrimination Testers: An Analysis of the Provisions Prohibiting Misrepresentation Under the Model Rules of Professional Conduct," 8 Geo. J. Legal Ethics 791, 817 (1995)). [Ex 10 at ¶ 22.]

The Comment to Rule 4.1(a) similarly makes clear that a lawyer "generally has no affirmative duty to inform an opposing party of relevant facts."  ABA Model Rule 4.1, Comment [1].  The Comment also recognizes significant latitude in business transactions, expressly permitting a lawyer to act on behalf of an undisclosed principal.  Id. at Comment [2].  All of ABS's complaints revolve around what F&R did not say to Mr. Lin, or what third parties have said.  Notwithstanding their serious allegations of fraud, ABS cannot point to a single misstatement coming from F&R.

> **b.    Courts Have Recognized The Propriety Of Purchasing Accused Goods In The Open Market**

Courts routinely uphold the conduct of attorneys and their investigator agents who purchase goods and services from a litigation adversary in an ordinary business transaction, even if the customer contacts include some pretense as to the lawyer's identity or purpose, provided that the attorney does not trick them into doing or saying anything that they would not otherwise do or say, such as revealing privileged information.  [Ex 10 at ¶¶ 24-26.]  For example, civil rights "testers," i.e, individuals pretending to be interested in renting an apartment or applying for a job, have been used since the adoption of the civil rights laws to gather evidence of unlawful discrimination.  See Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982); [Ex 10 at ¶ 24.]  "The prevailing understanding in the legal profession is that a public or private lawyer's use of an undercover investigator to detect ongoing violations of the law is not ethically

proscribed, especially where it would be difficult to discover the violations by other means.
Apple Corps, 15 F. Supp. 2d at 475.

In intellectual property cases such as this one, courts have repeatedly permitted lawyers
and their agents to pose as customers in order to gather information.  As a general matter, courts
have refused to disqualify counsel or exclude evidence, precisely because the rules cited by ABS
in its motion "cannot apply where lawyers and/or their investigators, seeking to learn about
current corporate misconduct, act as members of the general public to engage in ordinary
business transactions with low-level employees of a represented corporation."  Apple Corps, 15
F.Supp.2d at 474-75; (denying sanctions where attorneys and investigators made repeated calls
to test the vendor's compliance with a court order prohibiting sales to certain third parties).
Courts have also allowed lawyers or their agents to pose as customers in trademark infringement
and other private civil cases.  See, e.g., Gidatex v. Campaniello Imports, Ltd., 82 F. Supp. 2d
119, 122 (S.D.N.Y. 1999) (denying motion to exclude the evidence gathered by investigators
posing as customers and speaking to customer service representatives who were not involved in
the litigation, about transactions in the ordinary course of business on the same terms available to
members of the public; the investigators "did nothing more than observe and record the manner
in which [company] employees conducted routine business").

As the court in Apple Corps summarized, "[t]he prevailing understanding in the legal
profession is that a public or private lawyer's use of an undercover investigator to detect ongoing
violations of the law is not ethically proscribed," especially where it would be difficult to
discovery the violations by other means.  15 F. Supp. 2d at 475.  Thus, the court held that Rule
8.4(c) "does not apply to misrepresentations solely as to identity or purpose and solely for
evidence-gathering purposes."  Id.

These authorities thus recognize that informal information-gathering may be preferable to
formal discovery mechanisms, in that it may be more efficient, less costly and more effective in
obtaining truthful information.  [Ex 10 at ¶ 11.]  Courts have, in fact, cautioned that too broad a
restriction on contacts with an opponent's employees would needlessly prohibit exactly the kind

24

of background assembly of information that F&R conducted in this matter, "off-the-record private efforts to learn and assemble, rather than perpetuate, information," Niesig v. Team I, 558 N.E.2d 493, 1034 (N.Y. 1990) (applying New York analogue to Rule 4.2); see also Annotated Model R. Prof'l Conduct at 589 ("The limited number of court and ethics opinions dealing with the subject [testing and informal information-gathering] generally agree that Model rule 8.4(c) (or its Model Code counterpart) does not, standing alone, bar lawyers from participating in lawful undercover investigation into possible unlawful conduct."). Contrary to these courts' approach, ABS's interpretation of the rules disregards the recognized value of informal information-gathering. [Ex 10 at ¶¶ 24-26.] Here, F&R did exactly what courts have recognized as appropriate and efficient: they bought a system on the open market to get to the truth about the accused products.

### 2. F&R complied with Rules 8.4(c) and 4.1

Even if ABS's interpretation of the Rules and precedent were correct, there is still no violation of either Rule 8.4 or Rule 4.1.

#### a. F&R made no misrepresentations

F&R made no misrepresentations under Rules 8.4 and 4.1 either as part of the acquisition or installation of the OXE system. Acting initially through Miercom, F&R bought the accused products from Alliance, ABS's authorized reseller, by issuing the checks from its own account, under the firm's name. [Ex 7 at ¶ 5.] Ms. Elluru, the F&R attorney who dealt with Miercom concerning the purchase, unequivocally states that she made no such misrepresentations either to Miercom or Alliance. [Id. ¶ 4, 20.]

That Alliance was motivated by a desire to convert this small sale into a larger order, far from imposing any responsibility on F&R, confirms that Alliance and Mr. Lin's superiors regarded this as nothing more than an arms-length customer transaction. [Intal Decl. ¶ 5.] ABS in fact admits that Alliance had informed it that Alliance's customer, F&R, intended to deploy the system in "29 of their offices nationwide." [Amiss Decl. at 2; Intal Decl. ¶ 9.] If, in fact,

anyone from Alliance actually said this,[16] F&R is not responsible for those erroneous

representations. Certainly, the alleged misrepresentation could not originate with F&R, because

the firm does not have 29 offices; it has 10 offices, a fact easily verifiable by anyone who cared

to check the firm's website.[17]

If any misapprehension existed, it would have disappeared when the system was

delivered and installed in the office of F&R, a law firm. [Ex 7 at ¶ 7-8.] The room in which

Mr. Lin and Mr. Girr worked for four days to install the system was further conspicuously

labeled to show that it was the case room for "Microsoft-ALU ITC." As a twenty-year veteran

of the Alcatel-Lucent corporate family, Mr. Lin certainly would have recognized "ALU" as a

common abbreviation for "Alcatel-Lucent." [Oppo. Ex. 5 (pictures of signs).] Moreover, Mr.

Lin clearly knew that Ms. Elluru was an attorney based on the title of "attorney" on her business

card, and the numerous calls Mr. Lin and Mr. McGirr made to Ms. Elluru by dialing the direct

extension she had hand-written on her card. [Oppo. Ex. 6 (Elluru Business Card); Ex 7 at ¶ 10.]

And throughout the installation and the training of Ms. Elluru and Mr. Pond, there was no doubt

that the customer was F&R, a law firm.

Mr. Lin undisputedly treated the installation of the accused products at F&R, and the

training of F&R's personnel, as a routine transaction in the ordinary course of his business. As

his declaration acknowledged, he "specializes in the installation, configuration, troubleshooting

and customized onsite training of" the OXE and the OTUC. [Lin Decl. ¶ 5; see also id. ¶ 13.]

His responsibilities included "provid[ing] training on the administration, use and configuration of

the products." [Id. ¶ 7.] These installation and training services are essential in order to use the

product, and F&R paid for them as part of the $26,387 purchase price. [Ex 7 at ¶ 4-5.]. Mr. Lin

recognized that F&R was a customer, and he responded to these user inquiries with  information

---

[16] Though ABS insinuates that F&R was responsible for this misimpression, the
declarations do not support this. They discuss merely what Alcatel Internetworking  personnel
claim to have been told by Alliance, without reference to any statements by F&R.

that ABS routinely provides to its customers.  [Lin Decl. ¶ 27 ("I answered all of their questions to the best of my ability with information that is confidential to Alcatel-Lucent and is intended only for customers.").][18]

In this case, like the investigator in <u>Gidatex</u> and the lawyers and investigators in <u>Apple Corps</u>, the F&R attorneys engaged in an ordinary consumer transaction in order to gain meaningful access to evidence, here, the technology to be submitted for expert evaluation.  [Ex 10 at ¶¶ 24-26].  They made a lawful purchase of goods and services on the open market, on commercial terms available to any consumer.  The purchase included instruction in the operation and use of the products, i.e., the information provided by Mr. Lin.  ABS concedes that it would have provided the same information upon the request of any other customer who purchased the products.[19]

There is nothing inappropriate about F&R's desire to limit any premature exposure of the manner in which it was building Microsoft's case.  The ethics rules do not require that

---

[17] See F&R's website, www.fr.com, listing the firm's offices in Washington, D.C., Silicon Valley, San Diego, Austin, TX, Dallas, TX, Atlanta, GA, Wilmington, DE, New York, NY, Boston, MA and Minneapolis, MN.

[18] The care that F&R's attorneys showed in restricting their questions to subjects about which users of the products would inquire distinguishes this case from those cited by ABS in which courts have sanctioned attorneys for violating the rules and/or excluded the evidence developed as a result.  <u>See, e.g.</u> <u>Midwest Motor Sports v. Arctic Cat Sales, Inc.</u>, 347 F.2d 693(8th Cir. 2003) (sanctions appropriate where counsel's investigator used trickery to elicit specific admissions from an opposing party's employees)

[19] ABS's reliance on <u>Rentclub v. Transamerica Rental Finance Corp.</u>, 811 F.Supp. 651 (M.D. Fla. 1991) at pages 24-25 is severely misplaced both factually and legally.  First, Rentclub <u>did not involve an arms-length commercial transaction in which routine customer information was shared.</u>  <u>Id.</u> at 653-54.  Rather, that case involved side switching by a recently terminated Chief Financial Officer.  <u>Id.</u> The dishonesty that offended the court was the Plaintiff's retention of the former CFO of a division of the Defendant as a trial consultant as a pretext for paying him for favorable fact-testimony – testimony that required the CFO to provide his former employer's confidential and proprietary information.  <u>Id.</u> at 654-55.  Also, the CFO had participated in privileged discussions in a closely related case and he furnished information about his former employer's legal strategies to Plaintiff's lawyers.  <u>Id.</u> Second, by citing this case and <u>Kramer v. Scientific Control Corp.</u>, 534 F.2d 1085 (3rd Cir. 1976) at page 27, ABS resorts to relying on law that is no longer followed.  As Professor Hodes notes, when the Model Rules where adopted in 1985, "the appearance of impropriety" language that had appeared in the earlier Model Code of Professional Conduct was deliberately jettisoned as too vague and empty.  [Ex 11 at ¶ 18(c)].

27

information-gathering activities be transparent to the other side, as ABS seems to suggest, when those activities involve nothing more that the routine acquisition of the accused products. As ABS's own expert concedes, F&R was entitled to purchase the products and interact with a "random installer" employed by ABS. [Morgan Decl. ¶ 6(b).] Simply put, F&R did not make any misrepresentations to Mr. Lin or any other person in procuring and using the OXE system.

> ### b. F&R's communications with Mr. Lin were typical customer-trainer interactions

Ms. Elluru and Mr. Pond dealt with Mr. Lin solely as customers who had purchased the services of a professional engineer to install the products and train F&R personnel in their use. Even as described by ABS in its motion, all of their questions were directed towards operating the system and understanding how to use its features and functionalities. [Mtn. 7-10.] The most that ABS can say is that Mr. Lin showed them how to use some of the features that are the subject of this lawsuit. In short, they asked the kinds of things that any new user would want to know: what the system could do, how it did it, and how it could be used.

ABS even admits that Mr. Lin regarded the F&R attorneys as customers and responded to their questions with information regularly provided to customers. As its motion acknowledges, Mr. Lin "worked with them and answered their questions as if they worked for a company whose sole role was as a business customer of Alcatel." [Mnt. at 9; see also Lin Decl. ¶¶ 4-5, 7, 13-15, 18-23, 27.] Indeed, the very fact that Mr. Lin was able to respond to the questions by providing information "reserved for legitimate customers of the Alcatel System," [Mtn. at 10], demonstrates routine nature of the questions.

ABS does not complain that the attorneys exceeded the bounds of what a customer might ask. It complains instead that the attorneys for its adversary were not entitled to as much information as what its customers would receive, even though F&R had paid the full purchase price of over $26,000. As a commentator confirmed, ABS's position is untenable because "[t]here is no sound basis for a rule that affords less information to litigants than to the typical consumer." Phillip Barengolts, "Ethical Issues Arising from the Investigation of Activities of

28

Intellectual Property Infringers Represented by Counsel," 1 <u>NW. J. Tech. & Intell. Prop.</u> 47, 58 (2003). Here, Ms. Elluru and Mr. Pond did not obtain or try to obtain attorney-client privileged information. They did not ask Mr. Lin about the pending lawsuit or its merits. Notwithstanding his purported role in the development and testing of the ABS system, they did not ask him about his conduct or what he observed. They did not try to elicit admissions from him. They simply asked him to train them on the system, a service included in the purchase price of the contract. Their questions would have been no different, if, as they had been led to believe, an Alliance engineer had performed the installation and provided instruction.

**E.    Rule 4.4 Does Not Apply in This Case**

Although ABS does not discuss Rule 4.4[20] in its motion, ABS's expert, discusses that rule in his declaration. Specifically, ABS's expert argues that that F&R somehow violated Rule 4.4 by receiving "technical information and manuals" ABS routinely provides to customers. [Morgan Decl. ¶ 6(d).]

Tellingly, neither ABS nor its expert provides any explanation as to how Rule 4.4 even applies to the situation here. ABS routinely provides the "technical information and manuals" to customers in the ordinary course of its business, and F&R lawfully purchased that information as part of the training services for which it contracted. [Ex 10 at ¶ 20, n.1.] None of the lawyers in this case obtained attorney-client privileged information from an employee who lacked authority to waive the corporation's privilege. Nor did any attorney induce an employee to breach his fiduciary duty by disclosing trade secrets and other proprietary information. The fact that ABS

---

[20] Rule 4.4 states that:
     (a)  In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.
     (b)  A lawyer who receives a document relating to the representation of the lawyer's client and knows of reasonably should know that the document was inadvertently sent shall promptly notify the sender.
ABA Model Rule 4.4.

produced the same manuals in question in discovery belies any assertion that it was somehow improper for F&R to obtain them.

### F.    ABS's Request for Sanctions Is Unfounded

ABS has a heavy burden to carry to get the sanctions it requests: (i) attorney disqualification, (ii) expert disqualification, (iii) attorney work-product turnover, and (iv) monetary sanctions.  To disqualify F&R, ABS must prove that F&R violated the rules, that ABS has suffered prejudice as a result of the violations, and that other factors – especially substantial hardship to Microsoft – do not countervail sanctions.  ABS must prove how the expert has been tainted in a manner that invades ABS's legitimate rights.  ABS cannot prove any of these things, let alone all of them.  Further, monetary sanctions are only issued where counsel's behavior is egregious, as where an attorney openly flouts rules despite warning – not where, as here, a party merely purchases a product available on the open market in a routine transaction.  Finally, ABS has no right to receive F&R's notes, highly protected attorney work product, that will not clarify the few undisputed facts here.

### 1.    There Is No Proper Grounds For Disqualification

#### a.    Disqualification of Counsel is a Severe Sanction that is Not Warranted under the Circumstances Present Here

In the cases cited by ABS, counsel was disqualified because the movant was prejudiced by a breach or potential breach of the disqualified counsel's duty of loyalty or duty to protect privileged and/or confidential information received from a client or potential client.[21]  Here,

---

[21] Indeed, the cases that ABS cites underscore that disqualification is appropriate (1) where a conflict of interest undermines the court's faith in an attorney's ability to represent his client; and (2) where an attorney is privy to an opposing party's privileged information. See Hammond v. Junction City, 167 F. Supp. 2d 1271, 1289-90 (D. Kan. 2001) (attorney disqualified after opposing party's attorney-client privileged information disclosed to it by current employee of opposing counsel); Best Western Int'l, Inc. v. CSI Int'l Corp, No. 94 Civ. 0360 (LMM), 1995 U.S. Dist. LEXIS 12314, at *6 (S.D.N.Y. Aug. 22, 1995) (attorney disqualified after opposing party's attorney-client privileged information disclosed to it by former employee of opposing party); People ex rel. Dep't of Corp. v. SpeeDee Oil Change Sys., Inc., 980 P.2d 371, 383 (Cal. 1999) (counsel disqualified after it represented opposing parties in the same litigation); Republic Servs. v. Liberty Mut. Ins. Co., 2006 U.S. Dist. LEXIS 77363, at *31-32 (E.D. Ky. Oct. 20,

however, F&R never represented ABS and never received any information protected by the attorney-client privilege or the work product doctrine. It owes neither a duty of confidentiality nor a duty of loyalty to ABS. And there is no prejudice to ABS because there is no risk that F&R will violate such duties, since it owes no such duties to ABS.

ABS attempts to fit itself within the case law by asserting that F&R obtained "confidential" information from Mr. Lin. But ABS simultaneously admits in its brief, again and again, that the supposedly confidential information at issue is easily obtained by anyone in the public who pays to buy its products. There is no support for ABS's assertion that this information is "confidential," and ABS provides none. ABS can hardly complain that is has been prejudiced by supplying to F&R the same instruction in the use of the OXE system that ABS provides to purchasers of those products—of which F&R was one. Where, as here, F&R obtained this information properly, by paying ABS, ABS cannot claim prejudice in the form of seller's remorse.

> **b.    ABS's Arguments Based On the Model Rules Do Not Warrant Disqualification**

ABS's erroneous claim that F&R violated Model Rules does not justify disqualification under the facts of this case. As discussed above, F&R complied with its ethical obligations under those rules.

Even assuming that a violation occurred, federal courts which have considered the issue recognize that not every violation of the Model Rules creates prejudice or warrants any sanction, much less a sanction as serious as disqualification. See Elonex, 142 F. Supp. 2d at 583, Talecris, 491 F. Supp. 2d at 513; Papanicolaou v. Chase Manhattan Bank, 720 F. Supp. 1080, 1083 (S.D.N.Y. 1989) ("[A] violation of professional ethics rules does not alone trigger

---

2006); Cobb Publ'n. v. Hearst Corp., 907 F. Supp. 1038 (E.D. Mich. 1995) (disqualifying a law firm after attorney representing opposing counsel came to work at the law firm but the firm failed to erect ethical walls screening him from the matter upon his arrival).

disqualification…; rather, a trial judge should primarily assess the possibility of prejudice at trial that might result from the attorney's unethical act.").

In the cases relied upon by ABS, the movant was prejudiced because the disqualified attorney spoke directly with his represented adversary about the litigation itself.  Such direct discussion about the litigation included for example information subject to the attorney-client privilege.  Hammond v. Junction City, 167 F. Supp. 2d 1271 (D. Kan. 2001) (disqualifying attorney in employment discrimination case for discussing claims and defenses in particular lawsuit with HR director who served as the defendant's legal and technical advisor and who worked with counsel to respond to discovery requests); Papanicolaou, 720 F. Supp. 1080 (S.D.N.Y. 1989) (disqualifying defense counsel for speaking ex parte to represented plaintiff about the merits, interpretation, analysis and strategy for the case, including a 90-minute interview in which they discussed a key document meant to refute the plaintiff's testimony).  Alternatively, the proscribed action exploited an unrepresented witness in violation of controlling legal authority, Monsanto Co. v. Aetna Casualty & Surety Co., 593 A.2d 1013 (Del. Super. Ct. 1990) (stating that the Court issued an opinion on the same ethics issue ten months ago in another insurance coverage case and that "guidance of this nature gets immediate and wide dissemination to the members of the bar practicing in the insurance coverage cases pending in this jurisdiction").

ABS identifies no prejudice, apart from its unavailing and irrelevant contention that Mr. Lin provided ordinary customer information to F&R.  That, alone, requires that ABS's motion be denied.  Moreover, contrary to ABS's assertion, courts routinely refuse to disqualify or sanction attorneys who interact with employees of a corporate party while posing as consumers, unless they intrude into privileged areas or trick employees into doing or saying things that they would not otherwise do or say in the ordinary course of business.  See Gidatex, 82 F. Supp. 2d at 122 (stating that contact by investigators who did not trick or dupe the sales clerks they spoke to did not implicate the policy interests behind prohibitions on attorney misrepresentations); Apple Corps, 15 F. Supp. 2d 456 (stating that investigators' contact with opposing party's salespeople

was proper given lack of evidence that they intimidated the salespeople into selling the products at issue or that they provoked the breach at issue); Hill, 209 F. Supp. 2d at 876 (investigators' contact with sales clerks did not violate Rule 4.2 since the investigators "did not trick them into making statements they otherwise would not have made").

Finally, the tactical motivation of ABS's motion, including ABS's unreasonable delay, weighs heavily against disqualifying F&R. This is particularly true here where the motion to disqualify was filed at a time that is particularly disadvantageous to Microsoft and advantageous to ABS. Microsoft would obviously suffer substantial prejudice to lose its longtime counsel after conducting significant discovery in the ITC Investigation, which the parties have agreed is equally applicable in this case. See Best Western Int'l, Inc. v. CSI Int'l Corp., No. 94 Civ. 0360 (LMM), 1995 U.S. Dist. LEXIS 12314, at *2 (S.D.N.Y. Aug. 22, 1995) ("Disqualification undermines a client's right to counsel of his choice, disrupts the attorney-client relationship, delays the progress of litigation, and imposes additional costs on both parties.").

F&R is the only law firm that represents Microsoft on these patents and its attorneys have spent months mastering the issues and preparing the case in the ITC, including a lengthy pre-trial submission filed just days ago in the ITC. Again, both parties have agreed that the discovery from the ITC Investigation is applicable in this case  If ABS has its way, successor counsel would have to conduct discovery anew without instruction in the use of the infringing products. It would be hard to imagine more substantial hardship than that.

> ### 2.    Disqualification of Microsoft's Expert is a Drastic and Unnecessary measure and ABS Has Not Proven That Mr. Jack Chang Should Be Disqualified.

ABS also demands that Microsoft's expert, Mr. Jack Chang, be disqualified from this case, asserting that his opinions are based on information "obtained improperly by F&R's attorneys," and their use would therefore be prejudicial to ABS. The standard for disqualifying experts is similar to the demanding standard for disqualifying attorneys. As this Court noted, an expert's "disqualification is 'a drastic measure which courts should hesitate to impose except when absolutely necessary.'" Syngenta Seeds, Inc. v. Monsanto Co., Civ. No. 02-1331-SLR,

2004 U.S. Dist. LEXIS 19817, at *4 (D. Del. Sept. 27, 2004) (quoting <u>Owen v. Wangerin</u>, 985 F.2d 312, 317 (7th Cir. 1993)). This Court has also stated that the party moving for disqualification bears the burden of proving disqualification is appropriate. <u>Id.</u> at *6; <u>see also</u> <u>Eaton Corp. v. Rockwell Int'l Corp.</u>, No. 97-421-JJF, 1998 U.S. Dist. LEXIS 9742, at *3-4 (D. Del. Jun. 18, 1998) (denying motion to disqualify expert because movant failed to prove disqualification was appropriate); <u>Hansen v. Umtech Industrieservice und Spedition</u>, No. 95-516 MMS, 1996 WL 622557, at *6 (D. Del. Jul. 3, 1996).

For example, in <u>Syngenta</u>, the Court declined to disqualify the plaintiff's expert although the defendant had contacted and shared information with the expert. 2004 U.S. Dist. LEXIS 19817, at *12. The Court based its decision on two conclusions: (1) that no actual or constructive confidential relationship existed between the expert and defendant, and (2) that the defendant failed to establish that confidential information was exchanged. <u>Id.</u> at *7-11. The Court defined confidential information in the context of expert disqualification as including "discussion of[] litigation strategy, the kinds of experts the party expects to retain, views on the strengths and weaknesses of each side, the role of each witness, and anticipated defenses." <u>Id.</u> at *10.

Nor does caselaw from other federal courts support Mr. Chang's disqualification. With few exceptions, federal courts disqualify experts only when they switch sides in a litigation after (i) receiving confidential information from the first client, (ii) they have been retained by an opposing party and given confidential information by that party, or (iii) they have otherwise been exposed to attorney work product and attorney-client privileged information from the opposing party. <u>See</u> <u>Cordy v. The Sherwin-Williams Co.</u>, 156 F.R.D. 575, 579, 581 (D.N.J. 1994) (disqualifying expert for party after expert was retained and paid by opposing counsel, told what opposing counsel's impression of the case and litigation strategy were, and given some investigative materials by opposing counsel); <u>Wang Labs. v. Toshiba Corp.</u>, 762 F. Supp. 1246, 1246 (E.D. Va. 1991) (disqualifying expert who was retained by plaintiff, given confidential information and produced an opinion on the validity of the patents at issue before resigning his

34

job and being retaining by defendants to opine for them on the validity of the same patents);

Michelson v. Merrill Lynch Pierce Fenner & Smith, Inc., 1989 U.S. Dist. LEXIS 3013 at *1-2,

10-11 (S.D.N.Y. Mar. 28, 1989) (disqualifying expert for plaintiff because, in talks around a

related case, he had discussed with defendants legal arguments and theories of defense relevant

to this action).

     None of these cases applies here, because ABS does not allege that Mr. Chang  was ever

retained by ABS in this case, or that Mr. Chang had any contact with ABS or its counsel about

information related to this case.  ABS has not asserted that Mr. Lin was privy to ABS's attorney

work product, or exposed to ABS's attorney work product through F&R's communications with

Mr. Lin.  No such allegation was even made.

     In seeking to disqualify Mr. Chang, ABS relies solely on his alleged indirect receipt of

what ABS insists on describing as "confidential" information – the same supposed "confidential"

information provided to any customer by Mr. Lin and other service technicians.  As an initial

matter, there is no support for ABS's assertion that this information is "confidential," and ABS

provided none.  Moreover, this information is certainly not confidential for purposes of a

disqualification analysis.  Where confidential information is disclosed in a manner that does not

restrict its use or dissemination, an expert's exposure to it does not result in disqualification.

Since no one placed any restrictions on F&R's right to demonstrate or explain the operations of

the ABS system to others, ABS has no confidentiality to protect.

     Accordingly, ABS has no justified basis for seeking to disqualify Mr. Chang.

     **3.     F&R's Notes And Other Materials Regarding The Installation Of The
           OXE System Are Protected Work Product That It Should Not Have
           To Turn Over To ABS**

     ABS argues that F&R must turn over its notes about its contact with Mr. Lin and other

attorney work product stemming from this contact to both ABS and the Court.  Courts have not

ordered the turnover of notes about an incident or work product to an opposing party in the

absence of a clear, blatant and serious violation of Rule 4.2.  Penda Corp. v. STK LLC, 2004

U.S. Dist. LEXIS 13577 at *2, *20 n.6 (E.D. Pa. July 16, 2004) (ordering counsel to turn over

notes after contacting an employee of a represented party for an admission on which a key fact in the pleading was based); Hammond v. Junction City, 167 F. Supp. 2d 1271, 1291-92 (D. Kan. 2001) (requiring plaintiffs' counsel to turn over certain information to opposing party after ex parte contact with defendant's EEO director in employment discrimination case); Faison v. Thornton, 863 F. Supp. 1204 (D. Nev. 1992) (requiring notes regarding ex parte contact to be turned over where plaintiffs' counsel spoke with named defendant knowing "full well" he was represented). Even then, the court has reviewed any materials at issue in camera to insure that attorney-client privileged information was not invaded. Hammond, 167 F. Supp. 2d at 1291-921292-93.

Here, F&R has not violated any ethical rules, so the turnover of its notes regarding contact with Mr. Lin – and certainly any resulting attorney work product – would be a gross invasion of Microsoft's privilege. Nor should the Court be detained by the claim that ABS needs access to any F&R notes in order to figure out what happened. ABS apparently has plenary access to Mr. Lin, and his declaration describes the customer information that he provided to F&R.[22] Therefore, there is no basis to pierce Microsoft's work-product immunity.

**4.    Only Egregious Conduct Warrants Monetary Sanctions, And F&R's Conduct Was Never Improper**

ABS further argues that F&R and Microsoft should be ordered to pay monetary sanctions. This case presents none of the factors that causes courts to impose monetary sanctions: serious and intentional violations, coupled with significant prejudice to opposing parties. In re Air Crash Disaster Near Roselawn, Indiana on October 31, 1994, 909 F. Supp 1116, 1124 (N.D. Ill. 1995) (declining to impose monetary sanctions where counsel "operate[d] in good faith but used poor judgment").

Monetary sanctions are only imposed when counsel commits an egregious violation of the ethical rules. After holding that counsel's ex parte discussions with a named party was a

---

[22] ABS also briefly argues that equity requires that F&R's notes and materials be stricken so F&R does not retain the advantage they have gained by allegedly violating ethics rules. [Mtn. at 31.] As discussed above, F&R did not violate any ethics rules.

