IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MICROSOFT CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-090 (SLR) |
| | ) | |
| ALCATEL-LUCENT ENTERPRISE and | ) | |
| GENESYS TELECOMMUNICATIONS | ) | |
| LABORATORIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF SUBPOENA

PLEASE TAKE NOTICE that the following entities are being served with subpoenas, copies of which are attached to this notice:

1. Credit Union National Association -- Exhibit A;

2. Marina District Development Company, LLC – Borgata Hotel Casino and Spa – Exhibit B;

3. Mercy Health Plans Incorporated – Exhibit C;

4. West Bend Mutual Insurance Company – Exhibit D; and

5. VirtualLogger, LLC – Exhibit E.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Maryellen Noreika*

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com
*Attorneys for Defendants*
  *Alcatel-Lucent Enterprise and*
  *Genesys Telecommunications Laboratories, Inc.*

*Of Counsel*:

Steven C. Cherny
Clement J. Naples
Karen Y. Yu
LATHAM & WATKINS LLP
885 Third Avenue
Suite 1000
New York, NY  10022-4834
(212) 906-1200

David A. Nelson
LATHAM & WATKINS LLP
233 South Wacker Drive
Suite 5800
Chicago IL 60606
(312) 876-7700

March 7, 2008

CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2008 I electronically filed the foregoing document, which will send notification of such filing(s) to the following:

Thomas L. Halkowski, Esquire
FISH & RICHARDSON P.C.

I also certify that copies were caused to be served on March 7, 2008 upon the following in the manner indicated:

**BY ELECTRONIC MAIL**
**and HAND DELIVERY**

Thomas L. Halkowski, Esquire
FISH & RICHARDSON P.C.
919 N. Market Street, Suite 1100
Wilmington, DE 19801

**BY ELECTRONIC MAIL**

Ruffin B. Cordell, Esquire
Linda Liu Kordziel, Esquire
FISH & RICHARDSON P.C.
1425 K. Street, N.W., 11th Floor
Washington, DC 20005

John E. Gartman, Esquire
FISH & RICHARDSON P.C.
12390 EL Camino Real
San Diego, CA 92130

/s/ Maryellen Noreika

Maryellen Noreika (#3208)

EXHIBIT A

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

| WESTERN | DISTRICT OF | WISCONSIN |
|---|---|---|

MICROSOFT CORPORATION,
        Plaintiff,
        V.
ALCATEL LUCENT ENTERPRISE and
GENESYS TELECOMMUNICATIONS
LABORATORIES, INC.,
        Defendants.

**SUBPOENA IN A CIVIL CASE**

TO: Credit Union National Association, Incorporated
5710 Mineral Point Road
Madison, WI, 53705-4454

Case Number:[1] 07-090 (SLR)

Action pending in the U.S.
District Court for the District
of Delaware under the above
case number and title.

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.  See Schedule B for a list of deposition topics

| PLACE OF DEPOSITION<br>Madison Concourse Hotel and Governor's Club; 1 W Dayton St Madison, WI 53703.<br>Deposition to be recorded by stenographic, audio, audiovisual, and/or videographic means. | DATE AND TIME<br>3/19/2008 9:00 am |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Schedule A for Document Requests

| PLACE    Madison Concourse Hotel and Governor's Club<br>       1 W Dayton St Madison, WI 53703. | DATE AND TIME<br>3/19/2008 9:00 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Andrew MacArthur, attorney for defendant (GTEC)* | 3/5/2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Andrew P. MacArthur; Latham & Watkins LLP
885 Third Avenue, Suite 1000; New York, NY 10022; 212.906.4504

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE Credit Union National Association, Incorporated |
|---|---|---|
| SERVED | | 5710 Mineral Point Road Madison, WI, 53705-4454 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

| Executed on | | |
|---|---|---|
| | DATE | SIGNATURE OF SERVER |
| | | ADDRESS OF SERVER |

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises—or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

## INSTRUCTIONS AND DEFINITIONS

a.    Microsoft refers to (1) Microsoft Corporation and any parent, subsidiaries and divisions, (2) any predecessors and successors thereto, and (3) any and all persons or entities purporting to act or acting on Microsoft's behalf, including, but not limited to, all past and present agents, officers, employees, consultants, directors, affiliates, partners, associates, attorneys, or representatives thereof.

b.    "CUNA" refers to (1) Credit Union National Association, Incorporated and any parent, subsidiaries and divisions, (2) any predecessors and successors thereto, and (3) any and all persons or entities purporting to act or acting on Credit Union National Association's behalf, including, but not limited to, all past and present attorneys, employees, consultants, directors, agents, officers, partners, affiliates, associates, or representatives thereof.

c.    "CCF" refers to Customer Care Framework.

d.    "Product" means a manufacture, machine, device, apparatus, instrument, mechanism, appliance, collection of components/parts (either individually or together), method or process which are designed to function together electrically, mechanically, or otherwise, to achieve a particular purpose or function.

e.    As used herein, CTI means computer telephony integration.

f.    As used herein, line of business application ("LOB") means backend office systems, including, but not limited to, billing systems, customer relations management ("CRM") systems, or order management systems, or issue tracking systems.

g.    As used herein, "and" and "or" are to be construed either disjunctively or conjunctively so as to acquire the broadest possible meaning.

h.    As used herein, "any," "all," or "each" are to be construed as "any, all, and each" inclusively.

i.    As used herein, the use of the singular form of any word includes the plural and vice versa.

j.    The phrases "referring or relating to," "refer or relate to," "discussing," "summarizing," or "mentioning," as used herein, shall mean all information and all facts and/or documents that directly, indirectly or in any other way support, negate, bear upon, touch upon, incorporate, affect, include, pertain to and/or are otherwise connected with the subject matter.

k.   As used herein, "document" or "documents" have the broadest meaning which can be ascribed to them pursuant to Fed. R. Civ. P. 34, including without limitation all final forms and all drafts and revisions of any type of written or graphic matter, original or reproduced, and all copies thereof which are different in any way from the original, regardless of whether designated "confidential," "privileged," or otherwise restricted. Without limiting the foregoing, the term "document" includes video tapes, films, audio tapes, computer disks, electronic mail messages, books, papers, letters, telegrams, facsimile transmissions, memoranda, communications, minutes, notes, schedules, tabulations, vouchers, accounts, statements, affidavits, reports' abstracts, agreements, contracts, diaries, calendars, plans, specifications, drawings, sketches, photostats, photographs, charts, graphs and other similar objects, and any kind of transcript, transcription or recording of any conversation, discussion or oral presentation of any kind, and any information stored on and reproducible in documentary form from a computer or other electronic information storage device.

l.   All documents produced in response to these requests shall be produced in the same order as they are kept in the ordinary course of business and, where attached, shall not be separated or disassembled. If responsive documents are segregated or separated from other documents, whether by inclusion in binders, files, sub-files, or by use of dividers, tabs or any other method, produce such documents in that form.

m.   If any requested documents have been destroyed, state when they were destroyed, why they were destroyed, all persons who participated in or were involved in the decision to destroy, and supply an index of all such destroyed documents.

n.   If any document responsive to any Request was once within your possession, custody or control but no longer is, please state:
   a.   the identity of the last known custodian of the document;
   b.   the date or dates on which the document was lost, misplaced, transferred, destroyed, or otherwise disposed of;
   c.   the identity of the person responsible for the loss, misplacement, transfer, destruction, or other disposition of the document;
   d.   the reasons for and circumstances surrounding the loss, misplacement, transfer, destruction, or other disposition of the document; and
   e.   any policy, directive, procedure, regulation or requirement pursuant to which the loss, misplacement, transfer, destruction, or disposition of the document occurred or was carried out.

o.   When a document requested by any of these requests for production is withheld from production on any ground, such as that of the attorney-client privilege or the work product immunity doctrine, you will furnish Defendants with a list identifying each such document by:
   a.   date;
   b.   author, including position and title;
   c.   recipients, including position and title;
   d.   the general nature of the document (*e.g.*, a "letter" or an "opinion of counsel"); and

e.  identifying the subject matter with sufficient detail to enable the document to be referred to in any subsequent motion to compel production; and further, the listing shall state the basis asserted for withholding the document in sufficient detail so as to enable the claim of privilege or immunity or other claim to be adjudicated.

p.  If, in responding to any Document Request or Deposition Topic, you encounter any ambiguity in construing either the Request, Topic, or a definition or instruction relevant to it, set forth the matter deemed ambiguous and the construction selected or used in responding.

# SCHEDULE A

## DOCUMENT REQUESTS

**REQUEST NO. 1.:**

All documents referring or relating to Customer Care Framework ("CCF"), including, but not limited to, the integration of CCF.

**REQUEST NO. 2.:**

Documents sufficient to show CUNA's implementation of CCF.

**REQUEST NO. 3.:**

Documents sufficient to identify the individuals and/or entities that performed the implementation of CCF, including, but not limited to, Microsoft employees, and/or CUNA employees.

**REQUEST NO. 4.:**

All documents referring or relating to the selection by CUNA of CCF over other products CUNA considered as potential alternatives to CCF.

**REQUEST NO. 5.:**

Documents sufficient to identify how CCF has been integrated with any CTI applications, including the identification of the CTI applications.

**REQUEST NO. 6.:**

Documents sufficient to identify how CCF has been integrated with any line of business ("LOB") applications, including the identification of the LOB applications.

**REQUEST NO. 7.:**

Documents sufficient to identify how CCF has been integrated with any email applications, including the identification of the email applications.

# SCHEDULE B

## TOPICS

### TOPIC NO. 1.:

CUNA's integration and implementation of CCF.

### TOPIC NO. 2.:

The individuals and/or entities that performed the implementation of CCF, including, but not limited to, Microsoft employees and/or CUNA employees.

### TOPIC NO. 3.:

The selection by CUNA of CCF over other products CUNA considered as potential alternatives to CCF.

### TOPIC NO. 4.:

The integration of CCF with CTI applications.

### TOPIC NO. 5.:

The integration of CCF with line of business ("LOB") applications.

### TOPIC NO. 6.:

The integration of CCF with email applications.

### TOPIC NO. 7.:

Documents received by CUNA from Microsoft regarding CCF, including, but not limited to, any instruction or training manuals.

# EXHIBIT B

AO88 (Rev. 12/06) Subpoena in a Civil Case

# Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF _____ NEW JERSEY

MICROSOFT CORPORATION,
          Plaintiff,

V.

