IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MICROSOFT CORPORATION,
    Plaintiff,

v.

ALCATEL-LUCENT ENTERPRISE
and GENESYS TELECOMMUNICATIONS
LABORATORIES, INC.,
    Defendants.

C.A. No. 07-090-SLR

PUBLIC VERSION

**MICROSOFT CORP.'S MEMORANDUM IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT**

**FISH & RICHARDSON P.C.**
Thomas L. Halkowski #4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Tel:  (302) 652-5070

John E. Gartman
12390 El Camino Real
San Diego, CA 92130
Tel: (858) 678-5070

Ruffin B. Cordell
Linda Liu Kordziel
Indranil Mukerji
William Sekyi
Kfir Levy
Kori Anne Bagrowski
Robert P. Courtney
1425 K Street N.W., Suite 1100
Washington D.C. 20005
Tel: (202) 783-5070

**ATTORNEYS FOR PLAINTIFF
MICROSOFT CORPORATION**

# TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF THE PROCEEDINGS ............................................. 1

II.   SUMMARY OF THE ARGUMENT ................................................... 2

III.  STATEMENT OF UNDISPUTED MATERIAL FACTS ..................................... 3

IV.   ARGUMENT .................................................................... 10

      A.    The Uncontroverted Evidence Shows That The Prosecuting Attorney On The '439 Patent Was Unaware Of The '289 Patent And The DeSimone Reference. .................................... 12

      B.    The Prosecuting Attorneys Of The '289 Patent Were Not Substantively Involved With Prosecuting The '439 Patent And Therefore Did Not Cite the '439 Patent Or The Brennan Reference. ....................................................................... 13

      C.    There Is No Evidence Of Intent To Deceive On Anyone's Part... 15

      D.    The Brennan And DeSimone References Were Not Material To The Respective '289 And '439 Patent Prosecutions. .................... 16

            1.    Brennan Is Not Material to the '289 Application. ............ 17

            2.    DeSimone Is Not Material to the '439 Application. ......... 17

V.    CONCLUSION .................................................................. 19

## <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

**Cases**

<u>Burlington Indus., Inc. v. Dayco Corp.</u>,
  849 F.2d 1418 (Fed. Cir. 1988)............................................................................. 10

<u>Hoffmann-La Roche, Inc. v. Promega Corp.</u>,
  323 F.3d 1354 (Fed. Cir. 2003)............................................................................. 12

<u>Kingsdown Med. Consultants, Ltd. v. Hollister Inc.</u>,
  863 F.2d 867 (Fed.Cir.1988) (en banc)................................................................. 11

<u>Microsoft Corp. v. Alcatel−Lucent Enter., et. al.</u>,
  Civil Docket Case No: 1:07−cv−00090−SLR)........................................................ 9

<u>Molins PLC v. Textron</u>,
  48 F.3d 1172 (Fed. Cir. 1995)......................................................................... 10, 11

<u>Nordberg, Inc. v. Telsmith</u>,
  82 F.3d 394 (Fed.Cir.1996).................................................................................. 11

<u>Tenneco Auto. Operating Co. Inc. v. Visteon Corp.</u>,
  375 F. Supp.2d 366 (D. Del. 2005)....................................................................... 10


**Statutes**

37 C.F.R. § 1.56....................................................................................................... 11

## I.    NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Microsoft Corporation ("Microsoft") filed this patent case on February 16, 2007, as a companion district court case to an investigation of the U.S. International Trade Commission ("ITC") against Alcatel-Lucent Enterprise ("ALE") for infringement of four Microsoft patents – U.S. Patent Nos. 6,421,439 ("the '439 Patent"), 6,430,289 ("the '289 Patent"), 6,263,064, and 6,728,357. [D.I. 1]. On May 30, 2007, Microsoft amended its complaint to allege infringement by ALE's subsidiary, Genesys Telecommunications Laboratories, Inc. ("Genesys"). [D.I. 15]. A combined <u>Markman</u> and summary judgment hearing is set for June 30, 2008, and trial is scheduled to begin on September 22, 2008. [D.I. 26].

Microsoft hereby moves for summary judgment on the inequitable conduct defense and counterclaim asserted by Defendants as to the '439 and '289 Patents. ALE and Genesys have advanced identical theories of inequitable conduct in this case. Specifically, Defendants both allege that: (1) U.S. Patent No. 6,175,619 ("DeSimone"), which was cited during prosecution of the '289 Patent, should have been cited in the prosecution of the '439 Patent; (2) U.S. Patent No. 5,329,578 ("Brennan"), which was cited during prosecution of the '439 Patent, should have been cited in the prosecution of the '289 Patent; and (3) the applications that led to the '439 and '289 Patents should have been cross-referenced because, had they been cross-cited, the Patent Office might have issued a rejection in the cases for double-patenting (i.e., requiring the issued patents to expire at the same time). [D.I. 16 at 8-11; D.I. 21 at 9-12; Ex. J[1] at 10-18; Ex. K at 21-29].

