## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICROSOFT CORPORATION,<br>            Plaintiff,<br><br>v.<br><br>ALCATEL-LUCENT ENTERPRISE and<br>GENESYS TELECOMMUNICATIONS<br>LABORATORIES, INC.,<br>            Defendants. | C.A. No. 07-090-SLR<br><br>**PUBLIC VERSION** |

## MICROSOFT'S OPENING BRIEF ON CLAIM CONSTRUCTION

**FISH & RICHARDSON P.C.**
Thomas L. Halkowski (#4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
Fax: (302) 652-0607

John E. Gartman
12390 El Camino Real
San Diego, CA 92130

Ruffin B. Cordell
Linda Liu Kordziel
Indranil Mukerji
William Sekyi
Kfir Levy
Kori Anne Bagrowski
Robert P. Courtney
1425 K Street N.W., Suite 1100
Washington D.C. 20005

**ATTORNEYS FOR PLAINTIFF
MICROSOFT CORPORATION**

DATED:  May 16, 2008

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ....................................................................................................1

     A.   Overview of the Technology ....................................................................1

     B.   The Patents-in-Suit..................................................................................3

          1.   The '439 and '289 Liffick Patents ..................................................4

          2.   The '064 and '357 O'Neal Patents..................................................5

II.  THE LEGAL FRAMEWORK FOR CLAIM
     CONSTRUCTION..................................................................................................7

III. THE PROPER CONSTRUCTION OF THE '439
     AND '289 PATENTS .........................................................................................9

     A.   "telephone network" and "computer network"..........................................9

          1.   Defendants' Constructions Are Contrary to
               the Ordinary Meaning of "Telephone
               Network" and "Computer Network" ..............................................10

          2.   Defendants' Constructions Are Not
               Supported By the '439 and '289 Patent
               Specifications .............................................................................11

     B.   "current activity of subscribers on the computer
          network or according to current activity of the user
          on the computer network"......................................................................12

          1.   Defendants' Construction Is Contrary to the
               Plain Language of the Claims and
               Unsupported by the Specification..................................................13

          2.   Microsoft's Proposed Construction Is
               Supported by the Intrinsic Evidence ..............................................14

               a.   The Intrinsic Evidence Defines "Activity" as "Status" .....15

               b.   Microsoft's Construction Covers the Disclosed
                    Embodiments ....................................................................16

     C.   "monitoring activity of a user computer" ................................................18

i

### TABLE OF CONTENTS (cont'd)

**Page**

D.    "at the computer network, receiving information from the telephone network that a first party from whom a call is originating desires to establish telephone communication with a second party" ........................................21

IV.    THE PROPER CONSTRUCTION OF THE '064 AND '357 PATENTS .............................................................................23

    A.    "unified messaging system"........................................................23

    B.    "communication options" ..........................................................26

    C.    "[first/second] enable option for enabling or disabling the [first/second] communication service"................................28

    D.    "a single graphical menu for displaying said communication options for each of said communication services at the same time" ................................29

        1.    Microsoft's Proposed Construction Finds Direct Support in the Plain Language of the Claims ..........................................................................29

        2.    The '064/'357 Patent Specification Supports Microsoft's Proposed Construction .............................32

        3.    The Prosecution History Supports Microsoft's Proposed Construction .............................34

    E.    "telephony server being configured to audibly represent said communication options . . ."................................36

        1.    The Plain Language of the Claims Supports Microsoft's Proposed Construction .............................37

        2.    The Specification of the '064/'357 Patents Supports Microsoft's Proposed Construction ...............38

        3.    The Prosecution History Supports Microsoft's Proposed Construction .............................39

V.    CONCLUSION................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Acco Brands, Inc. v. Micro Sec. Devices, Inc.,
  346 F.3d 1075 (Fed. Cir. 2003)...............................................................................36

Autogiro Co. of Am. v. United States,
  384 F.2d 391 (Ct. Cl. 1967) ....................................................................................14

Cybor Corp. v. FAS Techs., Inc.,
  138 F.3d 1448 (Fed. Cir. 1998)................................................................................7

Dayco Prods., Inc. v. Total Containment, Inc.,
  329 F.3d 1358 (Fed. Cir. 2003).............................................................................13

Diamond v. Diehr,
  450 U.S. 175 (1981)..................................................................................................2

Dolbear v American Bell Tel. Co.,
  126 U.S. 1 (1888).....................................................................................................1

Intamin, Ltd. v. Magnetar Techs., Corp.,
  483 F.3d 1328 (Fed. Cir. 2007)..............................................................................30

Markman v. Westview Instr., Inc.,
  517 U.S. 370 (1996)..................................................................................................7

Omega Eng'g, Inc. v. Raytek Corp.,
  334 F.3d 1314 (Fed. Cir. 2003)...............................................................................8

Phillips v. AWH Corp.,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc)...........................8, 9, 18, 21, 22, 30, 32

Pitney Bowes, Inc. v. Hewlett-Packard Co.,
  182 F.3d 1298 (Fed. Cir. 1999)...............................................................................9

Renishaw PLC v. Marposs Societa' per Azioni,
  158 F.3d 1243 (Fed. Cir. 1998)........................................................................18, 21

Resqnet.com, Inc. v. Lansa, Inc.,
  364 F.3d 1374 (Fed. Cir. 2001)..............................................................................30

Sandisk v. Memorex Products, Inc.,
  415 F.3d 1278 (Fed. Cir. 2005)........................................................................18, 34

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**<u>Page(s)</u>**

<u>Texas Instruments Inc. v. Int'l Trade Comm'n</u>,
    988 F.2d 1165 (Fed. Cir. 1993)............................................................................. 13

<u>Vitronics Corp. v. Conceptronic, Inc.</u>,
    90 F. 3d 1576 (Fed. Cir. 1996)..................................................................... 8, 9, 32

Plaintiff Microsoft Corporation ("Microsoft") hereby submits its opening claim construction brief regarding disputed terms from the claims of U.S. Patent Nos. 6,421,439 ("the '439 patent"), 6,430,289 ("the '289 patent"), 6,263,064 ("the '064 patent") and 6,728,357 ("the '357 patent") asserted by Microsoft against Defendants Alcatel-Lucent Enterprise ("ALE") and Genesys Telecommunications Laboratories, Inc. ("Genesys").  For the convenience of the Court, the parties' Joint Claim Construction Chart is attached as Ex. 1, and the Microsoft patents-in-suit are attached as Exs. 2 through 5.[1]

## I.    INTRODUCTION

### A.    Overview of the Technology

The technology at issue in this case relates to the integration of telecommunications services.  Because they had evolved and developed separately, computer networks (such as distributed computer networks like Local Area Networks) and telephone networks (such as the Public Switched Telephone Network) were traditionally considered separate entities, each with its own infrastructures, protocols and methodologies.  The patents-in-suit cover an innovative way to integrate telephony and computer networks together in such a way that the benefits of one network can be used to improve upon the other.

For historical and technological reasons, computer and telephone technologies have developed and evolved separately, with little interconnection until recent times.  Telephone systems developed first, starting around the end of the 19th century when Alexander Graham Bell invented the telephone.  See Dolbear v American Bell Tel. Co., 126 U.S. 1, 531–538 (1888) (discussing development of telephone invention).  Since then, "[t]elephone communication systems have increased in both size and complexity."  [Ex. 3, '289 patent col.1:14–15].  Early

---

[1]    All exhibits referenced as "Ex. ___" are exhibits to the accompanying Declaration of Thomas L. Halkowski,  dated May 9, 2008, submitted herewith.

telephone networks relied on human operators to connect calls, but new switching and signaling technologies eliminated the need for human intervention, as well as providing a wealth of new features—"voicemail, caller identification, call waiting, call forwarding, three way calling and the like." [Ex. 3, '289 patent col.1:15–20.] Today, the Public Switched Telephone Network ("PSTN") interconnects local telephone exchanges with international and long distance exchanges, and makes modern telephony possible.

Computer technology came about much later than, and independently from, the telephone system. See Diamond v. Diehr, 450 U.S. 175, 194 (1981) (Stevens, J., dissenting) ("[T]he computer industry is relatively young. Although computer technology seems commonplace today, the first digital computer capable of utilizing stored programs was developed less than 30 years ago."). Computer systems evolved separately from the telephone system, thus developing divergent protocols, different hardware platforms, and distinct software. With time, the computer networks grew into much larger networks in the 1970s and '80s, becoming wide area networks (WANs) that reach across cities, states, or even across the world in the form of the Internet. As the '439 patent notes, the Internet is "a vast multi-computer network coupled together by data links having various communication speeds." [Ex. 2, '439 patent col.5:28–29.] With the wider adoption of the Internet, its network protocol—Internet Protocol ("IP")—also grew in popularity. [Id. col.5:30–33 (explaining that "a well-known communication protocol used by the Internet is a Transmission Control Protocol/Internet Protocol (TCP/IP)").]