36

"flagrant violation" of Rule 4.2 because counsel had actual knowledge that the defendant had legal representation, a federal district court ordered counsel to pay monetary sanctions. See Faison v. Thornton, 863 F. Supp. 1204, 1208, 1209-11 (D. Nev. 1992). Similarly, where defendant's counsel served a deposition subpoena on a named plaintiff and deposed plaintiff without his attorney present, counsel faced monetary sanctions. Parker v. Pepsi-Cola, 249 F. Supp. 2d 1006, 1013 (N.D. Ill. 2003)).[23] Where a violation of Rule 4.2 was minimal, however, monetary sanctions were held inappropriate. See Penda Corp. v. STK LLC, 2004 U.S. Dist. LEXIS 13577 at *2, *20.

In contrast to all of these cases, there was no violation justifying monetary sanctions in this case. First, no violation occurred in this case for the reasons discussed above and in the attached expert declarations. Second, even if a violation had occurred, it did not rise to the level of blatant disregard for the rules that would justify a monetary sanction. At best, if such violation did occur, it was clearly unintentional, given the care that counsel took not to exceed the bounds of conduct previously approved by courts and commentators. That F&R did not solicit contact with Mr. Lin or with ABS further demonstrates that they had no intention to trespass the ethics rules. Finally, there is a complete absence of prejudice to ABS from selling to F&R the same information that it sells to other customers, and receiving the substantial sum of $26,000.00 in return. Thus, there is no basis for imposing monetary sanctions.

###     5.     ABS suffers no prejudice here.

It bears repeating that ABS has suffered absolutely no prejudice from F&R's purchase of the ABS system. F&R has not used or relied on Mr. Lin's statements as evidence in this case, and it received from him only the same information provided to any customer who bought the same system. Moreover, ABS has produced the same information and user guides in discovery.

---

[23] The other cases cited by ABS for the proposition that monetary sanctions ought to be imposed also involved egregious violations of ethical rules. Kleiner v. First Nat'l Bank of Atlanta, 751 F.2d 1193 (11th Cir. 1985) (attorneys and others telephoned bank customers to persuade them to withdraw from class action suit); Hammond, 167 F.Supp.2d 1271 (D. Kan. 1991) (in employment lawsuit, ex parte communications with city's EEO director).

See Hora, 2007 WL 1875834 at *1-3 (no prejudice because company conceded that all the information that the employee gave plaintiff's counsel was produced during discovery). As a customer, F&R is entitled to use the system it purchased. In fact, the technicians charged with installing the products themselves had trouble getting the system to work, and there was no possible way for F&R to have an operational system without their help.

## IV.    CONCLUSION

For the foregoing reasons, Microsoft and its attorneys, Fish & Richardson, respectfully request that the Court enter an Order: (1) finding that Fish & Richardson did not violate any ethical rules; and (2) deny ABS's requests (a) to disqualify Fish & Richardson as Microsoft's counsel; (b) to disqualify Jack Chang as an expert witness; (c) for inspection of documents relating to Fish & Richardson's contact with Po Ching Lin; (d) for additional discovery relating to the foregoing; and (e) for monetary and other sanctions.

Dated:  September 17, 2007                 Respectfully submitted,
                                          **MICROSOFT CORPORATION**

                                          By its attorneys,

                                          /s/ Thomas L. Halkowski
                                          Thomas L. Halkowski (#4099)
                                          FISH & RICHARDSON P.C.
                                          919 N. Market Street, Suite 1100
                                          P.O. Box 1114
                                          Wilmington, DE 19899-1114
                                          Tel: (302) 652-5070
                                          Fax: (302) 652-0607
                                          E-Mail: halkowski@fr.com


                                          Ruffin B. Cordell
                                          Linda Liu Kordziel
                                          FISH & RICHARDSON P.C.
                                          1425 K Street N.W., Suite 1100
                                          Washington D.C. 20005
                                          Tel:  (202) 783-5070
                                          Fax: (202) 783-2331
                                          E-Mail: cordell@fr.com
                                          E-Mail: kordziel@fr.com

                                          John E. Gartman
                                          FISH & RICHARDSON P.C.
                                          12390 El Camino Real
                                          San Diego, CA 92130
                                          Telephone: (858) 678-5070
                                          Facsimile: (858) 678-5099
                                          E-Mail:  gartman@fr.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 17th day of September 2007, I electronically filed

**PLAINTIFF MICROSOFT CORPORATION'S OPPOSITION TO DEFENDANT**

**ALCATEL BUSINESS SYSTEMS' MOTION TO DISQUALIFY FISH & RICHARDSON**

**P.C., AND FOR OTHER SANCTIONS** with the Clerk of Court using CM/ECF which will

send electronic notification of such filing to the following Delaware counsel.  In addition, the

filing will also be sent via hand delivery:


Jack B. Blumenfeld                             *Attorneys for Defendants*
Maryellen Noreika                              *Alcatel Business Systems and*
Morris, Nichols, Arsht & Tunnell LLP           *Genesys Telecommunications*
Chase Manhattan Centre                         *Laboratories, Inc.*
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347


I also certify that the document was served on the following via electronic mail:

Steven C. Cherny                               *Attorneys for Defendants*
Latham & Watkins LLP                           *Alcatel Business Systems and*
885 Third Avenue, Suite 1000                   *Genesys Telecommunications*
New York, NY 10022-4834                        *Laboratories, Inc.*

David A. Nelson
Latham & Watkins LLP
233 South Wacker Drive, Suite 5800
Chicago, IL 60606


                                     */s/ Thomas L. Halkowski*
                                          Thomas L. Halkowski

# Exhibit 1

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C. 20436**

**Before The Honorable Paul J. Luckern**
**Administrative Law Judge**

In the Matter of

CERTAIN UNIFIED COMMUNICATION
SYSTEMS, PRODUCTS USED WITH SUCH
SYSTEMS, AND COMPONENTS THEREOF

Inv. No. 337-TA-598___

## COMPLAINANT MICROSOFT CORPORATION'S FIRST SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS AND THINGS (NOS. 1-62) TO RESPONDENT ALCATEL-LUCENT

Pursuant to the United States International Trade Commission's Rules of Practice and Procedure, 19 C.F.R. §§ 210.27 and 210.30, Complainant Microsoft Corporation ("Microsoft"), by its undersigned attorneys, hereby requests that Respondent Alcatel-Lucent ("Alcatel-Lucent") permit inspection and copying (with convenient access to duplicating equipment), or otherwise cause to be produced, each of the following documents and things within its possession, custody or control, designated and organized by the paragraphs and subparagraphs hereof to which they correspond, at the office of Complainant's counsel, Fish & Richardson P.C., 1425 K Street, N.W., Suite 1100, Washington, D.C. 20005, within the time prescribed by the rules of the Administrative Law Judge and of the Commission.

## DEFINITIONS

The definitions contained in Microsoft's First Set of Interrogatories to Respondent Alcatel-Lucent are hereby incorporated as completely set forth herein and apply to the following document requests.

Microsoft's First Set of Requests for the Production of Documents and Things

## INSTRUCTIONS

A.    If no documents are responsive to a particular request, you are to state that no responsive documents exist.

B.    If you decline to produce any document or part thereof based on a claim of privilege or any other claim, describe the nature and basis of your claim, describe the information withheld, identify the date and the sender and recipients of the document, and identify the number of the discovery request or interrogatory to which the document is responsive.

C.    All documents requested are to be produced in the same file or other organizational environment in which they are maintained.  For example, a document that is part of a file, docket, or other grouping, should be physically produced together with all other documents from said file, docket or grouping, in the same order or manner of arrangement as the original.

D.    These requests seek all responsive documents in their original language and, if such original language is not English, these requests also seek all English-language translations that may exist for any such documents.

E.    Since discovery requests are continuous in nature, you are under a duty to supplement or amend any prior response.

2

**Microsoft's First Set of Requests for the Production of Documents and Things**

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

All documents for which identification is requested in Complainant Microsoft's First Set of Interrogatories to Alcatel-Lucent served concurrently herewith, or relied on in preparation of, Alcatel-Lucent's responses, including any supplemental response, to Complainant Microsoft's First Set of Interrogatories, First Set of Requests for Admission, or these Requests for Production.

### REQUEST FOR PRODUCTION NO. 2:

Documents sufficient to determine the organizational structure and personnel of Alcatel-Lucent and its relationships to parent, subsidiary, or other affiliate corporations, including, without limitation, research or development units, departments, divisions, or other entities, responsible for each Accused Product.

### REQUEST FOR PRODUCTION NO. 3:

Documents sufficient to identify Alcatel-Lucent's predecessor affiliates, including parent companies, subsidiaries, partnerships, joint ventures, divisions, and shareholders that have engaged in any activities relating to the Accused Products.

### REQUEST FOR PRODUCTION NO. 4:

Documents sufficient to identify Alcatel-Lucent's present affiliates, including parent companies, subsidiaries, partnerships, joint ventures, divisions, and shareholders shareholders that have engaged in any activities relating to the Accused Products.

3

**REQUEST FOR PRODUCTION NO. 5:**

All minutes, memoranda, notes, or other documents relating to any Alcatel-Lucent corporate Board of Director meetings that relate to the Accused Products, Microsoft, any license with Microsoft, any license negotiations or discussions with Microsoft in the Present Investigation, or the Complaint in the Present Investigation.

**REQUEST FOR PRODUCTION NO. 6:**

Documents sufficient to identify each and every Accused Product which has been sold, imported into the United States, sold for importation into the United States, or sold or offered for sale after importation into the United States by or on behalf of Alcatel-Lucent.

**REQUEST FOR PRODUCTION NO. 7:**

Documents sufficient to identify each and every product that contains an Accused Product which has been sold, imported into the United States, sold for importation into the United States, or sold or offered for sale after importation into the United States by or on behalf of Alcatel-Lucent.

**REQUEST FOR PRODUCTION NO. 8:**

Documents sufficient to identify each and every Accused Product which has been or is committed to being sold, imported into the United States, sold for importation into the United States, or sold or offered for sale after importation into the United States by or on behalf of Alcatel-Lucent pursuant to an agreement entered on or about June 2003 with the Kennewick School District in Kennewick, Washington, and documents related to this contract.

**REQUEST FOR PRODUCTION NO. 9:**

Documents sufficient to identify each and every Accused Product which has been or is committed to being sold, imported into the United States, sold for importation into the United

4

States, or sold or offered for sale after importation into the United States by or on behalf of Alcatel-Lucent pursuant to an agreement entered on or about December 2003 with the Clark County School District in Las Vegas, Nevada, and documents related to this contract.

## REQUEST FOR PRODUCTION NO. 10:

Documents sufficient to identify each and every Accused Product which has been or is committed to being sold, imported into the United States, sold for importation into the United States, or sold or offered for sale after importation into the United States by or on behalf of Alcatel-Lucent pursuant to an agreement entered on or about November 2006 with the University of Pittsburgh Medical Center in Pittsburgh, Pennsylvania, and documents related to this contract.

## REQUEST FOR PRODUCTION NO. 11:

Documents sufficient to describe and explain the research, design, development, engineering, manufacture, use, testing, or sampling of each Accused Product.

## REQUEST FOR PRODUCTION NO. 12:

All documents including, without limitation, drawings, prototypes, notes, notebooks, workbooks, project reports, correspondence, memoranda, test results, schematics, engineering specifications, CAD files, source code, and simulation files that refer or relate to the structure, function, operation, capabilities, features, design, research, development, testing, or simulation of each and every Accused Product, sold by Alcatel-Lucent or its customers.

## REQUEST FOR PRODUCTION NO. 13:

All documents referring or relating to any modification, improvement, change, or any proposed modification, improvement, or change, in any Accused Product, including attempts to design or re-design products to avoid infringement of the Microsoft Patents.

5

Microsoft's First Set of Requests for the Production of Documents and Things

**REQUEST FOR PRODUCTION NO. 14:**

Documents sufficient to describe or explain Alcatel-Lucent's involvement in the research, development, design, engineering, manufacture, offer for sale, or sale of products sold by Alcatel-Lucent's customers that contain any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 15:**

All documents including, without limitation, drawings, schematic diagrams, block diagrams and datasheets that refer, reflect, or relate to any product family or technical relationship amongst and between any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 16:**

Documents sufficient to show the manufacture, assembly, or supply of the Accused Products.

**REQUEST FOR PRODUCTION NO. 17:**

Documents sufficient to identify any additional product necessary for the operation of each Accused Product.

**REQUEST FOR PRODUCTION NO. 18:**

One sample of each version of each Accused Product.

**REQUEST FOR PRODUCTION NO. 19:**

All instructions, manuals, brochures, or other guidance information associated with the sale and demonstration of each Accused Product.

**REQUEST FOR PRODUCTION NO. 20:**

All contracts or agreements relating to the manufacture, assembly, importation, sales or service of any Accused Product.

**REQUEST FOR PRODUCTION NO. 21:**

6

Documents sufficient to show the quantity, by quarter and in total, the sales prices of each of the Accused Products made, sold or offered for sale by or for Alcatel-Lucent.

**REQUEST FOR PRODUCTION NO. 22:**

All documents referring or relating to Alcatel-Lucent's commercial exploitation of the Accused Products, including without limitation feasibility studies, marketing plans, marketing forecasts, estimates, projections or reports of market share, periodic research and development reports, management reports and/or other periodic reports, and documents referring or relating to marketing, manufacturing, sampling, efforts to sell, offers for sale, and actual sales.

**REQUEST FOR PRODUCTION NO. 23:**

All documents referring or relating to any comparison between any Accused Product with the technology or products of any other manufacturers.

**REQUEST FOR PRODUCTION NO. 24:**

All documents that relate to or constitute advertising or marketing of the Accused Products, including but not limited to: all descriptive or promotional materials concerning each of the Accused Products and products containing same made, offered for sale or sold by or for Alcatel-Lucent, press releases and trade journal articles describing the Accused Products, advertisements, catalogs, materials prepared for use in trade meetings and conventions, package inserts, technical data sheets, specifications, price lists, sales presentations to customers or potential customers and any other materials promoting or describing such products.

**REQUEST FOR PRODUCTION NO. 25:**

All documents that are or have been included with the sale of Accused Products including, without limitation, instruction materials, brochures, product manuals, user manuals,

7

data sheets, installation manuals, retail kits, diagnostic software, installation software, or specifications.

**REQUEST FOR PRODUCTION NO. 26:**

All documents discussing or making reference to the quality, value, acceptability, workability, performance or benefits of the Accused Products and products containing same, including communications with customers praising, criticizing, or otherwise commenting on the Accused Products.

**REQUEST FOR PRODUCTION NO. 27:**

All technical articles, conference papers, or technical or marketing presentations which refer or relate to the Accused Products.

**REQUEST FOR PRODUCTION NO. 28:**

All documents referring or relating to any failures, problems with or complaints about any of the Accused Products.

**REQUEST FOR PRODUCTION NO. 29:**

All forecasts or projections concerning the marketing, importing, exporting, offering for sale, and sale of the Accused Products.

**REQUEST FOR PRODUCTION NO. 30:**

All business plans including, but not limited to, strategic plans, operating plans, marketing plans, financial plans, production plans, sales plans and capital or investment plans referring or relating to the Accused Products.

**REQUEST FOR PRODUCTION NO. 31:**

Documents sufficient to identify each potential customer, actual customer, purchaser, reseller, and distributor of the Accused Products.

8

**REQUEST FOR PRODUCTION NO. 32:**

All documents relating to how Alcatel-Lucent's customers, purchasers, resellers and distributors of the Accused Products use each Accused Product, including whether they incorporate or have incorporated the Accused Products into products containing same, and whether they import or sell for importation Accused Products.

**REQUEST FOR PRODUCTION NO. 33:**

All documents referring to, relating to or constituting patents, publications, written descriptions or other prior art references of which you are aware that concern, disclose, describe or claim any invention disclosed, described or claimed in the Microsoft Patents, or any product embodying or using any invention disclosed, described or claimed in the Microsoft Patents.

**REQUEST FOR PRODUCTION NO. 34:**

All documents referring or relating to any document, reference or activity alleged by anyone to be prior art to the Microsoft Patents, or to affect the validity, enforceability, or scope of the Microsoft Patents.

**REQUEST FOR PRODUCTION NO. 35:**

All documents referring or relating to knowledge or use by others of any invention disclosed, described or claimed in the Microsoft Patents.

**REQUEST FOR PRODUCTION NO. 36:**

All documents referring or relating to the sale or offer for sale of any product on which you rely as prior art that allegedly embodies or uses any invention disclosed, described or claimed in the Microsoft Patents, including without limitation all advertising, sales, promotional and technical materials related to such offer or sale.

9

**REQUEST FOR PRODUCTION NO. 37:**

All documents that refer or relate to the public use or prior invention of any product on which you rely as allegedly embodying or using any invention disclosed, described or claimed in the Microsoft Patents and rendering that patent invalid or unenforceable.

**REQUEST FOR PRODUCTION NO. 38:**

All documents allegedly referring or relating to the making in this or another country of any invention disclosed, described or claimed in the Microsoft Patents, by one who had not abandoned, suppressed or concealed it, that you contend render the Microsoft Patents invalid or unenforceable.

**REQUEST FOR PRODUCTION NO. 39:**

All documents that Alcatel-Lucent contends either alone or in combination anticipate or render obvious or in any other way render the Microsoft Patents invalid or unenforceable.

**REQUEST FOR PRODUCTION NO. 40:**

All documents referring to or relating to any prior art reference or potential prior art reference located or reviewed by or cited to Alcatel-Lucent during any study or search of domestic or foreign patents, literature or other published materials relating in any manner to the Microsoft Patents, including without limitation any study, search or analysis to determine the patentability, the validity, enforceability or enforceable scope of any of the claims of the Microsoft Patents.

**REQUEST FOR PRODUCTION NO. 41:**

All articles, including without limitation internal technical memoranda, published by any of your employees that relate to the subject matter described, disclosed or claimed in the Microsoft Patents.

10

**REQUEST FOR PRODUCTION NO. 42:**

All documents referring or relating to any license covering Alcatel-Lucent's alleged rights to make, use, or sell the Accused Products.

**REQUEST FOR PRODUCTION NO. 43:**

All communications, documents and things, negotiations, and licenses relating to Microsoft and the Accused Products.

**REQUEST FOR PRODUCTION NO. 44:**

All documents and things relating to any negotiations, discussions, or other communications between Alcatel-Lucent and Microsoft regarding any intellectual property matter that covers the Accused Products.

**REQUEST FOR PRODUCTION NO. 45:**

All communications, documents, and things relating to the scope or meaning or coverage of any license between Alcatel-Lucent and Microsoft that involve unified communication systems or the Accused Products.

**REQUEST FOR PRODUCTION NO. 46:**

Documents sufficient to identify all people involved in any communication, negotiation or licensing of any Alcatel-Lucent intellectual property to Microsoft.

**REQUEST FOR PRODUCTION NO. 47:**

Documents sufficient to reflect Alcatel-Lucent's licensing policies, goals, initiatives, or practices.

**REQUEST FOR PRODUCTION NO. 48:**

All documents referring or relating to the distribution, re-sale, or licensing of the Accused Products, including documents relating to all distributors, re-sellers, manufacturing and/or warehousing facilities, and product distribution outlets.

**REQUEST FOR PRODUCTION NO. 49:**

All documents referring or relating to those responsible for importing and shipping the Accused Products, and identifying who owns title to such Accused Products prior to, during, and after each importation or shipment.

**REQUEST FOR PRODUCTION NO. 50:**

All documents referring or relating to when and how Alcatel-Lucent first became aware of the Microsoft Patents.

**REQUEST FOR PRODUCTION NO. 51:**

All documents referring or relating to any consideration given by Alcatel-Lucent to any possible liability for patent infringement should Alcatel-Lucent commence or continue to make, use, distribute or sell the Accused Products, including without limitation any legal advice sought or received and any analysis of any Alcatel-Lucent products for potential or actual infringement of the Microsoft Patents.

**REQUEST FOR PRODUCTION NO. 52:**

All documents including, but not limited to, opinions and advice of counsel referring or relating to the infringement or non-infringement, validity or invalidity, enforceability or unenforceability, or interpretation of the scope of the claims of the Microsoft Patents and any related United States or foreign applications and/or patents.

**REQUEST FOR PRODUCTION NO. 53:**

All documents referring or relating to any evaluation, analysis, review, monitoring, testing, prior art search or investigation of the Microsoft Patents including, but not limited to,

12

documents relating to whether any Alcatel-Lucent product does or does not infringe any claim of the Microsoft Patents either literally or under the doctrine of equivalents.

## REQUEST FOR PRODUCTION NO. 54:

All documents referring or relating to the Microsoft Patents, Alcatel-Lucent's evaluation of Microsoft as, for example, a potential business partner, or any of Microsoft's unified communications systems.

## REQUEST FOR PRODUCTION NO. 55:

All documents relating to any meeting, discussion, or communication with Microsoft, any third party, or any non-party concerning any of the Microsoft Patents, or any patents related to the Microsoft Patent, or the subject matter of the claims thereof.

## REQUEST FOR PRODUCTION NO. 56:

All documents relating to any meeting, discussion, or communication between Alcatel-Lucent and any third party (including, without limitation, any competitors or customers of Alcatel-Lucent or Microsoft) concerning Alcatel-Lucent's infringement of any Microsoft Patents.

## REQUEST FOR PRODUCTION NO. 57:

All documents referring or relating to any affirmative defenses that Alcatel-Lucent intends to assert in this Investigation.

## REQUEST FOR PRODUCTION NO. 58:

Documents sufficient to describe Alcatel-Lucent's document retention, management, and/or destruction policies, including those with respect to e-mail, from 1998 to present.

## REQUEST FOR PRODUCTION NO. 59:

All documents and things, not produced in response to another request, you seek to introduce into evidence at the hearing in the Present Investigation.

13

Microsoft's First Set of Requests for the Production of Documents and Things

**REQUEST FOR PRODUCTION NO. 60:**

All documents and things, not produced in response to another request, shown to any

expert or fact witness in connection with the Present Investigation.

**REQUEST FOR PRODUCTION NO. 61:**

All documents and things, not produced in response to another request, relied upon or

referred to in preparing the Response to the Complaint.

**REQUEST FOR PRODUCTION NO. 62:**

All documents and things, not produced in response to another request, referring or

relating to any Accused Products, including any correspondence, manuals, brochures,

memoranda, notes, meeting minutes, presentations, and e-mails.

Respectfully submitted,

FISH & RICHARDSON P.C.

Dated: March 26, 2007

By: *Rama Elluru*

Joseph V. Colaianni, Jr.
Ahmed J. Davis
Jeffrey R. Whieldon
Rama G. Elluru
Joshua Pond
Kate Kelly
1425 K Street NW, Suite 1100
Washington, D.C. 20005
Tel: (202) 783-5070

Attorneys for Complainant
MICROSOFT CORPORATION

14

Microsoft's First Set of Requests for the Production of Documents and Things

## CERTIFICATE OF SERVICE

It is hereby certified that copies of the foregoing **COMPLAINANT**

**MICROSOFT CORPORATION'S FIRST SET OF REQUESTS FOR THE**

**PRODUCTION OF DOCUMENTS AND THINGS (NOS. 1-62) TO RESPONDENT**

**ALCATEL-LUCENT**   were served on this 26th day of March, 2007 as follows:

The Honorable Paul J. Luckern                  Via Hand Delivery
Administrative Law Judge                       (Two Copies)
U.S. International Trade Commission
500 E Street, S.W., Suite 317
Washington, D.C. 20436

David J. Hollander, Esq.                       Via Hand Delivery
U.S. International Trade Commission
Office of Unfair Import Investigations
500 E Street, S.W., Room 401
Washington, D.C. 20436

Alcatel-Lucent                                 Via Federal Express
54 Rue La Boetie                               International Delivery
Paris, France 75008


                                    _____
                                          Lydia Dean-Reese

# Exhibit 2

# LATHAM&WATKINS LLP

Sears Tower, Suite 5800
233 S. Wacker Dr.
Chicago, Illinois 60606
Tel: (312) 876-7700  Fax: (312) 993-9767
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Barcelona | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Shanghai |
| Madrid | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| Munich | Washington, D.C. |

File No. 038857-0008

April 13, 2007

**VIA EMAIL AND US MAIL**

Joseph V. Colaianni
Fish & Richardson P.C.
1425 K Street, N.W.
Washington, D.C. 20005

Re:    337-TA-598

Dear Joe:

As we have discussed this past week, Alcatel Lucent is not the proper party to the action Microsoft brought in the ITC and Delaware alleging infringement against the OmniPCX and OmniTouch Unified Communications Suite. Alcatel Lucent is a holding company that owns stock in various subsidiaries, but does not make any products, including those at issue in the recent actions filed by Microsoft. Instead, Alcatel Business Systems is the entity that makes the OmniPCX and OmniTouch Unified Communications Suite.

To confirm the discussion we had earlier this week concerning the relationship between Alcatel Business Systems and Alcatel Lucent, Alcatel Business Systems is owned by Alcatel Participations. Alcatel Participations is owned by Compagnie Financiere Alcatel-Lucent, which is owned by Alcatel Lucent. So, you can see that Alcatel Lucent, the holding company you have named in both actions, is three steps from the company that makes and sells the accused products.

We would not object to the substitution of Alcatel Business Systems as the named party in both the ITC and Delaware actions in place of Alcatel Lucent. We will not object to or resist any reasonable discovery based upon the corporate structure identified above. So, for example, if one of the companies in the chain is "in possession, custody or control" of relevant (non-privileged) documents sought by discovery requests to Alcatel Business Systems in the litigation, we will produce such documents in response to such requests. No subpoena will be required to these entities. Of course, as we discussed, we are not waiving any other potential objections to discovery requested by Microsoft.

Please let me know if you need any further information. We hope that the substitution can be made before our responsive pleadings are due in the Delaware (April 20) and ITC (April 23) litigations.

Joseph V. Colaianni
April 13, 2007
Page 2

**LATHAM&WATKINS**LLP

Sincerely,

David A. Nelson
of LATHAM & WATKINS LLP

cc:    Steven C. Cherny

# Exhibit 3

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C. 20436

Before The Honorable Paul J. Luckern
Administrative Law Judge

| | |
|---|---|
| In the Matter of | |
| CERTAIN UNIFIED COMMUNICATION SYSTEMS, PRODUCTS USED WITH SUCH SYSTEMS, AND COMPONENTS THEREOF | Inv. No. 337-TA-598 |

RESPONDENT'S OBJECTIONS AND RESPONSES TO COMPLAINANT
MICROSOFT CORPORATION'S FIRST SET OF REQUESTS FOR THE
PRODUCTION OF DOCUMENTS AND THINGS (Nos. 1-62)

Pursuant to 19 C.F.R. §§ 210.27 and 210.30, Respondent Alcatel Business Systems[1] ("ABS" or "Respondent"), by its undersigned attorneys, hereby objects and responds to Complainant Microsoft Corporation's ("Microsoft" or "Complainant") First Set of Requests for the Production of Documents and Things (Nos. 1-62) (hereinafter, "Document Requests"), as follows:

## GENERAL OBJECTIONS

1.     Respondent objects to the Document Requests to the extent they request information that is not relevant to the claim or defense of any party.

2.     Respondent objects to the Document Requests to the extent they seek information that would not be admissible at the hearing or are not reasonably calculated to lead to the discovery of admissible evidence.

---

[1]  Alcatel Business Systems notes that the currently named respondent is Alcatel-Lucent, but that pursuant to discussions between the parties and the Staff, Complainant has moved to file an Amended Complaint substituting Alcatel Business Systems as the proper Respondent. Alcatel Business Systems concurs with that substitution.

3.    Respondent objects to the Document Requests to the extent they are harassing, or would lead to unnecessary delay or needless increase in the cost of this Investigation.

4.    Respondent objects to the Document Requests to the extent they are unduly burdensome or expensive.

5.    Respondent objects to the Document Requests to the extent they seek information protected from disclosure by the attorney-client privilege and/or the work-product doctrine, the common interest privilege, any other evidentiary or discovery privilege, or otherwise protected from disclosure.

6.    Respondent objects to the Document Requests to the extent they seek confidential and/or proprietary information. Such information, to the extent it is not privileged or otherwise objectionable, will be provided pursuant to Order No. 2: Protective Order in this Investigation.

7.    Respondent objects to the Document Requests to the extent they assume facts not in evidence. Respondent's willingness to respond to any such Document Request shall not be construed as a concession or agreement with any implications or conclusions, factual or otherwise, that may be drawn from such a Request.

8.    Respondent objects to the Document Requests to the extent the information requested therein is not within the possession, custody or control of Respondent.