ALCATEL LUCENT ENTERPRISE and
GENESYS TELECOMMUNICATIONS
LABORATORIES, INC.,
          Defendants.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 07-090 (SLR)
Action pending in the U.S.
District Court for the District
of Delaware under the above
case number and title.

TO: MARINA DISTRICT DEVELOPMENT COMPANY, LLC
BORGATA HOTEL CASINO AND SPA
1 Borgata Way
Atlantic City, NJ 08401-1946 United States

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. See Schedule B for a list of deposition topics

| PLACE OF DEPOSITION Sheraton Atlantic City Convention Center Hotel; 2 Miss America Way; Atlantic City, NJ 08401.  Deposition to be recorded by stenographic, audio, audiovisual, and/or videographic means. | DATE AND TIME 3/24/2008 9:00 am |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Schedule A for Document Requests

| PLACE Sheraton Atlantic City Convention Center Hotel 2 Miss America Way; Atlantic City, NJ 08401. | DATE AND TIME 3/24/2008 9:00 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Andrew MacArthur* attorney for defendant (DEC) | 3/5/2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Andrew P. MacArthur; Latham & Watkins LLP
885 Third Avenue, Suite 1000; New York, NY 10022; 212.906.4504

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | Sheraton Atlantic City Convention Center Hotel 2 Miss America Way; Atlantic City, NJ 08401. |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.
  (1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.
  (2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.
  (B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises—or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.
  (3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
    (i) fails to allow reasonable time for compliance;
    (ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;
    (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) If a subpoena
    (i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
    (ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
    (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.
  (1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
  (B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.
  (C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.
  (D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
  (2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.
  (B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

## INSTRUCTIONS AND DEFINITIONS

a.    Microsoft refers to (1) Microsoft Corporation and any parent, subsidiaries and divisions, (2) any predecessors and successors thereto, and (3) any and all persons or entities purporting to act or acting on Microsoft's behalf, including, but not limited to, all past and present agents, officers, employees, consultants, directors, affiliates, partners, associates, attorneys, or representatives thereof.

b.    "Borgata" refers to (1) Borgata Hotel Casino and Spa and/or Marina District Development Company, LLC and any parent, subsidiaries and divisions, (2) any predecessors and successors thereto, and (3) any and all persons or entities purporting to act or acting on Borgata Hotel Casino and Spa's and/or Marina District Development Company's behalf, including, but not limited to, all past and present attorneys, employees, consultants, directors, agents, officers, partners, affiliates, associates, or representatives thereof.

c.    "CCF" refers to Customer Care Framework.

d.    "Product" means a manufacture, machine, device, apparatus, instrument, mechanism, appliance, collection of components/parts (either individually or together), method or process which are designed to function together electrically, mechanically, or otherwise, to achieve a particular purpose or function.

e.    As used herein, CTI means computer telephony integration.

f.    As used herein, line of business application ("LOB") means backend office systems, including, but not limited to, billing systems, customer relations management ("CRM") systems, or order management systems, or issue tracking systems.

g.    As used herein, "and" and "or" are to be construed either disjunctively or conjunctively so as to acquire the broadest possible meaning.

h.    As used herein, "any," "all," or "each" are to be construed as "any, all, and each" inclusively.

i.    As used herein, the use of the singular form of any word includes the plural and vice versa.

j.    The phrases "referring or relating to," "refer or relate to," "discussing," "summarizing," or "mentioning," as used herein, shall mean all information and all facts and/or documents that directly, indirectly or in any other way support, negate, bear upon, touch upon, incorporate, affect, include, pertain to and/or are otherwise connected with the subject matter.

k.    As used herein, "document" or "documents" have the broadest meaning which can be ascribed to them pursuant to Fed. R. Civ. P. 34, including without limitation all final forms and all drafts and revisions of any type of written or graphic matter, original or reproduced, and all copies thereof which are different in any way from the original, regardless of whether designated "confidential," "privileged," or otherwise restricted. Without limiting the foregoing, the term "document" includes video tapes, films, audio tapes, computer disks, electronic mail messages, books, papers, letters, telegrams, facsimile transmissions, memoranda, communications, minutes, notes, schedules, tabulations, vouchers, accounts, statements, affidavits, reports' abstracts, agreements, contracts, diaries, calendars, plans, specifications, drawings, sketches, photostats, photographs, charts, graphs and other similar objects, and any kind of transcript, transcription or recording of any conversation, discussion or oral presentation of any kind, and any information stored on and reproducible in documentary form from a computer or other electronic information storage device.

l.    All documents produced in response to these requests shall be produced in the same order as they are kept in the ordinary course of business and, where attached, shall not be separated or disassembled. If responsive documents are segregated or separated from other documents, whether by inclusion in binders, files, sub-files, or by use of dividers, tabs or any other method, produce such documents in that form.

m.    If any requested documents have been destroyed, state when they were destroyed, why they were destroyed, all persons who participated in or were involved in the decision to destroy, and supply an index of all such destroyed documents.

n.    If any document responsive to any Request was once within your possession, custody or control but no longer is, please state:
  a.   the identity of the last known custodian of the document;
  b.   the date or dates on which the document was lost, misplaced, transferred, destroyed, or otherwise disposed of;
  c.   the identity of the person responsible for the loss, misplacement, transfer, destruction, or other disposition of the document;
  d.   the reasons for and circumstances surrounding the loss, misplacement, transfer, destruction, or other disposition of the document; and
  e.   any policy, directive, procedure, regulation or requirement pursuant to which the loss, misplacement, transfer, destruction, or disposition of the document occurred or was carried out.

o.    When a document requested by any of these requests for production is withheld from production on any ground, such as that of the attorney-client privilege or the work product immunity doctrine, you will furnish Defendants with a list identifying each such document by:
  a.   date;
  b.   author, including position and title;
  c.   recipients, including position and title;
  d.   the general nature of the document (*e.g.*, a "letter" or an "opinion of counsel"); and

e.  identifying the subject matter with sufficient detail to enable the document to be referred to in any subsequent motion to compel production; and further, the listing shall state the basis asserted for withholding the document in sufficient detail so as to enable the claim of privilege or immunity or other claim to be adjudicated.

p.  If, in responding to any Document Request or Deposition Topic, you encounter any ambiguity in construing either the Request, Topic, or a definition or instruction relevant to it, set forth the matter deemed ambiguous and the construction selected or used in responding.

## SCHEDULE A

## DOCUMENT REQUESTS

**REQUEST NO. 1.:**

All documents referring or relating to Customer Care Framework ("CCF"), including, but not limited to, the integration of CCF.

**REQUEST NO. 2.:**

Documents sufficient to show Borgata's implementation of CCF.

**REQUEST NO. 3.:**

Documents sufficient to identify the individuals and/or entities that performed the implementation of CCF, including, but not limited to, Microsoft employees, and/or Borgata employees.

**REQUEST NO. 4.:**

All documents referring or relating to the selection by Borgata of CCF over other products Borgata considered as potential alternatives to CCF.

**REQUEST NO. 5.:**

Documents sufficient to identify how CCF has been integrated with any CTI applications, including the identification of the CTI applications.

**REQUEST NO. 6.:**

Documents sufficient to identify how CCF has been integrated with any line of business ("LOB") applications, including the identification of the LOB applications.

**REQUEST NO. 7.:**

Documents sufficient to identify how CCF has been integrated with any email applications, including the identification of the email applications.

# SCHEDULE B

## TOPICS

### TOPIC NO. 1.:

Borgata's integration and implementation of CCF.

### TOPIC NO. 2.:

The individuals and/or entities that performed the implementation of CCF, including, but not limited to, Microsoft employees and/or Borgata employees.

### TOPIC NO. 3.:

The selection by Borgata of CCF over other products Borgata considered as potential alternatives to CCF.

### TOPIC NO. 4.:

The integration of CCF with CTI applications.

### TOPIC NO. 5.:

The integration of CCF with line of business ("LOB") applications.

### TOPIC NO. 6.:

The integration of CCF with email applications.

### TOPIC NO. 7.:

Documents received by Borgata from Microsoft regarding CCF, including, but not limited to, any instruction or training manuals.

EXHIBIT C

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

| EASTERN | DISTRICT OF | MISSOURI |
|---|---|---|

| MICROSOFT CORPORATION,<br>Plaintiff,<br>V.<br>ALCATEL LUCENT ENTERPRISE and<br>GENESYS TELECOMMUNICATIONS<br>LABORATORIES, INC.,<br>Defendants. | **SUBPOENA IN A CIVIL CASE** |
|---|---|

TO: Mercy Health Plans Incorporated
14528 South Outer 40
Suite 300
Chesterfield, Missouri 63017-5743

Case Number:[1] 07-090 (SLR)
Action pending in the U.S.
District Court for the District
of Delaware under the above
case number and title.

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. See Schedule B for a list of deposition topics

| PLACE OF DEPOSITION<br>The Westin St. Louis; 811 Spruce Street; St. Louis, MO 63102. Deposition to be recorded by stenographic, audio, audiovisual, and/or videographic means. | DATE AND TIME<br>3/20/2008 9:00 am |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Schedule A for Document Requests

| PLACE  The Westin St. Louis<br>811 Spruce Street; St. Louis, MO 63102 | DATE AND TIME<br>3/20/2008 9:00 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Andrew McArthur, attorney for defendant (EEC)* | 3/5/2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Andrew P. MacArthur; Latham & Watkins LLP
885 Third Avenue, Suite 1000; New York, NY 10022; 212.906.4504

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | | PLACE | Mercy Health Plans Incorporated |
|---|---|---|---|---|
| **SERVED** | | | | 14528 South Outer 40 |
| | | | | Suite 300 |
| | | | | Chesterfield, Missouri 63017-5743 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

## INSTRUCTIONS AND DEFINITIONS

a.    Microsoft refers to (1) Microsoft Corporation and any parent, subsidiaries and divisions, (2) any predecessors and successors thereto, and (3) any and all persons or entities purporting to act or acting on Microsoft's behalf, including, but not limited to, all past and present agents, officers, employees, consultants, directors, affiliates, partners, associates, attorneys, or representatives thereof.

b.    "Mercy Health Plans" refers to (1) Mercy Health Plans Incorporated and any parent, subsidiaries and divisions, (2) any predecessors and successors thereto, and (3) any and all persons or entities purporting to act or acting on Mercy Health Plans' behalf, including, but not limited to, all past and present attorneys, employees, consultants, directors, agents, officers, partners, affiliates, associates, or representatives thereof.