Despite having two opportunities to pursue this defense (first in the ITC and now in this Court), Defendants still have not identified a shred of evidence that can support a finding that the prosecution attorneys failed to disclose material information with an intent to deceive the Patent

---

[1]    All exhibits referenced as "Ex. ___" are exhibits to the Declaration of Thomas L. Halkowski, dated May 9, 2008, submitted herewith.

Office.  Accordingly, Defendants' inequitable conduct allegations fail as a matter of law.

Microsoft, therefore, respectfully requests that the Court enter summary judgment against

Defendants.

## II.    SUMMARY OF THE ARGUMENT

ALE advanced the same exact allegations of inequitable conduct in a prior, related

proceeding before the ITC – and lost.  After a full hearing, Judge Luckern found both Microsoft

patents enforceable.  ALE petitioned the ITC, *inter alia*, to reconsider Judge Luckern's

inequitable conduct ruling.  The ITC declined to do so.  Nonetheless, ALE proceeds with its

proverbial second bite at the apple, advancing the same deficient arguments that the ITC already

weighed and rejected.

The deficiencies in ALE's and Genesys's inequitable conduct assertions are legion.  ALE

and Genesys cannot prove: (1) knowledge of the withheld information by the prosecution

attorneys; (2) any intent to deceive on the part of the attorneys; and (3) materiality of the

information.  Defendants' inequitable conduct allegations are focused on the conduct of three

patent attorneys – Messrs. Reed, Nydegger, and Israelsen – who all practiced at the law firm that

prosecuted the patents.  All three attorneys have testified under oath that they (a) did not know,

at the relevant times, the undisclosed information on which ALE and Genesys rely and (b) had

no intent to withhold any material information from the Patent Office.

With respect to the '439 Patent prosecution, Mr. Reed testified that he was not even

aware of the existence of the '289 Patent application while prosecuting the '439 Patent

application, let alone any technical material (such as the DeSimone patent) cited during the '289

prosecution.  Mr. Reed's lack of knowledge is undisputed, and without knowledge, there could

not have been any intent to deceive the Patent Office.  Messrs. Nydegger and Israelsen testified

that neither was substantively involved in the prosecution of the '439 Patent application.  With

respect to the '289 Patent prosecution, Messrs. Nydegger and Israelsen also explained that they could not have cited art (such as the Brennan patent) in the '289 prosecution from the '439 Patent prosecution because they did not know of such art at the relevant times. This lack of knowledge on the part of the attorneys, by itself, should end any inequitable conduct inquiry. In addition to the lack of knowledge, ALE has failed – and Genesys did not try – to uncover any evidence of an intent to deceive on the part of the three attorneys.

Beyond the lack of knowledge and intent, the undisclosed information also was not material to the prosecution of either patent application. Indeed, neither the DeSimone patent nor the Brennan patent merited mention by ALE's technical expert as potentially invalidating art (in a 331 page report spanning over 1,300 paragraphs) that anticipates or renders obvious a single claim of any of the Microsoft patents.

Taken together, no reasonable fact-finder could conclude – just as Judge Luckern was unable to conclude – that ALE and Genesys could prove inequitable conduct by the required clear and convincing evidence. There are no disputed material facts concerning the prosecution of the applications and, as a matter of law, ALE and Genesys cannot sustain their burden. Microsoft, therefore, respectfully submits that the defense and counterclaim of inequitable conduct should be disposed of by summary judgment.

### III.    STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      ALE and Genesys have asserted inequitable conduct as to the '439 Patent and the '289 Patent only. [D.I. 16 (Answer and Countercl. of ALE) at 8-11; D.I. 21 (Answer and Countercl. of Genesys) at 9-12].

2.      Stephen Liffick is the named inventor on both the '439 Patent and the '289 Patent. [Ex. A  at [75]; Ex. B [75]]. The '439 Patent was filed on March 24, 1999, and issued on July

16, 2002. [Ex. A at [22], [45]]. The '439 Patent will expire twenty years from its filing date, on

March 24, 2019. Claim 1 of the '439 Patent recites:

> 1. In an environment where subscribers call a user over a telephone network, wherein a user telephone is coupled with the telephone network, a system for processing an incoming call from a subscriber to a user in the telephone network according to user specifications, the system comprising: a data structure contained within a computer network to store user-selectable criteria for call processing, wherein the data structure stores the user-selectable criteria in one or more lists that are used in filtering an incoming call and wherein some of the one or more lists are used to filter the incoming call according to current activity of subscribers on the computer network or according to current activity of the user on the computer network; a computer network access port used by the telephone network to access the data structure such that the telephone network has access to the one or more lists over the computer network access port; and a controller to receive the incoming call designated for the user telephone and to process the incoming call in accordance with the user-selectable criteria, the controller accessing the user-selectable criteria in the one or more lists of the data structure via the computer network access port and thereby applying the user-selectable criteria to the incoming call.

[Ex. A at Col. 14:13-37].