Over time, it became clear that application of digital technologies to the PSTN could enhance the transmission capacities of its telephone lines. As a result, new technologies emerged to adapt the PSTN's established infrastructure for new purposes, such as the transmission of computer data. Technologies such as dial-up modems and digital subscriber loop ("DSL")

technology made it possible for computers to intercommunicate over the PSTN.  Such technologies work by converting a computer's digital communication (i.e., its 1s and 0s) into analog electrical signals (i.e., continuous, sinusoidal-shaped waveforms) that can be transmitted over the PSTN's copper wires.

At the same time the PSTN was being adapted to carry digital data, computer networking technologies were being adapted to carry telephone information.  One technology born from this convergence of telephony with computer networking was "Voice over Internet Protocol," which is often shortened to "VoIP."  VoIP permits the routing of voice communications over the Internet or through any other IP-based networks.  A VoIP call can be initiated from a user's computer by launching a software program application called a "softphone," and instructing the software to initiate a call on the network.  Instead of using a keyboard to type messages for transmission over the computer data network, the caller simply talks into a computer equipped to receive and convert the speech into data packets for transfer using a VoIP protocol.  At the receiving end, the voice packets are converted back into speech.

This convergence of computer and telephone technologies for the benefit of consumers is in greater demand today, although the process has been difficult because of the substantially divergent history, development, physical infrastructure, and protocols.  While voice and data may travel smoothly from one end of the PSTN to another using telephonic protocols, they do not easily cross over the computer networks, and vice-versa.  This inability of the telephone and computer networks to operate well together is an issue addressed in the patents in suit.

### B.    The Patents-in-Suit

Even though the telephone and computer networks came to share the same physical lines (regardless of whether it is a telephone line or computer line), both networks nonetheless remained logically and functionally separate, and continued using their independently-developed

protocols and technology platforms.  The field of unified communications emerged from the

need to bridge this separation of communication services and options in these networking

technologies.  The patents-in-suit bridge some of these logical and functional gaps, allowing

consumers to leverage the advantages of both networks.

### 1.    The '439 and '289 Liffick Patents

Stephen Liffick, the named inventor of the '439 and '289 patents, realized that he could

leverage computer technology to address certain problems faced by telephone users.  As the

patents note, "[e]xisting telephone technology does not provide the telephone subscriber with a

technique for controlling access to the user's telephone."  [Ex. 2, '439 patent col.2:58–60; see

also Ex. 3, '289 patent col.2:57–59.]  For instance, even with all the advancements in telephone

systems, users in the later half of the 1990s were "still limited in determining with whom the user

wishes to speak, and when the user wishes to speak with certain parties or, at the user's option,

not speak with certain parties."  [Ex. 2, '439 patent col.1:23–26.]  Likewise, despite all of the

advances (such as cellular telephones) or options (such as call waiting) in telephone

technologies, there was still a "significant need for a system and method that can establish a

telephone communication link when both parties are available to communicate."  [Ex. 3, '289

patent col.1:44–46.]  Simply put, "existing telephone technologies do not always provide [the]

user with the desired degree of control over incoming calls."  [Ex. 2, '439 patent col.1:33–35.]

By converging the parallel worlds of telephony and computer technologies, Mr. Liffick

offered a solution to these problems.  [Id. col.2:65–67 ("The present invention combines

telephone technology with Internet technology to allow the user to 'filter' incoming calls based

on user-selected criteria.").]  On March 24 and April 13, 1999, Mr. Liffick filed the applications

that would ultimately issue as the '439 and '289 patents, respectively.

Entitled "System and Method for User Affiliation in a Telephone Network," the '439 patent gave users more control over their incoming calls by allowing them to define call-processing criteria through their computers.  In one of the preferred embodiments, the '439 patent teaches that, instead of immediately connecting an incoming call to the destination telephone, the receiving central office switch (116) would first connect with the Internet computer network (134) to access certain user-defined affiliation lists.  [Ex. 2, '439 patent col.5:21–25, col.6:23–28, col.6:55–65.]  To mediate between the two technology platforms, the '439 patent contemplates the use of a computer-telephony interface (136) through which the telephone system queries a database which resides on the computer network and which is modifiable by the user through his computer.  [Id. col.5:40–50, 6:29–38.]  Based on this information, the telephone system could process the incoming call according to the user-selectable criteria by blocking the call, allowing certain calls to reach the destination phone, sending it to voicemail, or handling it in some other manner that the user has indicated.  [Id. col.8:35–9:6.]

The '289 patent similarly leverages the advantages of computer technology to process telephone calls.  Entitled "System And Method for Computerized Status Monitor and Use in A Telephone Network," the '289 patent is directed to determining when a user is available for a call by monitoring the activity of the caller's computer or callee's computer, and checking, for example, whether the computer status is active or idle.  [Ex. 3, '289 patent, Abstract.]  As the patent illustrates, the invention "combines telephone technology and computer network technology to monitor a caller and callee's computer activity and to access call processing criteria selected by the caller and callee and stored on the computer network."  [Id.]

## 2.    The '064 and '357 O'Neal Patents

The O'Neal patents relate to solutions that allow users to integrate and easily access and manage the various communications services and options associated with data-centric and telephony-centric networks. Although these two types of networks began to converge from a physical infrastructure standpoint, the communications services and options associated with each of these networks (e.g., e-mail, voicemail, facsimile, and pager services and options) remained separate from the perspective of administrative and user accessibility. [Ex. 4, '064 patent col.2:46–63.] At the time of the invention, there existed a pronounced separation between the communications services offered through the respective data and telephone networks as viewed in the traditional sense. For example, e-mail service (typically a data-centric network service) was considered separate from voicemail, facsimile and paging services (all typically considered telephony-centric network services). [Id.]

From the practical standpoint of a user, this imposed a significant burden in terms of managing and accessing these various services via different providers, using separate account information, and separate devices. [Id. col.3:7–22.] Changing and customizing communications settings for the various options became laborious and time-consuming. Indeed, the inventors of the O'Neal patents recognized that one "serious consequence" of this separation was "the burden on the consumer who needs to manage the communications options associated with different services (which [were] assigned to different physical devices and managed as different accounts) to ensure that incoming and outgoing messages are properly handled." [Id. col.3:7–12.]

On January 29, 1999, Stephen O'Neal and John Jiang filed the application that would ultimately issue as the '064 patent. Entitled "Centralized Communication Control Center for Visually and Audibly Updating Communication Options Associated With Communication Services of a Unified Messaging System and Methods Therefor," the '064 patent is directed to a

unified messaging system that brings together multiple communication services and options on a single graphical user interface ("GUI") or telephone user interface ("TUI") to "allow a subscriber of various communication services to review and customize his communication options, in an interactive and simplified manner, via either the data-centric network or the telephony-centric network." [Ex. 4, '064 patent col.1:56–59.] The '357 patent is a continuation of the '064 patent and is entitled "Centralized Communications Control Center Methods Therefor."[2]

The unified communications systems conceived by the inventors of the O'Neal Patents greatly improved accessibility to a user's multiple communication services and associated options by presenting multiple services and options to a user at the same time either visually, via the graphical user interface, or audibly, via a telephone user interface. [Id. col.4:27–47.] Using a web browser, for example, a user may easily log into the system, make changes to multiple services (e-mail, voicemail, facsimile) and associated options by simply pointing and clicking, and then storing the changes in the system. The user also can make changes via telephone, by dialing into the system and entering digits in response to audible prompts. This invention fully integrates the various communications services and options associated with the telephony-centric and data-centric networks in a manner that greatly enhances user accessibility.

## II.    THE LEGAL FRAMEWORK FOR CLAIM CONSTRUCTION

Claim construction is a question of law reserved solely for the court. Markman v. Westview Instr., Inc., 517 U.S. 370, 391 (1996); Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998). The court construes the disputed claim terms by primarily considering the intrinsic evidence, which includes the claim itself, the specification, and the

---

[2] Because the '064 and '357 patents share a common specification, citations are made to the '064 patent for ease of reference.

prosecution history of the patent.  Vitronics Corp. v. Conceptronic, Inc., 90 F. 3d 1576, 1582 (Fed. Cir. 1996).

Under established rules of claim interpretation, the court must first consider the words of the claims themselves, giving those words their ordinary and customary meaning to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.  Phillips v. AWH Corp., 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).  The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including other claims of the patent—whether asserted or unasserted—and the specification.  Id. at 1314 (citing Vitronics, 90 F.3d at 1582).  Based on the statutory requirement that the inventor provides a "full" and "exact" description of the claimed invention, the specification is "the primary basis for construing the claims," and it is "entirely appropriate for a court . . . to rely heavily on the written description for guidance as to the meaning of the claims."  Id. at 1316–17.  Nonetheless, characteristics of preferred embodiments should not become part of the claims as extraneous limitations.  See id. at 1323.