9.    Respondent objects to the Document Requests to the extent they are cumulative and/or duplicative.

10.    Respondent objects to the definitions and instructions set forth in the Document Requests to the extent they impose requirements or obligations inconsistent with or

different from those set forth in Title 19 of the Code of Federal Regulations, Order No. 1: Ground Rules, or any other orders governing this Investigation.

11.    Respondent objects to the Document Requests to the extent they are vague, ambiguous, and/or incapable of reasonable ascertainment.    Without waiver of its objections, Respondent has made reasonable interpretations of the meanings of such terms and will respond according to such interpretations.

12.    Respondent objects to the definition of "Accused Product" as overly broad and unduly burdensome, and further objects to the definition of "Accused Product" to the extent it seeks information that is not relevant to the claim or defense of any party. Respondent further objects to the definition of "Accused Product" to the extent it calls for information on products that are not reasonably related to Complainant's allegations regarding the patents-in-suit.

13.    Respondent's statement that it will produce documents in response to any Request is not a representation that such documents exist, but rather that any such responsive, non-privileged documents that are in Respondent's possession, custody, or control and that are located after a reasonable search will be produced subject to Respondent's objections.

14.    Respondent's responses to these Document Requests are based upon its present information and understanding. Respondent reserves the right to amend these Document Requests as discovery and its investigation proceed, as new facts come to light, as new facts shed a different light on previously discovered facts, or as the development of the pertinent legal issues alters the perceived significance of known facts.

15.    Respondent reserves the right to supplement its responses to these Document Requests pursuant to 19 C.F.R. § 210.27(c) because its investigation into the subject matter of the Document Requests is ongoing.

3

## RESPONSES TO REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

All documents for which identification is requested in Complainant Microsoft's First Set of Interrogatories to [Alcatel Business Systems][2] served concurrently herewith, or relied on in preparation of, [Alcatel Business Systems]'s responses, including any supplemental response, to Complainant Microsoft's First Set of Interrogatories, First Set of Document Requests, or these Requests for Production.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

---

[2] Pursuant to Microsoft's proposed substitution of Alcatel Business Systems as the named Respondent in this Investigation, Alcatel Business Systems has substituted its name for "Alcatel-Lucent" in these Requests for Admission.

**REQUEST FOR PRODUCTION NO. 2:**

Documents sufficient to determine the organizational structure and personnel of [Alcatel Business Systems] and its relationships to parent, subsidiary, or other affiliate corporations, including, without limitation, research or development units, departments, divisions, or other entities, responsible for each Accused Product.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 3:**

Documents sufficient to identify [Alcatel Business Systems]'s predecessor affiliates, including parent companies, subsidiaries, partnerships, joint ventures, divisions, and shareholders that have engaged in any activities relating to the Accused Products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 4:**

Documents sufficient to identify [Alcatel Business Systems]'s present affiliates, including parent companies, subsidiaries, partnerships, joint ventures, divisions, and shareholders that have engaged in any activities relating to the Accused Products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

(

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 5:**

All minutes, memoranda, notes, or other documents relating to any [Alcatel Business Systems] corporate Board of Director meetings that relate to the Accused Products, Microsoft, any license with Microsoft, any license negotiations or discussions with Microsoft in the Present Investigation, or the Complaint in the Present Investigation,

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 6:**

Documents sufficient to identify each and every Accused Product which has been sold, imported into the United States, sold for importation into the United States, or sold or offered for sale after importation into the United States by or on behalf of Respondent.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 7:**

Documents sufficient to identify each and every product that contains an Accused Product which has been sold, imported into the United States, sold for importation into the United States, or sold or offered for sale after importation into the United States by or on behalf of [Alcatel Business Systems].

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the

8

work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

## REQUEST FOR PRODUCTION NO. 8:

Documents sufficient to identify each and every Accused Product which has been or is committed to being sold, imported into the United States, sold for importation into the United States, or sold or offered for sale after importation into the United States by or on behalf of [Alcatel Business Systems] pursuant to an agreement entered on or about June 2003 with the Kennewick School District in Kennewick, Washington, and documents related to this contract.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 8:

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 9:**

Documents sufficient to identify each and every Accused Product which has been or is committed to being sold, imported into the United States, sold for importation into the United States, or sold or offered for sale after importation into the United States by or on behalf of [Alcatel Business Systems] pursuant to an agreement entered on or about December 2003 with the Clark County School District in Las Vegas, Nevada, and documents related to this contract.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 10:**

Documents sufficient to identify each and every Accused Product which has been or is committed to being sold, imported into the United States, sold for importation into the United States, or sold or offered for sale after importation into the United States by or on behalf of [Alcatel Business Systems] pursuant to an agreement entered on or about November 2006 with the University of Pittsburgh Medical Center in Pittsburgh, Pennsylvania, and documents related to this contract.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 11:**

Documents sufficient to describe and explain the research, design, development, engineering, manufacture, use, testing, or sampling of each Accused Product.

11

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 12:**

All documents including, without limitation, drawings, prototypes, notes, notebooks, workbooks, project reports, correspondence, memoranda, test results, schematics, engineering specifications, CAD files, source code, and simulation files that refer or relate to the structure, function, operation, capabilities, features, design, research, development, testing, or simulation of each and every Accused Product, sold by [Alcatel Business Systems] or its customers.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not

relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 13:**

All documents referring or relating to any modification, improvement, change, or any proposed modification, improvement, or change, in any Accused Product, including attempts to design or re-design products to avoid infringement of the Microsoft Patents.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

13

**REQUEST FOR PRODUCTION NO. 14:**

Documents sufficient to describe or explain [Alcatel Business Systems]'s involvement in the research, development, design, engineering, manufacture, offer for sale, or sale of products sold by Respondent's customers that contain any of the Accused Products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 15:**

All documents including, without limitation, drawings, schematic diagrams, block diagrams and datasheets that refer, reflect, or relate to any product family or technical relationship amongst and between any of the Accused Products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this

request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

## REQUEST FOR PRODUCTION NO. 16:

Documents sufficient to show the manufacture, assembly, or supply of the Accused Products.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 16:

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 17:**

Documents sufficient to identify any additional product necessary for the operation of each Accused Product.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.


**REQUEST FOR PRODUCTION NO. 18:**

One sample of each version of each Accused Product.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

## REQUEST FOR PRODUCTION NO. 19:

All instructions, manuals, brochures, or other guidance information associated with the sale and demonstration of each Accused Product.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 19:

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

## REQUEST FOR PRODUCTION NO. 20:

All contracts or agreements relating to the manufacture, assembly, importation, sales or service of any Accused Product.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

        In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

        Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 21:**

        Documents sufficient to show the quantity, by quarter and in total, the sales prices of each of the Accused Products made, sold or offered for sale by or for [Alcatel Business Systems].

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

        In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

18

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

## REQUEST FOR PRODUCTION NO. 22:

All documents referring or relating to [Alcatel Business Systems]'s commercial exploitation of the Accused Products, including without limitation feasibility studies, marketing plans, marketing forecasts, estimates, projections or reports of market share, periodic research and development reports, management reports and/or other periodic reports, and documents referring or relating to marketing, manufacturing, sampling, efforts to sell, offers for sale, and actual sales.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 22:

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

19

**REQUEST FOR PRODUCTION NO. 23:**

All documents referring or relating to any comparison between any Accused Product with the technology or products of any other manufacturers.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 24:**

All documents that relate to or constitute advertising or marketing of the Accused Products, including but not limited to: all descriptive or promotional materials concerning each of the Accused Products and products containing same made, offered for sale or sold by or for [Alcatel Business Systems], press releases and trade journal articles describing the Accused Products, advertisements, catalogs, materials prepared for use in trade meetings and conventions, package inserts, technical data sheets, specifications, price lists, sales presentations to customers or potential customers and any other materials promoting or describing such products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 25:**

All documents that are or have been included with the sale of Accused Products including, without limitation, instruction materials, brochures, product manuals, user manuals, data sheets, installation manuals, retail kits, diagnostic software, installation software, or specifications.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

## REQUEST FOR PRODUCTION NO. 26:

All documents discussing or making reference to the quality, value, acceptability, workability, performance or benefits of the Accused Products and products containing same, including communications with customers praising, criticizing, or otherwise commenting on the Accused Products.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 26:

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

## REQUEST FOR PRODUCTION NO. 27:

All technical articles, conference papers, or technical or marketing presentations which refer or relate to the Accused Products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 28:**

All documents referring or relating to any failures, problems with or complaints about any of the Accused Products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 28:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 29:**

All forecasts or projections concerning the marketing, importing, exporting, offering for sale, and sale of the Accused Products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 30:**

All business plans including, but not limited to, strategic plans, operating plans, marketing plans, financial plans, production plans, sales plans and capital or investment plans referring or relating to the Accused Products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 31:**

Documents sufficient to identify each potential customer, actual customer, purchaser, reseller, and distributor of the Accused Products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 31:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 32:**

All documents relating to how [Alcatel Business Systems]'s customers, purchasers, resellers and distributors of the Accused Products use each Accused Product, including whether they incorporate or have incorporated the Accused Products into products containing same, and whether they import or sell for importation Accused Products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 32:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 33:**

All documents referring to, relating to or constituting patents, publications, written descriptions or other prior art references of which you are aware that concern, disclose,

26

describe or claim any invention disclosed, described or claimed in the Microsoft Patents, or any product embodying or using any invention disclosed, described or claimed in the Microsoft Patents.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 33:

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

## REQUEST FOR PRODUCTION NO. 34:

All documents referring or relating to any document, reference or activity alleged by anyone to be prior art to the Microsoft Patents, or to affect the validity, enforceability, or scope of the Microsoft Patents.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 34:

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not

relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 35:**

All documents referring or relating to knowledge or use by others of any invention disclosed, described or claimed in the Microsoft Patents.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 35:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 36:**

All documents referring or relating to the sale or offer for sale of any product on which you rely as prior art that allegedly embodies or uses any invention disclosed, described or

claimed in the Microsoft Patents, including without limitation all advertising, sales, promotional and technical materials related to such offer or sale.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 36:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 37:**

All documents that refer or relate to the public use or prior invention of any product on which you rely as allegedly embodying or using any invention disclosed, described or claimed in the Microsoft Patents and rendering that patent invalid or unenforceable.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 37:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not

relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

## REQUEST FOR PRODUCTION NO. 38:

All documents allegedly referring or relating to the making in this or another country of any invention disclosed, described or claimed in the Microsoft Patents, by one who had not abandoned, suppressed or concealed it, that you contend render the Microsoft Patents invalid or unenforceable.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 38:

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 39:**

All documents that [Alcatel Business Systems] contends either alone or in combination anticipate or render obvious or in any other way render the Microsoft Patents invalid or unenforceable.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 39:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 40:**

All documents referring to or relating to any prior art reference or potential prior art reference located or reviewed by or cited to [Alcatel Business Systems] during any study or search of domestic or foreign patents, literature or other published materials relating in any manner to the Microsoft Patents, including without limitation any study, search or analysis to determine the patentability, the validity, enforceability or enforceable scope of any of the claims of the Microsoft Patents.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 40:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 41:**

All articles, including without limitation internal technical memoranda, published by any of your employees that relate to the subject matter described, disclosed or claimed in the Microsoft Patents.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 41:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 42:**

All documents referring or relating to any license covering [Alcatel Business Systems]'s alleged rights to make, use, or sell the Accused Products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 42:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 43:**

All communications, documents and things, negotiations, and licenses relating to Microsoft and the Accused Products.

33

**RESPONSE TO REQUEST FOR PRODUCTION NO. 43:**

        In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

        Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 44:**

        All documents and things relating to any negotiations, discussions, or other communications between [Alcatel Business Systems] and Microsoft regarding any intellectual property matter that covers the Accused Products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 44:**

        In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 45:**

All communications, documents, and things relating to the scope or meaning or coverage of any license between [Alcatel Business Systems] and Microsoft that involve unified communication systems or the Accused Products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 45:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 46:**

Documents sufficient to identify all people involved in any communication, negotiation or licensing of any [Alcatel Business Systems] intellectual property to Microsoft.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 46:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 47:**

Documents sufficient to reflect [Alcatel Business Systems]'s licensing policies, goals, initiatives, or practices.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 47:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 48:**

All documents referring or relating to the distribution, re-sale, or licensing of the Accused Products, including documents relating to all distributors, re-sellers, manufacturing and/or warehousing facilities, and product distribution outlets.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 48:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 49:**

All documents referring or relating to those responsible for importing and shipping the Accused Products, and identifying who owns title to such Accused Products prior to, during, and after each importation or shipment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 49:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 50:**

All documents referring or relating to when and how [Alcatel Business Systems] first became aware of the Microsoft Patents.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 50:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 51:**

All documents referring or relating to any consideration given by [Alcatel Business Systems] to any possible liability for patent infringement should Respondent commence or continue to make, use, distribute or sell the Accused Products, including without limitation any legal advice sought or received and any analysis of any [Alcatel Business Systems] products for potential or actual infringement of the Microsoft Patents.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 51:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 52:**

All documents including, but not limited to, opinions and advice of counsel referring or relating to the infringement or non-infringement, validity or invalidity, enforceability or unenforceability, or interpretation of the scope of the claims of the Microsoft Patents and any related United States or foreign applications and/or patents.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 52:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 53:**

All documents referring or relating to any evaluation, analysis, review, monitoring, testing, prior art search or investigation of the Microsoft Patents including, but not limited to, documents relating to whether any [Alcatel Business Systems] product does or does not infringe any claim of the Microsoft Patents either literally or under the doctrine of equivalents.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 53:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 54:**

All documents referring or relating to the Microsoft Patents, [Alcatel Business Systems]'s evaluation of Microsoft as, for example, a potential business partner, or any of Microsoft's unified communications systems.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 54:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 55:**

All documents relating to any meeting, discussion, or communication with Microsoft, any third party, or any non-party concerning any of the Microsoft Patents, or any patents related to the Microsoft Patent, or the subject matter of the claims thereof

**RESPONSE TO REQUEST FOR PRODUCTION NO. 55:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 56:**

All documents relating to any meeting, discussion, or communication between [Alcatel Business Systems] and any third party (including, without limitation, any competitors or

customers of [Alcatel Business Systems] or Microsoft) concerning [Alcatel Business Systems]'s infringement of any Microsoft Patents.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 56:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 57:**

All documents referring or relating to any affirmative defenses that [Alcatel Business Systems] intends to assert in this Investigation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 57:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

43

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 58:**

Documents sufficient to describe [Alcatel Business Systems]'s document retention, management, and/or destruction policies, including those with respect to e-mail, from 1998 to present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 58:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 59:**

All documents and things, not produced in response to another request, you seek to introduce into evidence at the hearing in the Present Investigation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 59:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 60:**

All documents and things, not produced in response to another request, shown to any expert or fact witness in connection with the Present Investigation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 60:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 61:**

All documents and things, not produced in response to another request, relied upon or referred to in preparing the Response to the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 61:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

**REQUEST FOR PRODUCTION NO. 62:**

An documents and things, not produced in response to another request, referring or relating to any Accused Products, including any correspondence, manuals, brochures, memoranda, notes, meeting minutes, presentations, and e-mails.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 62:**

In addition to the General Objections, Respondent further objects to this Request to the extent that it seeks material protected from disclosure by the attorney-client privilege, the work-product doctrine, and/or the common interest doctrine. Respondent further objects to this request on the grounds that it is vague and ambiguous, that it seeks information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to discovery of admissible evidence, and that it is overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Respondent will produce any responsive, non-privileged documents in its possession, custody or control that are located after a reasonable search.

Respectfully submitted,

Dated: April 23, 2007

_Attorneys for Respondent_

Steven C. Cherny, Esq.
LATHAM & WATKINS, LLP
885 Third Avenue, Ste. 1000
New York, NY 10022-4834
Telephone:  (212) 906-1345
Facsimile:  (212) 751-4864

David A. Nelson, Esq.
Sasha D. Mayergoyz, Esq.
Peter N. Moore, Esq.
LATHAM & WATKINS, LLP
233 South Wacker Drive, Ste. 5800
Chicago, IL 60606-6306
Telephone:  (312) 876-7716
Facsimile:  (312) 993-9767

David M. Farnum, Esq.
LATHAM & WATKINS, LLP
555 Eleventh Street, NW, Ste. 1000
Washington, D.C. 20004-1304
Telephone:  (202) 637-2232
Facsimile:  (202) 637-2201

Renny Hwang, Esq.
LATHAM & WATKINS, LLP
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071-2007
Telephone:  (213) 891-7973
Facsimile:  (213) 891-8763

**Certain Unified Communication Systems,**                                   Inv. 337-TA-598
**Products Used With Such Systems, and**
**Components Thereof**

## CERTIFICATE OF SERVICE

I, David M. Farnum, Esq., hereby certify that on April 23, 2007, I caused to be

served true and correct copies of the foregoing document on the parties listed below as indicated:

| | |
|---|---|
| The Honorable Paul J. Luckern<br>Administrative Law Judge<br>U.S. International Trade Commission<br>500 E. Street, S.W., Room 317<br>Washington, D.C. 20436 | ☐ Via First Class Mail<br>☒ Via Hand Delivery<br>☐ Via Overnight Courier<br>☐ Via Facsimile<br>☐ Via Electronic Mail |
| David H. Hollander, Esquire<br>Office of Unfair Import Investigations<br>U.S. International Trade Commission<br>500 E. Street, S.W., Room 401<br>Washington, DC 20436 | ☐ Via First Class Mail<br>☒ Via Hand Delivery<br>☐ Via Overnight Courier<br>☐ Via Facsimile<br>☐ Via Electronic Mail |
| *Counsel for Microsoft Corporation*: | |
| Joseph V. Colaianni, Jr., Esquire<br>Ahmed J. Davis, Esquire<br>Jeffrey R. Whieldon, Esquire<br>Rama G. Elluru, Esquire<br>Joshua Pond, Esquire<br>Kate Kelly, Esquire<br>FISH AND RICHARDSON<br>1425 K Street, N.W., Suite 1100<br>Washington, DC 20005 | ☐ Via First Class Mail<br>☒ Via Hand Delivery<br>☐ Via Overnight Courier<br>☐ Via Facsimile<br>☐ Via Electronic Mail |

David M. Farnum, Esq.
LATHAM & WATKINS, LLP
555 Eleventh Street, NW, Ste. 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2232
Facsimile: (202) 637-2201

# Exhibit 4



**Alliance**
TELECOMMUNICATIONS
*DATA, VOICE, FIBER*
*NETWORK INTEGRATORS*

April 20, 2007

Miecom
379 Princeton-Highstown Road
East Windsor, NJ 08512

ATT: Charles McCarthy

   **Re: Proposal No. 6899A: Alcatel OXE**

Dear Charles:

At your request I have put together the pricing for the Alcatel OXE product. You have asked that we provide pricing for the Omni Touch platform with My Phone, My Messaging, My Assistant and My Teamwork for licenses for four users. As you will see in the breakdown, these are all provided in this package. Because of this additional software, I had to increase my labor cost to cover my technician's time to install these packages and train the personnel who will be using them.

I hope the pricing presented in this proposal meets with your approval. I would like to meet with you to go over some of the other products that Alcatel can supply.

**Labor**
Install the OXE phone switch.
Program the phones and trunks.
Install four (4) software packages .
Train an individual on the system.

                                                    **Labor**          **$3,480.00**

**Material**
1    Omni PCX Enterprise package
1    Digital Interface UA/18 board
1    Digital Access PRA-T1 board
1    Analog trunk AP A4 board
1    GSCLI card
1    CLIDSP card
1    MADA3 card
1    MR3 mounting kit
1    Battery 12v/7AH
1    Rack Charger 48v/14AH
1    Rectifier 500w
1    Blind slot stiffener
1    Business IP 10 license
1    By Pass SIP Network link
1    Software Privilege pack
1    4645 Voicemail valve pack of 10 licenses
1    OmniTouch UC integrator
1    Software package of My Phone
1    Software package of My Messaging
1    Software package of My Assistant
1    Software package of My Teamwork



**Alliance**
TELECOMMUNICATIONS
*DATA, VOICE, FIBER*
*NETWORK INTEGRATORS*

Proposal No. 6899A
Miecom/OXE
April 20, 2007
Page 2

Material cont'd.
| | |
|---|---|
| 2 | Alcatel 4019 IP Touch sets (grey) |
| 2 | Alcatel 4019 digital sets |
| 1 | Remote control client CD ROM |
| 1 | OTUC SES Auto renew |

| | |
|---|---|
| **Material** | **$22,907.00** |
| **Total Labor and Material** | **$26,387.00** |

This price does not include NJ Sales Tax.

If you have any questions, please give me a call. My direct line is: 973-287-0171.

Thank you for allowing Alliance Telecommunications to submit this proposal. Again, I look forward to meeting you soon.

Very truly yours,

Richard Knapp

**THIS PROPOSAL IS VALID FOR THIRTY (30) DAYS.**

**PLEASE INDICATE YOUR ACKNOWLEDGEMENT AND ACCEPTANCE OF AND AGREEMENT WITH THE FOREGOING BY SIGNING THIS PROPOSAL BELOW, DATING IT AND RETURNING IT TO ALLIANCE. WE MUST RECEIVE YOUR SIGNED ACCEPTANCE and PURCHASE ORDER BEFORE WORK WILL BEGIN.**

**ACKNOWLEDGED, ACCEPTED AND AGREED BY:**

_Kane Geeuiry_ DATED: _4·27·07_ P.O.# _____

# Exhibit 5

Microsoft ALU ITC
10337-036LL1
See
Lydia Dean-Reese
x7702

# Exhibit 6



FISH & RICHARDSON P.C.

1425 K Street, N.W.
11th Floor
Washington, DC 20005

Rama G. Elluru
*Attorney*

Direct Dial 202 626-6417
Email elluru@fr.com

Telephone 202 783-5070
Facsimile 202 783-2331
www.fr.com

Intellectual Property | Litigation | Corporate

# Exhibit 7

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C. 20436

Before The Honorable Paul J. Luckern
Administrative Law Judge

In the Matter of

CERTAIN UNIFIED COMMUNICATION
SYSTEMS, PRODUCTS USED WITH SUCH
SYSTEMS, AND COMPONENTS THEREOF

Inv. No. 337-TA-598

## DECLARATION OF RAMA G. ELLURU

I, Rama G. Elluru, declare as follows:

1.    I am over the age of majority and under no legal disability. I make this
declaration upon personal knowledge, in support of the Opposition of Microsoft
Corporation ("Microsoft") to Alcatel Business Systems' ("ABS") Motion to
Disqualify Fish & Richardson P.C. as Counsel for Microsoft, to Exclude Jack
Chang as an Expert, and for Other Sanctions.

2.    I am an associate at the Washington, D.C. office of Fish & Richardson P.C. ("F &
R"). I have been practicing at F & R for almost four years. Prior to my work at F
& R, I served as an Attorney Advisor for an Administrative Law Judge at the
International Trade Commission. I also clerked at the United States Court of
Appeals for the Federal Circuit and the Fourth Circuit.

3.    Microsoft requested in discovery that ABS produce a working sample of the
accused OXE system running the OTUC software suite. On April 23, 2007, ABS
objected to this request and said it would produce responsive documents, but did
not agree to provide us with a sample of the accused products.

> Subject to and without waiving the foregoing objections,
> Respondent will produce any responsive, non-privileged
> documents in its possession, custody or control after a reasonable
> search.

*See* Respondent's Objections and Responses to Complainant Microsoft
Corporation's First Set of Documents and Things (Nos. 1-62).

4.    Prior to that time, we had contacted a telecommunications company called
Miercom about acquiring an OXE/OTUC system. Miercom found a third party

reseller that agreed to sell the ABS OXE/OTUC system F & R wanted to buy. Miercom arranged for F & R's purchase of the system for over $26,000, which included equipment, equipment installation and training on the system. I never told anyone at Miercom to make any misstatements whatsoever about who the end purchaser was to the reseller, or to state anything about our intention to buy additional systems.

5.    On April 27, Miercom forwarded me a contract from Alliance Telecommunications ("Alliance") covering the purchase, installation and training for the OXE/OTUC system. In the contract, Richard Knapp of Alliance notes that "I had to increase my labor cost to cover my technician's time to install these packages and train the personnel who will be using them." I was authorized to sign the contract on behalf of F & R. F & R paid Miercom a deposit of one-third the total purchase price, about $9,000 and subsequently paid for the entire purchase price of the OXE/OTUC system. F & R paid for the products using a Fish & Richardson P.C. firm check.

6.    After many delays, Miercom reported to me that the reseller would arrive on Tuesday, June 26 to begin installation of the system and would remain at F & R to completely install the system and provide training on the system.

7.    The technicians arrived to install the system late in the day on Tuesday, June 26. I came out to F & R's reception area which has a large sign that says "Fish & Richardson P.C." to meet them. When I met them, the technicians introduced themselves to me as Dan McGirr and Po Ching Lin. I had to meet them in the reception area so that I could show them to the room where we wanted the system installed. The technicians could not have gone to the room alone because access to the room where they installed the system requires a security badge to unlock entryway doors and a key to the room itself. The OXE/OTUC system was to be installed in one of our case rooms we were using for this investigation.

8.    The door to this room had a clear sign on it in large letters that reads "Microsoft ALU ITC" and next to the door is a plaque that says "Case Room." The shelves inside the room had the same sign on them. I gave Mr. McGirr and Mr. Lin access to this work room and stayed long enough to situate them in the room.

9.    From my conversation with Mr. McGirr and Mr. Lin on that day, I was under the impression that Mr. Lin was a contract engineer for Alliance and other resellers, whose role was to assist resellers in installations of these products. I believed that Mr. McGirr was managing the installation and that Alliance directed Mr. Lin's involvement in the installation.

10.   Before leaving the case room, I gave both Mr. McGirr and Mr. Lin my business card and received a card from each of them. My business card clearly identifies me as an attorney with F & R. I wrote my direct line extension on at least one of my business cards so they could reach me in my office from the room where they

2

1456805.10

were installing the system. They subsequently used this information to call me in my office several times.

11.    Neither Mr. McGirr's nor Mr. Lin's business card indicated that either was an employee of ABS, the respondent in this investigation. Mr. Lin's card indicated that he was an employee of Alcatel-Lucent, an entity I knew specifically not to be a party in this investigation.

12.    As planned, Mr. McGirr and Mr. Lin returned to F & R to continue installing the system on Wednesday, June 27, through Friday, the 29th. I checked on the progress of the installation from time to time during these days. Mr. McGirr and Mr. Lin encountered numerous errors while installing the system, and had to restart the installation process at least once.

13.    At various times during the installation, Mr. McGirr and Mr. Lin showed me and other F & R associates how to operate the system to the best of their ability given that the system was still not fully operational. Our discussions were strictly limited to the functionality of the system (e.g., how a user can use the system to route his calls) and ensuring that we received what we paid for, a fully operational system. Mr. Lin also taught us how to set up, change or add user identification codes and passwords as the administrator of the system. Mr. Lin also gave me the user guides that are provided to customers.

14.    By the afternoon of Friday, June 29, the system was not operating properly. Mr. McGirr and Mr. Linn stated that the system still needed to be "de-bugged' and that some of the features were inoperable (e.g., telephones). Mr. McGirr and Mr. Lin had already booked flights home early that evening. I insisted that, per our contract, the system be completely operable and that we receive the agreed upon training. I never threatened litigation over this issue and was surprised to hear that allegation. Mr. McGirr agreed before they left that Alliance would return to complete the installation and finish training. Although I requested that Alliance assign Mr. Lin to finish the installation, I did so because he had started the installation and was familiar with the problems that were encountered. Otherwise, I did not care who Alliance assigned to return to our offices.

15.    Mr. Lin returned to work on the system on Tuesday, July 3. On that date, our expert, Mr. Jack Chang was in our offices preparing his expert report. When our expert was in the case room or otherwise in the same area as Mr. Lin, Mr. Lin was placed in a conference room so that he could not interfere with our expert's work. Mr. Lin spent a significant part of the day in the conference room. I never spent any time talking to Mr. Lin in the conference room. At no time did Mr. Lin and our expert interact in any way.

16.    I never suggested to Mr. McGirr or Mr. Linn that there was a possibility that this installation could lead to a larger roll-out project. I was surprised by the statements in the Declarations of Arnold Intal, Mr. Lin's supervisor, and Richard Knapp, Mr. McGirr's supervisor, stating that this installation was or had the

3

potential to be the beginning of a roll-out over 29 Fish Richardson offices because (a) I never discussed anything like this with Mr. McGirr and/or Mr. Lin and (b) our firm has only 10 offices total.

17. At no time during the contracting, delivery, or installation of the system, did anyone ask that we treat the OXE/OTUC system or its documentation as confidential. Specifically, the user guides did not have any designation that they were confidential nor did Mr. Lin state that they were confidential.