c.    Infosys refers to (1) Infosys Technologies Limited and any parent, subsidiaries and divisions, (2) any predecessors and successors thereto, and (3) any and all persons or entities purporting to act or acting on Infosys's behalf, including, but not limited to, all past and present attorneys, employees, consultants, directors, agents, officers, partners, affiliates, associates, or representatives thereof.

d.    As used herein, "CCF" refers to Customer Care Framework.

e.    "Product" means a manufacture, machine, device, apparatus, instrument, mechanism, appliance, collection of components/parts (either individually or together), method or process which are designed to function together electrically, mechanically, or otherwise, to achieve a particular purpose or function.

f.    As used herein, CTI means computer telephony integration.

g.    As used herein, line of business application ("LOB") means backend office systems, including, but not limited to, billing systems, customer relations management ("CRM") systems, or order management systems, or issue tracking systems.

h.    As used herein, "and" and "or" are to be construed either disjunctively or conjunctively so as to acquire the broadest possible meaning.

i.    As used herein, "any," "all," or "each" are to be construed as "any, all, and each" inclusively.

j.    As used herein, the use of the singular form of any word includes the plural and vice versa.

k.    The phrases "referring or relating to," "refer or relate to," "discussing," "summarizing," or "mentioning," as used herein, shall mean all information and all facts and/or documents that directly, indirectly or in any other way support, negate, bear upon, touch upon, incorporate, affect, include, pertain to and/or are otherwise connected with the subject matter.

l.  As used herein, "document" or "documents" have the broadest meaning which can be ascribed to them pursuant to Fed. R. Civ. P. 34, including without limitation all final forms and all drafts and revisions of any type of written or graphic matter, original or reproduced, and all copies thereof which are different in any way from the original, regardless of whether designated "confidential," "privileged," or otherwise restricted.  Without limiting the foregoing, the term "document" includes video tapes, films, audio tapes, computer disks, electronic mail messages, books, papers, letters, telegrams, facsimile transmissions, memoranda, communications, minutes, notes, schedules, tabulations, vouchers, accounts, statements, affidavits, reports' abstracts, agreements, contracts, diaries, calendars, plans, specifications, drawings, sketches, photostats, photographs, charts, graphs and other similar objects, and any kind of transcript, transcription or recording of any conversation, discussion or oral presentation of any kind, and any information stored on and reproducible in documentary form from a computer or other electronic information storage device.

m.  All documents produced in response to these requests shall be produced in the same order as they are kept in the ordinary course of business and, where attached, shall not be separated or disassembled.  If responsive documents are segregated or separated from other documents, whether by inclusion in binders, files, sub-files, or by use of dividers, tabs or any other method, produce such documents in that form.

n.  If any requested documents have been destroyed, state when they were destroyed, why they were destroyed, all persons who participated in or were involved in the decision to destroy, and supply an index of all such destroyed documents.

o.  If any document responsive to any Request was once within your possession, custody or control but no longer is, please state:
   a.  the identity of the last known custodian of the document;
   b.  the date or dates on which the document was lost, misplaced, transferred, destroyed, or otherwise disposed of;
   c.  the identity of the person responsible for the loss, misplacement, transfer, destruction, or other disposition of the document;
   d.  the reasons for and circumstances surrounding the loss, misplacement, transfer, destruction, or other disposition of the document; and
   e.  any policy, directive, procedure, regulation or requirement pursuant to which the loss, misplacement, transfer, destruction, or disposition of the document occurred or was carried out.

p.  When a document requested by any of these requests for production is withheld from production on any ground, such as that of the attorney-client privilege or the work product immunity doctrine, you will furnish Defendants with a list identifying each such document by:
   a.  date;
   b.  author, including position and title;
   c.  recipients, including position and title;
   d.  the general nature of the document (*e.g.*, a "letter" or an "opinion of counsel"); and

    e.  identifying the subject matter with sufficient detail to enable the document to be referred to in any subsequent motion to compel production; and further, the listing shall state the basis asserted for withholding the document in sufficient detail so as to enable the claim of privilege or immunity or other claim to be adjudicated.

    q.  If, in responding to any Document Request or Deposition Topic, you encounter any ambiguity in construing either the Request, Topic, or a definition or instruction relevant to it, set forth the matter deemed ambiguous and the construction selected or used in responding.

# SCHEDULE A

## DOCUMENT REQUESTS

**REQUEST NO. 1.:**

All documents referring or relating to Customer Care Framework ("CCF"), including, but not limited to, the integration of CCF with the Infosys Integration and Collaboration Solution. *See* Ex. A and B.

**REQUEST NO. 2.:**

Documents sufficient to show Mercy Health Plans' implementation of CCF. *See* Ex. A.

**REQUEST NO. 3.:**

Documents sufficient to identify the individuals and/or entities that performed the implementation of CCF, including, but not limited to, Microsoft employees, Infosys employees, and/or Mercy Health Plans employees. *See* Ex. A and B.

**REQUEST NO. 4.:**

All documents referring or relating to the selection by Mercy Health Plans of CCF over other products Mercy Health Plan considered as potential alternatives to CCF. *See* Ex. A ("After reviewing alternatives, MHP selected the Infosys Integration and Collaboration Solution (ICS) with the Microsoft Customer Care Framework (CCF).").

**REQUEST NO. 5.:**

Documents sufficient to identify how CCF has been integrated with any CTI applications, including the identification of the CTI applications.

**REQUEST NO. 6.:**

Documents sufficient to identify how CCF has been integrated with any line of business ("LOB") applications, including the identification of the LOB applications.

**REQUEST NO. 7.:**

Documents sufficient to identify how CCF has been integrated with any email applications, including the identification of the email applications.

**SCHEDULE B**

**TOPICS**

**TOPIC NO. 1.:**

The integration of CCF with the Infosys Integration and Collaboration Solution. *See* Ex. A and B.

**TOPIC NO. 2.:**

Mercy Health Plans' implementation of CCF. *See* Ex. A.

**TOPIC NO. 3.:**

The individuals and/or entities that performed the implementation of CCF, including, but not limited to, Microsoft employees, Infosys employees, and/or Mercy Health Plans employees. *See* Ex. A and B.

**TOPIC NO. 4.:**

The selection by Mercy Health Plans of CCF over other products Mercy Health Plan considered as potential alternatives to CCF. *See* Ex. A ("After reviewing alternatives, MHP selected the Infosys Integration and Collaboration Solution (ICS) with the Microsoft Customer Care Framework (CCF).").

**TOPIC NO. 5.:**

The integration of CCF with CTI applications.

**TOPIC NO. 6.:**

The integration of CCF with line of business ("LOB") applications.

**TOPIC NO. 7.:**

The integration of CCF with email applications.

**TOPIC NO. 8.:**

Documents received by Mercy Health Plans from Microsoft regarding CCF, including, but not limited to, any instruction or training manuals.

# Exhibit A



**Microsoft Customer Care**
**Customer Solution Ca**



**Customer:** Mercy Health Plans (MHP)
**Web site:** www.mercyhealthplans.com
**Customer size:** 530
**Country:** United States
**Industry:** Healthcare Payor

**Customer Profile**
Mercy Health Plans is a full-service health management company providing a full range of HMO, PPO, and POS benefit plans to 250,000 members in 7 states. Mercy Health Plans is a subsidiary of the Sisters of Mercy Health System—a 3 billion dollar Catholic Health Care System, based in St. Louis, Missouri.

**Software and Services**
- Microsoft® Windows Server System™
  - Microsoft Content Management Server
  - Microsoft Host Integration Server
  - Microsoft SQL Server™ 2000
  - Microsoft Speech Server
  - Microsoft Windows Server™ 2003
- Technologies
  - Active Directory® directory service
  - Microsoft .NET

For more information about other Microsoft customer successes, please visit: www.microsoft.com/resources/casestudies

## Integrated Solution Enhances Productivity of Customer Care Representatives

"Our objective was to seek out a solution that provided the necessary efficiencies that would enable our customer care representatives to focus on customer service, not the applications."

Director of Director of Operations, discussing Mercy Health Plans

*Mercy Health Plans (MHP) places the highest value on member health and service quality. MHP needed to integrate its call center systems to better serve its customers. The Infosys Integration and Collaboration Solution, coupled with the Microsoft® Customer Care Framework, provided the integration MHP needed, and the result has created a more streamlined customer care organization.*

### Business Needs
Mercy Health Plans (MHP) places the highest value on member health and service quality. As a result, MHP regards customer service as one of its competitive advantages. To strengthen its lead in customer service, MHP recognized that, as consumers assume greater financial responsibility for their own healthcare, the company would need to reciprocate with continuous improvement in this area.

Rather than just meeting demand, MHP wanted to stay well ahead of the rising service expectations of individual members and employer groups. Whether MHP customers chose to work through a full-service channel, such as a customer contact representatives (CCRs), or the self-service

Web portals, MHP wanted to deliver timely and consistent answers.

Specifically, MHP wanted to achieve the following:
- Immediately reduce costs, while improving CCR productivity and customer satisfaction
- Increase complex-service capacity and consistency
- Ease integration now and in the future to accelerate time-to-market for new products and services
- Use single sign on (SSO) to eliminate the need for CCRs to log on more than once
- Present actionable customer information from back-end legacy systems through a



familiar, easy-to-use, front-end interface that could evolve to meet changing needs

- Reuse the same open standards infrastructure and business rules for all customer service channels
- Safeguard and extend existing investments

MHP envisioned a solution that would simplify and accelerate the process to reduce average call-handling time while increasing the capacity of each CCR and channel to handle more complex interactions. In addition, since MHP had also scheduled the phase-out of a legacy claims-administration application, the solution needed to ensure that customer service channels would not be adversely affected during that process.

## Solution
After reviewing alternatives, MHP selected the Infosys Integration and Collaboration Solution (ICS) with the Microsoft Customer Care Framework (CCF). CCF is an open-standards-based presentation and data integration environment that provides a 360-degree view of every customer through real-time synchronization between full- and self-service channels (portals, interactive voice response).

MHP chose CCF to simplify the integration of its customer service applications. It also saw the solution as a fast path to capitalize on the cross-channel economies of scale necessary to provide immediate and consistent answers regardless of which channel the customer might choose. Infosys extended the CCF by adding custom-built components such as Web control, mainframe control, external control, navigation toolbar, and SSO Web service to develop the complete ICS solution.