3. The '289 Patent was filed on April 13, 1999, and issued on August 6, 2002. [Ex. B at [22], [45]]. While the '289 Patent would have expired twenty years from its filing date, on April 13, 2019 – roughly three weeks after the '439 Patent expires – Microsoft voluntarily entered a terminal disclaimer surrendering the final weeks of the '289 Patent's term, so that it now expires on the same date as the '439 Patent. Claim 1 of the '289 Patent recites:

> 1. In a system that includes a telephone network and a computer network with one or more users, wherein each user is connected through a user computer the computer network and is logically connected through the computer network to the telephone network, a method of determining when to establish telephone communication between two parties, at least one of whom is a user connected to said computer network, comprising: at the computer network, receiving information from the telephone network that a

first party from whom a call is originating desires to establish telephone communication with a second party; at the computer network, monitoring activity of a user computer connected to the computer network and associated with the second party; at the computer network, storing a set of pre-determined rules for determining when the second party is available to take a call from the first party; at the computer network, using the set of a pre-determined rules to process i) the information received from the telephone network regarding the call being originated by the first party, and ii) information regarding the monitored activity of the user computer of the second party, to determine when the second party is available to take the call originated by the first party; and using the information processed at the computer network to facilitate connecting the call originated by the first party through the telephone network to the second party.

[Ex. B  Col.18:36-65].

4.      The United States Patent and Trademark Office assigned the '439 Patent (class/subclass 379/211.02 for call forwarding) and the '289 Patent (class/subclass 370/352 for combined circuit switching and packet switching) to different technical classes and subclasses in its Manual of Patent Classification.  [Ex. C, '439 PH, Issue Sheet (July 16, 2002); Ex. D, '289 PH, Issue Sheet (Aug. 6, 2002).]  The '289 Patent and the '439 Patent teach differing inventions with differing specifications.  [See Beckmann Decl. at ¶ 15].

5.      Patent attorney Michael Donohue of the Seed Berry law firm filed the application for the '439 Patent, but the '439 application later was transferred to a different law firm (Workman Nydegger), where patent attorney Carl Reed took over prosecution.  [Ex. E (Reed Depo.) at 40:6-20].

6.      Mr. Reed had no substantive involvement in (or even awareness of) the application for the '289 Patent until the ITC investigation, long after the '439 Patent had issued. [Ex. E (Reed Depo. at 40:6-20].

7.      Mr. Donohue also filed the application for the '289 Patent, and that application also was transferred to the Workman Nydegger firm, where patent attorneys Rick Nydegger and Burns Israelsen took over prosecution.  [Ex. D, '289 PH, Revocation and Substitute Power of Attorney (Oct. 16, 2001).]

8.      Neither Mr. Nydegger nor Mr. Israelsen had substantive involvement in the prosecution of the application for the '439 Patent.  [Ex. F (Israelsen Depo.) at 26:11-15; 36:2-37:4; 149:12-24; 177:1-22; Ex. G (Nydegger Depo.) at 13:10-14; 152:16-20; 192:8-18].

9.      Mr. Israelsen accompanied Mr. Reed to an examiner interview during the prosecution of the '439 Patent.  [Ex. E (Reed Depo.) at 39:17-40:20].  However, at the time of the interview, Mr. Israelsen was not aware of the '289 Patent application, so there was nothing for him to cite to the examiner during the interview.  [Ex. F (Israelsen Depo.) at 217:12-21].  Moreover, Mr. Israelsen testified that he had no substantive involvement in preparing for or conducting the interview.  [Ex. F (Israelsen Depo.) at 36:2-37:4].

10.     As the files were transferred into the Workman Nydegger firm, other than sharing a common inventor, there was no indication on the files that the applications shared any features requiring the chains to be prosecuted tracking each other, such as by citing art from one chain in the other throughout prosecution.  [Ex. G (Nydegger Depo.) at 133:2-23; 134:19-22; 144:4-145:10].

11.     During prosecution of the '439 Patent application, the applicant distinguished cited prior art by specifically noting that the '439 Patent teaches "[t]he ability to process an incoming call on a telephone network according to activity on a computer network . . . ."  [See Ex. C, '439 PH, Amendment A, at 14 (Dec. 28, 2001).]  The '439 Patent was allowed based on this position.   [See Beckmann Decl. at ¶ 5].

12.     In contrast, the DeSimone patent does not teach either (1) monitoring the activity of the caller or callee or (2) processing a call based on the status of the monitored activity.  No derivation of either "status" or "activity" appears in the DeSimone patent.  Rather, the DeSimone patent differs from the '439 Patent in that, *inter alia,* the DeSimone patent "uses an affirmative request from both participants to initiate the call in an anonymous manner through a broker" (as opposed to monitoring activity to determine whether a call should be connected to the caller, as is the case in the '439 Patent).  [See Ex. D, '289 PH, Amendment A, at 11 (Mar. 4, 2002).]  No such monitoring is implied in the DeSimone patent precisely because both participants have already elected to initiate the call.    [See Beckmann Decl. at ¶ 5].  After considering the DeSimone patent, the examiner of the '289 Patent application stated in the notice of allowance for the '289 Patent: "The prior art fails to show applicant's step of monitoring the activity of the called and calling parties while on the computer network (Internet)."  [See Ex. D,  '289 PH, Notice of Allowability, at 2 (Mar. 25, 2002).]