In addition to the claims and the written description, the Court must also review the patent's prosecution history, which is "the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims."  Vitronics, 90 F.3d at 1582–83.  A patent applicant can limit claims during prosecution by, for example, altering claim language to overcome an examiner rejection, arguing to overcome or distinguish a reference, or disavowing claim coverage.  Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1321 (Fed. Cir. 2003).

The Court may also consider "trustworthy" extrinsic evidence to ensure that its claim

construction is not inconsistent with "clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed. Cir. 1999). This is especially so for technical terms. Id. Such extrinsic evidence may take the form of expert testimony, dictionaries, technical treatises, and articles. Vitronics, 90 F.3d at 1584. Courts may not, however, rely on extrinsic evidence to contradict or vary the meaning of claims provided by the intrinsic evidence. Phillips, 415 F.3d at 1318.

## III. THE PROPER CONSTRUCTION OF THE '439 AND '289 PATENTS

### A. "telephone network" and "computer network"

| Disputed Term | Microsoft's Construction | Defendants' Construction |
|---|---|---|
| "telephone network" | "network for carrying telephony information." | "network for carrying telephony information originated by telephones" |
| "computer network" | "network for carrying digital data." | "network for carrying digital data originated by computers" |

While the parties have proposed different constructions for "telephone network" and "computer network," they agree on at least two points. First, there is consensus that the disputed terms should have the same meaning in both the '439 and '289 patents. Second, the parties agree that the "telephone network" carries telephony information, and the "computer network" carries digital data. Although ALE had agreed to Microsoft's proposed constructions as the proper constructions for "telephone network" and "computer network" in a prior proceeding,[3] Defendants now require the additional restriction that the information carried on the networks must be originated by a particular device. Thus, the parties' dispute boils down to whether the claim construction must include Defendants' additional verbiage that limits "telephone network" to carrying telephony information originated **only by telephones** and "computer network" to

---

[3]  Microsoft and ALE had litigated the Microsoft patents-in-suit in a parallel proceeding before the U.S. International Trade Commission. See Certain Unified Communication Systems, Products Used With Such Systems, and Components Thereof, Inv. No. 337-TA-598, Initial Determination, 2008 WL 683369 (U.S.I.T.C. Jan. 2008) (J. Luckern).

carrying digital data originated **only by computers**.  Incorporating such limitations distorts the ordinary meaning of those terms and contradicts the intrinsic evidence.  The Court should adopt Microsoft's proposed constructions and reject Defendants' attempt to import extraneous limitations into the claim terms.

> 1. **Defendants' Constructions Are Contrary to the Ordinary Meaning of "Telephone Network" and "Computer Network"**

Contrary to Defendants' strained constructions, a person skilled in the art would understand—as their own technical expert readily admitted—that the terms "telephone network" and "computer network" are defined by the information carried on the network, not by the particular device originating the information.  [Ex. 6, Hyde-Thomson Dep. Tr. at 56:13–17; <u>see also</u> Ex. 12, Beckmann at 21–22.]  Defendants' technical expert, Mr. Hyde-Thomson testified during his deposition at the ITC that he "agree[d] with the construction . . . that a definition of a telephone network is <u>a network that deals with telephony information</u>."  [Ex. 6, Hyde-Thomson Dep. Tr. at 56:13–17 (emphasis added).]  More importantly, Mr. Hyde-Thomson admitted that a "telephone network" can include data originating from devices other than traditional "telephone" handsets, such as, for example, from a computer running a softphone application.  [<u>Id.</u> at 217:10–15 ("[A] soft phone program is dealing with telephony data.  It's transmitting voice data and setting up calls and so on. . . . and that's the definition of a telephone network.").]  In his latest expert report dated April 18, 2008, Mr. Hyde-Thomson offered no distinction between telephone and computer networks based on the particular device originating the information.  For example, he described VoIP as the "transmission of voice in small packets between various points on a telephone or a computer network, such as between computers connected to the Internet, or between IP telephones."  [Ex. 7, Hyde-Thomson Rebuttal at 8.]

Not only are Defendants' constructions contrary to the ordinary meaning of those terms, but they conflict with how those terms are used in the claims of the '439 and '289 patents. First, there is nothing in the claim language requiring the telephone network or the computer network to be defined by the particular device originating the information. In fact, the claims expressly recognize that a computer may be connected to a computer network, as well as a telephone network. For example, the '289 patent claims recite "a system that includes a telephone network and a computer network . . ., wherein each user is connected through a user computer [to] the computer network and is logically connected through the computer network to the telephone network . . . ." [Ex. 3, '289 patent col.18:36–40.] A telephone network is still a telephone network, regardless of whether a telephone or computer is connected to that network. Defendants' construction restricting "telephone network" to a network carrying telephony data originated by **telephones** and "computer network" to a network carrying digital data originated by **computers** makes no sense in light of their ordinary meaning and usage in the claims.

### 2. Defendants' Constructions Are Not Supported By the '439 and '289 Patent Specifications

Both the '439 and '289 patent specifications make it clear that "telephone network" and "computer network" are not limited to any particular device or specific form of communications:

> Moreover, those skilled in the art will appreciate that the invention may be practiced with other computer system configurations, including hand-held devices, multiprocessor systems, microprocessor-based or programmable consumer electronics, network PCs, minicomputers, mainframe computers, and the like. The invention may also be practiced in distributed computing environments where tasks are performed by remote processing devices that are linked through a communications network. In a distributed computing environment, program modules may be located in both local and remote memory storage devices.

[Ex. 2, '439 patent col.3:14–24 (emphasis added); Ex. 3, '289 patent col.3:19–29.]

There is no support in the '439 and '289 patent specifications for limiting telephone and computers networks based on the particular devices originating the information carried on those networks. There is also no indication in the '439 and '289 patent specifications that telephone networks may not carry information from devices other than telephones or that computer networks may not carry information from devices other than computers. To the contrary, both patents specifically discuss configuration in which networks handle data from a wide variety of devices. For example, the specifications disclose a modem, which was well-known for connecting computers to the telephone network and transmitting data over a telephone network. The specifications state that "personal computer 20 typically includes a modem 45 or other means for establishing communications over the wide area network 44, such as the Internet. The modem 45, which may be internal or external, permits communication with remote computers 46-60." [Ex. 2, '439 patent col.4:16–21; Ex. 3, '289 patent col.4:23–25.] Likewise, the written descriptions indicate that the telephone voice information transmitted between the central offices of local exchange carriers can also travel over digital media "such as fiber optics." [Ex. 2, '439 patent col.4:40; Ex. 3, '289 patent col.4:47.]

Thus, Microsoft's proposed constructions for "telephone network" and "computer network" reflect the ordinary meanings of those terms as understood by persons skilled in the art. The Court should reject Defendants' attempt to import extraneous limitations into the claims.

**B.** **"current activity of subscribers on the computer network or according to current activity of the user on the computer network"**

| Microsoft's Construction | Defendants' Construction |
|---|---|
| "current status of subscribers on the computer network or according to current status of the user on the computer network" | "whether the calling party is present on the computer network or the called party is present on the computer network." |

All of the asserted claims of the '439 patent require that the filtering or processing of the incoming call takes place conditioned on or according to "current activity of subscribers on the computer network or according to current activity of the user on the computer network." Microsoft's use of the word "status" is supported by the specification and encompasses the different types of activity disclosed in the '439 patent. By contrast, Defendants' construction improperly reads out the express claim language and is not supported by the intrinsic evidence.

### 1. Defendants' Construction Is Contrary to the Plain Language of the Claims and Unsupported by the Specification

Defendants' construction reads out express claim language, viz. the terms "current" and "activity," from the text of the claims. It would require filtering or processing of incoming calls based only on whether the user is "present on" the computer network. This ignores the patent's express requirement that filtering be based on attributes both <u>current</u> and <u>related to the user's activity</u>. Contrary to Defendants' apparent belief, "present" on the computer network is neither a synonym of nor an appropriate interpretation of "current activity" on the computer network. If anything, "presence" is a mere precursor to "current activity," insofar as a user must be "present" on the network before he can have any "current activity" there.

It is well settled that a construction that reads out express claim language is axiomatically wrong. <u>Dayco Prods., Inc. v. Total Containment, Inc.</u>, 329 F.3d 1358, 1370 (Fed. Cir. 2003) ("Thus, the hose is expressly recited in the body of the claim and was improperly read out of the claim by the district court."); <u>Texas Instruments Inc. v. Int'l Trade Comm'n</u>, 988 F.2d 1165, 1171 (Fed. Cir. 1993) ("[T]o construe the claims in the manner suggested by TI would read an express limitation out of the claims. This we will not do because '[c]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth.'") (quoting

<u>Autogiro Co. of Am. v. United States</u>, 384 F.2d 391, 396 (Ct. Cl. 1967)).  For at least this reason, the Court should reject Defendants' proposed construction.