18. I did not ask Mr. McGirr or Mr. Lin anything about the pending lawsuits or any other questions that would elicit or divulge information protected by the attorney-client privilege or the work product doctrine. I did not ask Mr. McGirr or Mr. Lin anything about Mr. Lin's alleged role in the development or testing of the accused products, nor did I inquire about the past conduct of Mr. Lin or anyone else at ABS associated with ABS products.

19. At no time did either Mr. McGirr or Mr. Lin suggest, imply or state that any information they were providing us was anything but public information. At no time did Mr. McGirr or Mr. Lin indicate to me that any of the questions asked by F & R were outside the ordinary course of his business or called for information that was not routinely provided to its customers.

20. I did not and do not understand Mr. Lin to be employed by ABS. I did not misrepresent my identity, my firm's role in the case, or any other fact to Mr. Lin.

21. At no time was there any intention for Mr. Lin's or Mr. McGirr's basic training on the system to be used as evidence in this case. Our expert, Mr. Chang, did not rely on any information from Mr. Lin, but instead tested the products for himself. Indeed, Mr. Chang spent several days testing the system. He observed that the installation was done very poorly, and that the system is "still very buggy." The OXE/OTUC system completely crashed several times since July 3. We repeatedly called Alliance for assistance in restoring the system, but that was unsuccessful. Based on OXE/OTUC system configuration information retrieved from the web, however, we were able to restore the system.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Rama G. Elluru

Executed this ___//___ day of September 2007.

4

## CERTIFICATE OF SERVICE

It is hereby certified that copies of the foregoing **DECLARATION OF RAMA**

**G. ELLURU** was served on this 11th day of September, 2007 as follows:

| | |
|---|---|
| Marilyn R. Abbott<br>Secretary<br>U.S. International Trade Commission<br>500 E Street, S.W.<br>Washington, D.C. 20436 | Via Hand Delivery<br>(Original + 6) |
| The Honorable Paul J. Luckern<br>Administrative Law Judge<br>U.S. International Trade Commission<br>500 E Street, S.W., Suite 317<br>Washington, D.C. 20436 | Via Hand Delivery<br>(Two Copies) |
| David Lloyd, Esq.<br>U.S. International Trade Commission<br>Office of Unfair Import Investigations<br>500 E Street, S.W., Room 401<br>Washington, D.C. 20436<br>david.lloyd@usitc.gov | E-mail and Hand Delivery |
| David A. Nelson, Esq.<br>Latham & Watkins LLP<br>233 South Wacker Drive, Ste 5800<br>Chicago, IL 60606-6306<br>david.nelson@lw.com | E-mail and Overnight |
| Sasha D. Mayergoyz, Esq<br>Peter N. Moore, Esq.<br>Latham & Watkins LLP<br>233 South Wacker Drive, Ste 5800<br>Chicago, IL 606-6306<br>sasha.mayergoyz@lw.com<br>peter.moore@lw.com | E-mail |

Steven C. Cherny, Esq.                                    E-mail
Clement Naples, Esq.
Latham & Watkins LLP
885 Third Avenue, Ste 1000
New York, NY 10022-4834
steven.cherny@lw.com
clement.naples@lw.com

Renny Hwang, Esq.                                         E-mail
Latham & Watkins LLP
633 West Fifth Street, Ste 4000
Los Angeles, CA 90071-2007
renny.hwang@lw.com

David M. Farnum                                           E-mail
Latham & Watkins LLP
555 Eleventh Street, NW, Ste 1000
Washington, D.C. 20004-1304
david.farnum@lw.com

F. David Foster                                           E-mail and Hand delivery
Miller & Chevalier Chartered
655 Fifteenth Street, N.W.
Washington, D.C. 20005
dfoster@milchev.com

James B. Altman                                           E-mail
Kelly Busby
Miller & Chevalier Chartered
655 Fifteenth Street, N.W.
Washington, D.C. 20005
jaltman@milchev.com
kbusby@milchev.com


_____
Judith Best

40423747.doc

# Exhibit 8

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C. 20436

Before The Honorable Paul J. Luckern
Administrative Law Judge

---

In the Matter of

CERTAIN UNIFIED COMMUNICATION
SYSTEMS, PRODUCTS USED WITH SUCH
SYSTEMS, AND COMPONENTS THEREOF

Inv. No. 337-TA-598

---

## DECLARATION OF JOSHUA POND

I, Joshua Pond, declare as follows:

1.    I am over the age of majority and under no legal disability.  I make this
declaration upon personal knowledge, in support of the Opposition of Microsoft
Corporation to Alcatel Business Systems' Motion to Disqualify Fish &
Richardson P.C. as Counsel for Microsoft, to Exclude Jack Chang as an Expert,
and for Other Sanctions.

2.    I am an associate at the Washington, D.C. office of Fish & Richardson P.C.
("F&R").

3.    F&R represents plaintiff Microsoft Corporation ("Microsoft"), in litigation styled
*In the Matter of Certain Unified Communications Systems, Products Used With
Such Systems, and Components Thereof* before the ITC and in a corresponding
case styled *Microsoft Corporation v. Alcatel Business Systems et al.* in the United
States District Court for the District of Delaware.  In these proceedings, Microsoft
contends that Alcatel Business Systems ("ABS") is infringing U.S. Patent Nos.
6,430,289; 6,421,439; 6,263,064; and 6,728,357.  The accused ABS systems
include the OmniPCX Enterprise ("OXE") and OmniTouch Unified
Communication software suite ("OTUC").  I am one of the attorneys representing
Microsoft in these lawsuits.

4.    Dan McGirr and Po Ching Lin arrived at F&R's D.C. office late on the 26th of
June, 2007, to begin installing an OXE/OTUC system.  They returned on
Wednesday the 27th, Thursday the 28th and Friday the 29th.  During this time, I
introduced myself and met with them intermittently to check on their progress in
installing and configuring the system.

5.    At various times during their last two days at F&R, Mr. McGirr and Mr. Lin
demonstrated the system's functions to me and to Ms. Rama Elluru.  We asked
questions about administering and using the system and components.  Mr. Lin and
Mr. McGirr answered our questions, and also explained to us how to set up,

change or add user identification codes and passwords as administrators of the system.

6.    On Friday the 29th, when the installation was supposed to be complete, Ms. Elluru and I met with Mr. Lin and Mr. McGirr for further demonstration and instruction in the set up and use of the system. At this time, it became clear that the installation had not been completed – for example, the telephones were not working properly – and the system needed further de-bugging, requiring that installation and training personnel return to the office the following week to complete this work.

7.    I saw Mr. Lin again on Tuesday, July 3, when he came back to complete the installation and training of the system.

8.    I never told anyone that F&R planned to install the ABS system in 29 of F&R's offices or that 29 office managers from all over the country were coming to Washington, D.C. to observe and use the ABS system.

9.    I did not ask Mr.Lin about the pending lawsuits or any other questions that would elicit information protected by the attorney-client privilege or the work product doctrine. My questions were related to the contracted installation and training.

10.    At no time did either Mr. McGirr or Mr. Lin suggest, imply or state that any information they were providing us was anything but public information. At no time did Mr. McGirr or Mr. Lin indicate to me that any of the questions asked by F&R were outside the ordinary course of his business or called for information that was not routinely provided to its customers.

11.    I did not and do not understand Mr. Lin to be employed by ABS. I did not misrepresent my identity, my firm's role in the case, or any other fact to Mr. Lin.

12.    At no time was there any intention for Mr. Lin's or Mr. McGirr's basic training on the system to be used as evidence in this case. Our expert, Mr. Chang, did not rely on any information from Mr. Lin, but instead tested the products for himself. Indeed, Mr. Chang spent several days testing the system. The OXE/OTUC system completely crashed several times since July 3. We repeatedly called Alliance for assistance in restoring the system, but that was unsuccessful. Based on OXE/OTUC system configuration information retrieved from the web, however, we were able to restore the system.

2

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Joshua Pond

Executed this __11th__ day of September 2007.

3

1466939.3

## CERTIFICATE OF SERVICE

It is hereby certified that copies of the foregoing **DECLARATION OF**

**JOSHUA A. POND** was served on this 11th day of  September, 2007 as follows:

| | |
|---|---|
| Marilyn R. Abbott<br>Secretary<br>U.S. International Trade Commission<br>500 E Street, S.W.<br>Washington, D.C. 20436 | Via Hand Delivery<br>(Original + 6) |
| The Honorable Paul J. Luckern<br>Administrative Law Judge<br>U.S. International Trade Commission<br>500 E Street, S.W., Suite 317<br>Washington, D.C. 20436 | Via Hand Delivery<br>(Two Copies) |
| David Lloyd, Esq.<br>U.S. International Trade Commission<br>Office of Unfair Import Investigations<br>500 E Street, S.W., Room 401<br>Washington, D.C. 20436<br>david.lloyd@usitc.gov | E-mail and Hand Delivery |
| David A. Nelson, Esq.<br>Latham & Watkins LLP<br>233 South Wacker Drive, Ste 5800<br>Chicago, IL 60606-6306<br>david.nelson@lw.com | E-mail and Overnight |
| Sasha D. Mayergoyz, Esq<br>Peter N. Moore, Esq.<br>Latham & Watkins LLP<br>233 South Wacker Drive, Ste 5800<br>Chicago, IL 606-6306<br>sasha.mayergoyz@lw.com<br>peter.moore@lw.com | E-mail |

Steven C. Cherny, Esq.                              E-mail
Clement Naples, Esq.
Latham & Watkins LLP
885 Third Avenue, Ste 1000
New York, NY 10022-4834
steven.cherny@lw.com
clement.naples@lw.com

Renny Hwang, Esq.                                  E-mail
Latham & Watkins LLP
633 West Fifth Street, Ste 4000
Los Angeles, CA 90071-2007
renny.hwang@lw.com

David M. Farnum                                    E-mail
Latham & Watkins LLP
555 Eleventh Street, NW, Ste 1000
Washington, D.C. 20004-1304
david.farnum@lw.com

F. David Foster                            E-mail and Hand delivery
Miller & Chevalier Chartered
655 Fifteenth Street, N.W.
Washington, D.C. 20005
dfoster@milchev.com

James B. Altman                                    E-mail
Kelly Busby
Miller & Chevalier Chartered
655 Fifteenth Street, N.W.
Washington, D.C. 20005
jaltman@milchev.com
kbusby@milchev.com

Judith Best

40423747.doc

# Exhibit 9

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C. 20436

**Before The Honorable Paul J. Luckern**
**Administrative Law Judge**

| | |
|---|---|
| In the Matter of<br><br>CERTAIN UNIFIED COMMUNICATION SYSTEMS, PRODUCTS USED WITH SUCH SYSTEMS, AND COMPONENTS THEREOF | Inv. No. 337-TA-598 |

## DECLARATION OF AHMED J. DAVIS

I, Ahmed J. Davis, declare as follows:

1.    I am over the age of majority and under no legal disability. I make this declaration upon personal knowledge, in support of the Opposition of Microsoft Corporation to Alcatel Business Systems' Motion to Disqualify Fish & Richardson P.C. as Counsel for Microsoft, to Exclude Jack Chang as an Expert, and for Other Sanctions.

2.    I am an attorney and a principal at the Washington, D.C. office of Fish & Richardson P.C. ("F&R").

3.    F&R represents plaintiff Microsoft Corporation ("Microsoft"), in litigation styled *In the Matter of Certain Unified Communications Systems, Products Used With Such Systems, and Components Thereof* before the ITC and in a corresponding case styled *Microsoft Corporation v. Alcatel Business Systems et al.* in the United States District Court for the District of Delaware. In these proceedings, Microsoft contends that Alcatel Business Systems ("ABS") is infringing U.S. Patent Nos. 6,430,289; 6,421,439; 6,263,064; and 6,728,357. The accused ABS systems include the OmniPCX Enterprise ("OXE") and OmniTouch Unified Communication software suite ("OTUC"). I am one of the attorneys representing Microsoft in these lawsuits.

4.    I understand that F&R arranged to purchase its own OXE/OTUC system from an independent reseller, Alliance Telecommunications ("Alliance") through Miercom. I personally had no contact with anyone at Alliance or Miercom.

5.    I have reviewed the Declaration of Mr. Po Ching Lin. I am certain that I did not meet or speak with Mr. Lin, notwithstanding the assertion in his declaration that

1459878.7

he "met with" me while installing the OXE/OTUC system at F&R's Washington, D.C. office. *See* Lin Decl. at ¶ 28. In fact, I was out of the office for most, if not all, of the time that Mr. Lin was on the premises at F&R.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Ahmed J. Davis

Executed this _____ day of September 2007.

2

1459878.7

## **CERTIFICATE OF SERVICE**

It is hereby certified that copies of the foregoing **DECLARATION OF AHMED**

**J. DAVIS** was served on this 11th day of September, 2007 as follows:

| | |
|---|---|
| Marilyn R. Abbott<br>Secretary<br>U.S. International Trade Commission<br>500 E Street, S.W.<br>Washington, D.C. 20436 | Via Hand Delivery<br>(Original + 6) |
| The Honorable Paul J. Luckern<br>Administrative Law Judge<br>U.S. International Trade Commission<br>500 E Street, S.W., Suite 317<br>Washington, D.C. 20436 | Via Hand Delivery<br>(Two Copies) |
| David Lloyd, Esq.<br>U.S. International Trade Commission<br>Office of Unfair Import Investigations<br>500 E Street, S.W., Room 401<br>Washington, D.C. 20436<br>david.lloyd@usitc.gov | E-mail and Hand Delivery |
| David A. Nelson, Esq.<br>Latham & Watkins LLP<br>233 South Wacker Drive, Ste 5800<br>Chicago, IL 60606-6306<br>david.nelson@lw.com | E-mail and Overnight |
| Sasha D. Mayergoyz, Esq<br>Peter N. Moore, Esq.<br>Latham & Watkins LLP<br>233 South Wacker Drive, Ste 5800<br>Chicago, IL 606-6306<br>sasha.mayergoyz@lw.com<br>peter.moore@lw.com | E-mail |

Steven C. Cherny, Esq.                          E-mail
Clement Naples, Esq.
Latham & Watkins LLP
885 Third Avenue, Ste 1000
New York, NY 10022-4834
steven.cherny@lw.com
clement.naples@lw.com

Renny Hwang, Esq.                               E-mail
Latham & Watkins LLP
633 West Fifth Street, Ste 4000
Los Angeles, CA 90071-2007
renny.hwang@lw.com

David M. Farnum                                 E-mail
Latham & Watkins LLP
555 Eleventh Street, NW, Ste 1000
Washington, D.C. 20004-1304
david.farnum@lw.com

F. David Foster                                 E-mail and Hand delivery
Miller & Chevalier Chartered
655 Fifteenth Street, N.W.
Washington, D.C. 20005
dfoster@milchev.com

James B. Altman                                 E-mail
Kelly Busby
Miller & Chevalier Chartered
655 Fifteenth Street, N.W.
Washington, D.C. 20005
jaltman@milchev.com
kbusby@milchev.com


_____
Judith Best

40423747.doc

# Exhibit 10

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C. 20436

Before The Honorable Paul J. Luckern
Administrative Law Judge

In the Matter of

CERTAIN UNIFIED COMMUNICATION
SYSTEMS, PRODUCTS USED WITH SUCH
SYSTEMS, AND COMPONENTS THEREOF

Inv. No. 337-TA-598

## DECLARATION OF PROFESSOR BRUCE A. GREEN

I, Bruce A. Green, declare:

1.      I am the Stein Professor at Fordham University School of Law, where I direct the

Louis Stein Center for Law and Ethics.  I have been retained on behalf of the law firm of Fish &

Richardson P.C. to render objective expert opinions in connection with Alcatel Business

Systems' ("ABS") motion to disqualify the firm and for other sanctions in the captioned

proceeding and in a related lawsuit before the U.S. District Court for the District of Delaware

entitled *Microsoft Corporation v. Alcatel Business Systems.*  The federal district court in

Delaware has adopted the ABA Model Rules of Professional Conduct ("ABA Model Rules").[1]  I

---

[1] District of Delaware Local Rule 83.6(d) ("Standards for Professional Conduct. Subject to such modifications as
may be required or permitted by federal statute, court rule, or decision, all attorneys admitted or authorized to
practice before this Court, including attorneys admitted on motion or otherwise, shall be governed by the Model
Rules of Professional Conduct of the American Bar Association ("Model Rules"), as amended from time to time.")
This rule went into effect on June 30, 2007.  The previous version of the rule (83.6(d)(2)) stated, "Acts or omissions
by an attorney admitted to practice before this Court, individually or in concert with any other person or persons,
which violate the Model Rules of Professional Conduct of the American Bar Association, subject to such
modifications as may be required or permitted by Federal statute, court rule or decision of law, shall constitute

1

have been advised that the International Trade Commission ("ITC") likewise considers the ABA

Model Rules in motions to disqualify counsel. I have therefore been asked to express opinions

regarding the meaning and application of the ABA Model Rules. In doing so, I have looked for

guidance to decisions interpreting and applying analogous and identically worded provisions.

My conclusion is that, under the ABA Model Rules and relevant decisions, Fish & Richardson

has not engaged in professional misconduct and therefore neither disqualification nor other

sanctions are warranted. I discuss my reasoning below.

## **QUALIFICATIONS**

2.       A copy of my full curriculum vita is attached as Exhibit A, and I will outline only

certain qualifications here. Since 1987, I have been a member of the full-time faculty of

Fordham University School of Law. I previously served as a law clerk to Judge James L. Oakes

of the U.S. Court of Appeals for the Second Circuit, as a law clerk to Justice Thurgood Marshall

of the U.S. Supreme Court, and as an Assistant United States Attorney for the Southern District

of New York.

3.       I have regularly taught courses in the area of legal ethics at Fordham and

elsewhere since 1987, I speak frequently at CLE programs on the subject of legal ethics, and I

have authored a variety of scholarly articles and other writings in the area of legal ethics. Among

the subjects on which I have spoken and written are the conduct of litigators in gathering

evidence through informal processes.

4.       Additionally, I have occasionally provided expert opinions in the context of

litigation in which the applicable standards of professional conduct are disputed. I have

---

misconduct and be grounds for discipline, whether or not the act or omission occurred in the course of an attorney-

addressed, among other things, questions relating to the application of ABA Model Rule 4.2 and equivalent provisions and related questions concerning informal evidence gathering in litigation. These have included a submission in *Apple Corps Ltd. v. Int'l Collectors Soc'y*, 15 F. Supp. 2d 456 (D.N.J. 1998), addressing a claim similar to the one made here, namely, that a law firm allegedly obtained evidence through the use of impermissible deceit and impermissible communications with employees of a represented company. My conclusion that no improprieties occurred in that case, and my reasoning were adopted by the District Court. My reasoning was subsequently referred to and agreed with by the District Court in *Gidatex v. Campaniello Imps, Ltd.*, 82 F. Supp.2d 119 (S.D.N.Y. 1999).

5.     I have engaged in various other professional activities relating to legal ethics. On the state and local level, I currently serve as a member and past chair of the New York State Bar Association's Committee on Professional Ethics, which issues opinions interpreting the New York Code of Professional Responsibility ("New York Code"). I am also a current member of the New York State Bar Association's Committee on Standards of Attorney Conduct, which has been engaged in the multi-year project of reviewing the New York Code and proposing comprehensive revisions. I previously served as a member of the Departmental Disciplinary Committee of the New York State Supreme Court, Appellate Division, First Department, and as a member of the Committee on Professional and Judicial Ethics of the Association of the Bar of the City of New York.

6.     Nationally, I serve as a member of the Multistate Professional Responsibility Examination drafting committee, and I co-chair the ABA Criminal Justice Section's Committee

---

client relationship."

3

on Ethics, Gideon and Professionalism. I have previously served as chair of the ABA Litigation

Section's Committee on Ethics and Professionalism, as a member of the ABA Litigation

Section's Task Force on Settlement Ethics, as reporter to the ABA Commission on

Multijurisdictional Practice, and as chair of the Section on Professional Responsibility of the

Association of American Law Schools.

     7.     I render opinions in my individual capacity and do not speak on behalf of any of

the above-listed entities or other entities with which I have worked.

## RELEVANT FACTS

     8.     For purposes of rendering an opinion, I have received and reviewed:

         a)  The public version of the Brief in Support of Alcatel Business Systems'

            Motion To Disqualify Fish & Richardson P.C. as Counsel for Microsoft, to

            Exclude Jack Chang as an Expert, and for Other Sanctions, and the non-

            confidential exhibits filed in the above-captioned case on August 31, 2007, as

            well as the declarations of Po Ching Lin, Arnold Intal, and Jason Amiss that

            were appended to the Brief;

         b)  The declarations of: (i) Rama G. Elluru; (ii) Ahmed J. Davis; and (iii) Joshua

            Pond, all attorneys at F&R; and

         c)  A summary of facts the truth of which I have been asked to assume.

     9.     I understand that the relevant facts are likely to be disputed to some extent. For

purposes of rendering an opinion, I have been provided the facts set forth in Exhibit B and have

been asked to assume their accuracy.

4

## DISCUSSION

10.     ABS argues that Fish & Richardson engaged in sanctionable misconduct by purchasing certain products and accompanying services from ABS without seeking prior permission from ABS's counsel or disclosing that its motivation was to obtain information relating to its representation of Microsoft in a lawsuit against ABS. As discussed below, my opinion is that no rules were violated and no misconduct occurred.

### *Rule 4.2 does not apply*

11.     As a general matter, rules of professional conduct and judicial decisions impose certain limits on the means by which lawyers may gather information outside the formal discovery process. For example, ABA Model Rule 4.2, on which ABS primarily relies, restricts communications with represented persons. But, the rules and opinions do not categorically restrict informal means of gathering evidence for a lawsuit. On the contrary, courts and commentators throughout the United States recognize that informal evidence-gathering may be preferable to depositions and other formal discovery for various reasons, including that it may be less costly, more efficient, and more effective in obtaining truthful information, and that the rules of professional conduct regulating lawyers' conduct in litigation should be interpreted accordingly. For example, in *Niesig v. Team I*, 558 N.E.2d 493, 1034 (N.Y. 1990), which addressed New York's restriction on communications with represented parties (its analogue to ABA Model Rule 4.2), the Court recognized that too broad a restriction on communications with an opposing party's employees "closes off avenues of informal discovery of information that may serve both the litigants and the entire justice system by uncovering relevant facts, thus promoting the expeditious resolution of disputes. Foreclosing all direct, informal interviews of employees

5

of the corporate party unnecessarily sacrifices the long-recognized potential value of such

sessions . . .. Costly formal depositions that may deter litigants with limited resources, or even

somewhat less formal and costly interviews attended by adversary counsel, are no substitute for

such off-the-record private efforts to learn and assemble, rather than perpetuate, information."

*See also International Business Machs. Corp. v. Edelstein*, 526 F.2d 37, 41 (2d Cir.1975).

      12.     ABA Model Rule 4.2 makes plain that it does not generally restrict interviews and

other communications with the employees of a represented corporation.  The rule itself provides:

"In representing a client, a lawyer shall not communicate about the subject of the representation

with a person the lawyer knows to be represented by another lawyer in the matter, unless the

lawyer has the consent of the other lawyer or is authorized to do so by law or court order."  Prior

to 2002, when the ABA comprehensively amended its Model Rules of Professional Conduct,

there was considerable disagreement among state courts and ethics committees about how the

rule applied when the represented party was an entity, not an individual.  Some authorities held

that the rule restricted communications with all employees of the entity, others held that

communications were forbidden only with the small number of corporate officers who were

members of its "control group," and others adopted tests that were somewhere in between.  The

ABA resolved this disagreement, as far as its Model Rules are concerned, by  amending the

relevant Comment to Rule 4.2.  Comment [7] now provides in relevant part:

> In the case of a represented organization, this Rule prohibits communications with
> a constituent of the organization who supervises, directs or regularly consults with
> the organization's lawyer concerning the matter or has authority to obligate the
> organization with respect to the matter or whose act or omission in connection
> with the matter may be imputed to the organization for purposes of civil or
> criminal liability.

The ABA's intention was explicitly to reject a broader proposal which might have "been read to prohibit communication with anyone whose testimony would be admissible against the organization as an exception to the hearsay rule." Annotated Model Rules of Professional Conduct 400 (6th ed. 2007), *citing* American Bar Association, *A Legislative History: The Development of the ABA Model Rules of Professional Conduct, 1982-2005*, at 542 (2006). *See also Paris v. Union Pac. R.R. Co.*, 450 F. Supp. 2d 913, 915 (E.D. Ark. 2006) (stating that Comment [7] was designed to narrow the scope of the rule to permit contact with employees even if their statements might be admissible against their employer).

13.      Here, it appears that Po Ching Lin, the engineer sent to install ABS's phone system and to train its customer in the use of the system, was not employed by a company that is represented in this matter, and Rule 4.2 therefore does not apply to him. According to his declaration, Mr. Lin works for Alcatel USA, which is not a party to this case, although it is a sister subsidiary to the defendant, ABS. The fact that one member of a corporate family is represented by counsel does not mean that other members of the same corporate family are also represented for purposes of Rule 4.2. *See* ABA Model Rule 1.7, Comment [34] ("A lawyer who represents a corporation or other organization does not, by virtue of that representation, necessarily represent any constituent or affiliated organization, such as a parent or subsidiary."). Further, given that Mr. Lin was not its employee, it seems doubtful that ABS should be regarded as having "standing" to complain about Fish & Richardson's interactions with him or as having itself suffered the kinds of harm that might (if wrongdoing in fact occurred) justify the remedies it seeks.

14.      But even if Mr. Lin had been employed by Alcatel Business Systems, the

7

defendant represented in this litigation by Latham & Watkins, Rule 4.2 would not forbid communications with him unless he was (1) an officer or employee of ABS who "supervises, directs or regularly consults with" ABS's lawyers concerning the litigation, (2) an officer or employee with "authority to obligate [ABS] with respect to" the litigation, or (3) an officer or employee "whose act or omission in connection with the [litigation] may be imputed to [ABS] for purposes of civil or criminal liability." Based on ABS's own submissions, Mr. Lin does not fit into any of these three categories. Further, the rule, by its terms, would have applied only if Fish & Richardson's lawyers *knew* that Mr. Lin fit into one of these categories. The submissions suggest no reason to think that Fish & Richardson's lawyers knew or reasonably should have known that as a "senior professional services engineer" sent to install and explain ABS's system, Mr. Lin either was consulting with ABS's counsel in the litigation, had authority to settle the litigation, or had previously engaged in acts that were imputed to ABS in the litigation.

15.     There is no suggestion anywhere that Mr. Lin had any dealings with ABS's lawyers in this litigation or that he engaged in any previous acts or omissions that are in issue in the litigation. ABS appears to rely solely on the second of the three prongs of the above-quoted test, which it misconstrues. ABS submits: "[A]n employee is 'represented' if, for example, his or her statement may constitute an admission on the part of an organization." ABS's Brief at p. 18. ABS refers to a 1995 ABA opinion (pre-dating the adoption of Comment [7]) that stated that Rule 4.2 applies to an employee "who may legally bind the organization with respect to the matter in question." *Id.* (*quoting* ABA Comm. on Ethics and Prof's Responsibility, Formal Op. 95-396 (1995)). Likewise, in paragraph 6c of his Amended Declaration, Professor Morgan expresses the view that Mr. Lin was not a corporate constituent with whom Fish & Richardson

8

could informally communicate because as "an experienced [ABS] engineer who had helped develop the system, not a random installer," Mr. Lin "seems clearly to be the kind of person whose statements § 100 of the Restatement [of the Law Governing Lawyers] had in mind as having 'the effect of binding the organization with respect to proof of the matter.'''

16.    ABS's assertion that Fish & Richardson's lawyers could not communicate directly with a senior engineer because he could make admissible statements about ABS is mistaken. Comment [7] was adopted precisely to reject this interpretation of Rule 4.2. Under Comment [7] to ABA Model Rule 4.2, the test is not whether the employee's statements may subsequently be admissible against the company but whether they would be *binding* admissions – the functional equivalent of stipulations that the company may not contradict. Under Fed. R. Evid. 801(d)(2) (D), every current employee of ABS would be off limits if the test were simply whether they could make admissible out-of-court statements, because any one of them could make a statement "concerning a matter within the scope of [his or her] agency or employment" that would be admissible against the company. The ABA expressly rejected that standard, which would essentially foreclose informal discovery in cases involving corporate parties. Rather, the test is whether Mr. Lin was a constituent having "authority to obligate [ABS] with respect to" the litigation – for example, whether Mr. Lin had authority to enter into a stipulation, settlement or other agreement in the lawsuit that would bind ABS. There is no suggestion that Mr. Lin had such authority. (Indeed, as an employee of a separate subsidiary, he probably could not have had such authority over Alcatel Business Systems.) He was precisely the sort of corporate employee with whom a lawyer is authorized to communicate by Comment [7] – a garden-variety witness who had nothing to do with the facts in dispute and has no role in the litigation itself. Indeed,

9

there is not even any indication that Mr. Lin had any first-hand knowledge of the facts in dispute

and that his information would serve as anything more than background.