To implement the ICS customer service solution, Infosys first conducted a discovery phase during which the ICS solution implementation options and high-level scope were established. Six applications were targeted for integration. Next, requirements gathering identified 31 unique workflows that ran off the six applications. Finally, automated workflows were designed for each application using a detailed requirement analysis process.

In parallel, technical feasibilities of different approaches for the solutions were analyzed. Based on this technical analysis, Infosys designed, developed, tested, and delivered 31 workflows built on Microsoft .NET. Infosys used CCF and .NET technologies to overcome several complexities that were encountered during the implementation:

- Some of the native applications had unique behaviors that needed to be retained in the new user interface. For example, a Web application needed to spawn a new child-window for different modules. These behaviors were addressed by opening the application in a different tab control or writing generic components to replicate the specific behaviors of each type of application (Web-, Microsoft Windows–, and mainframe-based).
- Workflow automation required data exchange and scripting at the user interface (UI) level. For this to work, each application needed to be able to provide control IDs for different controls that appeared on-screen. Since one of the applications lacked a control ID, a generic hook library needed to be developed.

- Other design challenges included the capture, encryption, storage, and usage of agent application credentials to achieve SSO.

## Benefits
MHP sees the following business benefits as a result of the ICS and Microsoft solution:

- Reduction in response time and enhanced productivity. User-friendly navigation and caching context data to eliminate redundancy in data entry will support the efficiency of CCRs, thereby increasing productivity.
- Limited training cost. Because there were no modifications in the applications, the training cost involved was minimal and limited to the use of the unified desktop.
- "Swivel chair" phenomenon eliminated. Because all applications were integrated in a single, unified desktop, agents are able to serve each customer without physically moving from one system to another.
- Safeguards and extends existing IT investments. The solution was built by leveraging the existing business applications, thereby protecting past IT investments.
- Application reliability. Because the application will be used to support customer service, the application demands flawless performance.



© 2006 Microsoft Corporation. All rights reserved. The case study is for informational purposes only. MICROSOFT MAKES NO WARRANTIES, EXPRESS OR IMPLIED, IN THIS SUMMARY. Microsoft, Active Directory, Windows, the Windows logo, Windows Server, and Windows Server System are either registered trademarks or trademarks of Microsoft Corporation in the United States and/or other countries. All other trademarks are property of their respective owners.

Document published April 2006

# Exhibit B







# Win in the flat world

## Infosys' Integration & Collaboration Solution helps Mercy Health Plans Enhance Customer Satisfaction



### Client Overview

Mercy Health Plans (MHP) is a full-service health management company providing a full range of HMO, PPO, and POS benefit plans. Employers, state and local government agencies, school systems, unions, and individuals representing 250,000 members in 7 states are insured through MHP's commercial insurance products. MHP also provides benefit coverage to Medicare and Medicaid recipients, as well as third party administrative services for employers who choose to self-fund their health benefits program.

Mercy Health Plans is a subsidiary of the Sisters of Mercy Health System—a three billion dollar Catholic Health Care System —based in St. Louis, MO. MHP was established in 1994 to address changes occurring in health care delivery and to ensure that health plan members continue to receive quality, accessible and affordable health care.

### Business Need

In early 2005, Mercy Health Plans was in the middle of a coordinated series of projects, designed to improve their competitive positioning. Enhanced customer service, being a strategic competency and differentiator in the market, was selected as an additional area of focus. Although efforts were made to provide information through other avenues, majority of the customer contacts was through the telephone. For this reason, MHP selected to enhance the capability of Customer Contact Representatives (CCR) to efficiently and effectively serve their customers.

April 2006

As is common throughout the industry, the CCR in the contact center access multiple applications to input or extract data to respond to customer inquiries. MHP noticed that due to data inconsistency across different applications, and lack of integrated information, the CCR addressing the customer request was not able to provide a timely response, reducing the level of service below targeted levels. "The time it took to enter and re-enter data across systems was outside our established parameters," said Steve Kelley, Director of Operations Consulting and the Project Manager. "Our objective was to seek out a solution that provided the necessary efficiencies that would enable our CCRs to focus on customer service, not the applications."

MHP considered various options and decided to deploy Infosys' Integration and Collaboration Solution (ICS) solution, which:

- Eliminates service costs and streamlines operations by improving CCR productivity
- Reduces re-keying of data while accessing different applications
- Integrates different applications into a unified user interface
- Supports multi-channel delivery of customer service functions
- Allows access to different applications using Single Sign On (SSO)
- Protects existing manpower and technology investments

## The Infosys Approach

Infosys focuses on enhancing the productivity of CCRs through a more efficient use of existing applications. The business applications accessed by the CCRs were diverse in technology and presented specific challenges in navigating and retrieving caller information. The need, therefore, was to adopt a solution that could help navigate the multitude of systems and screens while efficiently retrieving information to answer callers' inquiries.

To implement ICS, Infosys adopted the following approach:

Discovery – Infosys carried out a discovery phase during which ICS solution implementation options and high-

level scope was decided. The different applications to be integrated were also identified.

Requirements Gathering – Infosys conducted a detailed requirement analysis to capture different workflows in each application that could be automated. Requirements for six different applications and thirty-one unique workflows were gathered thoroughly. In parallel, technical feasibilities of different approaches for the solutions were analyzed.

Delivery – Based on the technical analysis, Infosys designed, developed, tested and delivered thirty-one workflows built on a .NET platform

Scalability – Infosys built reusable components for integrating different types of applications, providing a robust and scalable platform for cost-effective expansion.

User Certification – Infosys provided support to MHP to conduct the user certification phase, wherein the developed solution was scrutinized by the MHP QA team.

To ensure the twin advantages of low costs and quick turnaround time, the Infosys team leveraged the Global Delivery Model (GDM) and completed all the client's imperatives in thirty-one weeks.

## Challenges

Since the solution involved integration of different applications, some of the complexities encountered during implementing the solution were as follows:

- The native applications had specific behaviors that had to be retained while integrating with Infosys' ICS. For example, a web application was used that spawns a new child-window for different modules. This demanded that each module be opened in a different tab control. Such behaviors demanded the writing of generic components that would take care of specific behaviors of each type of application (Web, Windows and Mainframes)
- Data exchange and scripting at the UI level is important for automating workflows. For this to



work, the individual applications needed to be capable of providing Control IDs of different controls that appear on screen. The windows application to be integrated in ICS failed to provide the same, which led to more R&D work and the development of a generic hook library

- There were design challenges, including capturing, encrypting, storing and using the application credentials of the agents. These were necessary to incorporate the SSO.

## Solution Architecture

The scope of the ICS solution implemented at MHP was limited to integrating different applications on a unified desktop. The technical architecture built to accomplish the same is depicted above. The architecture was developed based on Microsoft's Customer Care Framework (CCF), which provides different layers and components to enable hosting of such disparate applications. This framework was then extended by adding custom-built components like Web Control, MainFrame Control, External Control, Navigation Toolbar and SSO Web Service to develop the complete ICS solution.

## Client Benefits

Reduction in response time and enhanced productivity – User-friendly navigation and caching context data to eliminate redundancy in data entry will support the efficiency of CCRs, thereby increasing productivity.

Limited training cost – Since there were no amendments in the applications, the training cost involved was minimal and limited to the use of the unified desktop.

Eliminating Swivel Chair phenomenon – Since all applications are integrated in a single unified desktop, the agents are able to serve a customer, without physically moving from one system to another.

Leveraging existing investments – The solution was built by leveraging the existing business applications, thereby protecting past manpower and technology investments.

Significant cost benefits – Significant cost benefits resulted from Infosys' proven GDM.



© 2006 Infosys Technologies Limited, Bangalore, India. Infosys believes the information in this publication is accurate as of its publication date; such information is subject to change without notice. Infosys acknowledges the proprietary rights of the trademarks and product names of other companies mentioned in this document.

EXHIBIT D

AO88 (Rev. 12/06) Subpoena in a Civil Case

# Issued by the

# UNITED STATES DISTRICT COURT

EASTERN _____ DISTRICT OF _____ WISCONSIN

MICROSOFT CORPORATION,
            Plaintiff,
                V.
ALCATEL LUCENT ENTERPRISE and
GENESYS TELECOMMUNICATIONS
    LABORATORIES, INC.,
            Defendants.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 07-090 (SLR)
Action pending in the U.S.
District Court for the District
of Delaware under the above
case number and title.

TO: West Bend Mutual Insurance Company
    1900 South 18th Avenue
    West Bend, WI 53095-8796

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.  See Schedule B for a list of deposition topics

| PLACE OF DEPOSITION    Hilton Hotel; 509 W Wisconsin Ave    Milwaukee, WI 53203 | DATE AND TIME    3/21/2008 9:00 am |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Schedule A for Document Requests

| PLACE    Hilton Hotel; 509 W Wisconsin Ave    Milwaukee, WI 53203 | DATE AND TIME    3/21/2008 9:00 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

   Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _Andrew MacArthur, attorney for defendant (GTEC)_ | 3/5/2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Andrew P. MacArthur; Latham & Watkins LLP
885 Third Avenue, Suite 1000; New York, NY 10022; 212.906.4504

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | West Bend Mutual Insurance Company 1900 South 18th Avenue West Bend, WI 53095-8796 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.
(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.
(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.
(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.
(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) If a subpoena
(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.
(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.
(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.
(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.
(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

## INSTRUCTIONS AND DEFINITIONS

a.   Microsoft refers to (1) Microsoft Corporation and any parent, subsidiaries and divisions, (2) any predecessors and successors thereto, and (3) any and all persons or entities purporting to act or acting on Microsoft's behalf, including, but not limited to, all past and present agents, officers, employees, consultants, directors, affiliates, partners, associates, attorneys, or representatives thereof.

b.   "West Bend Mutual" refers to (1) West Bend Mutual Insurance Company and any parent, subsidiaries and divisions, (2) any predecessors and successors thereto, and (3) any and all persons or entities purporting to act or acting on West Bend Mutual's behalf, including, but not limited to, all past and present attorneys, employees, consultants, directors, agents, officers, partners, affiliates, associates, or representatives thereof.

c.   "CCF" refers to Customer Care Framework.

d.   "Product" means a manufacture, machine, device, apparatus, instrument, mechanism, appliance, collection of components/parts (either individually or together), method or process which are designed to function together electrically, mechanically, or otherwise, to achieve a particular purpose or function.

e.   As used herein, CTI means computer telephony integration.

f.   As used herein, line of business application ("LOB") means backend office systems, including, but not limited to, billing systems, customer relations management ("CRM") systems, or order management systems, or issue tracking systems.