13.     In view of the applicant's remarks during the '439 Patent application, the examiner's Reasons for Allowance of the '289 Patent, and the DeSimone patent itself, a reasonable examiner would not have considered the DeSimone patent important in deciding whether to allow the '439 Patent.  The DeSimone patent therefore was not material to the prosecution of the '439 Patent.  [See Beckmann Decl. at ¶ 8].

14.     During prosecution of the '289 Patent application, the applicant specifically noted that "[t]he [called party's] activity on the network is monitored."  [See Ex. D, '289 PH, Amendment A, at 11 (Mar. 4, 2002).]  The applicant also explained during prosecution of the '289 Patent application that the determination of whether the called party is available to take the call requires "information regarding the monitored activity of the user computer of the second

7

party . . . ."  [See id. at 12.]  The Brennan patent, however, does not depend on monitored

activity.  [See Beckmann Decl. at ¶¶ 10-11.]

15.     During prosecution of the '439 Patent application, the applicant explained that the

Brennan patent teaches that the flow of information regarding how to process a call is fixed.  In

other words, in the Brennan patent, the determination of whether to connect a call is not

dependent on any particular status or activity.  This is evidenced by the requirement in the

Brennan patent that the user call a special number to access or change the user requirements for

different callers.  [Ex. H at Col.13:7–15].  The Brennan patent teaches that the criteria for

determining how to process a call does not change unless the user expressly changes the user

requirements (or requests such changes be made by a system operator).  [Ex. H at Col.13:14–16].

However, monitoring computer activity as taught in the '289 Patent, eliminates this need of the

called party to make such change requests.  Thus, the Brennan patent's "fixed" criteria is

markedly different from the monitored activity system taught in the '289 Patent.  [See Beckmann

Decl. at ¶¶ 11-12].

16.     In view of the applicant's remarks during the '289 Patent application and the fact

that the Brennan patent does not address the teaching of the '289 Patent, a reasonable examiner

would not have considered the Brennan patent important in deciding whether to allow the '289

Patent.  The Brennan patent therefore was not material to the prosecution of the '289 Patent.

[See Beckmann Decl. at ¶ 14].

17.     During the course of the related proceeding before the ITC regarding the same

patents, ALE advanced the identical theories of inequitable conduct as to the '439 Patent and the

'289 Patent.  [Ex. I (Respondent ALE's Corrected Post Hr'g Br.) at 97-103; 128-132; Ex. J

(ALE's Obj. and Resp. to Microsoft's First Set of Interrogs.) at 10-18; Ex. K (Genesys' Obj. and Resp. to Microsoft's First Set of Interrogs.) at 21-29.)

18.    During the prior ITC action, ALE deposed Mr. Donohue, Mr. Reed, Mr. Nydegger, and Mr. Israelsen.  [See generally Ex. G (June 15, 2007 Nydegger Depo.); Ex. F (July 12, 2007 Israelsen Depo)].   Under this Court's scheduling order, discovery taken during the ITC action can be used in the present case.  [D.I. 26 at 1].

19.    Administrative Law Judge Luckern found, after a full evidentiary hearing in the ITC, that ALE failed to establish by clear and convincing evidence that either the '439 Patent or the '289 Patent are unenforceable for inequitable conduct.  [Ex. L (Final and Initial Recommended Initial Determination) at 199-207].  In particular, Judge Luckern found that (1) the Brennan patent was not material to the prosecution of the '289 Patent; (2) the DeSimone patent was not material to the prosecution of the '439 Patent; (3) the attorneys in charge of the '289 Patent prosecution were unaware of the '439 Patent application; and (4) the attorney prosecuting the '439 Patent was unaware of the '289 Patent application. [Id.].  ALE petitioned the ITC to reconsider Judge Luckern's finding on inequitable conduct, but the ITC declined to do so, likely rendering Judge Luckern's resolution of the inequitable conduct issue final.  [Ex. M (March 14, 2008 Notice of Comm'n Decision to Review-in-Part a Final Initial Determination Finding a Violation of Section 337) at 2-3].

20.    ALE and Genesys took no further discovery during the course of the present action from any of the attorneys involved in the preparation or prosecution of the '439 Patent (Mr. Donohue or Mr. Reed) or from any of the attorneys involved in the prosecution of the '289 Patent (Mr. Donohue, Mr. Nydegger, or Mr. Israelsen).  [See Ex. N (Microsoft Corp. v. Alcatel−Lucent Enter., et. al., Civil Docket Case No: 1:07−cv−00090−SLR)].