Moreover, Defendants' use of the word "present" finds no basis in either the ordinary meaning of "activity" or in the meaning of "activity" set forth in the '439 patent specification. Nowhere does the '439 patent specification define "activity" on the computer network to mean "present" on the computer network."  Nor does the '439 patent specification disclose any filtering or processing of incoming calls based on whether the user is present on the computer network.  Defendants' proposed construction ignores the direct and straightforward explanation of "activity" provided in the specification.

Defendants' proposed construction also ignores the specification's numerous descriptions of techniques for routing calls based on factors going far beyond simply whether the user is "present" on the network:

> For example, the user may accept calls from certain work parties during specified period of the day (<u>e.g.</u>, 9:00 a.m.–11:00 a.m.), block calls from selected calling parties during other periods of time (<u>e.g.</u>, 12:00—1:00 p.m.), or allow calls during a business meeting only from certain calling parties (<u>e.g.</u>, the boss).

['439 patent col.9:48–54; <u>see also</u> <u>id.</u> col.11:35–56 (describing techniques for routing a call to a specified message based on whether the callee is in a meeting, or not accepting calls), <u>id.</u> col.11:56–col.12:5 (describing techniques for routing a call based on a callee's computerized schedule).]  The false binary of Defendants' proposed construction—a party must be either "present" or "not present" on the computer network—would improperly read out such embodiments.

### 2. Microsoft's Proposed Construction Is Supported by the Intrinsic Evidence

In contrast to Defendants' flawed construction, Microsoft's construction is supported by the intrinsic evidence for at least two reasons: (i) the '439 patent ties the words "activity" and

"status" closely to one another, repeatedly using them interchangeably, and (ii) the broader term

"status" encompasses the different types of activity identified in the specification.  Specifically,

Microsoft's construction gives full meaning to this disputed limitation by covering two disclosed

embodiments:  (i) one based on the user's dynamic activity on a computer network and (ii) the

other based on the user's conditional activity on the computer network.

### a.    The Intrinsic Evidence Defines "Activity" as "Status"

The '439 patent specification defines "activity" as "status" – by tying the words

"activity" and "status" closely and repeatedly using both terms interchangeably to convey the

same idea.  For example, the '439 patent describes the various sub-lists of the affiliation list 150

in terms of subscriber "activity," with the forward list 160 being a "list of Internet subscribers

whose <u>activity</u> is reported to the user," the block list 164 containing "a list of Internet subscribers

that the user does not want to monitor his Internet <u>activity</u>," and the allow list 166 being "a list of

Internet subscribers . . . whose Internet <u>activity</u> the user does not wish to monitor."  [Ex. 2, '439

patent col.8:6–34 (emphasis added); <u>see also</u> Ex. 3, '289 patent col.8:14–41 (same).]

But later, when discussing a specific use of these sub-lists in a preferred embodiment, the

'439 patent substitutes the word "status" for "activity" when describing how "the affiliation list

150 may contain <u>status</u> data on an individual basis."  [Ex. 2, '439 patent col.10:17–18 (emphasis

added); <u>see also</u> Ex. 3, '289 patent col.10:24–25 (same).]  This substitution of "status" for the

earlier use of "activity" in the affiliation sub-lists is also apparent when the specification explains

that, "[i]n the example illustrated in FIG. 7, the affiliation list 150 contains one individual with an

'allowed' <u>status</u>, one individual with a 'blocked' <u>status</u>, and one individual with a 'conditional'

<u>status</u> based on user-selected criteria."  [Ex. 2, '439 patent col.10:21–23 (emphases added); <u>see

also</u> Ex. 3, '289 patent col.10:28–31 (same).]

In fact, one may substitute "status" for "activity," and vice-versa, in the specification of the '439 patent without any loss or change in meaning.  [E.g., Ex. 2, '439 patent col.7:57–8:34; Ex. 3, '289 patent col.7:65–8:42.]  Take for example the sentence "[w]ith the system 100, it is possible to determine who is monitoring the user's Internet activity."  [Ex. 2, '439 patent col.8:12–14; Ex. 3, '289 patent col.18–21.]  When "status" substitutes for "activity," the meaning of the sentence is indeed preserved:  "[w]ith the system 100, it is possible to determine who is monitoring the user's Internet status."  This interchangeability of both words is clear evidence that "status" is the correct construction for "activity."

Finally, the prosecution history of the '439 patent also supports Microsoft's proposed construction.  In distinguishing the prior art, the patentee stated that "Brennan teaches that the flow of information is fixed and is not dependent on any particular **status or activity** of the user or of the caller and that the flow of information is determined by the user's requirement for that particular caller."  [Ex. 14, U.S. Patent App'n No. 09/275,689, Amendment A, 13 (Dec. 28, 2001) (emphasis added).]  There, the patentee used the conjunction "or" to connect "status" and "activity," indicating that both words mean the same thing.

> **b.**     **Microsoft's Construction Covers the Disclosed Embodiments**

Not only does Microsoft's use of the word "status" reflect its usage in the specification, but it also best describes the different types of activity disclosed in the '439 patent—one based on the user's dynamic activity on the computer network, and the other based on the user's conditional activity on the computer network.

First, the specification describes a dynamic type of activity, where the ongoing "Internet activity [that] a user wishes to monitor" can be used by the system to filter calls.  This activity is further apparent in the patent's teachings that the user's computer receives information "indicating which Internet subscribers on the forward list 160 are **currently active on the**

Internet 134." [Ex. 2, '439 patent col.8:3–5.] According to the patent, a user can also "prevent

the user's Internet activity from being reported to the particular Internet subscriber." [Id.

col.8:26-28.] The monitoring of this activity can also occur in reverse, with others being able to

detect the user's Internet activity as soon as he accesses the Internet using his computer. [Id.

col.8:9–13) ("**When the user accesses the Internet 134 with the user computer 154**, that

activity can be **monitored** by others. With the system 100, it is possible to determine who is

monitoring the user's Internet activity." (underlining and bold added for emphasis)).] As

discussed above, the specification refers to this dynamic form of activity as status. [See, e.g., id.

col.10:17–23.] Based on the user's status along with information stored on data structure's lists,

"the central office switch 116 will access the Internet 134 in real-time and review data in the

affiliation list 150 to thereby process incoming calls for the user in accordance with the rules

present in the affiliation list." [Id. at 9:20-24.]

     Second, the dynamic activity discussed above is not the only type of activity disclosed in

the '439 patent. The '439 patent explicitly discloses filtering based on various "conditional

statuses, "such as the time of day, current availability of the user, work status, or the like." [Ex.

2, '439 patent col.9:45–55).] The user's conditional status serves as a reflection or proxy for the

user's activity on the computer network. For instance, the patent discloses:

- Filtering based on dynamic alteration of affiliation list based on time of day: "It
  should be noted that the affiliation list 150 may be dynamically altered by the user …
  to change the call processing options for a particular list depending on the user's
  preferences. For example, the user may want to accept all calls from any source **at
  certain times of the day**. . . . Thus, the central office switch 116 will access the
  Internet 134 in real-time and review data in the affiliation list 150 to thereby **process
  incoming calls** for the user in accordance with the rules present in the affiliation list."
  [Id. col.9:7–24 (emphases added).]

- Conditional blocking, or do-not-disturb, based on status of individual callers: "For
  example, the user can edit the allow list 166 to specify that certain individuals are
  'allowed' while other individuals may be allowed, conditionally allowed, or **blocked**

> **all together**. . . .  If the individual calling party has an <u>associated blocked status, the</u> <u>central office switch 116 will</u> **not process the call** and will not connect it to the destination telephone 104." [<u>Id.</u> col.9:34–44 (emphases added).]

Beyond these examples, the specification further teaches that the claimed system processes incoming calls based on individuals' statuses stored on a computer network, like the Internet, with time of day or do-not-disturb blocking being among these statuses:

> Rather than incoming call filtering on the basis of presence in a particular list, such as the allow list 166, as illustrated in FIG. 6, <u>the affiliation list 150 may</u> <u>contain status data on an individual basis</u>. . . .  In the example of FIG. 7, the **user-selected criteria may be based on the particular phone** from which the call is originating **as well as the time of day** in which the call is originated.  For example, the user may wish to allow all calls from a particular number, such as an [sic] caller's work number.  However, <u>calls from another number, such as the</u> <u>caller's home phone,</u> **may be blocked**.  <u>Other calls, such as from a caller's cellular</u> <u>telephone,</u> **may be allowed only at certain times of day**.  FIG. 7 is intended to illustrate some of the call processing options that are available to the user.  As can be appreciated, a variety of different conditional status criteria may be applied to one or more potential calling parties. However, **a common feature** of the system 100 is that the telecommunication system (<u>e.g.,</u> the central office switch 116) **determines calling party status on the basis of information stored on the Internet** and **processes the incoming call** in accordance with the user-specified criteria.