17.    The Restatement provision cited by Professor Morgan makes plain that the

authority to "obligate" a company (in the language of Comment [7]) or to "bind" a company (in

the language of the Restatement) is not synonymous with the ability to make an out-of-court

statement that is admissible in evidence against the company:

> *e. An employee or agent whose statement binds an organization under
> applicable evidence law (Subsection (2)(c)).* Under evidence law generally applied a
> century ago and still in force in some jurisdictions for certain purposes, some
> employees and agents have the power to make statements that bind the principal, in
> the sense that the principal may not introduce evidence contradicting the binding
> statement. When such a binding-admission rule applies, under Subsection (2)(c) an
> employee or agent with power to make such a statement is a represented nonclient
> within the anti-contact rule of § 99. Such a person is analogous to a person who
> possesses power to settle a dispute on behalf of the organization (see Comment *c*).
>      However, under modern evidence law, employees and agents who lack
> authority to enter into binding contractual settlements on behalf of the organization
> have no power to make such binding statements. Modern evidence rules make certain
> statements of an employee or agent admissible notwithstanding the hearsay rule, but
> allow the organization to impeach or contradict such statements. Employees or agents
> are not included within Subsection (2)(c) solely on the basis that their statements are
> admissible evidence. A contrary rule would essentially mean that most employees
> and agents with relevant information would be within the anti-contact rule, contrary
> to the policies described in Comment *b*.

Restatement (Third) of the Law Governing Lawyers § 100, Comment *e* (2000) (emphasis added).

18.    The above-quoted provision of the Restatement refers to Comment *b*, which in

turn explains why only a limited number of officers or employees are protected from informal

inquiries:

> A very broad definition . . . for example one including all present and former
> employees, would be easily administered but at an unacceptably high cost. Under
> such a rule, the organization's lawyer . . . could deny permission for the inquiring
> lawyer to speak to any employee. The opposing party would thus be required to resort
> to the burdensome process of filing suit (based on less information than would

10

otherwise be available) and obtaining discovery to gain access to relevant information. Moreover, employees may be unwilling to speak as freely or candidly at a deposition in the presence of the lawyers for their employer as in an informal, pretrial interview. There is no justification for permitting one party thus to control entirely the flow of information to opposing parties. Such control is not available to an individual party, whose friends and colleagues may be approached without infringing the rule. The anti-contact rule stated in the Section therefore reflects a balance among the considerations pertinent to the anti-contact rule.

*Id.*, § 100, Comment *b*.

19.     In light of the countervailing interests in promoting informal discovery, Rule 4.2 forbids communications with officers and employees of a represented company only when the public interest in "the proper functioning of the legal system" served by Rule 4.2 is most strongly implicated. In general, as Comment [1] reflects, the rule serves that interest by protecting clients from overreaching, from interference with their attorney-client relationship, and from uncounseled disclosures of information about the representation. Comment [7], dealing specifically with represented organizations, reflects the recognition that officers and employees who are directing the representation or who have the power to bind the corporation in the matter need counsel's advice or representation when dealing with opposing counsel on questions such as whether to settle a lawsuit or otherwise obligate the company. Likewise, the Comment reflects that there is a particular interest in ensuring that the employees whose past conduct is the very subject of the lawsuit receive counsel's advice about how to deal with the opposing counsel's questions. On the other hand, by drawing the line as it does, the provision recognizes that there is not a sufficiently compelling public interest to justify shutting down informal access to individuals such as Mr. Lin who may have some relevant information but who do not speak for the company and whose past conduct does not place them at the center of the litigation.

20.     In sum, Mr. Lin was not an employee with "authority to obligate [ABS] with

11

respect to" the litigation and, therefore, the Fish & Richardson lawyers were entitled to speak

with him under Rule 4.2.[2]

### *Rule 8.4(c) and Rule 4.1(a) do not apply.*

21.    ABS further argues that the Fish & Richardson lawyers' method of gathering

information in the litigation comprised sanctionable misconduct under ABA Model Rule 8.4(c),

which forbids a lawyer from "engag[ing] in conduct involving dishonesty, fraud, deceit, or

misrepresentation," and ABA Model Rule 4.1(a), which forbids a lawyer from "knowingly

mak[ing] a false statement of material law or fact to a third person" in the course of a

representation. The argument overlooks contemporary decisions which authorize lawyers and

their agents to gather evidence informally by engaging in garden-variety consumer transactions,

even if they are deceptive about their identity or motivation in doing so.

22.    In general, lawyers owe their own clients a fiduciary duty to disclose information

that it would be important for the client to know with respect to the representation. But lawyers

do not owe comparable duties to third parties in general or in the context of business transactions

in particular. Rule 8.4(c), which applies to lawyers whether they are engaged in a legal

representation or acting outside their professional role, is primarily intended to provide a basis

---

[2] In paragraph 6d of his Amended Declaration, Professor Morgan opines in passing that Fish & Richardson violated Rule 4.4 because they obtained "technical information and manuals" as to which "Alcatel had proprietary rights." I am unaware of any support for such a broad construction of Rule 4.4. Rule 4.4(a), to which I assume Professor Morgan is referring, provides that a lawyer representing a client "shall not . . . use methods of obtaining evidence that violate the legal rights of " a third person. The rule has been invoked to prohibit a lawyer from obtaining a company's attorney-client privileged information from an officer or employee who has no authority to waive the privilege and disclose the information. Likewise, the rule would forbid a lawyer from obtaining trade secrets and other confidential and proprietary information from a company by eliciting it from an employee who has no authority to provide it. But that is not what occurred here. The information in question was not kept confidential but was freely shared with customers in the ordinary course of business. And Fish & Richardson did not obtain it by inducing Mr. Lin to breach his fiduciary duty or otherwise act outside his authority. The law firm lawfully purchased the information as part of the training for which it paid in an ordinary, arm's length transaction with Mr. Lin's employer.

for disciplining lawyers who have acted in a manner reflecting the lack of integrity expected of a member of the profession. It is not particularly targeted at the lawyer's conduct of investigations in connection with litigation. There is nothing in the rule that suggests that in business dealings, on their own or a client's behalf, lawyers have heightened disclosure duties beyond those established by the substantive law generally. On the contrary, the ABA Model Rules suggest that the substantive law provides guidance, insofar as they define "fraud" for purposes of this and other rules to "denote[] conduct that is fraudulent under the substantive or procedural law of the applicable jurisdiction and has a purpose to deceive." *See also Apple Corps*, 15 F. Supp. 2d at 476 (finding that the principles of 8.4(c) "should apply only to grave misconduct that would not only be generally reproved if committed by anyone, whether lawyer or nonlawyer, but would be considered of such gravity as to raise questions as to a person's fitness to be a lawyer."). Likewise, the Comment to Rule 4.1(a), which forbids false statements of fact in the course of a legal representation, makes clear that a lawyer "generally has no duty to inform an opposing party of relevant facts." ABA Model Rule 4.1, Comment [1]. Further, the rule accommodates "accepted conventions in negotiation" which permit false "[e]stimates of price or value" and false statements regarding "a party's intentions as to an acceptable settlement," and allow "the existence of an undisclosed principal," none of which are regarded as false statements of "material" fact.[3]

23.    There is no claim that the Fish & Richardson lawyers' conduct contravened conventional norms in business transactions such as the one in which they engaged. Professor

---

[3] The Restatement of the Law Governing Lawyers recognizes that the disciplinary standards governing a lawyer's communications with a non-client "are generally based on the requirements of criminal and civil law." Restatement (Third) of the Law Governing Lawyers § 98 Comment b.

Morgan acknowledges that F&R was free to acquire the ABS system for its own use and to obtain installation and training services in connection with such a purchase from a random ABS installer. Morgan Decl. ¶ 6c. The law firm purchased goods and services in an ordinary business transaction, and its identity was known when the installation began. There is no claim that it made material misstatements or omissions that would amount to a fraud under contract or tort law. Even if the firm may have fostered ABS's hope that it would make substantial future purchases if it were satisfied with this one, and did not reveal that it was seeking to educate itself in connection with a pending lawsuit, there was no legal obligation to make its true motivations known. Further, there is no reason to read Rules 8.4 and 4.1 to impose a heightened disclosure obligation in this context. Just as a lawyer in a transaction may withhold the fact that he is making a purchase on behalf of an undisclosed principal, and may attempt to mislead the other side concerning his or the client's estimates of value or bottom line – and even make affirmative misstatements about such matters – the Fish & Richardson lawyers could hide their true purpose in purchasing ABS's goods and services and the fact that they were seeking to use the information they received on behalf of a client. *See* Restatement (Third) of the Law Governing Lawyers § 98 Comment e ("In general, a lawyer has no legal duty to make an affirmative disclosure of fact or law when dealing with a nonclient.").

24.     Judicial decisions specifically permit the use of some pretense or misdirection in gathering evidence for litigation. Civil rights "testers" – *e.g.*, individuals pretending to be interested in renting an apartment – have been used since the adoption of civil rights laws to gather evidence of impermissible discrimination. More recently, courts decisions have expressly permitted lawyers or their agents to pose as customers to gather evidence in trademark

14

infringement and other private civil cases. *See, e.g., Apple Corps Ltd. v. Int'l Collectors Soc'y,*

15 F. Supp.2d 456 (D.N.J. 1998); *Gidatex, S.r.L. v. Campaniello Imps., Ltd.,* 82 F. Supp.2d 119

(S.D.N.Y. 1999). Relying on, and approving, the decision in *Apple Corps,* the District Court in

*Gidatex* upheld the use of investigators posing as interior designers to gather evidence of

trademark infringement under the following circumstances:

> The investigators posed as interior designers -- typical Campaniello customers.
> Because the Campaniello showrooms and warehouse are open to "the trade", any
> interior designer is welcome to enter the showroom or warehouse and express an
> interest in Saporiti Italia furniture. While it might have been annoying and time-
> consuming for Campaniello sales clerks to talk with phony customers who had no
> interest in buying furniture, the investigators did nothing more than observe and
> record the manner in which Campaniello employees conducted routine business.
> Having operated a furniture business for over twenty years, surely Campaniello
> had come to expect that customers would enter the Campaniello showroom during
> business hours, engage in conversation with sales clerks, make inquiries regarding
> various brands of furniture, and leave without making a purchase. There was no
> risk that Campaniello's low level employees would disclose, or were even aware
> of, any information protected by the attorney/client privilege.

82 F. Supp.2d at 122. The District Court explained that the rule against "dishonesty, fraud,

deceit, [and] misrepresentation" had no application on the facts before it:

> As for DR 1-102(A)(4)'s prohibition against attorney "misrepresentations", hiring
> investigators to pose as consumers is an accepted investigative technique, not a
> misrepresentation. The policy interests behind forbidding misrepresentations by
> attorneys are to protect parties from being tricked into making statements in the
> absence of their counsel and to protect clients from misrepresentations by their
> own attorneys. The presence of investigators posing as interior decorators did not
> cause the sales clerks to make any statements they otherwise would not have
> made. There is no evidence to indicate that the sales clerks were tricked or duped
> by the investigators' simple questions such as "is the quality the same?" or "so
> there is no place to get their furniture?"

*Id.* As another District Court has noted:

> [T]here is a discernable continuum in the cases from clearly impermissible to
> clearly permissible conduct. Lawyers (and investigators) cannot trick protected

15

employees into doing things or saying things they otherwise would not do or say. They cannot normally interview protected employees or ask them to fill out questionnaires. *They probably can employ persons to play the role of customers seeking services on the same basis as the general public.* They can videotape protected employees going about their activities in what those employees believe is the normal course. That is akin to surveillance videos routinely admitted.

*Hill v. Shell Oil Co.*, 209 F. Supp. 2d 876, 880 (N.D. Ill. 2002) (emphasis added).[4]

25.    In my judgment, the investigative methods employed by Fish & Richardson's lawyers were consistent with the above-described conduct approved recently by courts. Like the investigator in *Gidatex*, the lawyers engaged in an ordinary consumer transaction in order to gather evidence. Indeed, their conduct is less problematic than that in *Gidatex*, where an investigator instigated a conversation with a salesperson while pretending to be an interior designer interested in making a purchase. In this case, the lawyers were known to be lawyers – they did not assume a false identity – and they actually made a lawful purchase on the same terms on which anyone else might have done so. Among the items purchased were installation and training. The information provided in response to the Fish & Richardson lawyers' questions was not incidental to the purchase; it was part of what the law firm had purchased, just as if the products, like a new car, had come with an owner's manual. There is no suggestion that the lawyer's questions were different from those that any customer might ask or that the information provided was different from what ABS's engineers or technicians would have provided to any other customer when they installed the products and conducted a training.

---

4 Courts likewise find that this conduct does not violate Rule 4.2. *See Hill*, 209 F.Supp.2d at 880 ("These interactions do not rise to the level of communication protected by Rule 4.2."); *Apple Corps*, 15 F.Supp.2d at 474-75 ("RPC 4.2 cannot apply where lawyers and/or their investigators seeking to learn about current corporate misconduct, act as members of the general public to engage in ordinary business transactions with low-level employees of a represented corporation."); *Gidatex,* 82 F.Supp.2d at 126 ("The use of private investigators, posing as consumers and speaking to nominal parties who are not involved in any aspect of the litigation, does not constitute an end-run around the attorney/client privilege.").

26.    In sum, Fish & Richardson engaged in an ordinary, arms'-length consumer purchase of goods and services – including training – from ABS, acting consistently with the legal expectations of such transactions. The relevant rules did not impose substantial, special disclosure obligations on the firm's lawyers, by virtue of the fact that they are lawyers, when they engage in consumer transactions such as this one. The lawyers did not use the purchase as a means of obtaining business secrets, privileged information or other information that ABS would not freely provide to its customers as part of the purchased services. Fish & Richardson, acting in its own persona, got what it paid for, and paid for what it got. That was not misconduct.

### Rule 4.3 is also inapplicable.

27.    ABA Model Rule 4.3, the remaining provision of the ABA Model Rules on which ABS relies, is even more plainly inapplicable. The rule, which governs a lawyer's dealings with unrepresented persons, is designed to ensure that third parties dealing with a lawyer do not rely on the lawyer's advice or statements about the law in a mistaken belief that the lawyer is acting on their behalf or is disinterested, when in fact the lawyer is acting out of loyalty to a client. The rule provides that a lawyer who is dealing with an unrepresented person on a client's behalf may not "state or imply that the lawyer is disinterested." If the unrepresented person's interests may conflict with those of the client, the rule also forbids the lawyer from giving legal advice to the third party. Finally, it provides: "When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding." ABS focuses its argument on this last sentence.

28.    Contrary to ABS's argument, Rule 4.3 did not require Fish & Richardson's

17

lawyers to tell any ABS personnel who came to deliver and install its product that their law firm was representing Microsoft in litigation against ABS. The installers did not misunderstand the lawyers' "role" within the meaning and intentions of Rule 4.3. The purported ABS employee Mr. Lin was not under any misimpression that the lawyers might be acting with his interests at heart or be disinterested in relation to him, that he could repose confidences in them, or that he could rely on their legal advice or information. He knew that the law firm was a purchaser in a transaction in which ABS was the seller – in other words, the lawyers were on the opposite side of a business deal from ABS. Mr. Lin was not seeking or receiving legal advice or information from the lawyers, and the lawyers were not providing any. It is true that Fish & Richardson was acting with the motivation of benefiting a client, Microsoft. But as Comment [2] to Rule 4.1 expressly provides, even if Fish & Richardson had been making the purchase on behalf of Microsoft – in other words, even if Microsoft had been an "undisclosed principal" and not simply an undisclosed beneficiary of the law firm's purchase – the lawyers would not have had to disclose this.

29.    The decision in *Apple Corps* makes it equally clear that Rule 4.3 does not apply to this situation. In that case, a law firm represented a client in trademark and copyright litigation against a stamp manufacturer regarding the use of the Beatles' likeness. Lawyers and others at the firm, acting as purchasers, telephoned the company to purchase Beatles stamps in order to obtain evidence that the company was violating a court order forbidding it from making such sales. Besides rejecting an argument that this investigative conduct was an impermissible violation of Rule 4.2 or Rule 8.4(c), the District Court rejected an objection predicated on Rule 4.3. It concluded that "[p]laintiffs' counsel and investigators in testing compliance were not

18

acting in the capacity of lawyers. Therefore, the prohibitions of RPC 4.3 do not apply here. RPC 4.3 does not apply to straightforward transactions undertaken solely to determine in accordance with Rule 11 of the Federal Rules of Civil Procedure, the existence of a well-founded claim." *Id.* at 476. Here, as in *Apple Corps*, the lawyers, although acting for the benefit of a client, were engaged in a straightforward business transaction in their individual personae in order to gather evidence relating to litigation. They were not rendering legal services or providing legal advice or information but were purchasers of a product. There was no conceivable risk that Mr. Lin or other ABS employees might have misconceived their role and relied on them as lawyers.

30.     Ultimately, the purpose of Rule 4.3 is to prevent an unrepresented person from deceived to his disadvantage about the lawyer's role. *See* Geoffrey C. Hazard, Jr. and W. William Hodes, *The Law of Lawyering*, § 39.2 (3d. ed. 2003); *see also Apple Corps*, 15 F.Supp.2d at 476 (purpose of Rule 4.3 is to prevent "allowing the unrepresented person to misunderstand that the lawyer is disinterested" and it will "only apply to a lawyer who is acting as a lawyer."); See generally Restatement (Third) of the Law Governing Lawyers §103 Comment b (rationale of rule is to protect non-client from relying on lawyer's advice or from being over-reached in negotiations). An employee who is simply providing a service to a lawyer-customer that he would provide to any other customer is, by definition, not being taken advantage of within the meaning of the Rule. Even if it were otherwise, is hard to see how ABS would have standing to complain, given that the rule is meant to protect unrepresented persons.

31.     In sum, this was not a situation where an ABS employee evidenced a misunderstanding about the Fish & Richardson lawyers' role that needed to be corrected to protect the employee from mistakenly relying on the lawyers. Accordingly, Rule 4.3 has no

19

09/11/2007  14:37 FAX                                                              ☑ 002/002

application to Fish & Richardson's purchase of goods and services from ABS.

## CONCLUSION

32.    There is a public interest in affording parties access to truthful information
relevant to their claims. The rules of professional conduct give weight to that interest in
determining the limits to be set on the means by which lawyers may obtain information outside
the formal discovery process. Here, there was a strong public interest in affording Microsoft
access to truthful, probative information outside the formal discovery process. The formal
discovery process, which Microsoft pursued by inspecting ABS's products in ABS's presence for
a brief period in France, and by obtaining written material provided to users, was slower, more
expensive and more burdensome, and in the end of the day would not necessarily have provided
as much information or the complete access to the products needed for expert review. Nothing in
the ABA Model Rules of Professional Conduct barred Fish & Richardson from supplementing its
formal discovery by engaging in an ordinary business transaction with the opposing party in
order to obtain information relevant to its client's claim. Fish & Richardson fully complied with
those ABA Model Rules, leaving no basis on which to impose sanctions for claimed non-
compliance.

Dated: September 11, 2007

Bruce A. Green

09/11/2007 TUE 15:37 [TX/RX NO 6204] ☑ 002

# Exhibit A

**BRUCE A. GREEN**
**Louis Stein Professor of Law**
**Fordham University School of Law**
**140 West 62nd Street**
**New York, NY 10023**
**(212) 636-6851; (212) 636-6899 (FAX)**
**bgreen@law.fordham.edu**

## Bar Admissions

New York State (since 1982)
U.S. District Courts for the Southern and Eastern Districts of New York
U.S. Court of Appeals for the Second Circuit
U.S. Supreme Court

## Education

**Columbia University School of Law**:  J.D. 1981
    Honors: James Kent Scholar; Harlan Fiske Stone Scholar
    Associate Editor, *Columbia Law Review*

**Princeton University**:  A.B. 1978, *summa cum laude*

## Current Legal Employment

**Fordham University School of Law**:
    Louis Stein Professor of Law, since 1997
    Professor, 1996-97; Associate Professor, 1987-96
    Director, Louis Stein Center for Law and Ethics, since 1997
    Director, Stein Center for Ethics and Public Interest Law, 1992-97
    Responsible for teaching courses in the areas of legal ethics, criminal law and
        criminal procedure, and for overseeing the Stein Scholars Program

**New York University School of Law**: Visiting Professor: January-May 2007

## Prior Full-time Legal Employment

**Office of the United States Attorney for the Southern District of New York**:
    October 1983 to August 1987, Assistant United States Attorney
    Deputy Chief Appellate Attorney, 1986-87; Chief Appellate Attorney, 1987

**U.S. Supreme Court**:  Law clerk to Justice Thurgood Marshall, 1982-83

**U.S. Court of Appeals for the Second Circuit**:  Law clerk to Judge James L. Oakes,
1981-82

1

## Other Legal Positions

**Departmental Disciplinary Committee, Appellate Division, First Department**: Member, 1997-2002

**New York City Conflicts of Interest Board**: Member, Nov. 1995 to March 2005

**Handschu Authority**: Civilian member, July 1994 to Nov. 1995

**Office of Investigations Officer (U.S. v. I.B.T.)**: Special Counsel (part-time), 1991

**Office of Independent Counsel Lawrence Walsh**, Associate Counsel (part-time), 1988-91

**New York State Commission on Government Integrity**: Consultant and special investigator, 1988-90

**Columbia University School of Law**: Adjunct Professor (part-time), 1990

**Office of the United States Attorney for the Southern District of New York**: Special Assistant United States Attorney (part-time), September 1987 to June 1988

**Fordham University School of Law**: Adjunct Assoc. Professor (part-time), 1985-87

## Professional Service

**American Bar Association**:
Commission on the American Jury Project: member, 2006 to present
Commission on Multijurisdictional Practice: reporter, 2000-02
Coordinating Group on Bioethics and the Law: member, 1997-2003
Section of Criminal Law:
Ethics, Gideon and Professionalism Committee: co-chair, 2006 to present
Section of Litigation:
Council member, 2004-07
Committee on Law Faculty Involvement: co-chair, 1998-2001, 2003-04
Civil Justice Institute: member, 2001-03
Task Force on Ethical Guidelines for Settlement Negotiations: member, 2000-02
Ethics 2000 Task Force: member, 1999-2000
Committee on Ethics and Professionalism: co-chair, 1995-98
Task Force on the Independent Counsel Act: reporter, 1997-99
Rep. to Sec./Div. Committee on Professionalism and Ethics, 1996-2003

**American Bar Association (continued)**:
Committee on Amicus Curiae Briefs: chair, 1991-95

Special Committee on Death Penalty Representation: member, 2006 to present
Standing Committee on Professionalism: reporter, 2000-01
Steering Committee for the Symposium on the Multijurisdictional Practice of Law:
    reporter, 1999-2000
Task Force on the Attorney-Client Privilege: reporter, 2004 to present
Task Force on Law Schools and the Profession: consultant, 1991-92

**Association of American Law Schools:** Chair, Section of Professional Responsibility,
    1999

**Association of the Bar of the City of New York:**
Delegate to NYS Bar Association, 2003-07
Committee on Professional and Judicial Ethics: member, 1994-97, 2003-06
Nominating Committee: member, 2005
Ethics 2000 Committee: member, 1999-2001
Jt. Committee on the Legal Referral Service: chair, 1993-96; member, 1996-
    2000
Committee on International Access to Justice: member,1999-2000
Committee on Disaster Plan: member, 1996-97
Marden Lecture Committee: member, 1991-94
Criminal Law Committee: member, 1991-94
Task Force on Lawyer Training: member, 1992-94
Corrections Committee: member, 1988-91

**Criminal Law Bulletin:** Contributing editor, 1988-98

**Evan B. Donaldson Adoption Institute:** Ethics Advisory Committee: member, 1998-
2001

**Federal Bar Council:**
Second Circuit Courts Committee: member, 1994-97; chair, Subcommittee on
    Criminal Law and Ethics
*Federal Bar Council News*: member of the Editorial Board, 1995 to present
Inn of Court: master, 2000-02

**Fund for the City of New York:** Member of Advisory Committee for the New York
Housing Court Online Preparation System (COPE), 1999

**National Conference of Bar Examiners:** Member of MPRE Drafting Committee, 2001
to present

**New York County Lawyers' Association:**
Director, 2004-07
Member of Justice Center advisory board, 2003 to present

**New York State Bar Association:**
> House of Delegates member, 2003-07
> Committee on Professional Ethics: Chair, 1998-2001; member, 1991 to present
> Committee on Standards of Attorney Conduct (formerly Special Committee to
>     Review the Code of Professional Responsibility): member, 1997 to present
> Task Force on Attorney Client Privilege, 2006 to present
> Task Force on "Pay to Play" Concerns, member, 1998-2000

**New York State Task Force on Attorney Professionalism and Conduct:** Member,
1996-98

## Awards

Powell Pierpont Award, given by the N.Y.C. Conflicts of Interest Board "for outstanding
service to the New York City Conflicts of Interest Board," May 23, 2006

New York State Bar Association Criminal Justice Section Award for "outstanding
contribution in the field of criminal law education," Jan. 23, 2003

Sanford D. Levy Award, given by New York State Bar Association Committee on
Professional and Judicial Ethics, 1990

## PUBLICATIONS

### Articles in Law Journals

Teaching Lawyers Ethics, 51 St. Louis L.J. 1091 (2007)

Permissive Rules of Professional Conduct, 91 Minn. L. Rev. 265 (2006) (with Fred C. Zacharias)

Taking Cues: Inferring Legality from Others' Conduct, 75 Fordham L. Rev. 1429 (2006)

The Religious Lawyering Critique, 21 J. of Law & Religion 283 (2006)

Representing Children in Families – Foreword, 6 Nevada L. Rev. 571 (2006) (with Annette R. Appell)

"Anything Rather Than a Deliberate and Well-Considered Opinion"–Henry Lord Brougham, Written by Himself, 19 Georgetown J. Legal Ethics 1221 (2006) (with Fred C. Zacharias)

Reconceptualizing Advocacy Ethics, 74 George Washington L. Rev. 1 (2005) (with Fred C. Zacharias)

Foreword, Professional Challenges in Large Firm Practices, 33 Fordham Urb. L.J. 7 (2005)

Prosecutorial Neutrality, 2004 Wisconsin L. Rev. 837  (with Fred C. Zacharias)

Foreword, Colloquium, Deborah Rhode's Access to Justice, 73 Fordham L. Rev. 841 (2004)

Federal Court Authority to Regulate Lawyers: A Practice in Search of a Theory, 56 Vand. L. Rev. 1303 (2003) (with Fred C. Zacharias)

Prosecutorial Ethics as Usual, 2003 Illinois L. Rev. 1573

Criminal Neglect: Indigent Defense from an Ethics Perspective, 52 Emory Law Review 1169 (2003)

Regulating Federal Prosecutors' Ethics, 55 Vand. L. Rev. 381 (2002) (with Fred C. Zacharias)

Bar Association Ethics Committees: Are They Broken?, 30 Hofstra L. Rev. 731 (2002)

May Judges Attend Privately Funded Educational Programs?  Should Judicial
Education Be Privatized?: Questions of Judicial Ethics and Policy, 29 Fordham Urb. L.J.
941 (2002)

John D. Feerick: The Dean of Ethics and Public Service, 70 Fordham L. Rev. 2165
(2002)

Judicial Rationalizations for Rationing Justice: How Sixth Amendment Doctrine
Undermines Reform, 70 Fordham L. Rev. 1729 (2002)

Thoughts About Corporate Lawyers After Reading The Cigarette Papers: Has the "Wise
Counselor" Given Way to the "Hired Gun"?, 51 DePaul L. Rev. 407 (2001)

Reflections on the Ethics of Legal Academics: Law Schools as MDPs; or, Should Law
Professors Practice What They Teach?, 42 S. Tex. L. Rev. 301 (2001)

Public Declarations of Professionalism, 52 S. Car. L. Rev. 729 (2001)

The Disciplinary Restrictions on Multidisciplinary Practice: Their Derivation, Their
Development, and Some Implications for the Core Values Debate, 84 Minn. L. Rev.
1115 (2000)

The Uniqueness of Federal Prosecutors, 88 Georgetown L.J. 207 (2000) (with Fred C.
Zacharias)

Must Government Lawyers "Seek Justice" in Civil Litigation?, 9 Widener J. Pub. L. 235
(2000)

There But for Fortune: Real-Life vs. Fictional "Case Studies" in Legal Ethics, 64
Fordham L. Rev. 977 (2000)