g.   As used herein, "and" and "or" are to be construed either disjunctively or conjunctively so as to acquire the broadest possible meaning.

h.   As used herein, "any," "all," or "each" are to be construed as "any, all, and each" inclusively.

i.   As used herein, the use of the singular form of any word includes the plural and vice versa.

j.   The phrases "referring or relating to," "refer or relate to," "discussing," "summarizing," or "mentioning," as used herein, shall mean all information and all facts and/or documents that directly, indirectly or in any other way support, negate, bear upon, touch upon, incorporate, affect, include, pertain to and/or are otherwise connected with the subject matter.

k.   As used herein, "document" or "documents" have the broadest meaning which can be ascribed to them pursuant to Fed. R. Civ. P. 34, including without limitation all final forms and all drafts and revisions of any type of written or graphic matter, original or reproduced, and all copies thereof which are different in any way from the original, regardless of whether designated "confidential," "privileged," or otherwise restricted.  Without limiting the foregoing, the term "document" includes video tapes, films, audio tapes, computer disks, electronic mail messages, books, papers, letters, telegrams, facsimile transmissions, memoranda, communications, minutes, notes, schedules, tabulations, vouchers, accounts, statements, affidavits, reports' abstracts, agreements, contracts, diaries, calendars, plans, specifications, drawings, sketches, photostats, photographs, charts, graphs and other similar objects, and any kind of transcript, transcription or recording of any conversation, discussion or oral presentation of any kind, and any information stored on and reproducible in documentary form from a computer or other electronic information storage device.

l.   All documents produced in response to these requests shall be produced in the same order as they are kept in the ordinary course of business and, where attached, shall not be separated or disassembled.  If responsive documents are segregated or separated from other documents, whether by inclusion in binders, files, sub-files, or by use of dividers, tabs or any other method, produce such documents in that form.

m.   If any requested documents have been destroyed, state when they were destroyed, why they were destroyed, all persons who participated in or were involved in the decision to destroy, and supply an index of all such destroyed documents.

n.   If any document responsive to any Request was once within your possession, custody or control but no longer is, please state:
  a.  the identity of the last known custodian of the document;
  b.  the date or dates on which the document was lost, misplaced, transferred, destroyed, or otherwise disposed of;
  c.  the identity of the person responsible for the loss, misplacement, transfer, destruction, or other disposition of the document;
  d.  the reasons for and circumstances surrounding the loss, misplacement, transfer, destruction, or other disposition of the document; and
  e.  any policy, directive, procedure, regulation or requirement pursuant to which the loss, misplacement, transfer, destruction, or disposition of the document occurred or was carried out.

o.   When a document requested by any of these requests for production is withheld from production on any ground, such as that of the attorney-client privilege or the work product immunity doctrine, you will furnish Defendants with a list identifying each such document by:
  a.  date;
  b.  author, including position and title;
  c.  recipients, including position and title;
  d.  the general nature of the document (*e.g.*, a "letter" or an "opinion of counsel"); and

    e.  identifying the subject matter with sufficient detail to enable the document to be referred to in any subsequent motion to compel production; and further, the listing shall state the basis asserted for withholding the document in sufficient detail so as to enable the claim of privilege or immunity or other claim to be adjudicated.

    p.  If, in responding to any Document Request or Deposition Topic, you encounter any ambiguity in construing either the Request, Topic, or a definition or instruction relevant to it, set forth the matter deemed ambiguous and the construction selected or used in responding.

## SCHEDULE A

### DOCUMENT REQUESTS

**REQUEST NO. 1.:**

All documents referring or relating to Customer Care Framework ("CCF"), including, but not limited to, the integration of CCF.

**REQUEST NO. 2.:**

Documents sufficient to show West Bend Mutual's implementation of CCF.

**REQUEST NO. 3.:**

Documents sufficient to identify the individuals and/or entities that performed the implementation of CCF, including, but not limited to, Microsoft employees, and/or West Bend Mutual employees.

**REQUEST NO. 4.:**

All documents referring or relating to the selection by West Bend Mutual of CCF over other products West Bend Mutual considered as potential alternatives to CCF.

**REQUEST NO. 5.:**

Documents sufficient to identify how CCF has been integrated with any CTI applications, including the identification of the CTI applications.

**REQUEST NO. 6.:**

Documents sufficient to identify how CCF has been integrated with any line of business ("LOB") applications, including the identification of the LOB applications.

**REQUEST NO. 7.:**

Documents sufficient to identify how CCF has been integrated with any email applications, including the identification of the email applications.

## SCHEDULE B

## TOPICS

### TOPIC NO. 1.:

West Bend Mutual's integration and implementation of CCF.

### TOPIC NO. 2.:

The individuals and/or entities that performed the implementation of CCF, including, but not limited to, Microsoft employees and/or West Bend Mutual employees.

### TOPIC NO. 3.:

The selection by West Bend Mutual of CCF over other products West Bend Mutual considered as potential alternatives to CCF.

### TOPIC NO. 4.:

The integration of CCF with CTI applications.

### TOPIC NO. 5.:

The integration of CCF with line of business ("LOB") applications.

### TOPIC NO. 6.:

The integration of CCF with email applications.

### TOPIC NO. 7.:

Documents received by West Bend Mutual from Microsoft regarding CCF, including, but not limited to, any instruction or training manuals.

# EXHIBIT E

AO88 (Rev. 12/07) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
Western District of North Carolina

MICROSOFT CORPORATION,
   Plaintiff,
    V.
ALCATEL LUCENT ENTERPRISE and
GENESYS TELECOMMUNICATIONS
LABORATORIES, INC.,
   Defendants.

TO: VirtualLogger, LLC
  9732 Nickleby Court
  Charlotte, NC 28210

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 07-090 (SLR)

Action pending in the U.S.
District Court for the District
of Delaware under the above
case number and title.

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. See Schedule B for a list of deposition topics

| PLACE OF DEPOSITION Omni Hotel; 132 East Trade Street Charlotte, NC 28202. Deposition to be recorded by stenographic, audio, audiovisual, and/or videographic means. | DATE AND TIME 3/21/2008 9:00 am |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Schedule A for Document Requests

| PLACE Omni Hotel; 132 East Trade Street Charlotte, NC 28202 | DATE AND TIME 3/21/2008 9:00 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

  Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Andrew MacArthur, attorney for defendant (SEC)* | 3/5/2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Andrew P. MacArthur; Latham & Watkins LLP
885 Third Avenue, Suite 1000; New York, NY 10022; 212.906.4504

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/07) Subpoena in a Civil Case (Page 2)

## PROOF OF SERVICE

| | DATE | PLACE | VirtualLogger, LLC |
|---|---|---|---|
| SERVED | | | 9732 Nickleby Court |
| | | | Charlotte NC 28210 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.
(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
(2) Command to Produce Materials or Permit Inspection.
(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
(3) Quashing or Modifying a Subpoena.
(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information;
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial
(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) DUTIES IN RESPONDING TO A SUBPOENA.
(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) Claiming Privilege or Protection.
(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT.
The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## INSTRUCTIONS AND DEFINITIONS

a.    Microsoft refers to (1) Microsoft Corporation and any parent, subsidiaries and divisions, (2) any predecessors and successors thereto, and (3) any and all persons or entities purporting to act or acting on Microsoft's behalf, including, but not limited to, all past and present agents, officers, employees, consultants, directors, affiliates, partners, associates, attorneys, or representatives thereof.

b.    CosmoCom refers to (1) CosmoCom, Inc. and any parent, subsidiaries and divisions, (2) any predecessors and successors thereto, and (3) any and all persons or entities purporting to act or acting on CosmoCom's behalf, including, but not limited to, all past and present attorneys, employees, consultants, directors, agents, officers, partners, affiliates, associates, or representatives thereof.

c.    EagleIP refers to (1) EagleIP, LLC and any parent, subsidiaries and divisions, (2) any predecessors and successors thereto, and (3) any and all persons or entities purporting to act or acting on EagleIP's behalf, including, but not limited to, all past and present attorneys, employees, consultants, directors, agents, officers, partners, affiliates, associates, or representatives thereof.

d.    VirtualLogger refers to (1) VirtualLogger, LLC and any parent, subsidiaries and divisions, (2) any predecessors and successors thereto, and (3) any and all persons or entities purporting to act or acting on VirtualLogger's behalf, including, but not limited to, all past and present attorneys, employees, consultants, directors, agents, officers, partners, affiliates, associates, or representatives thereof.

e.    "Product" means a manufacture, machine, device, apparatus, instrument, mechanism, appliance, collection of components/parts (either individually or together), method or process which are designed to function together electrically, mechanically, or otherwise, to achieve a particular purpose or function.

f.    As used herein, CTI means computer telephony integration.

g.    As used herein, line of business application ("LOB") means backend office systems, including, but not limited to, billing systems, customer relations management ("CRM") systems, or order management systems, or issue tracking systems.

h.    As used herein, "and" and "or" are to be construed either disjunctively or conjunctively so as to acquire the broadest possible meaning.

i.    As used herein, "any," "all," or "each" are to be construed as "any, all, and each" inclusively.

j.    As used herein, the use of the singular form of any word includes the plural and vice versa.

k.    The phrases "referring or relating to," "refer or relate to," "discussing," "summarizing," or "mentioning," as used herein, shall mean all information and all facts and/or documents that directly, indirectly or in any other way support, negate, bear upon, touch upon, incorporate, affect, include, pertain to and/or are otherwise connected with the subject matter.

l.    As used herein, "document" or "documents" have the broadest meaning which can be ascribed to them pursuant to Fed. R. Civ. P. 34, including without limitation all final forms and all drafts and revisions of any type of written or graphic matter, original or reproduced, and all copies thereof which are different in any way from the original, regardless of whether designated "confidential," "privileged," or otherwise restricted.  Without limiting the foregoing, the term "document" includes video tapes, films, audio tapes, computer disks, electronic mail messages, books, papers, letters, telegrams, facsimile transmissions, memoranda, communications, minutes, notes, schedules, tabulations, vouchers, accounts, statements, affidavits, reports' abstracts, agreements, contracts, diaries, calendars, plans, specifications, drawings, sketches, photostats, photographs, charts, graphs and other similar objects, and any kind of transcript, transcription or recording of any conversation, discussion or oral presentation of any kind, and any information stored on and reproducible in documentary form from a computer or other electronic information storage device.