## IV.     ARGUMENT

ALE already made and lost its inequitable conduct argument before the ITC.  Yet, ALE and its subsidiary, Genesys, persist in maligning the patent attorneys involved in the prosecution of the '439 and '289 Patents.  It is precisely this type of conduct that the Federal Circuit had in mind when it said:

> [T]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague. Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds, to represent their client's interests adequately, perhaps. They get anywhere with the accusation in but a small percentage of the cases, but such charges are not inconsequential on that account. They destroy the respect for one another's integrity, for being fellow members of an honorable profession, that used to make the bar a valuable help to the courts in making a sound disposition of their cases, and to sustain the good name of the bar itself. A patent litigant should be made to feel, therefore, that an unsupported charge of "inequitable conduct in the Patent Office" is a negative contribution to the rightful administration of justice.

Burlington Indus., Inc. v. Dayco Corp., 849 F.2d 1418, 1422 (Fed. Cir. 1988).  ALE and Genesys in this case malign three respected shareholders of a respected Utah law firm without any evidence of bad conduct, and even after the ITC found the accusation unsupported.

This Court is already familiar with the legal standards for summary judgment under Rule 56, including on the issue of inequitable conduct.  See, e.g., Tenneco Auto. Operating Co. Inc. v. Visteon Corp., 375 F. Supp.2d 366 (D. Del. 2005) (Robinson, Chief J.) (granting summary judgment of lack of inequitable conduct).  Microsoft highlights just a few of the principles applicable to resolving the present motion.

First, a person with a duty to disclose to the Patent Office must know of the allegedly withheld information.  Molins PLC v. Textron, 48 F.3d 1172, 1178 (Fed. Cir. 1995).  Without knowledge, there cannot be any intent to withhold the information from the Office.  Id.;

Nordberg, Inc. v. Telsmith, 82 F.3d 394, 397 (Fed. Cir. 1996).  By statute, the duty to disclose is owed by "(1) each inventor named in the application; (2) each attorney or agent who prepares or prosecutes the application; and (3) every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application."  37 C.F.R. § 1.56(c).

Many of ALE's and Genesys's inequitable conduct allegations are couched in terms of "Microsoft filed . . .", "Microsoft never informed . . .", and "Microsoft did not submit . . ."  As a matter of law, Microsoft's knowledge, if any, is legally irrelevant for purposes of assessing inequitable conduct.  The type of inequitable conduct alleged by ALE and Genesys requires a violation of the duty to disclose that is imposed upon a specified set of people by the patent regulations, namely "[e]ach individual associated with the filing and prosecution of a patent application[.]"  The only persons ALE and Genesys have accused of failing to satisfy the duty are three patent attorneys – Messrs. Reed, Nydegger, and Israelsen.

Second, the information must be withheld with an intent to deceive the Patent Office. Molins, 48 F.3d at 1178.  Mere gross negligence in failing to cite the information is not enough to satisfy the intent prong of the inequitable conduct inquiry.  Kingsdown Med. Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 876 (Fed.Cir.1988) (en banc).

Third, the withheld information must be material.  Molins, 48 F.3d at 1178.  If the withheld information is not material, or is cumulative of information already considered by the Patent Office, then a failure to disclose the information cannot constitute inequitable conduct. Id. at 1185.

Finally, because issued United States Patents are presumed valid, a party asserting inequitable conduct must prove its cause by clear and convincing evidence.  Hoffmann-La Roche, Inc. v. Promega Corp., 323 F.3d 1354, 1359 (Fed. Cir. 2003).

> **A.** **The Uncontroverted Evidence Shows That The Prosecuting Attorney On The '439 Patent Was Unaware Of The '289 Patent And The DeSimone Reference.**

According to ALE and Genesys, "Microsoft" knew of the '289 Patent application, and failed to cite it during the '439 Patent application.  Specifically, ALE and Genesys accuse patent attorney Carl Reed of withholding during the '439 Patent prosecution (1) his knowledge of the existence of the '289 Patent application; and (2) his knowledge of the DeSimone reference.  Yet nothing in the record evidence supports either accusation.  They also accuse Mr. Reed's colleagues, Mr. Nydegger and Mr. Israelsen, of fraud and deceit for withholding the information, despite the undisputed fact that neither was substantively involved with prosecution of the '439 Patent.

Mr. Reed was the only attorney at the Workman Nydegger firm substantively involved in the '439 Patent prosecution.  [Ex. E (Reed Depo.) at 40:6-20].  He had no involvement in, or even awareness of, the prosecution of the '289 Patent application. [Ex. F (Israelsen Depo.) at 36:2-37:4; Ex. E (Reed Depo.) at 40:6-20].  Similarly, Mr. Reed did not know of the DeSimone reference he is accused of withholding.  [Ex. E (Reed Depo.) at 69:7-70:21; 132:4-6; 133:1-15; 134:4-135:24.]  As a matter of law (and common sense), Mr. Reed could not withhold information he did not know.