[Ex. 2, '439 patent col.10:15–42 (emphases added).]  The '439 patent's specification discloses a number of user-selectable conditional criteria as status indicators, and Microsoft's proposed construction correctly captures this embodiment.  <u>See, e.g.</u>, <u>Sandisk v. Memorex Products, Inc.</u>, 415 F.3d 1278, 1285 (Fed. Cir. 2005) ("A claim construction that excludes a preferred embodiment, moreover, is rarely, if ever, correct.").

Microsoft's proposed construction is consistent with the intrinsic evidence, and thus, should be adopted as the proper construction.  <u>See</u> <u>Phillips</u>, 415 F.3d at 1317 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.") (quoting <u>Renishaw PLC v. Marposs</u> <u>Societa' per Azioni</u>, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

18

C.    "monitoring activity of a user computer"

| Microsoft's Construction | Defendants' Construction |
|---|---|
| Term does not require explicit construction. If construction necessary: "monitoring the status of a user computer" | "determining whether a called party's computer is active or idle" |

This term does not require explicit construction, as its ordinary meaning reflects its usage in the '289 patent.  To the extent the Court determines that an explicit construction for this term is necessary, Microsoft's proposed construction reflects the teachings of the '289 patent.  [Ex. 12, Beckmann at 27.]  The parties' dispute centers on whether the term should cover many different states, as reflected by Microsoft's "status" construction or only two particular states, as indicated by Defendants' "active or idle" construction.

Microsoft's construction is consistent with the intrinsic evidence for at least two reasons: (i) the '289 patent ties the words "activity" and "status" closely to one another, repeatedly using them interchangeably; and (ii) the broader term "status" encompasses "active or idle," along with other types of "activity" identified in the specification.

First, the intrinsic evidence ties the words "status" and "activity" closely.  This point is most apparent in the Summary of the Invention of the '289 patent, which states that "the potential callee's computer activity may be monitored and the status of the computer as idle or active may be reported to the computer network."  [Ex. 3, '289 patent col.2:15–18 (emphasis added).]  In this sentence, the phrase "status of the computer" is used interchangeably with "computer activity," demonstrating that "status" and "activity" are one and the same in the patent.  This sentence further indicates that the words "active" and "idle" are not the equivalent of "activity," but merely reflect possible statuses of the user's computer.

At repeated points throughout the rest of the '289 patent, the terms "activity" and "status" are used to denote the same concept—a description of what the computer is doing.  [See, e.g.,

19

Ex. 3, '289 patent col.2:15–18 ("[T]he potential callee's computer <u>activity</u> may be monitored, and the <u>status</u> of the computer as active or idle may be reported to the computer network.") (emphasis added), 16:18–19 (describing a "data structure containing call processing criteria, such as . . . the current <u>status</u> of the user's computer (<u>e.g.</u>, the idle or active <u>status</u> of the callee computer 154).") (emphasis added), 17:59–62 ("The system 100 can apply call processing rules derived from any source, such as the current <u>status</u> (<u>e.g.</u>, idle or active) of the callee computer 154 . . . .") (emphasis added).

    <u>Second</u>, Microsoft's proposed interpretation acknowledges that, while "active" and "idle" can correspond to a state or "activity" of the computer, they are not the only possible states of the computer on the computer network. This point is evidenced by the patent's use of the abbreviation "<u>e.g.</u>" to connect the phrase "idle or active" to the word "status." [Ex. 3, '289 patent col.16:18-19 ("current <u>status</u> of the user's computer (**<u>e.g.</u>**, the idle or active <u>status</u> of the callee computer 154)."); 17:59-62 ("The system 100 can apply call processing rules derived from any source, such as the current <u>status</u> (**<u>e.g.</u>**, idle or active) of the callee computer 154 or the caller computer 184 . . . .") (emphasis added).] Defendants' expert, Mr. Hyde-Thomson, conceded during the ITC hearing that the use of the abbreviation "<u>e.g.</u>" means that there are other possibilities besides idle or active. [Ex. 8, Hyde-Thomson ITC Tr. at 1573:24–1574:1; 1575:18–22.)] Accordingly, the correct construction of "activity" must be broader than "active" or "idle," and only "status" provides the necessary breadth for this purpose.

    This phrase does not require explicit construction—absent Defendants' inappropriate attempts to limit the activity to "active or idle," the phrase's meaning is clear on its face. By limiting "activity" to either "active or idle," Defendants' construction creates a false binary and improperly reads out the '289 patent's applicability to activity other than "on" or "off."

However, should construction be necessary, Microsoft's proposed construction is fully supported by the specification of the '289 patent and should be adopted by the Court. "Status" is the only proposed interpretation that comfortably encompasses all the examples of "activity" identified in the '289 patent, making "status" the best construction for "activity." See Phillips, 415 F.3d at 1317 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.") (quoting Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

   D.   **"at the computer network, receiving information from the telephone network that a first party from whom a call is originating desires to establish telephone communication with a second party"**

| Microsoft's Construction | Defendants' Construction |
|---|---|
| Term does not require explicit construction. If construction necessary: "receiving at the computer network information from the telephone network that a telephone call from a first party to a second party has been initiated" | "receiving at the computer network an indication from the telephone network that a first party requests to set up a telephone call with a second party prior to the time the call is placed by the first party" |

Microsoft does not believe that this phrase requires explicit construction, as its plain and ordinary meaning reflects its usage in the '289 patent. Should the Court determine that this phrase requires explicit construction, Microsoft's proposed construction best captures the ordinary meaning of the phrase. [Ex. 12, Beckmann at 29.]

Defendants have requested that the Court construe this term in order to bootstrap new noninfringement positions, and have proposed a construction that would reduce the claimed invention to nonsense. Remarkably, Defendants' proposal would require that the computer network receive information from the telephone network regarding an incoming call before the call is even placed. Notably, neither ALE nor Mr. Hyde-Thomson ever raised this novel construction theory before the ITC.

21

Claim limitations must come from the claims themselves—not from a selective reading

of the specification.  <u>Phillips</u>, 415 F.3d at 1323.  Nothing in the asserted claims of the '289 patent

indicates that the computer network must receive information from the telephone network about

an incoming call before the call is even made.  The '289 patent specification also clearly

describes the user first placing a telephone call:

> To place a telephone call, the caller activates the originating telephone 102 to dial
> in the telephone number corresponding to the destination telephone number 104,
> thereby establishing the communication link 110 with the central office switch
> 106.  In turn the central office switch 106 establishes . . . a communication link
> with the central office switch 116.

[Ex. 3, '289 patent col.5:7–14.]  The specification goes on to describe the steps of the invention,

beginning from this foundation.  [<u>Id.</u> col.5:29–43.]

The '289 patent fully supports Microsoft's position that this term's ordinary meaning

would be sufficient for a person of ordinary skill to understand and interpret the asserted claims.

The drawings themselves teach call processing after a call has been originated:



[Ex. 3, '289 patent fig.8.]

In the accompanying disclosure, the '289 patent sets forth a series of steps directly

contradicting Defendants' proposed construction:

> At a start 200, the <u>calling party has placed a call from the originating telephone</u>
> <u>102</u> (see FIG. 2) to the destination telephone 104.  In step 202, the central office

> switch 116 has received call data from the originating telephone 102. . . . In step 204, the central office switch 116 (see FIG. 2) <u>establishes the communication link 132 with the Internet 134</u>. . . . In step 206, the system 100 accesses the affiliation list 105 for the user (<u>i.e.</u>, the called party).

[<u>Id.</u> col.12 ll.38–50 (emphasis added).]  The cited disclosure makes clear that the '289 patent discloses a system in which the computer network receives from the telephone network information about an incoming call after the call has been placed.  Defendants' proposed construction should therefore be rejected.

Defendants also attempt to import the extraneous limitation—"requests to set up a telephone call with a second party"—into their proposed construction, despite the fact that the phrase "set up" appears nowhere in the specification of the '289 patent.  Defendants' choice of terminology is an attempt to import special meanings—not supported by the specification—into the claims.  Indeed, the only time "call setup" was ever mentioned in the prosecution of the '289 patent was during prosecution when the patentee wrote that a cited reference, part of which involved a "call setup" function, was "manifestly unlike the claimed invention."  Ex. 13, U.S. Patent App'n No. 09/291,693, Amendment A at 11 (Mar. 4, 2002).  And, as discussed, nothing in the '289 patent specification requires an exchange of information between the computer and telephone networks prior to the call.  Thus, Defendants' attempts to add extraneous limitations to the claim terms should be rejected.

This phrase does not require explicit construction—absent Defendants' inappropriate attempts to import claim limitations, the phrase's meaning is clear on its face.  However, should construction be necessary, Microsoft's proposed construction is fully supported by the specification of the '289 patent and should be adopted by the Court.