Rationing Lawyers: Ethical and Professional Issues in the Delivery of Legal Services to
Low-Income Clients, 67 Fordham L. Rev. 1713 (1999)

Why Should Prosecutors "Seek Justice"?, 26 Fordham Urb. L.J. 609 (1999)

The Criminal Regulation of Lawyers, 67 Fordham L. Rev. 327 (1998)

Lawyers as Nonlawyers in Child-Custody and Visitation Cases: Questions From a
"Legal Ethics" Perspective, 73 Ind. L.J. 665 (1998)

Lawyer Discipline: Conscientious Noncompliance, Conscious Avoidance, and
Prosecutorial Discretion, 66 Fordham L. Rev. 1307 (1998)

Less is More: Teaching Legal Ethics in Context, 39 Wm. & Mary L. Rev. 357 (1998)

Conflicts of Interest in Legal Representation: Should the Appearance of Impropriety Rule Be Eliminated in New Jersey--Or Revived Everywhere Else?, 28 Seton Hall L. Rev. 315 (1997)

The Role of Personal Values in Professional Decisionmaking, 11 Geo. J. of Legal Ethics 19 (1997)

Conflicts of Interest in Litigation: The Judicial Role, 65 Fordham L. Rev. 71 (1996)
Whose Rules of Professional Conduct Should Govern Lawyers in Federal Court and How Should the Rules Be Created?, 64 George Washington L. Rev. 460 (1996)

Foreword: Children and the Ethical Practice of Law, in Ethical Issues in the Legal Representation of Children, 64 Fordham L. Rev. 1281 (1996) (with Bernardine Dohrn)

Contextualizing Professional Responsibility: A New Curriculum for a New Age, 58 Law & Contemp. Probs. 193 (1995) (with Mary Daly & Russell Pearce)

Policing Federal Prosecutors: Do Too Many Regulators Produce Too Little Enforcement?, 8 St. Thomas L. Rev. 69 (1995)

Of Laws and Men: An Essay on Justice Marshall's View of Criminal Procedure, 26 Ariz. St. L.J. 369 (1994) (with Daniel Richman)

Foreword, Ethical Issues in Representing Older Clients, 62 Fordham L. Rev. 961 (1994) (with Nancy Coleman)

Foreword, Urban Environmental Equity, 21 Fordham Urb. L.J. 425 (1994)

Lethal Fiction: The Meaning of "Counsel" in the Sixth Amendment, 78 Iowa L. Rev. 433 (1993) [reprinted in 6 Crim. Prac. L. Rev. 183 (1994)]

"The Whole Truth?": How Rules of Evidence Make Lawyers Deceitful, 25 Loyola of Los Angeles L. Rev. 699 (1992)

"Power, Not Reason": Justice Marshall's Valedictory and the Fourth Amendment in the Supreme Court's 1990-91 Term, 70 N.C.L. Rev. 373 (1992)

After the Fall: The Criminal Law Enforcement Response to the S&L Crisis, 59 Fordham L. Rev. S155 (1991)

Zealous Representation Bound: The Intersection of the Ethical Codes and the Criminal Law, 69 N.C.L. Rev. 687 (1991) [reprinted in 4 Crim. Prac. L. Rev. 323 (1992)]

"Hare and Hounds": The Fugitive Defendant's Constitutional Right to Be Pursued, 56 Brooklyn L. Rev. 439 (1990) [reprinted in 4 Crim. Prac. L. Rev. 67 (1992)]

The Good-Faith Exception to the Fruit of the Poisonous Tree Doctrine, 26 Crim. L. Bull. 509 (1990)

Doe v. Federal Grievance Committee: On the Interpretation of Ethical Rules,  55 Brooklyn L.Rev. 485 (1989)

"Through a Glass, Darkly": How the Court Views Motions to Disqualify Criminal Defense Lawyers, 89 Colum. L. Rev. 1201 (1989) [reprinted in 2 Crim. Prac. L. Rev. 551 (1990)]

Her Brother's Keeper: The Prosecutor's Responsibility When Criminal Defense Counsel Has a Conflict of Interest, 16 Am. J. Crim. L. 323 (1989)

"Package" Plea Bargaining and the Prosecutor's Duty of Good Faith, 25 Crim. L. Bull. 507 (1989)

Limits on a Prosecutor's Communications With Prospective Defense Witnesses, 25 Crim. L. Bull. 139 (1989)

A Prosecutor's Communications With Represented Defendants: What Are the Limits?, 24 Crim. L. Bull. 283 (1988)

The Ethical Prosecutor and the Adversary System, 24 Crim. L. Bull. 126 (1988)

Note, Court Appointment of Attorneys in Civil Cases: The Constitutionality of Uncompensated Legal Assistance, 81 Colum. L. Rev. 366 (1981)

Note, A Functional Analysis of the Effective Assistance of Counsel, 80 Colum. L. Rev. 1053 (1980)

## Articles in Legal Periodicals

Articles in *Federal Bar Council News*: "Privileges in the Corporate Context," vol. 12, no. 1, p. 4 (2005); "Ethics Reform in New York," vol. 11, no. 2, p. 11 (2004); "MJP for Litigators," vol. 10, no. 4, p. 14 (2003); "Privately-Funded Seminars for Judges," vol. 9, no. 5, p. 1 (2002); "Multijurisdictional Issues," vol. 7, no. 4, p. 11 (2000); "Moral Ambiguity/Ambiguous Morals: Morgan Stanley and the $10,000 Payment," vol. 6, no. 4, p. 1 (1999); "When Prosecutors Accuse Criminal Defense Lawyers of Wrongdoing," vol. 5, no. 5, p. 1 (1998); "Prosecuting Lawyers," vol. 5, no. 4, p. 11 (1998); "A View From The 'Ethics' Front," vol. 5, no. 3, p. 7 (1998); "Professional Detachment," vol. 4, no. 4, p. 8 (1997); "The Philosophy of Our Ethical Rules," vol. 4, no. 3, p. 23 (1997); "The President vs. Mrs. Jones," vol. 4, no. 1, p. 11 (1997); "Should Judges Promote Professionalism?," vol. 3, no. 4, p. 4 (1996); "Bad Arguments," vol. 3, no. 1, p. 7 (1996); "The Sins of the Lawyer (and the Procedural Consequences)," vol. 2, no. 4, p. 9 (1995); "Attorney Discipline in the Second Circuit," vol. 2, no. 2, p. 11 (1995)

"Deceitful Silence," 33 Litigation 24 (Winter 2007)

"Feeling a Chill," ABA Journal, Dec. 2005, pp. 61-65 (with David C. Clifton)

"Prosecuting Means More Than Locking Up Bad Guys," 32 Litigation 12 (Fall 2005)
"Interviewing Corporate Client Officers and Employees: Ethical Considerations," ABA
Section of Litigation, Committee on Corporate Counsel Newsletter, vol. 19, no. 1, p. 1
(Fall 2004) [reprinted in ABA Section of Litigation, Professional Liability Litigation
[Newsletter], vol. 3, no. 1, p. 1 (Winter 2005)]

Client Confidences: Should Lawyers Be Allowed to Reveal Them to Prevent Death or
Serious Bodily Harm?: Yes, New York Lawyer, Oct. 2001, p. 20

Adventures in the Mortgage Trade: A Case Study in Legal Ethics, 27 N.Y. Real
Property Law Journal 49 (Spring, 1999) (with Joshua Stein) [also published in
Commercial Real Estate Financing: What Borrowers and Lenders Need to Know 1999
vol. 2, p. 749 (PLI 1999)]

Lying Clients: An Age-Old Problem, 26 Litigation 19 (Fall 1999) [updated and reprinted
in Priscilla Anne Schwab, ed., The Litigation Manual, First Supplement 1105 (2007)]

When Conflicts of Interest Arise Unexpectedly, Litigation Ethics (Spring/Summer 1998),
p. 11

The "No-Contact" Rule in New York State--Some Less Contentious Questions, N.Y.
Professional Responsibility Report (Aug. 1998), p.1

The Ten Most Common Ethical Violations, 24 Litigation 48 (Summer 1998) [reprinted in
Trial (March 1999), p. 70; updated and reprinted in Priscilla Anne Schwab, ed., The
Litigation Manual, First Supplement 1077 (2007)]

Teaching Legal Ethics in Context, 70 N.Y.S.B.J. 6 (May/June 1998) (with Mary Daly)

Ethical Issues in Representing Children, 7 The Professional Lawyer 9 (1996)

Federal Prosecutors' Ethics: Who Should Draw the Lines?, 7 The Professional Lawyer
1 (1995)

Ethical Issues in Representing Older Clients, 5 The Professional Lawyer 18 (1994)

Crime and Punishment After the S&L Crisis, 46 Consumer Finance L.Q. Rep. 195
(1992)

Conflicts of Interest in Corporate Criminal Cases, 1 Corp. Crim. & Const'l L. Rptr. 98
(1990)

9

"Judge Kennedy Might Not Meet Expectations of Administration," Nat'l L.J., Dec. 21, 1987, p. 20

## Other Legal Writings

"Prosecutors' Professional Independence: Reflections on *Garcetti v. Ceballos*," 22 [ABA] Criminal Justice, no. 2, pp. 4, 6-10 (Summer 2007)

"Interviewing Corporate Client Officers and Employees: Ethical Considerations," in ABA Section of Litigation, 2004 Annual Conference.

Report of the Commission on Multijurisdictional Practice (Aug. 2002)

"Representing Corporations Under Fire: Ethical Considerations – A Hypothetical," and "Representing Corporations Under Fire: Ethical Considerations," in MCLE Marathon 2002 521, 527 (PLI 2002)

Interim Report of the Commission on Multijurisdictional Practice (Nov. 2001)

"A Guide to Professionalism Commissions" report of the ABA Standing Committee on Professionalism (2001)

"Recent Federal Court Decisions in Professional Responsibility," in Current Developments in Federal Civil Practice 2001 413 (PLI 2001) (with Mary Lu Bilek)

Editor, *Litigation Ethics: Course Materials for Continuing Legal Education* (ABA Section of Litigation 2000) (with John Q. Barrett)

"Assisting Clients with Multi-State and Interstate Legal Problems: The Need to Bring the Professional Regulation of Lawyers into the 21st Century" (report summarizing the proceedings of the Symposium on the Multijurisdictional Practice of Law) (June 2000)

"Recent Federal Court Decisions in Professional Responsibility," in Current Developments in Federal Civil Practice 1999 311 (PLI 1999)

"The Duty to Report Ethical Misconduct," in ABA Section of Family Law, *1998 Annual Meeting* 17 (July 31-Aug. 3, 1998)

"The Ethics of Marketing Legal Services," in *Effective Marketing for Lawyers* (N.Y.S. Bar Ass'n 1996) (with Russell Pearce), and *Effective Marketing for Lawyers* (N.Y.S. Bar Ass'n 2d ed. 2005) (with Russell Pearce)

"Local Rules Limiting Attorney Speech in Criminal Proceedings" (Federal Bar Council, June 1996) (principal author)

"Establishing Ethical Standards for Federal Prosecutors and Defense Attorneys," 49 The Record of the Assn. of the Bar of the City of New York 21 (1994) (principal author)

*Tax Fraud and Money Laundering* (The John Marshall Publ. Co., 1993) (with Robert H. Hishon & Richard A. Westin)

Editor, *Government Ethics for the 1990's: The Collected Reports of the New York State Commission on Government Integrity* (Fordham Univ. Press, 1991)

Reporter to *Evidence in America: The Federal Rules in the United States* (1989-91 supp., Fed. R. Evid. 801, 802, and 804)

"Ex Parte Contacts With Employees of a Corporate Party in Civil Litigation," in ABA Section of Litigation, *Best Evidence Seminar* 41 (Apr. 19, 1991)

"Use of an Attorney's Statements Against His or Her Client," in ABA Section of Litigation, *Best Evidence Seminar* 35 (Mar. 9-10, 1990)

### Participation in Professional and Academic Programs  (since January 2000)

Panelist, "Issues in Judicial Ethics," Appellate Judges Seminar – New Judges Series, NYU Univ. School of Law, July 12, 2007

Panelist, Professional Ethics Workshop, Securities Indus. and Financial Markets Assn., June 12, 2007

Panelist, "Legal Industry Outsourcing," The American Lawyer, Corporate Counsel & Law Firm Inc., New York, NY, May 23, 2007

Speaker, "Ethical Limits on Informal Discovery," program on Winning Cases in Federal Court – Day 2, New York County Lawyers' Ass'n, May 22, 2007

Panelist, "After Hewlett Packard: Methods & Ethics of Conducting Corporate Investigations," Association of the Bar of the City of New York, May 17, 2007

Trainer, "Ethical Issues in Legal Services Practice," Legal Services of New York, May 7, 2007

Speaker, "Inquiring, Prying, Snooping and Spying -- The Use and Misuse of Private Investigators," American Academy of Matrimonial Lawyers, New York Chapter, May 4, 2007, NY, NY

Panelist, "Technology and Ethical Issues," Technology in the Practice & Workplace Committee Midwinter Meeting, ABA Section of Labor & Employment Law, NYU School of Law, April 27, 2007

11

Co-presenter, "The Private Bar and the Public Interest: Structuring Deliberation within Professional Associations," 13th Annual Clifford Symposium on Tort Law and Social Policy ("Distortions in the Attorney/Client Relationship: Threats to Sound Advice?"), DePaul Univ. College of Law, April 19, 2007

Panelist, "When the Ends Justify the Means: Use of Dissembling in Investigations in Aid of Civil and Criminal Litigation," NYCLA Inn of Court, March 22, 2007

Speaker, "Prosecutorial Ethics," Goldstock Criminal Law Lunch Seminar, N.Y.U. School of Law, March 8, 2007

Panelist, "Ethics and Mediation – Where There's Smoke, There's Fire!," Goliath vs. Goliath - Organizing the Construction Case for Mediation, ABA Section of Dispute Resolution, Feb. 23, 2007

Moderator, The Executive Branch's Legal Response to the Post 9-11 World: Unconstitutional Overreach or Necessary Precaution?, Fordham Law School, Feb. 22, 2007

Panelist, "The Prosecution and Defense of American White Collars - An Ethical Quagmire," Federal Bar Council Inn of Court, Jan. 25, 2006

Moderator, "Legal Ethics CLE in the Law School Setting: Can It Be Practical, Academic, and Interesting at the Same Time?," AALS 2007 Annual Meeting, Washington, D.C., Jan. 4, 2007

Co-panelist, Ethics in Criminal Practice, "2006 Legislative Program, Part I," Office of the NYS Attorney General, Dec. 7, 2006

Panelist, "Ethics and Professionalism," N.Y. State Bar Ass'n, Dec. 7, 2006

Speaker and moderator, "Ethics for Government Lawyers," Wisconsin Department of Justice, Office of the Attorney General, Madison, WI, Dec. 5, 2006

Co-panelist, "Ethical Issues Raised by Internal & Governmental Investigations," Mealey's Corporate Liability & Compliance Conference," Miami, Fla., Nov. 14, 2006

Panelist, "The Seventh Annual 'Ethics for Corporate Counsel' Program: Corporations in Crisis," N.Y. State Bar Ass'n, Oct. 13, 2006

Panelist, "NYCLA Retreat: Ethics," N.Y. County Lawyers' Association, Oct. 9, 2006

Response, "When Conscience Clashes with State Law & Policy: Distinctions between the Roles of Lawyers and Judges," Inst. on Religion, Law and Lawyer's Work, Fordham Law School, Sept. 22, 2006

Panelist, "Ethical Considerations for Corporate Investigations: Update 2006," Association of the Bar of the City of New York, Sept. 12, 2006

Panelist, "Assault on the Attorney-Client Privilege: What Every Lawyer Needs to Know," Fall 2006 National Legal Malpractice Conference, ABA Standing Committee on Lawyers' Professional Liability, Chicago, IL, Sept. 8, 2006

Panelist, "Avoiding Inadvertent Production of Privileged Documents," ABA TeleConference and Audio Webcast, August 8, 2006

Speaker, "Choice of Ethics Rules in Arbitration," Transatlantic Perspectives on ADR, St. John's Univ. School of Law & Chartered Institute of Arbitrators, London, England, July 27, 2006

Panelist, "Privileges in Regulatory & Criminal Investigations: Legal & Ethical Issues," Association of the Bar of the City of New York, June 27, 2006

Panelist, "Common Conflicts of Interest in Transactional Law Settings," ABA TeleConference and Audio Webcast, June 27, 2006

Panelist, "Emerging Issues: Money and Government," Twelfth Citywide Seminar on Ethics in New York City Government, N.Y.C. Conflicts of Interest Board/New York Law School, May 23, 2006

Panelist, "Preparing or Coaching the Witness: Where is the Ethical Line?," New York County Lawyers' Association, May 16, 2006

Keynote speaker, "The Conversation Between Law and Medicine," Student Physician Awareness Day, New York Medical College, Mt. Kisco, NY, April 27, 2006

Panelist, "Common Conflicts of Interest in Transactional Law Settings," Spring 2006 National Legal Malpractice Conference, NY, NY, April 6, 2006

Trainer, "Ethical Issues in Legal Services Practice," Legal Services for New York City, March 30, 2006

Co-speaker, "Ethics and Public Interest Law: Discussion of Current Issues (2006)," N.Y. Lawyers for the Public Interest, March 30, 2006

Panelist, "Ethical Considerations of an In-House Lawyer," Annual Seminar of the Securities Industry Association Compliance and Legal Division, Hollywood, Florida, March 20, 2006

Moderator, "Ethical Issues in Private Funds Practice," 7th Annual International Conference on Private Investment Funds, International Bar Ass'n & ABA Section of Business Law, London, England, Feb. 27, 2006

Panelist, "Ethics in Commercial Mortgage Practice," Commercial Real Estate Financing 2006, PLI, Feb. 17, 2006

Panelist, "Government Requests for Corporate Waivers of the Attorney-Client Privilege," NYSBA Annual Meeting, Jan. 25, 2006

Facilitator, "Conference on Representing Children in Families: Children's Advocacy and Justice Ten Years After Fordham," William S. Boyd School of Law, Las Vegas, NV, Jan. 12-14, 2006

Commentator, "Professional Responsibility and the Religious Traditions," AALS Annual Meeting, Washington, D.C., Jan. 4, 2006

Panelist, "Checking the Pulse of the Attorney-Client Privilege," ABA Connection teleconference, Dec. 21, 2005

Moderator, "Litigation Ethics: Problems of Conflicts, Confidentiality and Candor," Federal Bar Council 2005 Fall Bench & Bar Retreat, Nov. 6, 2005

Panelist, "Le secret Professionnel des Avocats en France et aux USA" [Attorney-Client Privilege in France and the U.S.], La Barreau de Lille & New York County Lawyers' Association, Lille, France, Oct. 28, 2005

Panelist, "Le Plaider coupable" [The Guilty Plea], La Barreau de Lille & New York County Lawyers' Association, Lille, France, Oct. 27, 2005

Panelist, "Corporate Crimes: Investigating and Prosecuting the Entity and its Employee," New York Council of Defense Lawyers Retreat, Oct. 15, 2005

Panelist, "Zealous Advocacy: Ethics for the Criminal Defense Attorney," Fordham Univ. School of Law, Oct. 11, 2005

Panelist, "Ethical Considerations for Corporate Investigations," Association of the Bar of the City of New York, September 14, 2005

Moderator, "The Attorney-Client Privilege from Cradle to Grave: An Examination of the Role, Implications, and Viability of the Attorney-Client Privilege," ABA Annual Meeting, Chicago, IL, Aug. 7, 2005

Moderator, "Ethical Issues in Pro Bono," Association of the Bar of the City of New York, June 28, 2005

Panelist, "Ethical Dilemmas for Financial Services Attorneys," SIA Compliance & Legal Division, June 21, 2005

Panelist, "Civility & Zealous Advocacy – Building Blocks to Success: The American College of Trial Lawyers Codes of Pre-Trial & Trial Conduct," Association of the Bar of the City of New York, June 20, 2005

Presenter, Symposium: "Should There Be an Effort to Develop Uniform Statewide Attorney Disciplinary Rules?", NYCLA, May 13, 2005

Panelist, "The Efficacy of Unbundling Legal Services," Partners in Justice: A Colloquium on Developing Collaborations Among Courts, Law School Clinical Programs and the Practicing Bar, New York State Judicial Institute, May 9, 2005

Panelist, "You're Fired! Conflicts of Interest and Disqualification of Counsel," Federal Bar Council, April 26, 2005

Speaker, "Ethical Issues in Legal Services Practice," Legal Services of New York, March 15, 2005

Panelist, "Rising to the Challenge: How Should a Civil Practitioner Deal with Liars, Cheaters, Suicide Threateners, and Other Difficult Clients?," Fordham Univ. School of Law, March 14, 2005

Panelist, "Ethical Considerations in Commercial Mortgage Practice," Commercial Real Estate Financing 2005, PLI, Feb. 18, 2005

Speaker, "United States Regulation of Multijurisdictional Practice," Conference on Liabilities of Lawyers in Crossborder Transactions and Disputes, Center for International Legal Studies, Kitzbuhel, Austria, Jan. 25, 2005

Panelist, "New Developments in Ethical Considerations for the Business Attorney," in MCLE Marathon 2004, PLI, Dec. 16, 2004

Panelist, "Waivers That Work - Managing Conflicts Effectively," NYLJ & Stein Center, Dec. 6, 2004

Moderator, "Practical Problems in Litigation Ethics," Trial Evidence in the Courts: Problems and Solutions, ALI-ABA, Dec. 2, 2004

Panelist, "'Acceptable Lies?' - The Ethics of Negotiation, and Legal Duties of Disclosure," NYLJ & Stein Center, Dec. 1, 2004

Moderator, "Ethical and Professional Issues in Litigation," Marilyn Stein Bellet Conference on Law and Ethics, Hilton Head, SC, Nov. 13, 2004

Panelist, "Ethical Considerations for Corporate Investigations: Updates 2004," Association of the Bar of the City of New York, Sept. 14, 2004

15

Moderator, "Tattletales or Crimestoppers: Disclosure Ethics Under Model Rules 1.6 and 1.13," ABA Annual Meeting, Atlanta, GA, Aug. 7, 2004

Panelist, "Representing Clients with Diminished Capacity," NYSBA Legal Assistance Partnership Conference, Albany, NY, June 15, 2004

Panelist, "Avoiding Potholes: Discovery and Ethics on the Highway to Trial," ABA Section of Litigation Annual Meeting, Phoenix, AZ, May 6, 2004

Panelist, "Confronting Possible Client Fraud: Is 'Don't Ask, Don't Tell' an Ethically Acceptable Approach?," Brooklyn Bar Ass'n, Apr. 14, 2004

Panelist, "Ethical Issues in Pro Bono," Association of the Bar of the City of New York, Feb. 25, 2004

Panelist, "Ethical Considerations in Commercial Mortgage Practice," Commercial Real Estate Financing 2004, PLI, Feb. 24, 2004

Panelist, "Should New York Adopt the Model Rules of Professional Conduct?," NYSBA 2004 Annual Meeting, Jan. 28, 2004

Panelist, "Ethical Challenges in Employment Law," ABCNY, Jan. 16, 2004

Moderator, "Ethics in Action: The Role of Intergenerational Differences in Setting a Lawyer's Moral Compass," Northeast NALP, Jan. 15, 2004

Panelist, "The Attorney-Client Privilege and the Potential Abuse of Public and Private Power," AALS Annual Meeting, Atlanta, Ga., Jan. 5, 2004

Panelist, "Conflict of Interest Issues in Corporate Representation," PLI, Dec. 19, 2003

Panelist, "New Developments in Ethical Considerations for the Business Attorney," PLI, Dec. 18, 2003

Panelist, "Should Criminal Defense Lawyers Be Constrained by the Truth?: The Limits of Zealous Advocacy," Fordham Univ. School of Law, Nov. 25, 2003

Speaker, "Government Attorney Conduct from the Ethics Committees' Perspective," 2003 Ethics for Government Attorneys, Office of the NYS Attorney General, Nov. 14, 2003

Panelist, "Ethical Dilemmas Faced During the Defense of a Criminal Case," co-sponsored by the Legal Aid Society and the Stein Center, Fordham Univ. School of Law, Nov. 13, 2003

16

Panelist, "Ethics for Corporate Counsel," N.Y.S. Bar Ass'n Corporate Counsel Section, Oct. 27, 2003

Panelist, "Thorny Ethical Issues in Litigation," Federal Bar Council 2003 Fall Bench & Bar Retreat, CT, Oct. 18, 2003

Panelist, "Legal Ethics vs. Personal Morality: How to Resolve the Unresolvable," co-sponsored by the Legal Aid Society and the Stein Center, Fordham Univ. School of Law, Sept. 29, 2003

Commentator, conference on "Judging Judges' Ethics," Hofstra University School of Law, Sept. 14-15, 2003

Panelist, "Ethical Considerations for Corporate Investigation: Updates 2003," ABCNY, September 11, 2003

Panelist, panel on Ethics for program on "Real Estate Titles and Transfers, N.Y. State Bar Ass'n, June 19, 2003

Moderator, "Conflicts of Interest in Criminal Practice," ABA National Conference on Professional Responsibility, Chicago, IL, May 29, 2003

Co-panelist, "Ethical Considerations of Asset Protection," Estate Planners Day, Estate Planning Council of NYC, May 9, 2003

Panelist, "Plenary Session: Coming Soon to a State Rules Committee Near You: How Will Ethics 2000 Affect Lawyer Liability?," ABA National Legal Malpractice Conference, New Orleans, Apr. 24, 2003

Moderator, "Ethics for Litigators," Assoc. of the Bar of the City of New York, Apr. 14, 2003

Moderator, "Top Ten Reasons Why You Should Read the 2002 Model Rules of Professional Conduct," ABA Section of Litigation Annual Meeting, Houston, TX, April 12, 2003

Panelist, "Collaborations Between Lawyers and Social Workers: Avoiding Ethical Minefields," Fordham Univ. School of Law, April 7, 2003

Moderator, "Effect of Present Wartime Legislation on Practicing Attorneys: A Discussion of Future Implications," conference on American Democracy in Times of War, Benjamin N. Cardozo School of Law, March 24, 2003

Speaker, "Criminal Neglect: Non-diligent Criminal Defenders, Under-funded Public Defense Systems, and the Disciplinary Non-response," What Do Clients Want? Emory Conference on Ethics and Professionalism, Emory Univ. School of Law, March 14,

2003

Speaker, "Ethical Issues and the Practice of Public Interest Law," Brennan Center for Justice, March 6, 2003

Panelist, "The Ethics of Helping Clients Who Cannot Help Themselves," Fordham Univ. School of Law, March 3, 2003

Speaker, "Criminal Neglect: Non-Diligent Criminal Defenders, Under-funded Public Defender Systems, and the Disciplinary Non-response," Association for Practical and Professional Ethics annual meeting, Charlotte, N.C., Feb. 28, 2003

Panelist, "Benchmarks of Ethics Center Excellence: Funding Strength," Ethics Center Colloquium: Strategic Planning for Ethics Centers, Association for Practical and Professional Ethics, Charlotte, N.C., Feb. 27, 2003

Panelist, "Ethical Considerations in Commercial Mortgage Practice," Commercial Real Estate Financing 2003, PLI, Feb. 25, 2003

Moderator, panel on "Integrity in the Practice of Law," Conference on Integrity in the Law, Fordham Univ. School of Law, Feb. 7, 2003

Co-presenter, Asset Protection – Ethical Considerations, UJA Federation of NY, Feb. 4, 2003

Trainer, "Disciplinary Procedures and Overview of Issues Relevant to MELS' Practice," Legal Services for New York City, Feb. 3, 2003

Panelist, "New Developments in Ethical Considerations for the Business Attorney," PLI, December 19, 2002

Panelist, "Ethical Issues in Representing a Corporation Under Investigation," Fordham Univ. School of Law, November 19, 2002

Luncheon speaker, "Ethical Issues for Government Lawyers in Dealing with Witnesses," Professional Responsibility Officers' Conference, U.S. Department of Justice, Washington, D.C., November 13, 2002

Panelist, "Talking to the Media: Practical & Ethical Considerations Lawyers Need to Know about the Big, Bad World of TV & Radio," Association of the Bar of the City of New York, November 12, 2002

Moderator, "Moral Philosophy and the Practice of Justice," Federal Bar Council, Kerhonkson, NY, October 26, 2002

Panelist, "Representing the Corporation in Crisis," New York State Bar Association, Business Law Section Fall Meeting, St. Thomas, October 11, 2002

Panelist, "Seminars for Judges: Should Judges Attend Seminars Funded by Private Organizations, and if so, How Should Such Programs Be Funded?,"Association of the Bar of the City of New York, October 9, 2002