m.    All documents produced in response to these requests shall be produced in the same order as they are kept in the ordinary course of business and, where attached, shall not be separated or disassembled.  If responsive documents are segregated or separated from other documents, whether by inclusion in binders, files, sub-files, or by use of dividers, tabs or any other method, produce such documents in that form.

n.    If any requested documents have been destroyed, state when they were destroyed, why they were destroyed, all persons who participated in or were involved in the decision to destroy, and supply an index of all such destroyed documents.

o.    If any document responsive to any Request was once within your possession, custody or control but no longer is, please state:
   a.    the identity of the last known custodian of the document;
   b.    the date or dates on which the document was lost, misplaced, transferred, destroyed, or otherwise disposed of;
   c.    the identity of the person responsible for the loss, misplacement, transfer, destruction, or other disposition of the document;
   d.    the reasons for and circumstances surrounding the loss, misplacement, transfer, destruction, or other disposition of the document; and
   e.    any policy, directive, procedure, regulation or requirement pursuant to which the loss, misplacement, transfer, destruction, or disposition of the document occurred or was carried out.

p.    When a document requested by any of these requests for production is withheld from production on any ground, such as that of the attorney-client privilege or the work product immunity doctrine, you will furnish Defendants with a list identifying each such document by:
   a.    date;

    b.  author, including position and title;

    c.  recipients, including position and title;

    d.  the general nature of the document (*e.g.*, a "letter" or an "opinion of counsel"); and

    e.  identifying the subject matter with sufficient detail to enable the document to be referred to in any subsequent motion to compel production; and further, the listing shall state the basis asserted for withholding the document in sufficient detail so as to enable the claim of privilege or immunity or other claim to be adjudicated.

    q.  If, in responding to any Document Request or Deposition Topic, you encounter any ambiguity in construing either the Request, Topic, or a definition or instruction relevant to it, set forth the matter deemed ambiguous and the construction selected or used in responding.

# SCHEDULE A

## DOCUMENT REQUESTS

### REQUEST NO. 1.:

Documents sufficient to show the operation of any VirtualLogger product or service that integrates or can be used in conjunction with EagleACD, CosmoCom's CosmoCall Universe, and/or Microsoft's Customer Care Framework.

### REQUEST NO. 2.:

Documents sufficient to show any testing, inspection, demonstration, marketing, or sale of any VirtualLogger product or service that uses Microsoft's Customer Care Framework.

### REQUEST NO. 3.:

All documents referring or relating to CosmoCom's UniFrame product. *See* Ex. A.

### REQUEST NO. 4.:

Documents sufficient to explain the basis for the statement: "Microsoft's CCF platform helped VoiceLog in a number of daily business activities to operate the call center. These activities include custom reports, Voicemail and e-mail storage, delivery of content and searching database." *See* Ex. B.

### REQUEST NO. 5.:

All documents referring or relating to any partnership between VirtualLogger and Microsoft, CosmoCom, and/or EagleIP.

### REQUEST NO. 6.:

Documents sufficient to identify all entities that use any VirtualLogger product or service that has been integrated and/or used in conjunction Microsoft's Customer Care Framework, including, but not limited to, EagleACD.

### REQUEST NO. 7.:

All documents referring or relating to any litigation between Microsoft and ALE or Genesys.

### REQUEST NO. 8.:

All documents referring or relating to any patent licenses and/or discussions related to the licensing of patents related to call routing between VirtualLogger and Microsoft, CosmoCom, amd/or EagleIP.

**REQUEST NO. 9.:**

All documents referring or relating to customers of VirtualLogger using any VirtualLogger product or service containing Microsoft's Customer Care Framework, CosmoCom CosmoCall Universe, and/or EagleIP products.

**REQUEST NO. 10.:**

Documents sufficient to identify how CCF has been integrated with any CTI applications, including the identification of the CTI applications.

**REQUEST NO. 11.:**

Documents sufficient to identify how CCF has been integrated with any line of business ("LOB") applications, including the identification of the LOB applications.

**REQUEST NO. 12.:**

Documents sufficient to identify how CCF has been integrated with any email applications, including the identification of the email applications.

## SCHEDULE B

### TOPICS

**TOPIC NO. 1.:**

The development and operation of any VirtualLogger product or service that can be used in conjunction with Microsoft's Customer Care Framework, including, but not limited to, EagleACD.

**TOPIC NO. 2.:**

The testing, inspection, demonstration, marketing, or sale of any VirtualLogger product or service that can be used in conjunction with Microsoft's Customer Care Framework, including, but not limited to, EagleACD.

**TOPIC NO. 3.:**

The statement, "Microsoft's CCF platform helped VoiceLog in a number of daily business activities to operate the call center. These activities include custom reports, Voicemail and e-mail storage, delivery of content and searching database." *See* Ex. B.

**TOPIC NO. 4.:**

The statement by Mr. James Veilleux, "EagleACD continues to deliver high standards of reliability per our requirements and we are able to bring our agents to speed very quickly." *See* Ex. B.

**TOPIC NO. 5.:**

The statement by Mr. James Veilleux, "EagleACD's routing allocates the skilled attendant to the call by any agents connected to the network." *See* Ex. B.

**TOPIC NO. 6.:**

Users, potential users, customers, distributors, and licensees of any VirtualLogger product or service that are used, deployed, or implemented in conjunction with EagleIP products, CosmoCom products, and/or Microsoft's Customer Care Framework.

**TOPIC NO. 7.:**

VirtualLogger's awareness of any litigation between Microsoft, CosmoCom, and/or EagleIP with ALE or Genesys, including, but not limited to any communications between VirtualLogger and any other party involved in the litigation.

**TOPIC NO. 8.:**

Any patent licenses or negotiations for patent licenses related to call routing between VirtualLogger and Microsoft, CosmoCom, and/or EagleIP.

**TOPIC NO. 9.:**

VirtualLogger's knowledge of CosmoCom's participation in Microsoft's Technology Adoption Program, including but not limited to the role of CosmoCall Universe and CosmoCom's UniFrame Product in the Technology Adoption Program, and the relation of these matters to Genesys' involvement in or departure from Microsoft's Technology Adoption Program.

**TOPIC NO. 10.:**

All documents referring or relating to customers of VirtualLogger using any VirtualLogger product or service containing Microsoft's Customer Care Framework, CosmoCom CosmoCall Universe, and/or EagleIP products.

**TOPIC NO. 11.:**

The integration of CCF with CTI applications.

**TOPIC NO. 12.:**

The integration of CCF with line of business ("LOB") applications.

**TOPIC NO. 13.:**

The integration of CCF with email applications.

**TOPIC NO. 14.:**

Documents received by VirtualLogger from Microsoft regarding CCF, including, but not limited to, any instruction or training manuals.

# Exhibit A



COSMOCOM & MICROSOFT SOLUTIONS

## Microsoft + CosmoCom = UniFrame

# MICROSOFT. CUSTOMER CARE FRAMEWORK AND COSMOCALL UNIVERSE



# Best-of-Breed Collaboration to Make the Most of Customer Interactions

## Features

CosmoCall Universe (CCU) offers a complete and robust set of features and functions that can address most customer contact requirements or contingencies such as:

- Incoming telephone calls with interactive voice response (IVR) and live agents
- Outgoing telephone calls with preview and predictive dialing
- Computer calls from the Web with keyboard chat, joint browsing, voice, video, and collaboration
- E-mail messages
- Voice and fax messages
- Universal queues and routing rules for all media
- Unlimited queues and agent groups
- Skills-based routing
- Intelligent priority handling
- Web-based, location-independent agents
- Web-based administration and supervision
- Open database connectivity
- Real-time and historical reporting
- Graphical application development tools
- Interaction history for all media
- Recording and quality monitoring for all media

*Microsoft*

Best-of-breed systems are the ideal solutions because they mean few compromises or limitations in the features and functions that you need now, and those you may need in the future. But putting together a best-of-breed solution also means taking on the responsibility of making sure that different vendors' components will work together the way you want them to. And because contact center operations are both extremely complex and mission critical, getting everything right and working optimally is resource consuming and costly.

So when Microsoft and CosmoCom, a preeminent developer of Internet Protocol (IP)–based contact center communication technology, team up to leverage the outstanding features and performance of their mutual contact center offerings, you get exceptional value: a best-of-breed solution from CosmoCom that is both cost-effective and easy to implement.

The Microsoft Customer Care Framework (CCF) provides one of the most flexible development frameworks for creating, extending, and scaling customer service delivery and support capabilities through traditional contact center facilities as well as alternative self-service channels. CCF is based on a Service-Oriented Architecture (SOA) and combines state-of-the-art information integration and presentation tools with prescriptive implementation methodologies.

CCF was designed to facilitate the following functional objectives:

- Significantly reduce the time for an agent to execute a customer's service or support requests
- Improve agents' abilities to be effective and provide a satisfying customer experience
- Allow continuous reconfiguration to accommodate the ongoing introduction of new products and service plans without disrupting operations and increasing developmental overhead
- Be easily deployable and maintainable with a low total cost of ownership (TCO)
- Scale transparently and cost-effectively

CosmoCom CCU is a Telco-grade contact center communication platform that is entirely IP-based. It is a comprehensive and fully unified set of contact center communication modules for ACD, CTI, IVR, recording, and reporting functions. Designed for flexible deployment and scalability, CCU can address most contact center requirements and contingencies across all media and channels. CCU exploits the unification of voice and data over IP to create a network-based "virtual call center" supporting multiple physical call center facilities or none at all. Call center agents can be located anywhere in the world and working at any time. All they need is a standard off-the-shelf multimedia PC and a connection to the Internet.

CCF combines an innovative desktop client interface for integrating applications and information with the extensive use of XML and Web services and the support of Microsoft server foundational technology. CCF blends Object-Oriented and SOA methods to create a technology infrastructure that is optimized for continuous change and growth and is designed to help ensure that any customer service application can be quickly and cost-effectively created and deployed. CCF provides significant development and integration efficiencies as a result of its highly effective architectural design, advanced methodologies, and the prebuilt and configured components that it incorporates.

UniFrame facilitates inbound call screen pops for agents that are essentially the same for telephone calls, live Internet sessions, and e-mail messages. Interaction history of all channels is created automatically and stored either in the line-of-business (LOB) CRMs or in CosmoCom Universe's own interaction history module, CosmoTracker. Outbound calls using any channel can be launched with a single click on the contact's phone number, e-mail address, or Session Initiation Protocol (SIP) address. Again, interaction history is created automatically, saving vital agent time and keystrokes, and more important, ensuring that the history is complete so that the next contact with the same customer will be fully and accurately informed by that customer's history. UniFrame utilizes the same technology for self-service and for agent-provided customer service across all channels. Escalation from self-service to agent-provided service is smooth and contextual for the customer and for the agent. Because the same information infrastructure is used, self-provided and agent-provided information will always be consistent.