ALE and Genesys also suggest that Messrs. Israelsen and Nydegger were "associated with" the prosecution of the '439 Patent and the '289 Patent, and were therefore knowledgeable. While Messrs. Israelsen and Nydegger did (and still do) work at the same law firm as Mr. Reed, neither of these attorneys from the '289 Patent prosecution were substantively involved in the

prosecution of the '439 Patent application. [Ex F (Israelsen Depo.) at 26:11-15; 36:2-37:4; 149:12-24; 177:1-22; Ex. G (Nydegger Depo.) at 13:10-14; 152:16-20; 192:8-18]. Rick Nydegger's involvement with the '439 Patent application was limited to simply performing administrative duties. [Ex. G (Nydegger Depo.) at 13:10-14; 192:8-18]. Indeed, prior to the ITC investigation, Mr. Nydegger never read the specification, reviewed the figures, reviewed the claims of the '439 Patent, nor was he aware of the prior art cited in the '439 Patent or prosecution history. [Id. at 191:3-15; 174:20-23; 186:4-21].

Similarly, Mr. Israelsen's involvement was limited to accompanying Mr. Reed to an examiner interview during the prosecution of the '439 Patent for which he had no substantive involvement in preparing or conducting.[2]   At the time of the interview, Mr. Israelsen was a senior associate, and Mr. Reed a more junior one. They made the trip together from Utah, and Mr. Israelsen attended the interview principally as an observer.

Since Mr. Reed did not know, and Messrs. Nydegger and Israelsen were not substantively involved in the '439 Patent prosecution, there can be no inequitable conduct stemming from the prosecution of the '439 Patent.

### B. The Prosecuting Attorneys Of The '289 Patent Were Not Substantively Involved With Prosecuting The '439 Patent And Therefore Did Not Cite the '439 Patent Or The Brennan Reference.

As the lawyers (Nydegger and Israelsen) prosecuting the '289 Patent application were not substantively involved with prosecution of the '439 Patent, their knowledge regarding the

---

[2]      On October 17, 2001, Reed and Israelsen attended an interview with the patent examiner. Mr. Reed was "almost exclusively responsible" for the October 17, 2001 interview with Examiner Tieu—Mr. Israelsen testified that he did not assist Reed in preparing for the October 17, 2001 interview. [Ex. F (Israelsen Depo.) at 36:2-37:4; Ex. E (Reed Depo.) at 39:17-40:20]. Mr. Israelsen was not substantively involved in the application for the '439 patent. [Ex. F (Israelsen Depo.) at 26:11-15; 36:2-37:4; 149:12-24; 177:1-22]. In fact, Mr. Israelsen's only involvement in the application for the '439 patent was attending the October 2001 interview. [Id. at 26:11-15; 177:1-22].

substance of the '439 Patent application, and any art cited during the '439 Patent prosecution,

was necessarily limited. Mr. Nydegger, whose role was entirely non-substantive as to the '439

Patent, knew nothing from the '439 Patent to cite during prosecution of the '289 Patent. [Ex. G

(Nydegger Depo.) at 13:10-14; 152:16-20; 192:8-18]. Again, without knowledge of withheld

information, such information cannot have been withheld with an intent to deceive the Patent

Office.

Mr. Israelsen's role was similarly non-substantive. Other than observing the interview

during the '439 Patent prosecution, Israelsen had no involvement in prosecuting the '439 Patent.

On March 4, 2002, Israelsen prepared and submitted a response to the October 2, 2001 office

action for the application for the '289 Patent. [Ex. D, '289 PH, Amendment A (Mar. 4, 2002).];

Ex. F (Israelsen Depo.) at 80:1-25]. At the time Israelsen prepared the office action response for

the application for the '289 Patent, Israelsen was not presently aware of the existence of the

application for the '439 Patent, or the existence of the Brennan reference [Id. at 113:14-20;

114:22-115:2; 152:9-18; 157:8-20]. This lack of knowledge was critical: Mr. Israelsen testified

that had he been aware of the application for the '439 Patent while working on the application

for the '289 Patent, then, without making any determination regarding materiality, he would

likely have disclosed the existence of the application for the '439 Patent to the patent examiner.

[Id. at 108:1-109:24; 110:12-112:2]. Likewise, had Mr. Nydegger been aware of the substance

of the '439 Patent while working on the application for the '289 Patent, then, without making

any determination regarding materiality, he would likely have disclosed the existence of the '439

Patent to the patent examiner. [Ex. G (Nydegger Depo). at 150:16-151:24]. Nydegger also

testified that had he been aware of the Brennan reference while working on the application for

the '289 Patent, he would likely have disclosed the existence of the Brennan reference to the patent examiner. [Id. at 150:16-151:24; 175:15-176:14].

Notably, there was no link between the '439 Patent and the '289 Patent prosecutions, beyond the tenuous one provided by the tangential presence of Messrs. Nydegger and Israelsen during the '439 prosecution. Mr. Reed testified that he had no involvement in the prosecution of the application for the '289 Patent. [Ex. E (Reed Depo.) at 69:7-70:21]. Indeed, prior to this investigation, Reed was not aware of the existence of the '289 Patent. [Id. at 69:7-70:21; 132:4-6; 133:1-15; 134:4-135:24]. ALE and Genesys cannot establish any flow of knowledge between the '439 and '289 Patent prosecutions, and therefore cannot show the requisite knowledge element with regard to proving inequitable conduct in either prosecution.