IV.     **THE PROPER CONSTRUCTION OF THE '064 AND '357 PATENTS**

A.     **"unified messaging system"**

| Microsoft's Construction | Defendants' Construction |
|---|---|
| "system that allows messages of a data-centric network and a telephony-centric network to be received, stored, retrieved, and forwarded without regard to the communication devices or networks employed for the transmission of the messages (i.e., in a coordinated manner)" | "system that allows messages of a data-centric network and a telephony-centric network to be received, stored, retrieved, and forwarded to the communication devices or networks employed for the transmission of the messages" |

The parties' dispute centers on whether the system allows messages to be received, stored, retrieved, and forwarded **without regard to** the communication devices or networks **(i.e., in a coordinated manner)**.  Specifically, Microsoft's construction requires the messages to be received, stored, retrieved and forwarded without regard to the communication devices or networks.  In other words, a unified messaging system allows messages to be received, stored, retrieved and forward in a coordinated manner.

Microsoft's proposed construction finds direct support in the specifications of the '357 and '064 patents, which expressly define "unified messaging system" as a system that "allows messages to be received, stored, retrieved, and/or forwarded . . . **without regard** to the communication devices and/or networks (i.e., data-centric vs. telephony-centric) employed for the transmissions of the messages."  [Ex. 4, '064 patent col.6:59–65 (emphasis added).]  Mr. Hyde-Thomson offered no opinion regarding Microsoft's construction and, therefore, does not appear to dispute it. [See Ex. 9, Hyde-Thomson at 3–9.]

Defendants' construction acknowledges that a unified messaging system allows messages to be received, stored, retrieved, and forwarded, but inexplicably ignores the explicit language of the specification stating that the unified messaging system performs these tasks without regard to the communication devices or networks employed for the transmissions of the messages.  [Ex. 4,

'064 patent col.6:59–65]  A unified messaging system represents a central store for subscribers'

messages and manages messages "without regard to the communication devices or networks

employed for the transmissions of the messages."  Those skilled in the relevant art at the time of

the O'Neal inventions would have understood that a unified messaging system's store is

maintained so that a subscriber may retrieve messages using any one the subscriber's

communication devices, and thus, a unified messaging system has to be capable of receiving,

storing, retrieving and forwarding messages in a coordinated manner.  [Ex. 12, Beckmann at 13–

14.]  In other words, an action taken on a communication using any one of a subscriber's

communication devices needs to be reflected on all other devices that a subscriber might use to

access the communication via the centralized store.

     The coordinated management of messages and communications was a known and

important feature of unified messaging systems at the time of the invention.  For example,

presentations prepared by Cisco Systems during the relevant timeframe plainly describe and

illustrate this coordination.  As shown below, the presentations compare and contrast POP

systems which do not provide such coordinated access to a subscriber's messages, with unified

messaging systems, such as IMAP systems, which allow multiple concurrent access to messages

stored in a unified messaging system's central message store using several subscriber devices:



[Ex. 10, MSAL05059555, MSAL05059557.]

The multiple concurrent access, essential to a unified messaging system, allows changes made using one of a subscriber's communication devices, to be reflected on the subscriber's other communication devices that access the same messages.  This coordination is shown above in MSAL05059557, for example, by the double headed arrows between the subscriber's communication devices and the central message store.  Another Cisco presentation (shown below) describes and illustrates the multiple concurrent access provided in unified messaging systems which is missing from POP ("Post Office Protocol") messaging systems.



[Ex. 10, MSAL05059589.]

Defendants' proposed construction for this term inexplicably ignores language in the O'Neal patents' specification describing this coordination (i.e., "without regard to the communication devices or networks employed for the transmissions of the messages").  [Ex. 4, '064 patent col.6:62–65.]  Microsoft's proposed construction reflects this language, as well as the understanding of those skilled in the art, and should therefore be adopted.

26

### B.    "communication options"

| Microsoft's Construction | Defendants' Construction |
|---|---|
| "settings that control how communication services will be handled" | "parameters associated with specific types of communication services" |

The term "communication options" is properly construed in view of the intrinsic record to mean "settings that control how communication services will be handled." [See Ex. 12, Beckmann at 15–16.] The '064 and '357 patents explain that "[o]nce the subscriber saves the changes…the modified communication option settings will be employed to handle future messages transmitted and/or received through either the telephony centric network or the data-centric network." [Ex. 4, '064 patent col.17:5–9 (emphasis added).] The surrounding words of the claims reinforce the fact that communication options are settings that control how future communications will be handled. Claim 1 of the '357 patent, for example, recites:

> receiving from said subscriber . . . a first change to at least one of said communication options . . . updating said first change to said account in said subscriber communication profile database, thereby resulting in a first updated subscriber communication profile database, wherein subsequent messages . . . are handled in accordance with said first updated subscriber communication profile database.

[Ex. 5, '357 patent col.18:61–19:6 (emphasis added).] It is also clear from the claim language of both patents that communication options modify the operation of communication services. [See, e.g., Ex. 4, '064 patent col.18:32–36 ("said communication options for said subscriber, said communication options including parameters associated with individual ones of said plurality of said communication services and routings among said plurality of communication services".]

Defendants' construction, however, ignores the explicit language in the claims and patent specifications explaining that communication options are settings that are applied to future communications and control the way future communications are handled. Defendants' construction would read on functions and controls that apply only to past or current (real time)

27

communications, rather than settings that apply to future communications.  For example, the

patents describe parameters associated with e-mail and voicemail services for listening to

voicemail messages, reading e-mails, or composing emails.  [Ex. 4, '064 patent col.14:18–32.]

However, the patents never describe these functions as communication options.  Instead, the

patents solely and consistently describe "communication options" as stored settings that apply to

future communications.  Microsoft's proposed construction is consistent with the intrinsic

evidence and should therefore be adopted.


   **C.**     **"[first/second] enable option for enabling or disabling the [first/second]
              communication service"**

| Microsoft's Construction | Defendants' Construction |
|---|---|
| "communication option that controls the extent to which a communication service is implemented" | "an option that allows a subscriber to turn on or off a communication service" |

        The phrase "enable option for enabling or disabling the . . . communication service"

should be construed consistent with the disclosure in the '064 and '357 patents to mean a

"communication option that controls the extent to which a communication service is

implemented."  [See Ex. 12, Beckmann at 17–18.]  The '064 and '357 patents use the terms

"enable" and "disable" more broadly than in the binary sense of switching a service on or off.

The patent specifications do not equate the term "enable" with switching on or the term "disable"

with switching off a service.  For example, Figures 3 and 4 of the '064 and '357 patents illustrate

several ways of enabling and disabling a service, including selecting an ON or OFF radio button

and entering or deleting a telephone number in an appropriate field.  In a more specific example,

the paging service shown in Figure 4 of the patent will not be enabled if an appropriate PIN

number is not entered in addition to a paging number.  As yet another example, irrespective of

whether the fax receiving service depicted in Figure 4 (shown as 319) is on or off, the included fax forwarding service can be independently enabled or disabled. Therefore, it is clear from the patents that certain features of a service can continue to function even though other features have been disabled. [See '064 Patent col.13:40–60.]

According to Defendants' construction, the enable option simply means an option that allows a subscriber to turn on or off a communication service. The O'Neal patents describe "on-off settings," (see, e.g., '064 patent col.14:46–49), but do not suggest that these on-off settings are the claimed enable options. As noted above, one skilled in the art would have understood that there are many ways disclosed in the patents for enabling or disabling functions of a communication service beyond simply turning the entire service on or off. Defendants have again ignored the intrinsic record in an attempt to unduly narrow this claim language. Microsoft's proposed construction is supported by the intrinsic evidence and should be adopted.

**D.    "a single graphical menu for displaying said communication options for each of said communication services at the same time"**

| Microsoft's Construction | Defendants' Construction |
|---|---|
| "a single graphical menu for displaying at least a first communication service and option and a second communication service and option at the same time" | "one graphical menu that shows all of the communication options associated with the subscriber's communication services" |

The phrase "a single graphical menu for displaying said communication options for each of said communication services at the same time" is properly construed to mean "a single graphical menu for displaying at least a first communication service and option and a second communication service and option at the same time." [See Ex. 12, Beckmann at 18–19.] Defendants' construction contradicts the very claim language it purports to construe and fails to consider the import of the surrounding claim language.

29

**1.     Microsoft's Proposed Construction Finds Direct Support in the Plain Language of the Claims**

The actual language of the claims is the starting point in any construction analysis, including the language being construed and the surrounding claim language.  Phillips, 415 F.3d at 1314.  The disputed phrase recites "a single graphical menu for displaying said communication options for each of said communication services at the same time . . . ." (emphasis added).  It is well-settled that the use of the word "said" in a claim simply refers to an earlier use of the term in the claim.  Intamin, Ltd. v. Magnetar Techs., Corp., 483 F.3d 1328, 1333 (Fed. Cir. 2007).  The terms "communication services" and "communication options" are first recited in the preamble of the asserted claims.  Specifically, the preamble of the asserted claims recites "permitting a subscriber of a "plurality of communication services of a unified messaging system to customize communication options pertaining to said plurality of communication services." ['064 Patent col.18:23–25.]  Nowhere does this claim language require that all communication options for a subscriber's services be displayed simultaneously, as asserted by Defendants.  The preamble expressly uses the term "plurality," which means "at least two."  See Resqnet.com, Inc. v. Lansa, Inc., 364 F.3d 1374, 1383 (Fed. Cir. 2001).  Thus, the preamble requires only "a subscriber of at least two communication services."