Speaker, ABA National Legal Malpractice Conference, Chicago, IL, Sept. 13, 2002

Panelist, "Keeping to the Straight and Narrow: Ethical Issues for Civil Litigators," N.Y. State Bar Ass'n, June 7, 2002

Panelist, "Teaching Professional Responsibility: 'Woodshedding' or Coaching the Witness and Impeaching the Honest Witness," plenary session of AALS Conference on Evidence, Alexandria, Va., June 1, 2002

Moderator, "Law Practice at the Crossroads: How Far Should We Go in Changing Rules Governing Cross-Border Practice and Bar Admission?," N.J. State Bar Ass'n annual meeting, May 22, 2002

Panelist, "The New York Lawyer Practicing Delaware Law" (program on "The Delaware-New York Nexus 2002"), N.Y. County Lawyers' Ass'n, May 3, 2002

Speaker, "Prosecutorial Ethics as Usual," conference on ABA Model Rules of Professional Conduct, University of Illinois School of Law, April 5, 2002

Moderator, "Ethical Issues for the Lawyer in Dealing with Mentally Ill Clients," Association of the Bar of the City of New York, March 23, 2002

Moderator, "Legal Issues Arising from Acts of Terrorism and Anti-Terrorist Efforts," U.S. Judicial Conference for the District of New Jersey, March 20, 2002

Co-panelist, "Ethical Issues in Transactional Practice," Fordham Law School, March 6, 2002

Trainer, "Selected Topics in Legal Ethics," Legal Services for New York City, March 5, 2002

Speaker, "Ethical Considerations," program on "Commercial Real Estate Finance," PLI, February 26, 2002

Panelist, "Legal Ethics in the Practice of Criminal Law," Association of the Bar of the City of New York, February 21, 2002

Panelist, "Ethics Issues in Multijurisdictional Practice," ABA Connection, February 20, 2002 and February 21, 2002 (teleconference)

Panelist, "Dialogue Regarding the Issue: Justice Monitors Attorney/Client Communications," Joint program of APRL and ABA Center for Professional Responsibility, ABA Midyear Meeting, Philadelphia, Jan. 31, 2002

Panelist, "Preparing and Presenting Experts: Practical and Ethical Issues," N.Y.S. Bar Ass'n annual meeting, Antitrust Law Section, Jan. 24, 2002

Speaker, "Ethical Issues and the Practice of Public Interest Law," Brennan Center for Justice at NYU School of Law, Dec. 11, 2001

Panelist, New Developments in Ethical Considerations for the Business Lawyer, MCLE Marathon 2001, PLI, Dec. 7, 2001

Speaker, "Ethics and Professionalism," program titled "Update 2001," N.Y.S. Bar Ass'n, Nov. 2, 2001

Panelist, "Ethics and Discovery," Federal Bar Council, Oct. 14, 2001

Co-presenter, "Ethics for Transactional Lawyers," Fordham Law School, Oct. 10, 2001

Speaker, 2001 Legal Ethics Conference: "Legal Ethics: What Needs Fixing?," Hofstra University School of Law, Sept. 10, 2001

Panelist, "Ethics and Criminal Procedure," Israeli Ministry of Justice (in conjunction with the Stein Center), Jerusalem, Israel, July 5, 2001

Panelist, ethics issues in real estate practice, "Real Estate Titles and Transfers," N.Y.S. Bar Ass'n, June 14, 2001

Co-chair and speaker, "Ethics and Professionalism," N.Y.S. Bar Ass'n, June 13, 2001

Panelist, "Ethical Issues in Welfare Advocacy," The Legal Aid Society, June 11, 2001Panelist, "Ethics in Government," State of New York Office of the Attorney General, June 9, 2001

Panelist, "What Every New Attorney Must Know About Ethics, Part II," PLI, May 29, 2001

Panelist, "Training the Advocate," ABA Section of Litigation Annual Meeting, Phoenix, AZ, May 10, 2001

Presenter, ethics issues in commercial real estate finance, program on "Commercial Real Estate Finance," PLI, May 4, 2001

Panelist, program on Ethics in Litigation, New York County Lawyers' Assn., April 30, 2001

Presenter, Clifford Symposium on Tort Law and Social Policy ("Smoke Signals: The Changing Landscape of the Practice, Financing and Ethics of Civil Litigation in the Wake of the Tobacco Wars"), April 5-6, 2001, DePaul College of Law

Moderator, Ethical Issues in Settlement Negotiations, Walter F. George School of Law, Mercer University, March 9-10, 2001

Presenter, CLE program on ethics in criminal defense representation, Brooklyn Defender Services, Jan. 30, 2001

Panelist, Symposium on Unlawful Practice of Law: Toward a Definition of the "Practice of Law," NYSBA annual meeting, Jan. 25, 2001

Panelist, CLE program on legal ethics, PLI, Nov. 21, 2000

Panelist, CLE program on ethics in transactional representation, Fordham Univ. School of Law, Nov. 8, 2000

Panelist, CLE program on ethics in criminal advocacy, Fordham Univ. School of Law, Nov. 1, 2000

Panelist, CLE program on ethics in real estate transactions, Chicago Title, Oct. 30, 2000

Panelist, CLE program on witness preparation, Federal Bar Council, Oct. 25, 2000

Panelist, symposium on professionalism sponsored by S. Carolina Univ. School of Law, Savannah, Ga., Oct. 21, 2000

Panelist, CLE program on ethical issues for legal services lawyers, LSNY, Oct. 11, 2000

Presenter, symposium on ethics issues for law professors, S. Tex. College of Law, Oct. 6, 2000

Presenter, faculty workshop, ethics issues for law professors, Fordham Univ. School of Law, Sept. 28, 2000

Panelist, "Ethical Considerations in Asset Protection – Views from the Bench and Bar," ABA annual meeting, July 10, 2000

Panelist, "Lawyer vs. Client: Avoiding Ethical Pitfalls When the Attorney-Client Relationship Becomes Rocky," ABA annual meeting, July 9, 2000

Panelist, program on corporate internal investigations and cooperation, titled "I'm from the Government and I'm Here to Help You," ACCA, June 27, 2000

21

Panelist, program titled "Ethical Considerations for Criminal Practitioners," NYCLA, June 27, 2000

Speaker, "The Blurring Line Between Law & Business – Maintaining Ethical Standards," NYLJ General Counsel Conference, June 16, 2000

Panelist, panel on Ethics and the Newsgathering Process, for PLI program on "Newsgathering & Libel Litigation 2000," June 15, 2000

Member of planning committee, Partnerships Across Borders: A Global Forum on Access to Justice, ABCNY, Apr. 6-8, 2000.

Speaker, Symposium on "Prosecutorial Misconduct: Discretion, Remedies, and Ethics," Georgetown Law School, Mar. 30, 2000

Speaker, CLE program on legal ethics, Appellate Division, First Department, Mar. 27, 2000

Speaker, Symposium on "Legal Ethics for Government Lawyers: Straight Talk for Tough Times," Widener Univ. School of Law (Harrisburg), March 23, 2000

Organizer and participant, Symposium on the Multijurisdictional Practice of Law, Mar. 10-11, 2000

Speaker, CLE program on current topics in legal ethics, Fordham Law School, March 7, 2000

Panelist, "The Ethics, Tactics and the Law of Witness Preparation," Federal Bar Council annual winter meeting, Feb. 29, 2000

Panelist, "Lawyers Under Investigation: Are Prosecutors and Defense Lawyers Simply 'Doing Their Jobs'?", Federal Bar Counsel annual winter meeting, Feb. 28, 2000

Speaker, "The Future of the Legal Profession: A Symposium on Multidisciplinary Practice," Minnesota Law School, Feb. 26, 2000

Moderator, workshop program for deans and bar leaders, ABA Mid-Year Meeting, Feb. 11, 2000

Organizer and speaker, CLE program on ethics in litigation, Fordham Law School, Feb. 8, 2000

Invited guest, meeting of the Subcommittee on Attorney Conduct Rules, Committee on Rules of Practice and Procedure, Judicial Conference of the United States, Feb. 4, 2000

Organizer and introducer, program on "Ethics in Criminal Advocacy," AALS Annual Conference, Jan. 6, 2000

# Exhibit B

## STATEMENT OF FACTS

On February 16, 2007, Microsoft filed its initial Complaint with the Commission, alleging a violation of Section 337 based on four U.S. patents. After the filing of its complaint, Microsoft started the process of purchasing a complete OmniPCX Enterprise ("OXE") system in order to perform a full array of tests. To do so, Microsoft's counsel, Fish & Richardson P.C. ("F&R"), requested the assistance of a third party company named Miercom to expedite the purchase. It, however, took much longer than anticipated to purchase the latest OXE system with the latest version of its software. By the time the Commission instituted this investigation on March 20, 2007 with Alcatel-Lucent as a named respondent, the purchase was still in progress. To ensure that there would be an OXE system for testing in this Investigation, Microsoft separately requested that Alcatel-Lucent produce "[o]ne sample of each version of each Accused Product." [Mar. 23, 2007 Microsoft's 1st Set of Req. for Prod. at p. 6 (RFP No. 18).]

Instead of responding within the 10-day period permitted by the Commission Rules and the Ground Rules, see, e.g., Ground Rule 4(i), counsel for respondent instead informed Microsoft that Alcatel-Lucent was not the proper respondent in this Investigation, and that a separate French entity called Alcatel Business Systems should be substituted:

> As we have discussed this past week, Alcatel Lucent is not the proper party to the action Microsoft brought in the ITC and Delaware alleging infringement against the OmniPCX and OmniTouch Unified Communications Suite. Alcatel Lucent is a holding company that owns stock in various subsidiaries, but does not make any products, including those at issue in the recent actions filed by Microsoft. Instead, Alcatel Business Systems is the entity that makes the OmniPCX and OmniTouch Unified Communications Suite.

> To confirm the discussion we had earlier this week concerning the relationship between Alcatel Business Systems and Alcatel Lucent, Alcatel Business Systems is owned by Alcatel Participations. Alcatel Participations is owned by Compagnie Financiere Alcatel-Lucent, which is owned by Alcatel Lucent. So, you can see that Alcatel Lucent, the holding company you have named in both actions, is three steps from the company that makes and sells the accused products.

[Apr. 13, 2007 Ltr. fr. Mr. Nelson to Mr. Colaianni at 1 (emphases added).] Based on this representation, Microsoft filed a motion on April 19, 2007 to amend the complaint and notice of investigation to reflect the correct respondent, Alcatel Business Systems, as well as to assert additional claims from the patents at issue in the investigation. In Order No. 4 issued on April 26, 2007, the Court granted Microsoft's motion to amend.

While the motion to amend was pending and over a month after service of Microsoft's requests for production, ABS responded to Microsoft's request for production of an OXE system by indicating that it would only produce <u>documents</u> in response to this request. [Apr. 23, 2007 Respondent's Resp. to Microsoft's 1st Set of Req. for Prod. at 17 (Subject to and without waiving the foregoing objections, <u>Respondent will produce</u> any responsive, non-privileged <u>documents</u> in its possession, custody or control that are located after a reasonable search." (emphases added)).]

Given ABS's unilateral decision to only produce documents instead of an actual system, Microsoft proceeded with its plans to acquire an OXE system on the open market. On April 27, 2007, Miercom forwarded to Microsoft's counsel a commercial offer for sale from Alliance Telecommunications ("Alliance"), an ABS-authorized independent resellers, willing and able to sell the latest OXE hardware and software. [Apr. 20, 2007 Ltr fr. Alliance to Miercom re pricing proposal).] Alliance's commercial sales offer covered the components of an OXE system, as well as time and labor to install the system and train someone to use the system:

| Labor | | |
|---|---|---|
| Install the OXE phone switch. | | |
| Program the phones and trunks. | | |
| Install four (4) software packages . | | |
| Train an individual on the system. | | |
| | Labor | $3,480.00 |

[Apr. 20, 2007 Ltr fr. Alliance to Miercom re pricing proposal at 1.] As the offer noted, the OmniTouch software suite for use in the OXE system required proper installation and training, leading Alliance to state: "Because of this additional software, I had to increase my labor cost to

cover <u>my technician's time</u> to install these packages and <u>train the personnel who will be using</u>

<u>them</u>."[1]  [<u>Id.</u> (emphases added).]  The Alliance offer directly stated that an Alliance technician –

not an ABS technician – would install the system and train the system's user.  [<u>Id.</u>]  Given this

opportunity to acquire an OXE system on the open market, F&R placed an order on the same day

it received Alliance's offer for sale, making a deposit of about a third of the $26,387 purchase

price with a check drawn on F&R's bank account.  Delivery and installation of the phone system

were unfortunately delayed repeatedly by Alliance.

After repeated delays, Alliance finally confirmed that it would deliver and install the

purchased OXE system on Tuesday June 26, 2007.  On that date, Mr. Dan McGirr – one of

Alliance's technicians – came to F&R's office with the components of the OXE system.

Without any advanced notice to F&R and upon Alliance's own initiative, another person—Mr.

PoChing Lin—accompanied Mr. McGirr.  By the time they announced themselves to the F&R

receptionist, both Messrs. McGirr and Lin knew that the installation would take place within

F&R's office.

Ms. Elluru greeted Messrs. McGirr and Lin in the F&R lobby and escorted them to a

secure case room where they needed to install the OXE system.  The door of this secured room

and the bookshelf inside were conspicuously labeled with signs stating:

---

[1] Such training appears to be customary with the purchase of an OXE system, as reflected in Mr. Lin's own declaration: "As part of the installation of OXE and OTUC, I also provide training on the administration, use and configuration of the products."  [Declaration of Poching Lin ("Lin Decl.") at ¶ 7.]



After situating Messrs. Lin and McGirr and exchanging pleasantries with them, Ms. Elluru provided each of them with her business card, which expressly identified her as an attorney for a law firm specializing in "Intellectual Property \ Litigation \ Corporate":

| FISH & RICHARDSON P.C. |
| --- |

**FR**

FISH & RICHARDSON P.C.

1425 K Street, N.W.
11th Floor
Washington, DC 20005

Rama G. Elluru
*Attorney*

Direct Dial 202 626-6417
Email elluru@fr.com

Telephone 202 783-5070
Facsimile 202 783-2331
www.fr.com

Intellectual Property | Litigation | Corporate

To ensure that they could contact her that day in case they needed anything, Ms. Elluru further noted her direct extension on the business cards she gave them. In return, Messrs. McGirr and Lin gave to Ms. Elluru their respective business card, with Mr. Lin's indicating an affiliation with Alcatel-Lucent, which is not a party to this Investigation. [Lin Decl. Ex. C (Lin Business Card).] After Ms. Elluru left the secured room and returned to her office, either Mr. Lin or Mr. McGirr called her direct line a number of times to ask questions, indicating that they had reviewed the card she had given him.

As they continued their installation, they ran into numerous technical difficulties which required them to extend their stay by a few days. [E.g., Lin Decl. ¶ 25 (noting technical

problems with the My Assistant software).] As the technicians were troubleshooting the system, Ms. Elluru periodically checked on their progress. Mr. Joshua Pond, one of her colleagues, also intermittently came to the secured room to assess their progress. On such occasions, Mr. Pond introduced himself and exchanged pleasantries with the technicians.

After three and a half day of installation and technical troubleshooting, the techicians represented that the OXE system was finally operational in the afternoon of Friday June 29, 2007. At that point, Messrs. Lin and McGirr proceeded with some training, as is customary with such installation and as specifically provided by the purchase agreement with Alliance. [Lin Decl. ¶¶ 5 & 7.] Mr. Lin began a demonstration on network administration and configuration for Ms. Elluru and Mr. Pond, with the demonstration turning into a conversation – similar to one Mr. Lin would have with any customer learning to operate the system – about the system's operations and features. During his demonstration, Mr. Lin realized that multiple features – such as the telephones – were not operating properly and that the installation was far from complete. Because both technicians stated that they had to catch flights later that afternoon, they were unable to complete the troubleshooting that day. Since Alliance had contractually agreed to perform the installation and training, Ms. Elluru contacted Alliance to arrange for additional installation and training.

Mr. Lin's return, which Alliance coordinated without consulting with F&R, occurred on Tuesday July 3, 2007, and not on Monday July 2, 2007 as Mr. Lin noted. [Lin Decl. ¶ 27 (stating that he returned on July 2). Not only did Mr. Lin incorrectly recall his dates, he also mistakenly asserted that he spoke with Mr. Ahmed Davis, one of the F&R principals representing Microsoft in this Investigation, "at some point, possibly on July 2, 2007." [Lin Decl. ¶ 28-29.] Mr. Davis is certain that he had no contact with Mr. Lin, either on July 2 or on any other date. Mr. Davis was out of the office most of the time that Mr. Lin was at F&R. Perhaps Mr. Lin had memory lapses, or perhaps ABS needed to implicate someone other than an associate to buttress its motion. The fact nonetheless remains that Mr. Davis never even met or spoke with Mr. Lin. [Id. ¶¶5-6.]

It is also a fact that Mr. Lin returned to F&R's office on Tuesday July 3 to complete the installation of the system. Once the installation appeared to be completed, Mr. Lin discharged Alliance's obligations to provide training by providing instructions to Ms. Elluru and Mr. Pond about various features of the OXE system, including the functionality of OTUC software applications, the configuration of the system, and the manner in which it performed call routing. The information he provided to Ms. Elluru and Mr. Pond, including the user guides, was typical information which any purchaser of the OXE system would receive after paying over to $26,000 for a functioning system.

At no time did F&R personnel ask Mr. Lin about the pending lawsuits. They did not seek information covered by the attorney-client privilege or the work product doctrine, and they received none. Nor did anyone ask Mr. Lin anything about his purported role in the development or testing of the products by ABS, or inquire about the past conduct of Mr. Lin or anyone else associated with these products. And certainly, F&R and Microsoft do not rely on any statements or acts or omissions by Mr. Lin as evidence in these proceedings.

The evidence on which Microsoft relies is the independent analysis of its technical expert, Mr. Jack Chang. When Mr. Lin returned to complete his installation and troubleshooting of the OXE system on Tuesday July 3, Mr. Chang had already arrived in Washington D.C. to work on his initial expert report, which was due to be submitted on July 11, 2007. Since Mr. Chang desired to perform his tests independently in order to develop his expert opinions, he had no contact with Mr. Lin. For this reason, Mr. Lin had to wait in a conference room after he completed his installation, while Mr. Chang performed a number of tests on the OXE system. When the system required additional "debugging," Mr. Chang left the room before Mr. Lin returned to make additional adjustments to the equipment.

The result of his own independent analysis and opinion appears in the expert report Mr. Chang submitted on July 11, 2007. Not only did he provide a detailed basis for his opinion, he clearly stated that he performed his tests on an OXE system located at F&R's D.C. office:

> The Alcatel Demonstration System is located at Fish & Richardson P.C.'s offices in Washington, D.C., and included an OmniPCX Enterprise (OXE) connected to the telephone network through a trunking line, and to a LAN through the "Gateway Driver Processing Unit" and "Call Server Processing Unit" LAN ports on the OXE. . . . The OXE was also connected over the LAN, using the 3COM router, to a server running version 4.1.00.32 (admin version 3.3-006.010) of the Alcatel OmniTouch Unified Communication software product ("OTUC server"), a server running version ACS 7.0.0b3257 of Alcatel's My Teamwork application ("My Teamwork server"), and to an e-mail server running version of Microsoft Exchange Server 2003 SP1 ("Exchange server").

Thus, ABS and its counsel have known for almost to two months that F&R had acquired a recent version of the OXE system before July 11, and that Mr. Chang had performed tests using this system. Since installation and training services are customarily provided with these products, [Lin Decl. ¶ 7], ABS and its counsel were certainly on notice for more than seven weeks before filing this Motion to Disqualify that F&R personnel had received such services in connection with this litigation.

## CERTIFICATE OF SERVICE

It is hereby certified that copies of the foregoing **DECLARATION OF BRUCE**

**A. GREEN** was served on this 11th day of September, 2007 as follows:

| | |
|---|---|
| Marilyn R. Abbott<br>Secretary<br>U.S. International Trade Commission<br>500 E Street, S.W.<br>Washington, D.C. 20436 | Via Hand Delivery<br>(Original + 6) |
| The Honorable Paul J. Luckern<br>Administrative Law Judge<br>U.S. International Trade Commission<br>500 E Street, S.W., Suite 317<br>Washington, D.C. 20436 | Via Hand Delivery<br>(Two Copies) |
| David Lloyd, Esq.<br>U.S. International Trade Commission<br>Office of Unfair Import Investigations<br>500 E Street, S.W., Room 401<br>Washington, D.C. 20436<br>david.lloyd@usitc.gov | E-mail and Hand Delivery |
| David A. Nelson, Esq.<br>Latham & Watkins LLP<br>233 South Wacker Drive, Ste 5800<br>Chicago, IL 60606-6306<br>david.nelson@lw.com | E-mail and Overnight |
| Sasha D. Mayergoyz, Esq<br>Peter N. Moore, Esq.<br>Latham & Watkins LLP<br>233 South Wacker Drive, Ste 5800<br>Chicago, IL 606-6306<br>sasha.mayergoyz@lw.com<br>peter.moore@lw.com | E-mail |

Steven C. Cherny, Esq.                    E-mail
Clement Naples, Esq.
Latham & Watkins LLP
885 Third Avenue, Ste 1000
New York, NY 10022-4834
steven.cherny@lw.com
clement.naples@lw.com

Renny Hwang, Esq.                         E-mail
Latham & Watkins LLP
633 West Fifth Street, Ste 4000
Los Angeles, CA 90071-2007
renny.hwang@lw.com

David M. Farnum                           E-mail
Latham & Watkins LLP
555 Eleventh Street, NW, Ste 1000
Washington, D.C. 20004-1304
david.farnum@lw.com

F. David Foster                           E-mail and Hand delivery
Miller & Chevalier Chartered
655 Fifteenth Street, N.W.
Washington, D.C. 20005
dfoster@milchev.com

James B. Altman                           E-mail
Kelly Busby
Miller & Chevalier Chartered
655 Fifteenth Street, N.W.
Washington, D.C. 20005
jaltman@milchev.com
kbusby@milchev.com

Judith Best

40423747.doc

# Exhibit 11

1

## UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C. 20436

### Before The Honorable Paul J. Luckern
### Administrative Law Judge

In the Matter of

CERTAIN UNIFIED COMMUNICATION
SYSTEMS, PRODUCTS USED WITH
SUCH SYSTEMS, AND COMPONENTS
THEREOF

Inv. No. 337-TA-598

## DECLARATION OF W. WILLIAM HODES

W. WILLIAM HODES, a person of the full age of majority, based upon personal
knowledge and under penalty of perjury, declares and states the following:

### QUALIFICATIONS AND DISCLOSURE OF INTEREST

1.      I am a citizen of the United States, and an attorney admitted to practice in the
courts of Louisiana, New Jersey, and Indiana, as well as in the Supreme Court of the United
States.  I was first admitted to practice in Louisiana in 1969.  I am the owner and president of
the William Hodes Professional Corporation, which was formed on July 1, 1999, and is located
at 8125 Raven Rock Drive, Indianapolis, Indiana, 46256.  My current curriculum vita is
attached hereto.

2.      I graduated from Harvard College in 1966 (B.A., cum laude in general studies),
and from Rutgers Law School (Newark) in 1969 (J.D., with highest honors).  I practiced law in
both the public and private sectors for nine years, and then served as a Bigelow Teaching
Fellow at the University of Chicago Law School in the 1978-79 school year.  I then taught law
full-time at the Indiana University School of Law in Indianapolis from 1979 to 1999, except
for visiting teaching assignments, and two periods of sabbatical leave, including a one-year
clerkship with Justice Ruth Bader Ginsburg during the October 1996 Term of the United States

2

Supreme Court. I retired from Indiana University on December 31, 1999, and became Professor Emeritus of Law during the spring of 2000.

3.      During my academic career, I taught public law subjects that included Administrative Law, Civil Procedure, Constitutional Law, and Federal Courts. My main area of expertise was Legal Ethics or Professional Responsibility—today often referred to as "the law of lawyering," after a book of that name of which I am a co-author. I taught a course in Professional Responsibility or Legal Ethics most school years between 1979 and 1999. That includes once at the Southern Illinois University School of Law and once at the University of Illinois College of Law, where I served as Visiting Professor of Law in the fall semesters of 1990 and 1994, respectively.

4.      I am the co-author, with Professor Geoffrey C. Hazard, Jr., of a treatise on legal ethics and related subjects, entitled THE LAW OF LAWYERING, the third edition of which was published in 2000, after initial publication in 1985. The treatise is accepted as an authoritative work and has often been cited in court opinions on issues of legal ethics and "other law" governing the legal profession and the conduct of lawyers and judges. Because the treatise is supplemented annually, I keep myself informed not only with respect to specific developments in the field of legal ethics and "other law" governing lawyers, but with respect to national trends as well.

5.      Between 1998 and 2002, I served as a member of the Advisory Council to the Ethics 2000 Commission, a task force of the American Bar Association that proposed significant revisions to the Model Rules of Professional Conduct, many of which were adopted by the ABA House of Delegates, and most of which have been adopted or are under consideration by the highest courts in a large number of jurisdictions in the United States. I have been a member of the American Law Institute since 1997, and participated both before and after my election to membership in debate over the provisions of the Restatement of the Law Governing Lawyers.

6.      From October 2004 until February 2007, I served as one of the two Reporters for the American Bar Association, Joint Commission to Evaluate the Model Code of Judicial

3

Conduct; its final report was submitted to the ABA House of Delegates in February 2007, at the ABA mid-year meeting in Miami, Florida, and was approved.

7.    I have been engaged, through its outside counsel, by the law firm of Fish & Richardson, P.C., to provide limited expert testimony in this matter, in connection with the pending Motion to Disqualify Counsel (F & R) and for related relief. Apart from this engagement, I do not have and have not had any financial or other association with any party, attorney, or witness in the case of which I am aware, except for unrelated professional engagements, and social or professional working relationships. All of the opinions I express in this declaration are opinions that I genuinely hold, and would be willing to testify to in open court, under oath.

## SCOPE OF EXPERT OPINIONS

8.    I have been provided with the public version of Alcatel Business System's Motion to Disqualify Counsel and its Brief in support thereof, along with the non-confidential accompanying exhibits and declarations, including that of Professor Thomas Morgan. I was also provided with a near-final draft of Professor Bruce Green's declaration and a copy of the statement of facts that he relied on.

9.    I have been asked to limit my expert opinion to the issue of the appropriateness (or not) of a court or other tribunal disqualifying counsel for a party on the eve of trial in private party litigation, when counsel has participated in what is commonly referred to as "testing" activities in civil rights, intellectual property, and other areas of the law.

10.    As an expert witness, I have neither the competence nor the authority to resolve any factual disputes that might exist in connection with the pending Motion to Disqualify Counsel. Moreover, my reading of the case materials has convinced me that the parties do not disagree on a large number of significant factual issues. Nonetheless, before stating any opinion, I will note the facts that I am assuming, where that is germane. Although I am relying on the statement of facts noted above in ¶8 of this declaration and cannot vouch for their accuracy, I am confident that the assumed facts are not inconsistent with the parts of the

4

documentary record I examined. Moreover, I did not and would not rely on any assumption that is manifestly erroneous or inherently incredible.

11.    I am thoroughly familiar with the legal principles that generally apply to motions to disqualify counsel and for related relief in both state and federal courts. Ultimately, however, those legal issues are for the Administrative Law Judge to decide; accordingly, where it is germane I will note the assumptions I am making about the legal universe that the ALJ will provide. Thus, my opinions are for the limited purpose of assisting the ALJ in applying the agreed or assumed facts to that legal universe.

## FACTS ASSUMED AND OPINIONS HELD

12.    In its motion and brief Alcatel Business Systems ("ABS") proceeds on the theory that state (or District of Columbia) law supplies the rule of decision for this motion in federal private party litigation, and that the law in question is embodied chiefly in the formally promulgated Rules of Professional Conduct. In my opinion, both of these related propositions are highly dubious; moreover, it has been my experience that both propositions are among the most commonly misunderstood and misapplied concepts in the law of lawyering—especially when the subject is disqualification of counsel.

13.    It is my understanding that the United States District Court for the District of Delaware has by local rule adopted the ABA Model Rules of Professional Conduct, as amended from time to time, as the rules applicable to attorneys appearing before it. The parties appear to agree, and I assume, that the International Trade Commission looks to those same Model Rules in adjudicating motions to disqualify counsel and for other sanctions. In other words, each of these tribunals has *chosen* to adopt or borrow the ABA Model Rules, in furtherance of its inherent power to control the conduct of lawyers appearing before it. In my view, therefore, when the ITC or the federal court in Delaware "applies" a rule of professional conduct to a lawyer, it is applying *federal* law, taking into account, of course, relevant interpretations of the borrowed rules.