UniFrame combines the agile integration and presentation capabilities of CCF with the highly versatile and cost-effective IP communication infrastructure of CosmoCall Universe. By integrating these two components to create UniFrame, CosmoCom and Microsoft are delivering the ultimate contact center system value. And by optimizing the two products' integration points and simplifying configuration settings using wizards and/or automated configuration scripts implementers get an "out-of-the-box" solution that requires a minimum amount of setup and configuration effort.

CosmoCom's innovative use of IP technology and on-demand service provisioning coupled with CCF results in a contact center platform that has one of the highest performance-to-cost ratios of any system. For developers and operators of contact center applications, CCF and CosmoCom technologies provide exceptional value in terms of functionality, performance metrics, and economic return on investment.

For more information about CosmoCom CCU, please visit www.cosmocom.com.

For more information about the Microsoft Customer Care Framework, please visit www.microsoft.com/ccf.

# UniFrame Unifies the Contact Center



© 2006 Microsoft Corporation. All rights reserved.
This document is for informational purposes only. MICROSOFT MAKES NO WARRANTIES, EXPRESS OR IMPLIED, IN THIS SUMMARY.
Microsoft is a registered trademark of Microsoft Corporation in the United States and/or other countries. The names of actual companies and products mentioned herein may be the trademarks of their respective owners.
Rev 2.0

*Microsoft*

# Exhibit B

# EagleACD Serves SMB Market Using Microsoft Customer Care Framework

White Paper

Published: dated 6-15-06

For the latest information, please see http://www.microsoft.com/ccf

NY\1382365.1

# Contents

Introduction..................................................................................3

EagleACD Utility Architecture......................................................... 5

Call Queuing and Call Routing Requirements for Flexibility and High Performance...6

The Microsoft Factor- Driver for Strong Platform............................................7

Call Queuing and Call Routing Mechanism..................................................7

Customer Experiences.......................................................................9

Customer Benefits...........................................................................10

Conclusion..................................................................................11

NY\1382365.1

The information contained in this document represents the current view of EagleACD on the issues discussed as of the date of publication. Because Microsoft must respond to changing market conditions, it should not be interpreted to be a commitment on the part of Microsoft, and Microsoft cannot guarantee the accuracy of any information presented after the date of publication.

This White Paper is for informational purposes only. MICROSOFT MAKES NO WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, AS TO THE INFORMATION IN THIS DOCUMENT.

Complying with all applicable copyright laws is the responsibility of the user. Without limiting the rights under copyright, no part of this document may be reproduced, stored in or introduced into a retrieval system, or transmitted in any form or by any means (electronic, mechanical, photocopying, recording, or otherwise), or for any purpose, without the express written permission of Microsoft Corporation.

Microsoft may have patents, patent applications, trademarks, copyrights, or other intellectual property rights covering subject matter in this document. Except as expressly provided in any written license agreement from Microsoft, the furnishing of this document does not give you any license to these patents, trademarks, copyrights, or other intellectual property. 2006 Microsoft Corporation. All rights reserved.

Microsoft, Customer Care Framework, Microsoft Windows Server 2000®, Windows 2000 Advanced Server® and Windows Server 2003®, Microsoft SQL Server 2000® and the Microsoft Exchange Server®, Microsoft Network Load Balancing (NLB) technology, Microsoft Cluster Services (MSCS) is either a registered trademark or trademark of Microsoft Corporation in the United States and/or other countries.

The names of actual companies and products, EagleACD, Datamonitor and CosmoCall Universe, mentioned herein may be the trademarks of their respective owners.

EagleACD Serves SMB Market Using Microsoft Customer Care Framework     3

## Introduction

Internet Protocol (IP) has revolutionized the way businesses communicate, making e-mail and web transactions as commonplace as phone calls. Now IP is also revolutionizing the way contact (call) centers are operated, managed, and controlled. The maturity of IP Telephony standards and the quality of service on IP networks has opened up a new realm of possibilities in service opportunities, efficiencies, management, control, and cost savings. More specifically, IP communications have brought the corporate global village much closer and distance is irrelevant. The SMB (Small Medium Business) market segment has taken the lead in the IP revolution.

With more than 75 million companies around the world, the SMB market spends more than $800 billion each year on IT and telecommunications hardware, software and service. According to an AMI-Partners report, dated August 2004, by 2008 that figure is expected to top $1.1 trillion. In addition, IT and communications spending growth among SMBs tends to outpace that of larger businesses—even during periods of economic downturn. The purchasing power of this group, coupled with its apparent resiliency to recession, provides tremendous opportunities for early movers to capture market share and generate significant revenues. The number of SMBs using hosted applications in the U.S. has exploded during 2003, to 750,000 SMBs, and is expected to grow exponentially during the next few years. With this high rate of adoption, the AMI-Partners Market Research firm estimates that overall spending on hosted applications will increase approximately 40% during the next few years.

Work activities for back office and call center services are now distributed globally. This paradigm shift requires a distributed architecture rather than a centralized solution as jobs are dynamically rotated among many workers on an as-needed basis. The traditional premises-based contact center investment for setting-up an SMB contact center may not be a prudent investment choice during the current uncertain financial recovery period. It is not unusual to find call centers running their telecom and data infrastructure assets at a mere fraction of their capacity. This is due to ongoing changes in the business environment and the unpredictable duration of the customer contract life. In fact, sudden cancellations of service contracts with call center operators have become common. According to Everest Consulting Group, more than 50 percent of recently signed outsourcing contracts were negotiated for five years or shorter in duration.

The so-called "peak-traffic" design approach has driven up costs, cut into operating margins, and created an overall financial drag on the entire call center industry, which is estimated at about 100,000 call centers worldwide. Faced with tight budget constraints and stretched operating budgets, every business is looking to cut the initial capital investment and recurring operating costs of the call center. In addition, the industry is being asked to improve call center utilization capacity, while maintaining an acceptable level of customer service. This underutilized capacity environment along with the advancement of technology has contributed to the birth for the IP hosted call center.

Near shore (Canada and Mexico) and offshore (India and the Philippines) locations are gaining traction with US outsourcing firms and this mega trend is irreversible. A report by Datamonitor predicts that by 2008, 50% more agent positions will be outsourced to a foreign market. This is being triggered by the fact that the traditional big spenders on customer relationship outsourcing services like financial services, communications and technology have now almost been expended. As a result, the incessant pressures to cut costs and reduce capital outlay have triggered the offshore and near shore exodus in the US Customer Relationship Management (CRM) outsourcing industry.

During the last two to three years, IP Hosted solutions that use one common network for voice and data services have been introduced in the market place. This approach has addressed the capacity utilization, network efficiency, and related economic concerns. According to Datamonitor, a leading contact center market research firm, there will be 463,000 hosted agent positions globally by the end of 2008.



Source: Datamonitor

The migration from the premise-based infrastructure to the IP hosted model is accelerating rapidly. Further, a number of legacy hosted call centers are migrating to the IP Hosted solution rather than upgrading their existing systems. There are compelling financial and technical reasons why a number of call centers are now interested in the IP hosted solution. And while there are still some applications where the premise-based solution will be financially and technically attractive rather than leasing port connections, a hybrid of the IP hosted solution and the premise-based solution is emerging as an attractive alternative.

EagleACD is a New York-based company that has taken a leadership role to address the SMB market using the Microsoft® Customer Care Framework platform since early 2004. Its utility-based IP hosted architecture offers a unique unlimited call center infrastructure resource on a true on-demand basis. The call center is simply charged for minutes used by each agent. Fees are charged according to the application use as well, including

EagleACD Serves SMB Market Using Microsoft Customer Care Framework    5

support for live agents, Webchat or predictive dialing. This model provides for financial predictability that maps closely to revenue. It is completely transparent as usage-based pricing is clearly defined. There are 'no expenses' if there is 'no traffic'.

## EagleACD Utility Architecture

A network grid is a compilation of dynamic network resources--server, ACDs, telecom and data network, and storage--acting together to create a large pool of resources and dynamically align resources to specific business needs. The use of a grid to provide network resources is analogous to that of an electric utility. The EagleACD network grid is both a technology solution and a business solution. This technology allows running existing business applications in a network grid environment. In a network grid there is a pool of resources that hosts specific customer applications. Resource usage on a per minute basis for a selected application is tracked, and billed accordingly for usage of minutes.

EagleACD employs a state-of-the-art infrastructure with the use of all industry-leading standards, and provides multi-tenant capabilities. Its IP-based infrastructure allows call center agents located anywhere, to interact with voice or Internet callers – regardless of whether the origin point is a public switch network or IP network. This unified and convergence-ready architecture provides a complete contact center solution in one simple package – including multi-media ACD, IVR, predictive dialing, Internet collaboration, E-mail Response Management (ERM), call recording, and CTI-like integration. With EagleACD's cutting-edge VoIP contact center service, contact centers can be located anywhere in the world.

EagleACD uses the CosmoCall Universe (CCU) platform that is based on the Microsoft® Customer Care Framework (CCF). CCU exploits the unification of VoIP to create a network-based hosted "virtual call center". It uses IP technology and the on-demand paradigm to bring a whole new level of feature richness and cost effectiveness to hosted contact center offerings. All server applications run entirely on the Microsoft Windows Server 2000® and Windows Server 2003, with support from the Microsoft SQL Server 2000 and the Microsoft Exchange Server.



## Call Queuing and Call Routing Requirements for Flexibility and High Performance

EagleACD addresses both the engineering and economic issues by utilizing the advanced capabilities of Microsoft server technology to architect a high-capacity, high-availability solution in the most economical way. This architecture is enabled by Microsoft's Network Load Balancing (NLB) technology, which distributes incoming IP traffic among multiple cluster servers, and Microsoft Cluster Services (MSCS), which provides automatic, fail over for critical SQL Server database applications. Both technologies are found in the Microsoft Windows 2000 Advanced Server and its successor Windows Server 2003.