### C.    There Is No Evidence Of Intent To Deceive On Anyone's Part.

ALE and Genesys have failed to adduce any evidence of intent to deceive on the part of any of the lawyers accused of committing inequitable conduct. As discussed above, Mr. Reed did not know of the '289 Patent application, or the DeSimone patent cited in the '289 Patent application, and therefore could not have intended any deceit. Mr. Nydegger did not intentionally withhold the application for the '289 Patent from the examiner for the '439 Patent, nor did he intentionally withhold the DeSimone reference from the examiner for the '439 Patent. [Ex. G (Nydegger Depo.) at 13:10-14; 152:16-20; 191:3-15; 192:8-18]. Mr. Nydegger did not intend to deceive the patent office during prosecution of the '439 Patent. [Id. at 13:10-14; 152:16-20; 191:3-15; 192:8-18]. Likewise, Mr. Israelsen did not intentionally withhold the application for the '289 Patent from the examiner for the '439 Patent, nor did he intentionally withhold the DeSimone reference from the examiner for the '439 Patent. [Ex. F (Israelsen Depo.) at 108:1-109:24; 110:12-112:2; 217:12-2]. Mr. Israelsen did not intend to deceive the patent office during prosecution of the '439 Patent. [Id. at 108:1-109:24; 110:12-112:2; 217:12-2].

Faced with a lack of direct evidence, ALE and Genesys rely on circumstantial evidence to imply deceptive intent, pointing principally to the notion that the respective examiners of the '439 Patent and the '289 Patent may have used the existence of the applications as a reason for issuing a double-patenting rejection between the applications. This circumstantial evidence falls well short of demonstrating deceptive intent. ALE and Genesys fail to recognize that there was simply no motive to keep the '439 and '289 applications separate and secret, because they were filed only about three weeks apart – meaning the end game of the grand conspiracy envisioned by ALE and Genesys would be to have the '289 Patent expire three weeks later than the '439 Patent *in the year 2019*. [See Ex. C, '439 PH, Utility Patent App'n Transmittal Sheet (Mar. 24, 1999);Ex. D, '289 PH, Utility Patent App'n Transmittal Sheet (Apr. 13, 1999).] A rational applicant simply would not have intentionally failed to cross-reference applications in order to gain, at most, an additional three weeks in the patent term, and no patent attorney would risk his license on such a scheme. Indeed, both Mr. Israelsen and Mr. Nydegger testified that if either had been substantively involved in the prosecution of both cases and if either perceived any redundancy between the applications, there is little doubt that they would have cross-referenced the applications or filed a terminal disclaimer simply to avoid the type of frivolous allegations now asserted by ALE. [Ex. F (Israelsen Depo. at 108:1-109:24; 110:12-112:2; Ex. G (Nydegger Depo.) at 150:16-151:24; 175:15-176:14]. If anything, the failure to cross-reference these two applications is strong evidence of a lack of meaningful awareness by Mr. Israelsen and Mr. Nydegger of the parallel existence of the two prosecutions.

### D.     The Brennan And DeSimone References Were Not Material To The Respective '289 And '439 Patent Prosecutions.

Even if – contrary to the evidence – the right attorney knew about the prosecution of the right application at the right time, neither reference (Brennan from the '439 Patent prosecution,

DeSimone from the '289 Patent prosecution) on which ALE and Genesys base their inequitable conduct claim were material to the prosecution of the other application.  As such, any failure to disclose the references to the Patent Office cannot constitute bad conduct on the attorneys' part.

### 1.    Brennan Is Not Material to the '289 Application.

During prosecution of the '289 Patent application, the applicant specifically noted that "[t]he [called party's] activity on the network is monitored." [Ex. D, '289 PH, Amendment A, at 11 (Mar. 4, 2002).]  The applicant also explained during prosecution of the '289 Patent application that the claimed system processes "information regarding the monitored activity of the user computer of the second party" to determine when the second party is available to take the call originated by the first party.  [Id. at 12.]  The Brennan reference, however, does not disclose monitoring the activity of a user computer connected to the computer network, nor does it disclose processing the information regarding such monitored activity.  [See Ex. C, '439 PH, Office Action (Jul. 30, 2001) (enclosing U.S. Patent No. 5,329,578 to Brennan (filed May 26, 1992).]  In the Brennan reference, the determination of whether to connect a call is not dependent on any particular status or activity on the computer network.  [Id. at 72-97.)  Therefore, Brennan would not have been material to the prosecution of the '289 Patent application.  [See Beckmann Decl. at ¶¶ 9-14].

The examiner of the '289 Patent application apparently agreed with this conclusion.  The prior art search the examiner conducted would have revealed the Brennan reference because the Brennan reference was cross-classified under the 379/196 art groups and the 379 art group was searched during the review of the '289 Patent application.  Regardless, the examiner did not include the Brennan reference in the '289 prosecution.  [See generally Ex. D, '289 PH.]