Moreover, the preamble of the claims says nothing about the number of communication options associated with a communication service.  The preamble requires only permitting a subscriber of at least two communication services to customize the communication options pertaining to the communication services.  The preamble itself does not specify whether each communication service must have a communication option or the number of communication options.  As a result, when read in conjunction with the preamble, the disputed phrase "each of said communication services" means "each of a plurality of communication services" or "each of

at least two communication services."  See Resqnet.com, 346 F.3d at 1382 (construing "each of a plurality of fields" to mean "each of at least two fields").  As confirmed by Defendants' expert Mr. Hyde-Thomson, a person skilled in the art at the time of the invention of the '064 and '357 patents would have understood the recitation of "each of said communication services" to refer back to the previously recited "each of said plurality of communication services."  [Ex. 8, Hyde-Thomson ITC Tr. at 1502–05; see also Ex. 12, Beckmann at 18–19.]

Furthermore, the preamble makes clear that not all communication options must be displayed.  For example, the preamble of claim 1 of the '064 patent is directed to a "computer-implemented control center for permitting a subscriber . . . to customize communication options…through either a  telephony-centric network using a telephone or a data-centric network using a display terminal."  [Ex. 4, '064 patent col.18:21–26 (emphasis added)]  This claim language plainly contemplates that some communication options may be accessible via a telephone (i.e., audibly), other communication options may be available via a display (i.e., graphically displayed), and yet other communication options will be available via both a telephone and a display.  Contrary to Defendants' proposed construction, the claims do not require that all communication options are displayed.

Finally, Microsoft's proposed construction is consistent with the relevant surrounding claim language as set forth in the "wherein" clause reproduced below, which defines precisely what the "single graphical menu" must display:

> wherein said single graphical menu comprises at least a first display area for showing a first communication service and a first communication option associated with said first communication service, and a second display area for showing a second communication service and a second communication option associated with said second communication service.

[Ex. 4, '064 patent col.18:39–58.]

31

The "wherein" clause makes clear that the single graphical menu requires only two communication services and a communication option associated with each service. Specifically, this claim language is clear and unambiguous that "said communication options" displayed in the single graphical menu need only include the recited "first communication option" and "second communication option," not all the communication options associated with all of the communication services. ALE's proposed construction requiring the simultaneous display of all communication options for all communication services renders this "wherein" clause superfluous and thus impermissibly reads this limitation out of the claims. Nowhere do the claims recite that "all" communication options associated with a subscriber's communication services must be displayed at the same time; Defendants are improperly attempting to insert this extraneous limitation into the claims.

Therefore, it is seen that the best and most reliable source for ascertaining the meaning of claim language—the actual words of the claims—fully supports Microsoft's proposed construction and contradicts ALE's proposed claim construction. Simply put, nowhere do the claims recite or require the simultaneous display of all communication options for all communication services, and it is improper to import such an extraneous limitation into the claim where it does not exist.

### 2. The '064/'357 Patent Specification Supports Microsoft's Proposed Construction

The Federal Circuit has consistently held that the patent specification is a very important piece of intrinsic evidence that must be consulted when construing claim language; and that the correct construction will be the one that is consistent with the teachings of the specification. See Phillips, 514 F.3d at 1315 (quoting Vitronics, 90 F.3d at 1582) (the specification "is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best

guide to the meaning of a disputed term.")  Indeed, a fundamental rule of claim construction is that claims must be construed so as to be consistent with the specification, of which they are a part.  Id. at 1316.  In construing the asserted claims to require the single graphical menu to display all communication options associated with all communication services, Defendants disregard the specification of the O'Neal patents which does not disclose a single embodiment showing all communication services and options simultaneously displayed on a graphical interface.

The computer-implemented control center described in the O'Neal patents includes illustrations of two single graphical menus as preferred embodiments, one shown in Figure 3, the other in Figure 4:

> In one embodiment, the computer-implemented control center has two views: the minimized view and the full view.  In the minimized view (e.g., FIG. 3 in one embodiment), the computer-implemented control center may simply show the simplified routing details and the on-off settings associated with the communication options.  Although the user may make changes to the on-off settings, fuller edit capabilities are preferably provided in the full view.  In the full view (e.g., FIG. 4 in one embodiment), the computer-implemented control center additionally add explanations and detailed routing choices.  If desired, an authentication procedure may be implemented with either the minimized view or the full view to ensure that the person making editing changes to the communication options is properly authorized.

[Ex. 4, '064 patent col.14:44–58 (emphasis added).]  As described above, and as is evident from a comparison of Figures 3 and 4 of the O'Neal patents, the embodiment of the invention shown in Figure 3 displays fewer options and communication services than Figure 4.  The specification confirms that the graphical user interface of Figure 3 shows less than all available communication options: "In the exemplary implementation of Fig. 3, six representative communication options are shown,"  [Id. col.11:51–52 (emphasis added).]  The specification further describes the graphical user interface of Figure 3 as "a minimized view."  [Id. col.14:44–

49.]  And, importantly, neither of the preferred embodiments of the single graphical menu

display all of the available communication services and options.

For example, Figure 3 does not simultaneously display the Fax Sending service or its

options, the Forward Faxes To service or its options, or all the options for entering telephone

numbers to route communications for the Follow Me and Paging services that are shown in

Figure 4.  Figure 4 also does not display all communication options for all communication

services because it omits the options included in several drop down menus (e.g., the "Follow Me

call routing" option, the "Fax Sending Send attempts" option, and item 318 all include drop

down menus for displaying additional options).  Moreover, neither disclosed graphical interface

displays services for processing incoming voicemail messages or placing an outgoing call, both

of which are described in the specification as available services.

Defendants' construction of the "single graphical menu" limitation excludes the preferred

embodiments shown in Figures 3 and 4 because the embodiments do not display all

communication options for all communication services at the same time.  As a result, ALE's

construction runs contrary to a long line of established cases.  See, e.g., Sandisk, 415 F.3d 1278,

1285 (Fed. Cir. 2005) ("[a] claim construction that excludes a preferred embodiment, moreover,

is rarely, if ever, correct.).

Further evidence in support of Microsoft's proposed construction is found in the

specification of the '064/'357 patents, which clearly states that only "substantially all"

communication options associated with "various" communication services must be accessible via

the single graphical menu:

> Unlike the prior art approach which requires the user to contact individual service
> providers/accounts and/or to access individual communication devices to review
> and change the communication options associated therewith, the computer-
> implemented control center allows the communication options associated with the

> various communication services to be accessed substantially all at once. That is, the computer-implemented control center provides a single central facility through which the communication option settings associated with the different communication services may be reviewed and/or modified.

['064 patent col.16:2–13.]  The specification of the '064/'357 patents clearly supports Microsoft's proposed construction.

### 3.    The Prosecution History Supports Microsoft's Proposed Construction

The prosecution history of the O'Neal patents supports Microsoft's construction.  During prosecution of the '064 patent (which is also the parent of the '357 patent), the Examiner ultimately allowed the asserted claims, which included the disputed single graphical menu limitation.  The Examiner noted in his Reasons for Allowability that the prior art, including the Pepe patent, did not teach or suggest all the limitations of claim 1 including a graphical display that simultaneously displays first and second communication services and options:

> The subject independent claim 1 is directed to permitting a subscriber of a unified messaging system to customize communication options.  Specifically, the prior art of record fails to teach a unified messaging system having the following combination of additional features:
>
> 1) a subscriber communications profile database.
>
> 2) a computer server with a graphical display that displays a single graphical menu comprising a first display area for showing a first communication service and a first enable/disable option and a second display showing a second communication [sic] and a second enable/disable option where the first and second display area are displayed at the same time.
>
> 3) a telephony server that audibly represents said communication options to a telephone.

[Ex. 11, '064 patent prosecution history, 2/7/2001 Notice of Allowability (emphasis added).]

Thus, the Examiner understood that the allowed claims expressly recite that the single graphical menu need only display at least first and second communication services and options—a

limitation that formed the basis for the allowance of the claims and which was acknowledged by the Examiner in his Reasons for Allowability. ]

A person of ordinary skill in the art having reviewed the claims in the context of the intrinsic evidence (including the Examiner's Reasons for Allowance) would have understood the asserted claims to require only the display of first and second communication options and services in the single graphical menu.  See Acco Brands, Inc. v. Micro Sec. Devices, Inc., 346 F.3d 1075, 1079 (Fed. Cir. 2003) (explaining that courts can use an Examiner's Reasons for Allowance to confirm a claim construction based on other intrinsic evidence).