14.    It is further my opinion that when the International Trade Commission (or any other tribunal, for that matter) is asked to disqualify counsel because of a claimed violation of

5

the rules of professional conduct, it is not actually "applying" those rules, because the rules of professional conduct are *rules of discipline*; they do not speak to the remedies available in civil litigation between private parties. Instead, motions to disqualify counsel are decided under a common law of disqualification, *derived from and informed by the principles discernible in the rules of professional conduct.*

15.    Having read, analyzed and written about a large number of disqualification cases, both state and federal, and having participating in more than a few myself, both as lawyer and consultant or expert witness, I am well aware that lawyers prosecuting and defending motions to disqualify counsel, and courts deciding them, often argue *as if* the motion should be granted or denied, depending on whether a particular rule of professional conduct has or has not been violated. But, as I explain below, while the violation of a disciplinary rule is often a necessary predicate to a motion to disqualify, it by no means sufficient. Therefore, when courts and authorities speak about disqualifying a lawyer "because of a violation of the ethics rules," this can only be understood, in my opinion, as shorthand for the proposition that I stated in ¶14 of this declaration, immediately above.

16.    In my opinion, the distinction posed in the preceding two paragraphs is not a matter of semantics, but is fundamental to understanding the true nature of motions to disqualify counsel. Unlike in disciplinary cases, where the only question is whether the lawyer violated the formal Rules of Professional Conduct (with the requisite scienter), in private party litigation disqualification cases, the developing common law takes into account a variety of equitable factors that are not applicable in the disciplinary realm. Examples include standing, laches, balancing of the harms to each party that will likely occur if the remedy of disqualification is ordered or withheld, and the need to avoid tactical use of disqualification motions in the absence of genuine harm. As a result, even when a violation has occurred, the common law of disqualification of counsel provides far more scope for the exercise of a tribunal's discretion, and gives a tribunal the ability to tailor a remedy to fit the specific facts of the case.

17.    Testing the "testing" activities that the parties agree that Fish & Richardson engaged in against the criteria that federal and state courts have commonly employed, I have formed the opinion that this tribunal should deny the pending Motion to Disqualify Counsel

6

and related relief on three grounds chiefly, which I elaborate on below: 1) The F & R lawyers did not violate established principles of the law of lawyering; 2) Despite its unsupported claims that it suffered prejudice, substantial prejudice, unfair prejudice, and gross prejudice,[1] ABS has actually suffered no prejudice at all; 3) The timing of the ABS motion smacks of tactical gamesmanship, especially in light of ABS's tardiness in asserting what it claims are its rights.

18.    In my opinion, Professor Bruce Green has correctly explained why the F & R lawyers did *not* violate the Model Rules that ABS relies on—or, more properly, the policies underlying those Rules, as reflected in the common law of lawyer disqualification and the law of lawyering generally. Below, I summarize my opinions on the subject, elaborating on some aspects of the issue that helped me reach the same conclusion as Professor Green.

    a)    Rule 4.2.

Neither ABS nor Professor Thomas Morgan in his declaration is wrong to note that disqualification may be imposed as a remedy where a serious violation of the no-contact rule has in fact occurred. Indeed, assuming that a serious violation has been proved *and* that the equitable factors I alluded to earlier have been met—which they have not in this case, in my opinion—disqualification for violation of the no-contact rule is second in frequency only to disqualification for violation of conflicts of interest rules.

In the case of an *entity* that is represented by counsel, however, as ABS clearly was, application of the no-contact rule cannot proceed until it has been determined *whether the human agent contacted does or does not personify the entity*, in accord with the underlying purpose of the rule.

Inasmuch as the first purpose of Rule 4.2 is to prevent a lawyer from extracting information that would otherwise be protected by the attorney-client privilege, all management personnel *and all agents who consult with legal counsel about the matter in question* are off-limits. They are off-limits because they might inadvertently disclose and thus waive privileged material—especially likely given that as nonlawyers

---

[1] Brief in Support of Alcatel Business Systems' Motion to Disqualify Fish & Richardson P.C. as Counsel for Microsoft, to Exclude Jack Chang as an Expert, and for Other Sanctions at 2 ("F&R's conduct has grossly prejudiced Alcatel") and request to  "cure the prejudice"); at 3 ("substantial prejudice of Alcatel"); at 25 ("sufficiently prejudicial  to warrant disqualification in light of the paramount interest in fundamental fairness"); at 29 ("use of these opinions would be unfairly prejudicial"); at 30 (order requiring  production of documents would  allow Alcatel to identify extent of "prejudice"); at 32 (without relief, Alcatel will continue to be "prejudiced").

7

they are typically not up to speed on the intricacies of the privilege. I assume, however, that the engineer who helped install the products used in the F & R "test," Mr. Po Ching Lin, was *not* in that category, because assuredly ABS would have presented evidence to that effect if he was.

Second, Rule 4.2 is designed to prevent a lawyer from "going behind the back" of opposing counsel and negotiating a quick settlement or obtaining an important concession from the opposing party. Thus, persons "who have authority to obligate the organization with respect to the matter," in the words of Comment [7] to Model Rule 4.2, are also off-limits. I have seen no evidence, however, that Mr. Lin, as skilled as he was with respect to the technology, had any authority to "obligate" ABS or any other company, *with respect to the intellectual property issues at hand.* (He might, to take a trivial example, be able to "obligate" ABS by "guaranteeing" that equipment of a different color would be substituted, or even that a particular bug in the software would be corrected within a week, but that is manifestly not what the no-contact rule contemplates.)

Finally, representatives of an entity whose acts or omissions can be "imputed" to the organization itself, for purposes of imposing civil liability, are off-limits, and for obvious reasons. It is important to remember, however, as Professor Green cogently describes, that on the recommendation of the Ethics 2000 Commission—which Professor Morgan served as Associate Reporter during part of its existence—the ABA House of Delegates revised the rationale for this strand of Rule 4.2 in 2002.

Prior to the 2002 package of amendments, the ABA position was that the protected class included not only persons whose acts could be *imputed* to the organization, but persons "whose statement may constitute an *admission* of the part of the organization."[2] Today's Rule 4.2 applies to imputation only, which means that it is *permissible* for a lawyer to contact and interview an employee who is merely a percipient witness to the events in question, without the knowledge or consent of the organization's counsel. The resulting testimony will be *admissible* under an important exception to the hearsay rule, which is wholly different from *imputing* the actions of the employee to the organization, as a matter of law.

---

[2] In its Brief, Alcatel Business Systems referred to this aspect of the Comments to Rule 4.2, which have now been superseded. The ABA Formal Opinions it relied on were also from a different era.

8

Assuming, as I do, that the court will follow this trend towards *narrowing* the scope of the no-contact rule, it is wholly fanciful, in my opinion, to imagine that even a highly placed engineer with considerable information about the development of the product in question could have his actions *imputed* to the company itself.

All of the above reasons for concluding that the policies underlying Model Rule 4.2 do *not* apply to the F & R lawyers' contacts with Mr. Lin pale in comparison to a reason that Professor Green touches on only briefly, but in my opinion is dispositive.

According to the facts that I have been given—not merely assumed, but confirmed by both ABS and Mr. Lin—Mr. Lin did *not* work for any party to this litigation. Instead, according to his declaration, he was employed by Alcatel USA, which is not the same company as Alcatel Business Systems. His business card—which I have not seen, but is described in the statement of facts—apparently states that he is also associated with Alcatel-Lucent, which is another company that has "Alcatel" in its name, but is *not* ABS. Indeed, according to counsel now pressing the Motion to Disqualify Counsel, Alcatel-Lucent is three-steps removed from the actual maker of the products at issue, which is ABS.

This is not a mere technicality, in my opinion. The law of lawyering places a subset of all of the employees or agents of a company off-limits for contact without permission of the company's lawyer. But if contact is made with someone who is not even in the larger group—often referred to as "constituents" of a company or organization—then Rule 4.2 and the policy of protecting the client-lawyer relationship of *that* organization with *its* lawyers perforce cannot apply. It would be precisely contrary to the salutary purposes of the no-contact rule to permit ABS to wall off constituents of some *other* company from voluntarily engaging in discussions with legal adversaries of ABS.

b)    Rule 4.3.

In my opinion, ABS'S reliance on Model Rule 4.3 is misplaced, because it has misjudged the purpose of this companion rule to Rule 4.2. The purpose of the former Rule is to encourage lay persons to consult counsel, so that they are not overreached by counsel for their opponents. In Chapter 39 of THE LAW OF LAWYERING, Professor Hazard and I give the classic examples: a lawyer for an insurance company reaches a quick settlement with an unrepresented accident victim; a lawyer interviews a soon-to-be defendant before suit is filed, gaining admissions that might not otherwise have been

9

obtained. Once a person has wisely obtained counsel, of course, Rule 4.2 then ensures that the protection is not negated.

Everything about Rule 4.3 and its underlying policies suggests that the injunction against dealing substantively on behalf of a client with an unrepresented person is for the protection of that person. Indeed, the black letter text of the Restatement of the Law Governing Lawyers, for which Professor Morgan was one of the Associate Reporters, *explicitly* states that the comparable Restatement provision applies only if dissembling about the lawyer's status is "to the prejudice of the nonclient," and failure to correct an evident misapprehension on that score would "materially prejudice the nonclient." See Restatement of the Law Governing Lawyers §103.

It is obvious, in my view, that Mr. Lin, the only nonclient contacted by F & R lawyers on behalf of Microsoft, has not been prejudiced in any way. Despite ABS'S colorful characterization of the interactions as "improper interrogations," some of which took place while Mr. Lin was "sequestered in a conference room," Mr. Lin himself takes a more bland view in his declaration: he installed and helped configure the system, did some trouble-shooting, answered many questions about the system's capabilities, and provided the equivalent of user manuals—exactly as he does in other installation projects. More important, he has not been sued; I assume that he is not going to be sued, and no other possible prejudice to him suggests itself or has been suggested by ABS.

As I will describe below, moreover, even if Mr. Lin *had* been prejudiced by his encounter with the F & R lawyers, he is not the one who is seeking the remedy of disqualification. As I noted at the outset of this declaration, in disqualification cases, as opposed to discipline cases, the movant must show that *it* is entitled to this equitable relief, which at a minimum means that it must show that *it* has been prejudiced. That, ABS has not and cannot do.

c)    Rules 4.1, 4.4 and 8.4.

ABS relies on a combination of these rules and their underlying principles to argue that the investigatory "testing" conducted by the F & R lawyers was unethical because it was deceitful and oppressive to others (although it must concede that *it* was not deceived in any event). In my opinion, ABS is wrong in its view of the law as it is developing, but in large part that is a matter of legal argumentation, based on the

10

specific facts and circumstances involved, about which the parties largely agree, with a few important exceptions. (Where they disagree most clearly is with respect to the legal consequences of "testing" scenario.)

As I stated at the outset of this declaration and will elaborate below, it is my opinion that quite apart from whether or not the F & R lawyers "violated" (in the abstract) certain ethical rules and principles, ABS'S case for disqualification will fall in any event because it cannot satisfy the equitable considerations inherent in this area of the law.

With respect to the deceit-related rules, it is sufficient for me note only the following. First, "testing" projects, even when conducted or supervised by lawyers, have repeatedly been upheld as not improper, even where the "testers" do *not* go through with the transaction.[3] In this case, F & R paid a large sum of money, actually had the equipment installed and configured, and thus actually became customers who receive documentation and user manuals as a matter of course.

Second, while courts and commentators use various methods to draw the line between permissible and "over the line" activities—criminality is always in the latter category—it is in my opinion nothing short of quaint for ABS to proffer "the appearance of impropriety" as a guideline, citing a 1976 case. As Professor Morgan (who does *not* employ that rubric in his declaration) well knows, when the Model Rules were adopted in 1985, "the appearance of impropriety" language that had appeared in the earlier Model Code of Professional Conduct was deliberately jettisoned as too vague and empty.

Finally, ABS'S suggestion, citing a 1975 case, that once a court has found a serious violation of ethics-related rules, "when in doubt, disqualify," is also sadly past its shelf-life, in my view. To the contrary, most courts today face a far larger number of disqualification motions than 30 years ago, and have become leery of weak or unsupported motions being used as a tactical ploy, especially when made on the eve of trial or other important date in the life of a case. I have been informed by Ms. Jeffrey, and I will assume, that the International Trade Commission takes the modern skeptical view rather than the cavalier view of 30 years ago. To be sure, proven cases of unethical conduct *that harms an opposing party or interferes with a fair proceeding*

---

[3] The most common example is when a couple of minority or mixed race pretends to rent an apartment in a building whose landlord is suspected of practicing racial discrimination. Even while filling out an application blank, the couple has *no* intention of moving in if the application is approved.

11

can call for the remedy of disqualification, but that is not the case here, as I explain below.

19.    In my opinion, even if ABS had been able to demonstrate a clear-cut violation of one or more of the rules of ethics, its case for disqualification would still fail for the equitable reasons described at the outset of this declaration. Most important, ABS cannot show that it has been prejudiced in any way, and therefore has no standing to seek disqualification and no entitlement to that relief.

20.    In a discipline case, a lawyer who violates a Rule of Professional Conduct may be subjected to discipline without any showing of harm or prejudice to the complaining party (although lack of harm may cause the disciplinary authority to exercise discretion not to prosecute, or may prove to be a mitigating factor). Discipline is a public law remedy, and the chief harm is to the regularity of the system itself. In private party litigation, by contrast, a party seeking disqualification or other sanction must demonstrate specific serious harm, *such that the failure to impose sanctions—especially the sanction of disqualification—would cause more harm to the movant than granting disqualification would harm the opposing party*. It is a classic case of balancing the equities, in my view.

21. Considering Alcatel Business System's Brief, I have been unable to discern any claim of harm or prejudice that is cognizable by this tribunal, let alone sufficient to weigh heavily on the scale. Repeated many times in different forms, the claim is essentially as follows, as set forth on page 2 of the Brief:

F & R's misconduct has grossly prejudiced Alcatel in both this investigation and a related lawsuit, particularly because Microsoft, through F & R, bases its expert testimony and strategy in this investigation on the improperly obtained confidential information of its adversary.

Similarly, referring specifically to the physical testing of the system itself by Microsoft's expert, ABS says, on page 13 of its Brief: "the F & R attorneys obtained confidential information from Mr. Lin under false pretenses and, improperly, are using it against Alcatel."

22.    In my opinion, however, the claim that F & R obtained "confidential" information is unintelligible. Material that is *intended* to be provided to every customer who

12

pays for it, and *is* routinely provided to them, cannot simply by fiat declared to be "confidential." Mr. Lin's declaration clearly shows that he did nothing that he would not have done with respect to any other major installation, and the fact that the customer had no long term interest in *using* the system changes nothing, in my view.

23.    The claim by ABS that Microsoft is "basing" its expert testimony and strategy on information provided by Mr. Lin is entirely conclusory, in my opinion, not because of facts that I am assuming, but because ABS has not in its own submission made any such showing. The same may be said of the similar claim of prejudice based on "use" *of the information provided by Mr. Lin.* As I understand the situation, not being privy to the sealed material and no doubt unable to understand it anyway, Microsoft is *not* relying on any information provided by Mr. Lin during his encounters with the F & R lawyers, and Microsoft's expert witness is *not* relying on such information either. Instead, Mr. Chang (the expert) relied on Mr. Lin to install and configure the system so that it was running properly, *and then performed his own tests, completely independently.*

24.    Even if Alcatel Business Systems could show that it was prejudiced in some meaningful way by having Microsoft (through F & R) purchase one of its systems on the open market for physical testing, ABS would not be entitled to the relief it seeks, in my opinion. First, the balancing of the equities is heavily in favor of Microsoft, even without taking into account the suspicious timing of the Motion to Disqualify Counsel. The information that ABS claims was wrongfully extracted from it would have become available to Microsoft in due course (through several possible routes, including, of course, discovery), and thus the "harm" done to ABS—even if it exists, which in my view it does not—would be minimal is F & R is *not* disqualified. By contrast, although Microsoft is hardly without resources to hire other counsel, it would be devastating blow for it to have to attempt to engage a new firm and bring it up to speed in the extremely short time period before trial. It might be impossible.

25. Finally, in an equitable proceeding such as disqualification of counsel, equitable concerns such as laches and unclean hands loom large. According to its own submission, ABS learned of what it claims is "gross prejudice" no later than August 14, 2007, but then waited until August 24 even to raise the issue with Fish & Richardson, and did not file the Motion to Disqualify Counsel until August 31. Moreover, the record seems clear to me—although it is

13

not my function to resolve factual disputes—that Alcatel knew as early as July 5, 2007 that Mr. Lin was installing the equipment in a law firm (and not just any law firm, but its adversary in this litigation). In addition when Mr. Chang's expert report was filed, he noted explicitly that he had done his testing on equipment that had been installed in the Washington, D.C. office of Fish & Richardson.

26.    Even taking the later date of August 14, it is simply inequitable, in my view, for ABS to allow another 10 days to go by, as trial rapidly approached. I am aware, of course, that 10 days is a short period of time in ordinary litigation, but I have been informed (and have myself experienced in preparing this declaration) that cases in the International Trade Commission run on an unusually fast track. Thus, this court should recognize the current motion for what, in my view, it is: a tactical ploy deliberately delayed to an inconvenient time.

FURTHER, DECLARANT SAYETH NOT.

I declare under penalty of perjury that the foregoing declarations and statements are true and correct.

Executed, this __11 th__ day of ___September_____ 2007, in Indianapolis, Indiana.

W. William Hodes

W. William Hodes, Esq.
The William Hodes Professional Corporation
8125 Raven Rock Drive
Indianapolis, IN   46256

Telephone:  317-578-0258
Facsimile:  317-863-1163
E-Mail: wwh@hodeslaw.com
Website:  www.hodeslaw.com

COLLEGE
Harvard College, B.A., 1966, *cum laude in general studies.*

LAW SCHOOL
Rutgers Law School, J.D., 1969, *with highest honors.*

ACTIVITIES
Research Editor (supervisor of student writing), Rutgers Law Review.

HONORS
A. Harry Moore Prize–highest grade over entire course.

West Publishing Company Award–highest average in senior class.

Cornelius W. Wichersham, Jr. Award—highest grade in Constitutional Law.

J. Skelly Wright Prize—greatest contribution to the civil rights, liberties and human affairs of fellow citizens during the three years at Rutgers Law School.

MEMBER OF THE BAR
Louisiana (1969), New Jersey (1971), and Indiana (1999).
United States Supreme Court (1974).

EMPLOYMENT

Associate, Smith & Scheuermann, New Orleans, Louisiana; June 1969 to July 1970.

1456570.1

Assistant Corporation Counsel, City of Newark, New Jersey; October 1970 to December 1973.

Staff Attorney, Education Law Center, Newark, New Jersey; December 1973 to June 1978.

Designated Counsel (pool attorney), Office of the Public Defender of New Jersey, Appellate Section; September 1971 to June 1978.

Academic Appointments (see below); September 1978 to December 1999.

Law Clerk to Justice Ruth Bader Ginsburg, United States Supreme Court, (sabbatical leave); August 1996 to July 1997.

Owner and President, The William Hodes Professional Corporation; July 1999 to present.

ACADEMIC APPOINTMENTS

Bigelow Teaching Fellow and Lecturer in Law, University of Chicago Law School; September 1978 to June 1979.

Assistant Professor of Law, Associate Professor of Law, and Professor of Law, Indiana University School of Law-Indianapolis; August 1979 to December 1999.

Director, Indiana University School of Law, China Summer Program, Shanghai; 1987 and 1989.

Scholar-in-Residence and Lecturer, China University of Political Science and Law, Beijing; Spring, 1989.

Visiting Professor of Law, Southern Illinois University School of Law; Fall, 1990; University of Illinois College of Law; Fall, 1994.

Professor Emeritus of Law, Indiana University; January 2000 to present.

1456570.1

PUBLICATIONS

BOOKS

THE LAW OF LAWYERING (with Geoffrey C. Hazard, Jr. and Peter R. Jarvis) (Aspen Law and Business, 1985; 3d ed., 2000) (with annual supplements).

LEGAL RESEARCH: A SELF-TEACHING GUIDE TO THE LAW LIBRARY (National Institute of Trial Advocacy, 1983; 2d ed., 1988) (includes teachers' manual).

ARTICLES

*Seeking the Truth Versus Telling the Truth at the Boundaries of the Law: Misdirection, Lying, and "Lying with an Explanation,"* 44 S. Tex. L. Rev. 53 (2002).

*Cheating Clients With the Percentage-of-the-Gross Contingent Fee Scam*, 30 Hofstra L. Rev. 767 (2002).

*Truthfulness and Honesty Among American Lawyers:  Perception, Reality, and the Professional Reform Initiative*, 53 S. Car. L. Rev. 527 (2002).

*Accepting and Rejecting Clients—the Moral Autonomy of the Second-to-the-Last Lawyer in Town*, 48 U. Kan. L. Rev. 977 (2000).

*Rethinking the Way Law is Taught: Can we Improve Lawyer Professionalism by Teaching Hired Guns to Aim Better?* 87 Ky. L.J. 1019 (1999).

*The Professional Duty to Horseshed Witnesses—Zealously, Within the Bounds of the Law*, 30 Texas Tech. L. Rev. 1343 (1999).

*Foreword: The Several Stances of the Modern American Lawyer*, 47 U. Kan. L. Rev. 777 (1999).

*Congressional Federalism and the Judicial Power: Horizontal and Vertical Tension Merge*, 32 Ind. L. Rev. 155 (1998).

*Lord Brougham, the Dream Team, and Jury Nullification of the Third Kind*, 67 U. Colo. L. Rev. 1075 (1996).

1456570.1

*What Ought to be Done—What* Can *be Done—When the Wrong Person is in Jail or About to be Executed? An Invitation to a Multi-Disciplined Inquiry, and a Detour About Law School Pedagogy*, 29 Loy. L.A.L. Rev. 1547 (1996).

*The Overtly "Political" Character of the Advise and Consent Function: Offsetting the Presidential Veto with Senatorial Rejection*, 7 St. John's J. Legal Comment. 109 (1991).

*The Code of Professional Responsibility, the Kutak Rules, and the Trial Lawyer's Code: Surprisingly, Three Peas in a Pod*, 35 U. Miami L. Rev. 739 (1981).

*Women and the Constitution: Some Legal History and a New Approach to the Nineteenth Amendment*, 25 Rutgers L. Rev. 26 (1970).

*Dombrowski v. Eastland—A Political Compromise and its Impact*, 22 Rutgers L. Rev. 137 (1967).

OTHER PUBLICATIONS

*Nino Protested Too Much, but Larry Created the Appearance of Politicizing Judicial Ethics*, 15 THE PROF. LAWYER, November 2004, at 1.

*That is Correct: When a Client Lies, Duty of Candor to the Court Trumps Confidentiality, and Turns Silence into Complicity*, RES GESTAE, April 2003, at 46.

*We Need More Zealousness, not Less—But Within the Bounds of Law*, RES GESTAE, March 2001, at 46.

*A Clerk's-Eye View of the Supreme Court*, INDIANA ALUMNI MAGAZINE, Jan.-Feb. 1998, at 30.

*The Ethics of Defending Guilty Clients*, NATIONAL LAW JOURNAL, May 29, 1995 (Op-Ed).

*How Much Purity Can a Judge Attain?*, NATIONAL LAW JOURNAL, August 1, 1994 (Op-Ed).

*Two Cheers for Lying (About Immaterial Matters)*, 5 THE PROF. LAWYER, May

1456570.1

1994, at 1.

"*Thinking and Writing Like a Lawyer*," unpublished materials, now incorporated in orientation materials, "Approaching the First Class," Indiana University School of Law-Indianapolis ((c) 1978, 1980, 1981).

*The Model Rules After New Orleans–Radical at Last*, 35 Virginia Law Weekly, No. 21 (April 8, 1983).

Materials on legal ethics for Continuing Legal Education presentations.

PROFESSIONAL ACTIVITIES

MEMBERSHIPS AND POSITIONS HELD

* Member, American Law Institute-American Bar Association Advisory Panel on Professional Responsibility, 2006-present.

* Co-Reporter, American Bar Association, Joint Commission to Evaluate the Model Code of Judicial Conduct, 2004-2007.

* Board of Directors, Association of Professional Responsibility Lawyers (APRL), 2002-2005.

* Reporter, Professional Reform Initiative (PRI) of the National Conference of Bar Presidents, 2001-2004.

* Member, Advisory Council to the American Bar Association Ethics 2000 Commission, 1998-2001.

* Member, National Conference of Bar Examiners, Multi-State Professional Responsibility Examination Drafting Committee, 1996–2001.

* Consultant and On-Air Commentator, MSNBC's *Inside the Supreme Court* segment, November 2000.

* Elected Member, American Law Institute, 1997-present.

* Consultant, the W.M. Keck Foundation, 1993 (development and

1456570.1

production of two professionally acted videotapes for use in Professional Responsibility courses in American law schools).

* Chair, Association of American Law Schools, Section on Professional Responsibility, 1990.


SPEECHES AND PRESENTATIONS (partial list)

* Presenter, Association of Professional Responsibility Lawyers Annual Meeting, *Joint Representation and Aggregate Settlements*, August 10, 2007.

* Presenter, South Texas College of Law Symposium, *The Ethics of Advocacy*, October 18, 2002.

* Presenter, National Business Institute Continuing Legal Education program, *The Attorney-Client Privilege, Confidentiality, and the Work-Product Doctrine*, June 5, 2002.

* Presenter, Indiana Continuing Legal Education Forum, Business Law Institute, *Legal Ethics for the Business Lawyer*, December 5, 2001.

* Faculty, Hofstra University School of Law Symposium, *Legal Ethics: What Needs Fixing?*, September 9-11, 2001.

* Faculty, Hofstra University School of Law Symposium, *Legal Ethics: The Core Issues*, March 10-12, 1996.

* Faculty, University of Colorado Law Review Symposium, *O.J. Simpson and the Criminal Justice System on Trial*, February 23-24, 1996.

* Debated defense attorney Alan Dershowitz on legal ethics issues arising in the O.J. Simpson case, *Larry King Live*, August 28, 1995.

* Faculty, American Bar Association Satellite Seminar, *Positional Conflicts of Interest*, June 1994.

* Faculty, 18th National Conference on Professional Responsibility, June 1992.

1456570.1

## CERTIFICATE OF SERVICE

It is hereby certified that copies of the foregoing **DECLARATION OF W.**

**WILLIAM HODES** was served on this 11th day of  September, 2007 as follows:

| | |
|---|---|
| Marilyn R. Abbott<br>Secretary<br>U.S. International Trade Commission<br>500 E Street, S.W.<br>Washington, D.C. 20436 | Via Hand Delivery<br>(Original + 6) |
| The Honorable Paul J. Luckern<br>Administrative Law Judge<br>U.S. International Trade Commission<br>500 E Street, S.W., Suite 317<br>Washington, D.C. 20436 | Via Hand Delivery<br>(Two Copies) |
| David Lloyd, Esq.<br>U.S. International Trade Commission<br>Office of Unfair Import Investigations<br>500 E Street, S.W., Room 401<br>Washington, D.C. 20436<br>david.lloyd@usitc.gov | E-mail and Hand Delivery |
| David A. Nelson, Esq.<br>Latham & Watkins LLP<br>233 South Wacker Drive, Ste 5800<br>Chicago, IL 60606-6306<br>david.nelson@lw.com | E-mail and Overnight |
| Sasha D. Mayergoyz, Esq<br>Peter N. Moore, Esq.<br>Latham & Watkins LLP<br>233 South Wacker Drive, Ste 5800<br>Chicago, IL 606-6306<br>sasha.mayergoyz@lw.com<br>peter.moore@lw.com | E-mail |

Steven C. Cherny, Esq.                              E-mail
Clement Naples, Esq.
Latham & Watkins LLP
885 Third Avenue, Ste 1000
New York, NY 10022-4834
steven.cherny@lw.com
clement.naples@lw.com

Renny Hwang, Esq.                                   E-mail
Latham & Watkins LLP
633 West Fifth Street, Ste 4000
Los Angeles, CA 90071-2007
renny.hwang@lw.com

David M. Farnum                                     E-mail
Latham & Watkins LLP
555 Eleventh Street, NW, Ste 1000
Washington, D.C. 20004-1304
david.farnum@lw.com

F. David Foster                              E-mail and Hand delivery
Miller & Chevalier Chartered
655 Fifteenth Street, N.W.
Washington, D.C. 20005
dfoster@milchev.com

James B. Altman                                     E-mail
Kelly Busby
Miller & Chevalier Chartered
655 Fifteenth Street, N.W.
Washington, D.C. 20005
jaltman@milchev.com
kbusby@milchev.com


                                        Judith Best
                                    _____
                                        Judith Best

40423747.doc