The user interface utilizes intuitive features aimed at facilitating efficient customer service. A chat call is placed on hold while the agent uses the tabbed call window and

EagleACD Serves SMB Market Using Microsoft Customer Care Framework     7

dialer to place a new call. The agent has easy access to canned phrases for commonly asked questions. EagleACD has a graphical tool for call flow generation that does not require programming for the creation and modification of call flows, including IVR scripting components. The service creation environment is browser-based, enabling the ability to securely modify call flows from any PC connected to the Internet.

The Queue is CosmoCall Universe's basic call organizing unit. Call requests are organized into one or more Queues, where the next available agent is scheduled to serve them. The name of a Queue is one of the attributes of a call request, and CosmoCall allows the administrator to define any number of queues. The ACD (Automatic Call Distributor) Server, the core component of CosmoCall Universe, manages calls, queues, CSRs, agent groups, teams, skills, and call priorities. This is a full-featured, high capacity ACD, capable of managing thousands of CSRs, organizing calls into any number of Queues. CSRs are organized into Agent Groups with customer-defined many-to-many relationships between Queues and Groups. Call Requests and Agents are completed as independent objects, which are defined by attributes and properties, which the ACD uses to determine queue configuration and processing.

It also provides multimedia, multi-channel recordings of agent-caller interactions. It records voice, chat, and e-mail sessions, and includes a database searchable by parameters such as agent, time frame and call type. It includes a browser-based client for administrative personnel to review the captured sessions.

## The Microsoft Factor--Driver for Strong Platform

Microsoft Customer Care Framework (CCF) 2005 is a software product that provides a reference architecture and software building block utilizing Microsoft core technology assets to accelerate an organization's ability to enhance a customer care environment. Microsoft Customer Care Framework 2005 offers multi-channel integration capabilities via web services, and desktop level application integration through information sharing and interaction between different Line of Business applications. CCF increases contact center agent productivity, facilitating reduction in costs and improving the quality of service.

CCF enables dramatic improvements in contact center efficiency by delivering better information faster to service representatives through the use of XML Web Services. CCF provides the call center agent a single sign-on to multiple applications, a 360° unified view of customer information, and a user-friendly interface. The flexible CCF architecture builds on top of the Microsoft platform and integrates with existing systems, enabling contact center operators to reduce total cost of ownership (TCO) and accelerate return on investment (ROI). The platform seamlessly integrates with underlying business applications without requiring changes to existing systems, and avoids costly and time-consuming 'rip-and-replace' of existing systems.

An important consideration in the design and engineering of the strong Microsoft platform was the optimization of packet routing and sequencing, and the minimization of

the introduction of latency whenever possible. This is critical because the quality of VoIP is highly susceptible to degradation due to latency and sequencing factors. To provide carrier-grade switching, it had to be capable of consistently maintaining PSTN-quality voice sessions under any workload or session contingencies.

## Call Queuing and Call Routing Mechanism

The CosmoCall Universe Message Connection Server (MCS) receives and manages all types of incoming messages, including e-mail, voice messages and fax, and submits them for routing by the ACD Server's universal queues. Messages created through Web and IVR applications are routed according to the parameters set by those applications. Other incoming messages are routed by the default parameters of the mailboxes to which they are addressed, and optionally by tools that examine the subject and text, routing by keywords and other custom rules. Messages are delivered to CSRs in the same way as live calls, and administrators can set up the system to present the messages during slow-downs in live calls, improving CSR efficiency.

A flexible combination of routing rules determines the most appropriate destination for each call. In the contact center environment, this is often called "pre-routing" because there is typically a second level of routing performed by the premises ACD. The NGIN platform includes a complete Interactive voice response platform, making it possible to create call flows based on any combination of voice menus, user inputs, and other rules.

### Static Routing

Static Routing uses rules that can be resolved within the network, such as time-of-day, percentage allocation, IVR menu selection, and others that do not require dynamic information about the status of potential destinations. The elementary rules are simple, but they may be freely combined in the user interface to create highly customized call treatment scenarios. Static Routing has the advantage of adding value while requiring absolutely no change to an existing PBX or contact center operations.

### Dynamic Pre-routing

Dynamic Pre-routing uses information about the current state of the queues and agents in premises contact centers to make routing decisions, resulting in more efficient balancing of traffic across a multi-site contact center operation. Changes in queue and agent status are updated dynamically at the network router.

Skills are an attribute of both call requests and a CosmoCall CSR profile. When a call that includes required skills reaches the front of the queue, it is assigned to the next available CSR who possesses the required skill sets. The Universe ACD Server features a highly configurable priority management algorithm. Call request priority is independent of both queue and skills. Higher priority requests move faster through their queue than lower priority requests. Any number of priorities may be defined.

EagleACD Serves SMB Market Using Microsoft Customer Care Framework    9

- Call Control and Routing
- Least cost inbound and outbound routing
- Call restriction (e.g., block certain numbers, exchanges, international calls)
- Centralized point for incoming calls data collection for routing and queuing
- Attended and unattended call transfer to anywhere in the network, or any external phone number
- Agent-to-agent dialing in IP network for agents in any location
- Agent-to-agent transfer across any locations, including screen pop

## Customer Experiences

### VoiceLog

VoiceLog LLC is the leading provider of monitoring and call recording services, Third Party Verification, and related services to the contact center industry. With over 40 million calls recorded and over 10 million calls scored, VoiceLog offers call recording, automated monitoring systems, third party quality monitoring, Third Party Verification, and long-term audio data storage. With over 250 telecommunications, competitive electric and natural gas and financial services clients in the US, Canada and Europe, VoiceLog is the world's number1 provider of Third Party Verification.
The management decided not to invest additionally in the telecom and data infrastructure in order to provide call center support. Instead, it decided to outsource its telecom and data infrastructure to EagleACD. This decision thwarted any technology obsolescence issues, allowed speed-to-market, and provided a complete stress-free network solution.

### Seeing Fast Results

By combining the premises based call center and the hosted call center, VoiceLog was able to create the flexible inbound/outbound call center platform to meet variable customer needs as well as combine in-house agents with the home based agents. This converged approach helped to reduce operating costs and simplify call center administration. Currently customer calls come through VoiceLog's premises based call center in Ashburn, Virginia and then the call is transferred to EagleACD be hosted IP call center in NY. Then these calls are distributed to home agents based on their skill sets and availability.

Mr. James Veilleux, President of VoiceLog, reports, "EagleACD solutions were essential in creating a more reliable and cost-effective environment. Managing costs based on workload were clear just after implementation. So we were able to quickly capitalize on the investment and optimize costs. We required that 90% of calls are answered in less than 15 seconds and that requires 99.999% network reliability. This is the gold standard benchmark in telecom industry—in other words, 6 second down time allowed per week. EagleACD continues to deliver high standards of reliability per our requirements and we are able to bring our agents to speed very quickly."

EagleACD Serves SMB Market Using Microsoft Customer Care Framework     10

Microsoft's CCF platform helped VoiceLog in a number of daily business activities to operate the call center. These activities include custom reports, Voicemail and e-mail storage, delivery of content and searching database. These are key parameters not only for customer experience and creating positive working environment, but also for efficient and effective call center operation.

Microsoft Exchange Server acts as a messaging collaboration server, receives, stores and sends both e-mails and voicemails to authenticated users. Voicemails are handled as an e-mail with the recorded audio message as an attachment. So, the Microsoft Exchange Server component of the CCF platform provides storage features to end-users such as VoiceLog.

As a result of the EagleACD solution, VoiceLog has developed a flexible call center platform to manage its call-handling capacity.  It has resulted in improved service and operating costs have gone down.  EagleACD's "pay as you go" features have helped to eliminate payments for idle time of call center agents.  Mr. Veilleux explains another benefit, "EagleACD's routing allocates the skilled attendant to the call by any agents connected to the network.  This allows us to optimize staffing and increase service quality for a better ROI- creating a more efficient company and more productive call centers.  No over staffing is required due to this high reliability.  This reduces operating costs for delivering services".

Since May 2004, VoiceLog was able to achieve the following results:

> More efficient use of call center infrastructure and call handling capacity.
> Able to attract more agents as they can work from home
> Future career opportunities are focused on home office agents and fewer premises based agents
> Improved ROI as margin for home-operated agents is much higher than premises based call center agents
> Improved utilization of skill based call center agents.  Number of Verification Agents, Live operators, and Quality Assurance Agents, are spread throughout US.
> Improved call-handling quality as scalability is completely flexible.  This allowed mix–and-match any agents at any time.
> Higher satisfaction for agents as well as management.  Agents do not have to drive to work and management does not have to worry about the absenteeism due to uncontrollable external factors.

## Customer Benefits

Call center operators do not need to spend their scarce capital on purchasing, operating, and maintaining telecom and data infrastructure. In the IP Hosted industry, there are two types of On-Demand communication services available.  Most commonly available solutions require fixed monthly payments for each agent seat. However, EagleACD

NY\1382365.1

offers the standardized pricing for a measured unit of usage without any fixed monthly charges. These services can be live agents, webchat, predictive dialing, etc. Consider the advantages:

- No hardware acquisition and follow-up costs (technology is refreshed by the service provider without the buyer paying for it)
- No software licenses or upgrades to manage
- No facilities to purchase or lease
- No maintenance or support staff
- No capital costs (capital expenditure avoidance)
- No fixed monthly expenses (offered by one leading service provider)
- Full scalability (empowering customers to tap into and take advantage of vast traditional and IP network resources at any time anywhere in world.)

The IP hosted contact center industry is looking at a future where customers never have to buy hardware or software again while serving all customer needs regardless of agent seat requirements at anytime, anywhere.

## Conclusion

During the last 2-3 years, a number of companies have understood the concept of IP, and the importance of the hosted solution in the telecom and data service industries. They have seen the costs reduced in their operations by an order of magnitude. They have gained a solid competitive advantage for their own company. The IP hosted industry is adding more and more customers each quarter and bringing them value that they need and seek. IP Hosted service providers have seen tremendous opportunity to serve the call center industry and customers as they realize that this service is financially and technically attractive.

Call centers can be started with a small number of seats. As one decommissions old premise based systems according to their business needs, one can add new capacity into the network and move more agents onto the IP hosted system. Over time, the complexity of the telecom and data infrastructure will drop and financial benefits will multiply. The IP hosted solution provides short-term and long-term benefits to the entire call center industry. Businesses can begin to adopt IP Hosted network technologies with no initial investment, zero service disruption, and a fast ROI. The IP hosted industry will continue to place contact centers on the path to even longer term benefits as telecom and data networks evolve and mature.

EagleACD Serves SMB Market Using Microsoft Customer Care Framework    12