### 2.    DeSimone Is Not Material to the '439 Application.

During prosecution of the '439 application, the applicant distinguished the cited prior art by specifically noting that the '439 Patent teaches "[t]he ability to process an incoming call on a telephone network according to activity on a computer network…." [Ex. C, '439 PH Amendment A, at 14 (Dec. 28, 2001).] In contrast, the DeSimone reference describes a "call broker" situation where affirmative requests to initiate telephone communications from at least two parties, who meet in an Internet chat room for example, are sent to the "call broker" through the Internet. [Ex. D, '289 PH Office Action (Oct. 2, 2001) (attaching U.S. Patent No. 6,175,619 to DiSimone (filed Jul. 8, 1998)); id., Amendment A, at 11 (Mar. 4, 2002).] The "call broker" then sets up anonymous telephone communication between the requesting parties. [Ex. D, '289 PH Office Action (Oct. 2, 2001) (attaching U.S. Patent No. 6,175,619 to DiSimone (filed Jul. 8, 1998)); id., Amendment A, at 11 (Mar. 4, 2002).] Thus, the DeSimone reference, for example, does not disclose "filtering" an "incoming call according to current activity of subscribers on the computer network or according to current activity of the user on the computer network." DeSimone also does not disclose user-selectable criteria for call processing" as claimed in the '439 Patent. [See Beckmann Decl. at ¶¶ 4-7].

The DeSimone reference involves a situation entirely different from that of the '439 Patent and was not material to the prosecution of the '439 application. As opposed to processing an incoming call according to either current activity of the subscribers or the user on the computer network, the DeSimone patent "uses an affirmative request from both participants to initiate the call in an anonymous manner through a broker." [Ex. D, '289 PH Office Action (Oct. 2, 2001) (attaching U.S. Patent No. 6,175,619 to DiSimone (filed Jul. 8, 1998)); id., Amendment A, at 11 (Mar. 4, 2002).]

The examiner of the '439 application also apparently agreed with this conclusion.  The prior art search the examiner conducted would have revealed the DeSimone reference because the DeSimone reference was cross-classified under the 379/900 art groups and the 379 art group was searched during the review of the '439 application.  Regardless, the examiner did not include the DeSimone reference in the '439 prosecution.  [Ex. C, '439 PH; see Beckmann Decl. at ¶ 8].

### V.     CONCLUSION

Because ALE and Genesys have failed to adduce any proof of critical elements of their inequitable conduct defense, no reasonable fact-finder could conclude that either the '439 and '289 Patents were procured with the aid of inequitable conduct and Microsoft's motion for summary judgment should be granted.

Dated:  May 9, 2008

Respectfully submitted,

**FISH & RICHARDSON P.C.**

/s/ *Thomas L. Halkowski*
Thomas L. Halkowski (#4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
Fax:  (302) 652-0607
halkowski@fr.com

John E. Gartman
12390 El Camino Real
San Diego, CA 92130
Tel: (858) 678-5070
Fax: (858) 678-5099
gartman@fr.com

Ruffin B. Cordell
Linda Liu Kordziel
Indranil Mukerji
William Sekyi
Kfir Levy
Kori Anne Bagrowski
Robert P. Courtney
1425 K Street N.W., Suite 1100
Washington D.C. 20005
Tel:  (202) 783-5070
Fax: (202) 783-2331
cordell@fr.com
kordziel@fr.com
mukerji@fr.com
sekyi@fr.com
kylevy@fr.com
bagrowski@fr.com
courtney@fr.com

**ATTORNEYS FOR PLAINTIFF
MICROSOFT CORPORATION**

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2008, I electronically filed with the Clerk of Court the attached **PUBLIC VERSION - MICROSOFT CORP.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT** using CM/ECF which will send notification of such filing to the following individuals:

> Jack B. Blumenfeld
> Maryellen Noreika
> Richard John Bauer
> MORRIS, NICHOLS, ARSHT & TUNNEL LLP
> 1201 North Market Street
> Wilmington, DE 19899-1347
> jblumenfeld@mnat.com
> mnoreika@mnat.com
> rbauer@mnat.com
> ***(Also served via hand delivery)***

I also certify that copies were caused to be served on May 16, 2008 upon the following individuals via electronic mail:

> Steven C. Cherny
> Karen Y. Tu
> Clement J. Naples
> LATHAM & WATKINS LLP
> 885 Third Avenue, Suite 1000
> New York, NY 10022
> steven.cherny@lw.com
> karen.tu@lw.com
> clement.naples@lw.com

> Michael J. Schallop
> LATHAM & WATKINS LLP
> 140 Scott Drive
> Menlo Park, CA 94025
> michael.schallop@lw.com

> Susan S. Azad
> LATHAM & WATKINS LLP
> 633 West Fifth Street, Suite 4000
> Los Angeles, CA 90071
> susan.azad@lw.com

> David A. Nelson
> Alan Devlin
> Brett M. Doran
> LATHAM & WATKINS LLP
> Sears Tower, Suite 5800
> Chicago, IL 60606
> david.nelson@lw.com
> alan.devlin@lw.com
> brett.doran@lw.com

/s/ Thomas L. Halkowski