In sum, Defendants' proposed construction of the single graphical menu limitation is not supported by the intrinsic evidence and should be rejected.  Instead, the intrinsic evidence, including the claim language, the patent specification and the prosecution history, supports Microsoft's proposed construction.  The phrase "a single graphical menu for displaying said communication options for each of said communication services at the same time" simply means "a single graphical menu for displaying at least a first communication service and option and a second communication service and option at the same time."

    **E.**    **"telephony server being configured to audibly represent said communication options . . ."**

| Microsoft's Construction | Defendants' Construction |
|---|---|
| "telephony server being configured to audibly represent communication options pertaining to at least two communication services to a telephone when the subscriber employs said telephone to access the computer-implemented control center" ['064 patent, claims 1 and 20] | "a telephony server that represents the same communication options that are available through the single graphical menu" ['064 patent, claims 1 and 20] |
| "audibly representing communication options pertaining to at least two communication services to a telephone using said telephony server, when a subscriber employs one of the telephones to access the computer-implemented control center" ['357 patent, claim 1] | "audibly representing the same options available through the graphical menu to one of said telephones, using said telephony server, when said subscriber employs said one of said telephones to access said computer-implemented control |

| | center" ['357 patent, claim 1] |
|---|---|
| "an audible representation of communication options pertaining to at least two communication services capable of being provided to one of the telephones, using said telephony server, when a subscriber employs one of the telephones to access the computer-implemented control center" ['357 patent, claim 17] | "an audible representation of the same options available through the graphical menu to one of said telephones, using said telephony server, when said subscriber employs said one of said telephones to access said computer-implemented control center" ['357 patent, claim 17] |

As shown in the parties' Joint Claim Construction Chart, the "telephony server" limitation appears in several asserted claims with slight variations in the claim language. The parties appear to agree, however, that the "telephony server" limitation should be construed consistently with respect to the asserted claims of the O'Neal patents. The parties' dispute focuses on whether the "telephony server" limitation requires audibly representing communication options pertaining to at least two communication services (as proposed by Microsoft) or audibly representing the same communication options available through the single graphical menu (as proposed by Defendants). Because Defendants' construction of the single graphical menu requires all of the communication options associated with the subscriber's communication services, their proposed construction for the TUI limitation essentially requires all communication options associated with the subscriber's communication services as well. For at least the reasons set forth below, Defendants' construction should be rejected.

### 1. The Plain Language of the Claims Supports Microsoft's Proposed Construction

Starting by examining the words of the claim, it is seen that the familiar phrase "said communication options" is at issue once again: "said telephony server being configured to audibly represent said communication options . . . ." As explained above with respect to the single graphical menu claim limitation, nothing in the intrinsic record limits the recited "communication options" as Defendants propose. The claim language plainly does not state that

all communication options displayed on the single graphical menu must be audibly represented; it merely recites "communication options" in the preamble and in connection with the single graphical menu limitation, and later recites that "said communication options" are audibly represented via the telephony server.

If one assigns a number of communication options (say, ten options) to be the "communication options" recited in the preamble, then it is entirely consistent with the claim language, other intrinsic evidence, and applicable law regarding claim construction to display via the single graphical menu a subset of these ten options and audibly represent via the telephony server a different subset of the ten options. In other words, the term "said" in connection with the graphically-represented options and in connection with the audibly-represented options can refer back to different ones of the set of "communications options" recited in the preamble.

The preamble of claims 1 and 20 of the '064 patent reinforce the fact that the claims do not require that the displayed and audibly represented communication options be identical. The preamble of the claims call for to a "computer-implemented control center for permitting a subscriber . . . to customize communication options . . . through either a telephony-centric network using a telephone or a data-centric network using a display terminal." ['064 patent col.18:21–26, col.22:43–49 (emphasis added).] This claim language plainly contemplates that some communication options may be accessible via a telephone (i.e., audibly), other communication options may be available via a display (i.e., graphically displayed), and yet other communication options will be available via both a telephone and a display. Contrary to Defendants' proposed construction, the claims do not require that all the same communication options that are displayed must also be audibly represented. The claim language simply requires

the telephony server to audibly represent some of the communication options recited in the preamble of the claim, not all of the options.

### 2. The Specification of the '064/'357 Patents Supports Microsoft's Proposed Construction

The common specification of the O'Neal patents fully supports Microsoft's proposed construction that the claimed telephony server need not audibly represent all communication options. The specification provides that it "should be apparent to those skilled in the art that the same control panel <u>may</u> be presented to the subscriber through the telephone interface if the subscriber wishes to review and/or change communication options using a telephone connected to the telephony-centric network." [Ex. 4, '064 patent col.14:62–67 (emphasis added)] This sentence does not require the same menu items displayed to be audibly represented, but rather makes clear that the options and services shown in the control panel (figures 3 and 4) <u>may</u> be audibly represented. When viewed in the context of the immediately preceding sentence, it is clear that the specification merely provides an exemplary description of communication services and options available through the single graphical display and audibly represented through the telephony server:

> It should be appreciated that the communication services and option discussed in connection with FIGS. 3 and 4 are <u>only illustrative of the capabilities of the inventive computer-implemented control center</u>.

['064 patent col.14:59–62 (emphasis added).]

Moreover, the specification identifies at least one option (<u>e.g.</u>, the option to place a phone call) that is disclosed as being available to a user via the telephony server, but does not appear on the graphical user interface shown in Figure 3 or 4. ['064 patent col.16:16–26.] Thus, Defendants' proposal for a strict correspondence between the options that are displayed via the

single graphical menu and those that are audibly represented via the telephony server is undermined and contradicted by the express teachings of the patent specification.

### 3. The Prosecution History Supports Microsoft's Proposed Construction

The telephony server limitation was not a point of contention during prosecution; hence there was no unambiguous disavowal of claim scope.  In the Examiner's statement of Reasons for Allowance, the Examiner stated that the prior art did not teach "a telephony server that audibly represents said communication options to a telephone."  [Ex. 11, '064 patent prosecution history, Notice of Allowability.].  Notably, the Examiner did not state that the telephony server had to audibly represent all of the communication options displayed on the single graphical menu; rather, his statement is consistent with Microsoft's construction that only some of the communication options of the computer-implemented control center need be audibly represented via the telephony server.

In sum, the language "telephony server being configured to audibly represent said communication options to said telephone" is properly construed to require only that a subset of available communication options be audibly represented.  There is no requirement that all a subscriber's communication options, or even the same communication options that are displayed in the single graphical menu must be audibly represented by the telephony server.

## V. CONCLUSION

For the reasons discussed above, Microsoft respectfully requests the Court to adopt its proposed constructions for the disputed claim terms of the Microsoft patents-in-suit.

Dated: May 9, 2008

Respectfully submitted,

**FISH & RICHARDSON P.C.**

/s/ *Thomas L. Halkowski*

Thomas L. Halkowski (#4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
Fax: (302) 652-0607
halkowski@fr.com

John E. Gartman
12390 El Camino Real
San Diego, CA 92130
Tel: (858) 678-5070
Fax: (858) 678-5099
gartman@fr.com

Ruffin B. Cordell
Linda Liu Kordziel
Indranil Mukerji
William Sekyi
Kfir Levy
Kori Anne Bagrowski
Robert Courtney
1425 K Street NW, Suite 1100
Washington, D.C. 20005
Tel: (202) 783-5070
Fax: (202) 783-2331
cordell@fr.com
kordziel@fr.com
mukerji@fr.com
sekyi@fr.com
kylevy@fr.com
bagrowski@fr.com
courtney@fr.com

}

**ATTORNEYS FOR PLAINTIFF
MICROSOFT CORPORATION**

41

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 16, 2008, I electronically filed with the Clerk of Court the attached **PUBLIC VERSION – MICROSOFT'S OPENING BRIEF ON CLAIM CONSTRUCTION** using CM/ECF which will send notification of such filing to the following individuals:

Jack B. Blumenfeld
Maryellen Noreika
Richard John Bauer
MORRIS, NICHOLS, ARSHT & TUNNEL LLP
1201 North Market Street
Wilmington, DE 19899-1347
jblumenfeld@mnat.com
mnoreika@mnat.com
rbauer@mnat.com
***(Also served via hand delivery)***

I also certify that copies were caused to be served on May 16, 2008 upon the following individuals via electronic mail:

Steven C. Cherny
Karen Y. Tu
Clement J. Naples
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY 10022
steven.cherny@lw.com
karen.tu@lw.com
clement.naples@lw.com

Michael J. Schallop
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
michael.schallop@lw.com

Susan S. Azad
LATHAM & WATKINS LLP
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071
susan.azad@lw.com

David A. Nelson
Alan Devlin
Brett M. Doran
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
Chicago, IL 60606
david.nelson@lw.com
alan.devlin@lw.com
brett.doran@lw.com

*/s/ Thomas L. Halkowski*