# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MICROSOFT CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-090 (SLR) |
| | ) | |
| ALCATEL-LUCENT ENTERPRISE and | ) | **REDACTED VERSION** |
| GENESYS TELECOMMUNICATIONS | ) | |
| LABORATORIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' ANSWERING CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Defendants*
*Alcatel-Lucent Enterprise and*
*Genesys Telecommunications Laboratories, Inc.*

*Of Counsel*:
Steven C. Cherny
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY  10022-4834
(212) 906-1200

David A. Nelson
LATHAM & WATKINS LLP
233 South Wacker Drive
Suite 5800
Chicago IL 60606
(312) 876-7700

Original Filing Date:  June 25, 2008
Redacted Filing Date: July 1, 2008

## TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF PROCEEDINGS ...................................................................1

II.   SUMMARY OF ARGUMENT ......................................................................................1

III.  STATEMENT OF FACTS .............................................................................................2

IV.   ARGUMENT ..................................................................................................................2

    A.    Disputed O'Neal Claim Elements..........................................................................2

        1.    The Single Graphical Menu Limitation Requires that the
            Subscriber's Communication Options Associated with Each
            Communication Service be Displayed on One Menu.................................2

        2.    The Telephony Server Must Audibly Represent the Same
            Communication Options as the Single Graphical Menu..........................15

        3.    The Enable/Disable Option Limitation......................................................18

        4.    The Unified Messaging System Limitation ...............................................19

    B.    Disputed Claim Constructions of the '289 Patent.................................................22

        1.    "[M]onitoring the Activity of a User Computer" Means
            "Determining Whether a Called Party's Computer is Active or
            Idle"...........................................................................................................22

        2.    Construction of "Receiving Information From the Telephone
            Network that a First Party From Whom a Call is Originating
            Desires to Establish Telephone Communication with a Second
            Party" ........................................................................................................26

        3.    Constructions of "Telephone Network" and "Computer Network" ..........30

    C.    Disputed Claim Constructions of the '439 Patent.................................................30

        1.    "Current Activity of the User on the Computer Network"
            Construction...............................................................................................31

         2.    "Telephone Network" and "Computer Network" Constructions...............35

V.    CONCLUSION...............................................................................................................39

i

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Acco Brands, Inc. v. Micro Sec. Devices, Inc.,*
    346 F.3d 1075 (Fed. Cir. 2003)..................................................................... 12

*Andersen Corp. v. Fiber Composites, LLC,*
    474 F.3d 1361 (Fed. Cir. 2007)..................................................................... 11

*Bass Pro Trademarks, L.L.C., v. Cabela's Inc.,*
    485 F.3d 1364 (2007)..................................................................................... 11

*DeMarini Sports, Inc. v. Worth, Inc.,*
    239 F.3d 1314 (Fed. Cir. 2001)..................................................................... 13

*Digital Biometrics, Inc. v. Identix, Inc.,*
    149 F.3d 1335 (Fed. Cir. 1998)..................................................................... 11

*Ekchian v. Home Depot, Inc.,*
    104 F.3d 1299 (Fed. Cir. 1997)....................................................................... 8

*Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc.,*
    214 F.3d 1302 (Fed. Cir. 2000)..................................................................... 14

*Energizer Holdings, Inc. v. ITC,*
    2008 U.S. App. LEXIS 8593 (Fed. Cir. April 21, 2008) ............................. 28

*Enzo Biochem v. Gen-Probe, Inc.,*
    424 F.3d 1276 (Fed. Cir. 2005)..................................................................... 13

*Gentry Gallery, Inc. v. Berkline Corp.,*
    134 F.3d 1473 (Fed. Cir. 1998)..................................................................... 11

*In re Hyatt,*
    708 F.2d 712 (Fed. Cir. 1983)......................................................................... 6

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,*
    381 F.3d 1111 (Fed. Cir. 2004)..................................................................... 13

*Lemelson v. General Mills, Inc.,*
    968 F.2d 1202 (Fed. Cir. 1992)..................................................................... 34

*Liquid Dynamics Corp. v. Vaughan Co.,*
    355 F.3d 1361 (Fed. Cir. 2004)................................................................ 7, 25

*Microsoft Corp. v. Multi-Tech Sys.*,
    357 F.3d 1340 (Fed. Cir. 2004)................................................................28

*North Am. Container v. Plastipak Packaging, Inc.*,
    415 F.3d 1335 (Fed. Cir. 2005)................................................................14

*O2 Micro Intl Ltd. v. Beyond Innovation Tech. Co., et al*,
    No. 07-1302, 2008 U.S. App. LEXIS 7053 (Fed. Cir. April 3, 2008)..............23, 28

*Personalized Media Communications, LLC v. U.S. Int'l Trade Comm'n*,
    161 F.3d 696 (1998)...............................................................................21

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005), *cert denied*, 546 U.S. 1170 (2006)............3, 14, 30

*PSN Illinois v. Ivoclar Vivadent*,
    No. 2007-1512, 2008 WL 1946550 (Fed. Cir. 2008)...............................31, 33

*Renishaw PLC v. Marposss Societá Per Azion*,
    158 F.3d 1243 (Fed. Cir. 1998)................................................................30

*ResQNET.com, Inc. v. Lansa, Inc.*,
    364 F.3d 1374 (Fed. Cir. 2003)..............................................................3, 4

*Rheox, Inc. v. Entact, Inc.*,
    276 F.3d 1319 (Fed. Cir. 2002)....................................................14, 33, 34, 35

*Sandisk v. Memorex Products, Inc.*,
    415 F.3d 1278 (Fed. Cir. 2005)................................................................34

*Sentry Protection Prods. v. Eagle Mfg. Co.*,
    400 F.3d 910 (Fed. Cir. 2005)...................................................................8

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)......................................................7, 20, 25, 31

## I.    NATURE AND STAGE OF PROCEEDINGS

Pursuant to the Court's August 3, 2007 Scheduling Order, as amended by the Joint Stipulation for Extension of Time (D.I. 181) entered by the Court on May 30, 2008, Defendants Alcatel-Lucent Enterprise ("ALE") and Genesys Telecommunications Laboratories ("Genesys") submit this responsive claim construction brief.    Microsoft Corporation ("Microsoft") asserts four patents in this action: U.S. Patent No. 6,263,064 ("'064 Patent"), U.S. Patent No. 6,728,357 ("'357 Patent") (collectively referred to as "the O'Neal Patents"), U.S. Patent No. 6,430,289 ("'289 Patent"), and U.S. Patent No. 6,421,439 ("'439 Patent") (Exs. 1-4). Microsoft asserts the O'Neal and '439 Patents against ALE, and Microsoft asserts the '289 Patent against ALE and Genesys.  This brief addresses the disputed terms of all four patents.

Microsoft asserted the same patents against ALE in the International Trade Commission ("ITC").  The ITC has determined that ALE did not infringe any of those patents and that the asserted claims of the '439 were invalid.

## II.    SUMMARY OF ARGUMENT

ALE's proposed constructions of the disputed terms are provided in the Joint Claim Construction Statement (D.I. 150) ("Joint Statement') (*See* Ex. 5) and are addressed in the Argument section for each patent.

### III.    STATEMENT OF FACTS

The relevant facts are discussed in the Argument section for each patent in Defendants' Opening Claim Construction Brief (D.I. 162) (incorporated by reference herein).

### IV.    ARGUMENT

#### A.    Disputed O'Neal Claim Elements

Defendants' opening brief (D.I. 162) proposes constructions for four disputed terms from the asserted claims of the O'Neal Patents:  (1) whether the "single graphical menu" must display the options for each communication service; (2) whether the telephony server must audibly represent the same options displayed by the "single graphical menu;" (3) whether "enabling or disabling" means to turn on or off; and (4) whether the "Unified Messaging System" limitation requires the ability to retrieve a message from the central message storage of the system after that message has already been retrieved using a different device.[1]

#### 1.    The Single Graphical Menu Limitation Requires that the Subscriber's Communication Options Associated with Each Communication Service be Displayed on One Menu

#### a.    Microsoft's Proposed Construction is Inconsistent with the Plain Meaning of the Claim Language

| Disputed Term | Microsoft's Proposed Construction | ALE's Proposed Construction |
| --- | --- | --- |
| "a single graphical menu for displaying said communication options for each of said communication services at the [s]ame time" <br><br> ['064 Patent: Claims 1, 3, 8, 9, 11, 20; '357 Patent: Claims 1, 6, 17] | "A single graphical menu for displaying at least a first communications service and option and a second communication service and option at the same time" | "one graphical menu that shows all of the communication options associated with the subscriber's communication services" |

---

[1]    Plaintiff raised a fifth term, "communication options" in its opening brief.  Defendants agree to the Plaintiff's proposed construction of this term to focus on the material disputed terms.

(Ex. 5 (Joint Statement (D.I. 150)) at 4.)

In the related ITC proceeding, the Administrative Law Judge (ALJ) and the Commission adopted ALE's construction. (*See* Ex. 6 (ALJ's Final Initial Determination (January 28, 2008)) at 60; Ex. 7 (Commission Decision (June 6, 2008)) at 7 (adopting all of the ALJ's findings from the Initial Determination that are not inconsistent with the final decision).) The explicit claim language requires that the options for "each" communication service be displayed on "a single graphical menu" "at the same time." Microsoft's construction disregards the plain language and reads the words "single," "each" and "at the same time" out of the claims. But those words may not be ignored or "construed" out of existence. The law is clear that claim terms must be given meaning and the default is the plain meaning to persons of ordinary skill in the pertinent art. That is especially true where, as here, the terms are plain English terms that are easily understandable. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005), *cert denied*, 546 U.S. 1170 (2006) ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words"). Microsoft ignores the plain meaning of common English words such as "each" and "single" and argues that "[n]owhere does this claim language require that all communication options for a subscriber's services be displayed simultaneously." (Plaintiff Microsoft's Opening Claim Construction Brief (D.I. 163) at 30.) Microsoft's argument is not rooted in the words carefully chosen to claim the invention but rather in a desire to cover a commercial product.

Microsoft cites *ResQNET.com, Inc. v. Lansa, Inc.*, 364 F.3d 1374, 1383 (Fed. Cir. 2003), for the well-settled proposition that "plurality" means "at least two," and proceeds to

argue that the reference to "said communication services" in the single graphical menu limitation requires an option for only two communication services to be displayed. (D.I. 163 at 30-31.) However, *ResQNET.com* also stands for the equally important proposition that the term "each" means "all" or "each (and every)," as consistently construed by the Federal Circuit and consistent with its ordinary meaning. *See ResQNET.com*, 364 F.3d at 1379. (*See also* Ex. 8 (*American Heritage Dictionary*) at 560 (defining "each" to mean "every").) Here, the antecedent basis for "each of said communication services" is the phrase "a computer-implemented control center for permitting a subscriber of a plurality of communication services" recited in the preamble. The claimed "single graphical menu for displaying said communication options *for each of said communication services*" must display the communication options "for each" of the plurality of communication services *to which the subscriber has subscribed*. Thus, the asserted claims require that the subscriber have a plurality of communication services, *each of which must be displayed* on the single menu, not, as Microsoft argues, at least two services of which a plurality must be displayed.

The fundamental flaw in Microsoft's argument is that it focuses solely on the word "plurality" and ignores the rest of the claim language. Although the claim requires the subscriber to have at least two communication services to meet the preamble limitation of a plurality of communication services, the single graphical menu limitation *additionally* requires that *the communication options* for *each communication service* to which the subscriber has subscribed (however many that may be) be displayed on the single graphical menu. (Ex. 1 ('064 Patent) at 8:39-42 and 18:32-18:34.) "Plurality" refers to the minimum required number of a subscriber's communication services, *i.e.*, at least two. If a subscriber has five communication services, "said plurality of communication services" would refer to those five communication

services. But the subsequent claim language requires each of those five services to be displayed on the single graphical menu at the same time (not a plurality of those five services, as Microsoft argues). Microsoft's construction substitutes "plurality" for "each" and thus impermissibly reads terms out of the claim.

In a similar vein, Microsoft argues that the claim language does not require the options for each of the communication services to be displayed simultaneously, because the preamble does "not specify whether each communication service must have a communication option or the number of communication options." (D.I. 163 at 30-31.) Microsoft concludes that this must mean that only one communication option for at least two of the subscriber's communication services is required. This reasoning is flawed.

The preamble describes the communication options for the subscriber's communication services as a set. The preamble recites "permitting a subscriber of a plurality of communication services of a unified messaging system to customize *communication options* pertaining to said plurality of communication services." (Ex. 1 ('064 Patent) at 18:23-25 (emphasis added).) *see also id.* 827:4-828:23.) The plural use of the recited "communication options" clearly does not refer to just *one* communication option, as Microsoft contends. Nor do the claims recite or suggest any subset of the communication options. The claims could have been drafted to recite "a communication option," "at least one communication option," "one or more communication options," or even "substantially all communication options," as Microsoft would now have the

Court believe.  But the inventor chose different words indicating that the subscriber has a set of communications services which include an associated set of communications options.

The only meaningful way to interpret this claim language consistent with normal English grammar and syntax is to require that the "communication options," regardless of number, for *each* "communication service," be denoted by "said communication options."  *See In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983) (providing that claim terms are to be read according to the rules of ordinary English grammar).

As purported additional support for its argument that not all communication options must be displayed, Microsoft cites the following language from the preamble of claim 1 of the '064 Patent:  a "computer- implemented control center for permitting a subscriber . . . to customize communication options...through either a telephony-centric network using a telephone or a data-centric network using a display terminal." (D.I. 163 at 31 (citing Ex. 1 ('064 Patent) at 18:21-26).)  Microsoft contends "[t]his plain *claim language contemplates* that some options may be accessible via a telephone (*i.e.*, audibly), other communication options may be available via a display (*i.e.*, graphically displayed), and yet other communication options will be available via both a telephone and a display."  (D.I. 163 at 30 (emphasis added).)  As the specification makes clear, however, the claimed invention "allows a user to access, using either a telephone or a computer, *the communication options* associated with *the various communication services* of a unified messaging service."  (Ex. 1 ('064 Patent) at 5:66-6:2 (emphasis added).)  The plain language of these excerpts requires the ability of the subscriber to customize the communication options through the telephony server or through the graphical menu, but nowhere suggests that some options are available only through the telephony server while others are available only through the graphical menu.  Microsoft's construction thus reads

out the limitations that define the claimed invention in an attempt to make the bounds of the claims more flexible. *But see Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004) ("Courts construe claim terms in order to assign a fixed, unambiguous, legally operative meaning to the claim.") (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

Finally, as discussed below, the single graphical menu limitation was added to overcome a prior art rejection. In asserting that the single graphical menu limitation should be construed to mean "a single graphical menu for displaying at least a first communications service and option and a second communication service and option at the same time," Microsoft impermissibly seeks to recapture claim scope that was expressly disavowed.

### b.    The Prosecution History Confirms ALE's Construction

#### (1)    The Applicants Added the Single Graphical Menu Limitation In Response to Prior Art Rejections and Attempted to Distinguish from the Prior Art by Arguing that the Present Invention Did Not Require Multiple Screens to Display Options

Microsoft's opening brief avoids any substantive discussion of the O'Neal Patents' prosecution history. There is no way to reconcile Microsoft's proposed construction with the clear disavowal of scope in the prosecution history. In response to the Examiner's rejection, the applicants amended claim 1, adding the "single graphical menu" limitation to distinguish the Pepe Patent. (Ex. 10 ('064 Patent Prosecution History) at 993-94.) The applicants argued that, unlike Pepe, the claimed single graphical menu shows the subscriber's options for each of the communication services on a single screen at the same time:

> In contrast to Pepe, independent claims 1 and 20 of the present application require a **single graphical menu** that is arranged to display the communication options for each of the communication services at the same time. *That is, the communication options for each of the communication services are simultaneously displayed on a computer*

*terminal when the subscriber employs the display terminal to access the computer-implemented control center through a data-centric network.* . . Claims 1 and 20 have been amended to better clarify this aspect of the invention.

While Pepe may disclose the use of control options and subscriber profiles, *Pepe does not contemplate a single graphical menu where only one view is used to display the communication options. Rather, in Pepe, the subscriber must go through a plurality of views independently, wherein the options are displayed at different times* (See, Col. 34, Line 10- Col. 36, Line 51 and Figures 28-45). In order to access all of the screens in Pepe, a subscriber must traverse through at least 18 screens as shown in Figures 28-45. *In contrast, the present invention does not have to access multiple screens to modify options.* In fact, the communications options, which are displayed on a single screen, may be modified as needed with a few keystrokes. Accordingly, it is respectfully submitted that a single graphical menu containing the communication options is neither disclosed nor reasonably suggested by Pepe et al.

(*Id.* at MSAL 01001 (bold italics emphasis added, bold only in original).)

By adding the single graphical menu limitation and arguing that, unlike the prior art, the claimed "single graphical menu" must "simultaneously" show the communication options for "each of" the communication services on a "single screen," the applicants confirmed the proper scope of the single graphical menu limitation and surrendered any coverage of a system that uses multiple menus to display the subscriber's communication options. *Sentry Protection Prods. v. Eagle Mfg. Co.*, 400 F.3d 910, 915 (Fed. Cir. 2005). Furthermore, by arguing that, unlike the prior art, their invention does not access multiple screens to modify options, the applicants *disavowed* coverage of systems such as the accused systems that use multiple screens to modify options. *See Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997) ("[B]y distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection"). Microsoft's construction, requiring only that the single graphical menu display one option for each of two services, regardless of how many options and services the subscriber has and

regardless of how many screens must be accessed to modify the options, impermissibly attempts to recapture the coverage the applicants surrendered during prosecution.

### (2)    The Later Added "Wherein Said Single Graphical Menu" Clause is a Distinct Limitation

Microsoft also argues that the "wherein said single graphical menu" clause of the claims defines the scope of the graphical menu and "requires only two communication services and [one] communication option associated with each service." (D.I. 163 at 32 (citing Ex. 1 ('064 Patent) at 18:39-58).) This argument is backwards. First, this clause undermines Microsoft's argument, as it shows the applicants were able to draft claim language specifying "a first communication option associated with said first communication service" and "a second communication option associated with said second communication service" when that was the intended scope. (Ex. 1 ('064 Patent) at 18:52-58.) Second, the prosecution history of the O'Neal Patents makes clear that the "wherein said single graphical menu" clause is a distinct limitation of the claims that does not change the plain and ordinary meaning of the disputed single graphical menu limitation. (*See* Ex. 10 ('064 Patent Prosecution History) at MSAL 1001 and 1159-60 (discussed below); *compare* Ex. 1 ('064 Patent) at 18:39-42 *with id.* at 18:52-58.)

Indeed, despite the above-discussed amendment to the claims requiring a single graphical menu for the communication options, the examiner *again* rejected claim 1 as obvious in light of the Pepe patent because using a single menu for the communication options was obvious, and the Schmitz patent disclosed a single menu.[2] (Ex. 10 ('064 Patent Prosecution History) at MSAL 1010-11.) In response, the applicants further amended claim 1 to require, *in addition to* the single graphical menu limitation, the limitations set forth in pending claims 23

---

[2]    The Examiner stated that "Schmitz teaches of an interactive menu program that displays all user options on one screen." (Ex. 10 ('064 Patent Prosecution History) at MSAL 1011.)

and 24, which depended from claim 1. (*Id.* at MSAL 997-98 and 1002.) These claims further required the single graphical menu for displaying the communications options for each of the communication services at the same time *also* be "comprised" of "at least a first display area ... and a second display area ..." (hereinafter "the display area limitation") and at least two communication services with an enable and disable option (hereinafter "the enable/disable limitation," which is a disputed term and is further discussed below in Section IV.A.3.).[3] (*Id.*)

Thus, when the applicants amended claim 1 to include the display area and the enable/disable limitations, those limitations did not replace the single graphical menu limitation; they were required by the examiner *in addition to* the single graphical menu limitation. (*Id.*) In short, as a result of *both* amendments, claim 1 requires a single graphical menu for displaying the communication options and services *and* two display areas *and* at least two of the communication services having an enable/disable option.

Microsoft's construction, however, conflates these distinct claim limitations, completely ignores the clear statements of disavowal in the prosecution history concerning the single graphical menu limitation, and argues that the single graphical menu limitation should be construed to mirror the *rejected* display area limitation of dependent claim 23. (*Id.* at MSAL 1159-60.)

---

[3]    The single graphical menu limitation is distinct from the display area and enable/disable limitations. Indeed, in their final response to the PTO, the applicants explicitly recognized the distinction between the single graphical menu limitation of claim 1 and the display area and enable/disable limitations of dependent claims 23 and 24, and that *all* were required in order to put claim 1 in condition for allowance. (Ex. 10 ('064 Patent Prosecution History) at MSAL 1159-60.)

| Microsoft's Proposed Construction | Rejected Claim 23 |
|---|---|
| A single graphical menu for displaying at least | Wherein said single graphical menu comprises at least: |
| a first communication service and an option and | A first display area for showing a first communication service and a first communication option … and |
| a second communication service and an option | A second display area for showing a second communication service, and a second communication option… |

Microsoft's conflation of distinct limitations is at odds with Federal Circuit precedent. *See Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007) ("An applicant's invocation of multiple grounds for distinguishing a prior art reference does not immunize each of them from being used to construe the claim language. Rather, as we have made clear, an applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well.") (citing *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998), and *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1477 n.* (Fed. Cir. 1998)). *See also Bass Pro Trademarks, L.L.C., v. Cabela's Inc.*, 485 F.3d 1364, 1368-69 (2007) (rejecting the patentee's argument, holding that the use of the term "comprising" did not allow the patentee to recapture what it surrendered during prosecution for its claimed "unique combination of vest and pivotable seat member" as stressed in the prosecution history, finding that the vest is also a material element of the claimed combination).

> (3)     **The Examiner's Reasons for Allowance Do Not Change the Meaning of the Single Graphical Menu Limitation**

Microsoft asserts that the only limitations to these claims are those expressly recited in the Examiner's Reasons for Allowance. (D.I. 163 at 35-36.) This is an incorrect

statement of the law.[4]  Microsoft's reliance on *Acco Brands, Inc. v. Micro Sec. Devices, Inc.* is misplaced.  In *Acco Brands*, the patentee amended claim 1 in view of a prior art rejection but did not make such amendments to the same wording in claim 10.  *Acco Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1078-79 (Fed. Cir. 2003).  Thereafter, during claim construction, the patentee argued that the Examiner's Reasons for Allowance, which did not specify particular claims, should not be used as a basis to limit claim 10.  *Id.*  The Federal Circuit rejected this argument because the patentee made no arguments for claim 10 that would suggest the patentee's arguments with respect to claim 1 did not apply to all the claims.  *Acco Brands* is factually distinct and has no application to this case.

Here, Microsoft points to the uncontroversial fact that the Examiner's Reasons for Allowance did not recite every limitation of all of the claims, along with all of the arguments made by the applicants with respect to every such claim limitation during the prosecution history.  Microsoft uses this purported omission to justify vitiating the single graphical menu limitation by conflating it with the distinct display area limitation and enable/disable limitation.  The reasons for allowance, however, do recite the claimed "single graphical menu" limitation.  Regardless, as in *Acco Brands*, not only is there no evidence in the prosecution history to support Microsoft's argument, but the prosecution history makes clear that Microsoft's construction was expressly disavowed.  (*See* Ex. 10 ('064 Patent Prosecution History) at MSAL 1165-67.)

Moreover, claims are not construed based on drawing inferences from an Examiner's silence.  *See DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1326 (Fed. Cir.

---

[4]    Microsoft also contends that one of ordinary skill in the art would infer from the Examiner's Reasons for Allowance that only the display of first and second communication options and services in the single graphical menu is required.  (D.I. 163 at 35-36.)  However, Microsoft cites no support for their assertion, and its technical expert, William H. Beckmann, offers no such opinion.

2001) ("Drawing inferences of the meaning of claim terms from an examiner's silence is not a proper basis on which to construe a patent claim ...."). And an Examiner's silence cannot and does not trump a clear statement of disavowal made by a patentee in the prosecution history. *See Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1124 (Fed. Cir. 2004) ("[I]t is the applicant, not the examiner, who must give up or disclaim subject matter that would otherwise fall within the scope of the claims.").

> **c.    The Specification of the O'Neal Patents Discloses a Full View Embodiment of the Single Graphical Menu Limitation Consistent With ALE's Construction**

The O'Neal Patents' specification shows an example of the claimed single graphical menu at Figure 4, which displays the communication options for each of the communication services at the same time. (*See* Ex. 1 ('064 Patent) at Fig. 4, 14:44-54.) The O'Neal Patents describe Figure 4 as showing a "*full view*" embodiment of the claimed graphical menu. (*Id.*)

Microsoft argues that certain options for the communication services are not shown on Figure 4, such as all the options for entering telephone numbers to route communications for the Follow Me and Paging services. Not only is this "attorney argument" incorrect (one need only look at Figure 4 to see that all options are displayed, not *one* option for at least two services), such unsupported attorney arguments have no probative value and should be disregarded. *See Enzo Biochem v. Gen-Probe, Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005) ("Attorney argument is no substitute for evidence.")

Indeed, the only supposed specification support cited in Microsoft's opening brief actually supports ALE's proposed construction.  Microsoft argues that the specification "clearly states that 'substantially all' communication options associated with 'various' communication services must be accessible via the single graphical menu." (D.I. 163 at 34).  The specification language reads quite differently, however.  The cited excerpt provides:

> the computer-implemented control center allows *the* communication options associated with *the various* communication services to be accessed substantially all at once.

(Ex. 1 ('064 Patent) at 6:2-13 (emphasis added).)  (D.I. 163 at 34-35.)  A plain reading of this phrase indicates that "substantially all" does not modify "communication options," as Microsoft would have the Court believe.  Moreover, it is obvious from the context that the words "the various" mean "the different" and not "some of the," as Microsoft argues.

Moreover, even if certain disclosed embodiments were not encompassed by ALE's construction (which is not the case), ALE's construction is still correct, because the properly construed claims need not encompass all disclosed embodiments as a subsequent prosecution history disclaimer (which is the case here, as discussed above) trumps prior description of preferred embodiments in the specification.[5]  *See, e.g., North Am. Container v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1345-46  (Fed. Cir. 2005); *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319 (Fed. Cir. 2002); *Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc.*, 214 F.3d 1302, 1308-09 (Fed. Cir. 2000).

---

[5] 



*See Phillips*, 415 F.3d at 1318 (reiterating that extrinsic evidence, such as inventor testimony, can be used "to explain how an invention works" and "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art").

**2.    The Telephony Server Must Audibly Represent the Same Communication Options as the Single Graphical Menu**

| Disputed Term | Microsoft's Proposed Construction | ALE's Proposed Construction |
|---|---|---|
| "telephony server being configured to audibly represent said communication options to said telephone when said subscriber employs said telephone to access said computer-implemented control center"<br><br>['064 Patent:  Claims 1, 3, 8, 9, 11, 20] | "Telephony server being configured to audibly represent said communication options pertaining to at least two communication services to a telephone when the subscriber employs said telephone to access the computer-implemented control center" | "a telephony server that represents the same communication options that are available through the single graphical menu" |
| "audibly representing said communication options to one of said telephones, using said telephony server, when said subscriber employs said one of said telephones to access said computer-implemented control center"<br><br>['357 Patent:  Claims 1, 6] | "Audibly representing communication options pertaining to at least two communication services to a telephone using said telephony server, when a subscriber employs the telephones to access the computer-implemented control center" | "audibly representing the same options available through the graphical menu to one of said telephones, using said telephony server, when said subscriber employs said one of said telephones to access said computer-implemented control center" |
| "an audible representation of said communication options capable of being provided to one of said telephones, using said telephony server, when said subscriber employs said one of said telephones to access said computer-implemented control center"[6]<br><br>['357 Patent:  Claim 17] | "an audible representation of communication options pertaining to at least two communication services capable of being provided to one of the telephones, using said telephony server, when a subscriber employs one of the telephones to access the computer-implemented control center" | "an audible representation of the same options available through the graphical menu to one of said telephones, using said telephony server, when said subscriber employs said one of said telephones to access said computer-implemented control center" |

(Ex. 5 (Joint Statement (D.I. 150)) at 4-5.)

---

[6]    All of these terms are discussed together unless stated otherwise.

**a.**    **The Plain Meaning of the Claim Language Requires The Same Communication Options on Both User Interfaces**

The telephony server limitation requires that the telephony server audibly represent the same communication options that are available through the single graphical menu. Microsoft's construction requires that the telephony server merely provide "some" of the options available via the single graphical menu, Microsoft admits, however, that "said" in a claim simply refers to an earlier use of the term in the claim (D.I. 163 at 30), and thus, logic and grammar dictate that the communication options identified in the preamble must be the same options displayed in the single graphical menu and the same options available via the telephony server. Microsoft's argument with respect to the telephony server limitation is based on the same flawed reasoning as its single graphical menu limitation argument – that the preamble does not refer to the subscribers' entire set of communication options.  (*Id.* at 37-38.)  As discussed above in Section IV.A.1.a. and in Defendants' opening brief, this is incorrect.  (D.I. 162 at 13-16 (addressing the support for Defendants' proposed construction in view of the plain claim language and the specification).

**b.**    **The Specification Requires the Same Communication Options on both User Interfaces**

Not only do the plain words of the claims support ALE's proposed construction, the specification also supports that construction.  Microsoft cannot point to any disclosed embodiment in which the communication options are different between the two interfaces. Although Microsoft *attempts* to identify one option disclosed in the specification, "the option to place a phone call," as disclosed as available to a user via the telephony server but not via the

graphical menu (D.I. 163 at 39 (citing Ex. 1 ('064 Patent) at 16:16-26, FIGs. 3 and 4)), Microsoft again misses the mark.  The disclosed embodiment provides that "[a]s one of the options, the subscriber may be given a choice (with proper authentication) to *use the unified messaging system* to originate an outgoing call." (Ex. 1 ('064 Patent) at 16:24-26 (emphasis added).)  The disclosed embodiment refers to such as being available through the unified messaging system, not just the telephony server, as even Microsoft admits.  (*See* D.I. 163 at 24-26 (arguing for a construction of the unified messaging system as not being limited to any specific communication device.)  There simply is no support in Microsoft's cited embodiment or elsewhere in the specification for the proposition that this option or any other option is only available via the telephony server or only available via the graphical menu.

### c.      Microsoft Mischaracterizes the Prosecution History

Microsoft argues that "the Examiner did not state that the telephony server had to audibly represent all of the communication options displayed on the single graphical menu; rather, his statement is consistent with Microsoft's construction that only some of the communication options of the computer-implemented control center need be audibly represented via the telephony server." (*Id.* at 40.)  This misrepresents the Examiner's stated Reasons for Allowance, which explicitly require:   "3) a telephony server that audibly represents *said communication options* to a telephone." (Ex. 10 ('064 Patent Prosecution History) at MSAL 1165 (emphasis added).)  The Examiner's statement does not support Microsoft's assertion that *only some of the communication options* of the computer-implemented control center need be audibly represented via the telephony server and certainly does not override the plain meaning of the term "said options" as the same options previously discussed earlier in the claim.  Regardless, as discussed above, silence in an Examiner's Reasons for Allowance is not a proper claim

construction methodology and does not and cannot alter the plain claim language and other intrinsic evidence.

### 3.     The Enable/Disable Option Limitation

| Disputed Term | Microsoft's Proposed Construction | ALE's Proposed Construction |
|---|---|---|
| "enable option for enabling or disabling the first communication service, and wherein the second communication option includes a second enable option for enabling or disabling the second communication service"<br><br>['064 Patent:  Claims 1, 3, 8, 9, 11; '357 Patent: Claims 1, 6, 17] | "Communication option that controls the extent to which a communication service is implemented" | "an option that allows a subscriber to turn on or off a communication service" |

(Ex. 5 (Joint Statement (D.I. 150)) at 4.)

Microsoft ignores the plain meaning of "enable" and "disable" and searches instead for language in the specification to confuse this issue.  Thus, in support of its argument that enable/disable does not mean on/off, Microsoft argues that "certain features of a service can continue to function even though other features have been disabled."  (D.I. 163 at 28-29 (citing Ex. 1 ('064 Patent) at 13:40-60).)  But how a subscriber enables or disables a service, whether through an ON or OFF button or entering numbers/text in a particular field, or otherwise, is immaterial to the proper construction of these terms.

The embodiment on which Microsoft relies proves this point.  The embodiment uses the words "enable" and "not enable" to describe "turning on" or "not turning on" certain communication options, two of which are communication services and one of which is a facsimile forward option within the facsimile receiving service.  The embodiment describes the

scenario in which the facsimile receiving option (service) is enabled, in which case the telephony server will detect and process an incoming facsimile. It also describes enabling the facsimile forward option, in which case the incoming detected facsimile will *also* be forwarded to the specified "forward to" facsimile number. The specification then indicates that if the facsimile receiving option (service) is not enabled and the call forwarding option (service) is enabled, all calls will be forwarded by "call forwarding" to the specified "call forwarding" device. In that scenario, an incoming fax would only be detected if the "call forwarding" device is a fax machine. This embodiment simply provides that facsimiles are detected and processed *if and only if* the facsimile receiving service option is enabled (denoted in 319 of Figure 4 as enabled by using "on" and "off" buttons). If the facsimile receiving service is not enabled (*i.e.*, the "off" button is activated) and the call forward service option is enabled, all calls are processed under the call forwarding service. Accordingly, this cited embodiment (and all of the others in the specification) uses the "enable" and "disable" terms consistently with the meaning proposed by ALE and lends no support to Microsoft's proposed construction. (D.I. 162 at 16-17.) (*See, e.g.,* Ex. 1 ('064 Patent) at 14:46-49 (referring to the "on-off settings" shown in FIG. 3, which contrary to Microsoft's assertion, clearly do correspond to the claimed enable/disable options in that disclosed embodiment).)

### 4. The Unified Messaging System Limitation

| Disputed Term | Microsoft's Proposed Construction | ALE's Proposed Construction |
| --- | --- | --- |
| "unified messaging system"<br><br>['064 Patent: Claims 1, 3, 8, 9, 11, 20; '357 Patent: Claims 1, 6, 17] | "System that allows messages of a data-centric network and a telephony-centric network to be received, stored, retrieved, and forwarded without regard to the communication devices or networks employed for the transmission of the messages (i.e., in a coordinated manner)" | "system that allows messages of a data-centric network and a telephony-centric network to be received, stored, retrieved, and forwarded to the communication devices or networks employed for the transmission of the messages" |

(Ex. 5 (Joint Statement (D.I. 150)) at 4.)

The Unified Messaging System limitation dispute reduces to Microsoft's insertion of "(i.e., in a coordinated manner)." Microsoft contends "in a coordinated manner" means "a unified message system's store is maintained so that a subscriber may retrieve messages using any one of the subscriber's communication devices . . . " (D.I. 163 at 25). Nowhere in the specification, however, is "unified messaging system" so limited. The specification refers to a unified messaging system as "integrating various communication services" stating "[w]ithin limits, a unified messaging system allows messages to be received, stored, retrieved, *and/or* forwarded . . . without regard to the communication devices and/or networks employed for the *transmission* of the messages." (Ex. 1 ('064 Patent) at 6:50-65.) Hence, under this definition, a unified messaging system might store or forward transmissions without regard to the devices (fax, phone or computer) that sent them. Nowhere is there a requirement that a unified messaging system permit the *retrieval* of all stored messages from any of the user's devices.

Because no intrinsic evidence supports Microsoft's construction, Microsoft is left to rely on *extrinsic* evidence to make its case.[7] (*See, e.g.,* D.I. 163 at 25-26 (discussing Cisco Systems presentations and its own technical expert's opinion).) *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("*Vitronics*") (in construing claims, a court should look to intrinsic evidence consisting of the language of the claims, the specification and the prosecution history as it "is the most significant source of the legally operative meaning of disputed claim language"). *See also Personalized Media Communications, LLC v. U.S. Int'l*

---

[7]    The only intrinsic evidence cited in Microsoft's opening brief (*see* D.I. 163 at 26 (citing Ex. 1 ('064 Patent) at 6:62-65)) unambiguously confirms ALE's proposed construction and was cited and discussed in Defendants' opening brief. (D.I. 162 at 18 (citing Ex. 1 ('064 Patent) at 6:49-6:65).)

*Trade Comm'n*, 161 F.3d 696, 706 (1998) ("Extrinsic evidence may not be relied upon during claim construction when the intrinsic evidence unambiguously defines the disputed claim language. ... Accordingly, because the meaning of the term 'digital detector' is unambiguously set forth in the specification, the expert testimony on this issue is irrelevant to the issue of indefiniteness and cannot serve to inject ambiguity where none exists.").

Microsoft presents extrinsic evidence to denigrate the use of POP vs. IMAP e-mail servers in unified messaging systems in a not so subtle attempt to avoid invalidating prior art that discloses the use of POP based unified messaging systems. This argument, however, is based on a fallacy, that POP e-mail server based systems do not allow for storing and retrieval of messages and are not suitable for unified messaging systems.[8] (*See* ALE's Motion for Summary Judgment of Non-Infringement and Invalidity of the O'Neal Patents (D.I. 157) at 20 (addressing this POP fallacy).) Microsoft's own expert in the ITC proceeding admitted that a POP e-mail server can be used to retrieve, receive, store and transmit" e-mails and can be used for unified messaging systems. (Ex. 9 (Chang ITC Hrg Tr.) at 1801:7-21, 1825:19-1827:2, 1852:9-1853:16, and 1856:22-1857:14; *see also id.* 1797:14-21 and 1849:24-1851:6.) (*See also* Ex. 12 (Hyde-Thomson ITC Hrg Tr.) at 1283:6-1284:11 (testifying that he has also built unified messaging systems using POP e-mail servers).) Moreover, nothing in the intrinsic evidence specifies the use of IMAP vs. POP e-mail servers. Rather, the specification states that the centralized communication interface of the claimed invention can be used with any unified messaging system. (Ex. 1 ('064 Patent) at 6:44-49 (emphasizing that "the present invention may be

---

[8]    Microsoft impermissibly seeks to import another extraneous requirement, requiring "multiple concurrent access." (*See* D.I. 163 at 26.) Microsoft cites to no intrinsic evidence to support this additional requirement, and there is none.

implemented on any unified messaging system").)  Accordingly, Microsoft's extrinsic evidence argument is off the mark.

**B.      Disputed Claim Constructions of the '289 Patent**

There are three claim construction issues with respect to the '289 Patent:  (1) whether "activity of a user computer" means determining whether such computer is "active or idle"; (2) whether information received at the computer network determines *when* to establish telephone communication; and (3) whether there is a distinction between the telephone network and the computer network.

**1.      "[M]onitoring the Activity of a User Computer" Means "Determining Whether a Called Party's Computer is Active or Idle"**

**a.      Defendants' Construction is Consistent with the Specification**

| Disputed Term | Microsoft's Proposed Construction | ALE's Proposed Construction |
|---|---|---|
| "monitoring activity of a user computer"<br><br>[Claims 1, 7] | *Phrase does not require construction.*<br><br>*If construction is required:*<br><br>"monitoring the status of a user computer" | "determining whether a called party's computer is active or idle" |

(Ex. 5 (Joint Statement (D.I. 150)) at 3.)

The '289 Patent purports to solve the problem that prior art systems allegedly lacked the ability to determine when a particular callee was actually available to take a call, forcing callers to place a call and hope the callee answered or to leave a message in an attempt to set up a time for a call.  (Ex. 3 ('289 Patent) at 1:33-38.)  The '289 Patent purports to solve this "problem" by monitoring the activity of a user's computer.  The idea is that when a user actively provides inputs to her computer (such as typing on a keyboard or moving the mouse), that is a

good indication that such user is physically near the phone and available to take a call. (*Id.* at 14:33-43.)  Mr. Chang, Microsoft's expert in the ITC proceeding, agreed that determining when a user is actually available to take a call is central to the problem the '289 Patent purports to solve. (*See* Ex. 9 (Chang ITC Hrg Tr.) at 960:10-962:1.)

The '289 Patent's specification unambiguously describes "activity of a user computer" as observing whether the user's computer is "active or idle." (*See* D.I. 162 at 21-24; *see also* Ex. 3 ('289 Patent) at Abstract, 2:15-18, 14:33-43, 14:50-15:11, 15:35-42, 15:56-59, 16:3-7, and 17:22-25.)  The ALJ in the ITC proceeding agreed. (*See* Ex. 6 (ALJ's Final Initial Determination (January 28, 2008)) at 31 (the '289 Patent "equates computer status to 'idle or active.'").)

### b.    Microsoft Presents No Support For Its Construction

Microsoft's initial position that construction is not required ignores recent Federal Circuit precedent holding that disputed claim terms must be construed.  *See O2 Micro Intl Ltd. v. Beyond Innovation Tech. Co., et al*, No. 07-1302, 2008 U.S. App. LEXIS 7053, at *18-27 (Fed. Cir. April 3, 2008).  Microsoft's fall-back position – that "activity" is broader than "active" and "idle" – is incorrect, as it relies on a mere two instances in which "*e.g.*" is used instead of "*i.e.*" to connect "idle or active" to "status." (*See* D.I. 163 at 20 (citing Ex. 3 ('289 Patent) at 16:18-19, 17:59-62).)  Microsoft has not pointed to and cannot point to any intrinsic evidence supporting its assertion that a user computer can be anything other than "idle or active" for purposes of the monitoring limitation of the '289 Patent.

Microsoft simply ignores the scores of places in the specification explicitly defining computer activity as the user's computer being active or idle. (*See, e.g.,* Ex. 6 (ALJ's Final Initial Determination (January 28, 2008)) at 34 (finding that there are no examples in the '289 Patent of any states other than "idle or active").)  Microsoft repackages its argument before

the ITC that "computer activity" and "user activity" are one and the same.[9]  The ALJ found that

the disputed limitation "explicitly refers to the activity of a user computer and not to the status or

activity of a user." (*See id.* at 28-29.)  As a result, Microsoft has now abandoned the purported

examples of "activity" other than "idle or active" that were unpersuasive in its unsuccessful ITC

briefing. (*See* Ex. 13 (Microsoft ITC Post-Hearing Br.) at 35; *see also* D.I. 162 at 24, n.8.)  In its

opening brief, Microsoft provides no example whatsoever of monitored user computer activity

other than "active" or "idle." (*See* D.I. 163 at 20.)  Nor could it, because the '289 Patent

specification consistently refers *only* to observing whether the user's computer is "active" or

"idle" in describing the "monitored activity a user computer." (*See, e.g.,* Ex. 3 ('289 Patent) at

Abstract, 2:15-18, 14:33-43, 14:50-15:11, 15:35-42, 15:56-59, 16:3-7, and 17:22-25.)

Tacking a new tack, Microsoft now suggests that "status of the computer" is

interchangeable with "computer activity" throughout the specification of the '289 Patent. (*See*

D.I. 163 at 19-20 (citing Ex. 3 ('289 Patent) at 2:15-18).)  Microsoft misses the mark here as

well.  The specification makes clear that the monitored "*activity* of the user computer" is binary

– "the callee computer 154 may be in an '*active' state (as opposed to the idle state*)." (Ex. 3

('289 Patent) at 14:58-60 (emphasis added).)  The '289 Patent further recites:

> The computer operating system . . . is capable of *monitoring user activity*
> *on the computer*.  For example, the operating system on the callee
> computer 154 can detect user activity on the keyboard 154*a* or the mouse
> 154*b*.  By *monitoring this activity*, the operating system can determine the
> user's status and activate certain software programs, such as a screen
> saver, when no user activity has been detected for a period of time.  Under
> these circumstances, the operating system may determine that the callee
> computer 154 has entered *an "idle" state*.

---

[9]    During the ITC hearing, Microsoft relied on specification language referring to the status
of the *user*, rather than the *user computer*, to find examples of "activity" beyond "active
or idle." (*See* Ex. 13 (Microsoft ITC Post-Hearing Br.) at 35; *see also* Ex. 9 (Chang ITC
Hrg Tr.) at 478:20-479:22.)

(*Id.* at 14:33-43 (emphasis added); *see also id.* at 14:50-53 ("The system 100 can *monitor computer activity* and generate signals to both the originating telephone 102 and the destination telephone 104 when the callee computer 154 and the caller computer 184 are not in the *idle* state.") (emphasis added).)

In addition, Microsoft's suggestion that "status" is interchangeable with "activity" begs the key question. The point is not whether the specification uses the word "status" in connection with its description of the user computer being "idle or active." Rather, the object of the monitoring – whether the claimed system is monitoring "activity" or "status" of the user computer – is to *determine whether the computer is idle or active* (*i.e.*, letting the system know whether the user is active on the computer and thus physically near the phone). *See Liquid Dynamics Corp.*, 355 F.3d at 1367 (claims are construed in order "to resolve disputes about claim terms and to assign a fixed, unambiguous, legally operative meaning to the claim") (citing *Vitronics*, 90 F.3d at 1582). The ALJ agreed. (*See* Ex. 6 (ALJ's Final Initial Determination (January 28, 2008)) at 32-33 ("[T]he issue at hand is not the construction of the lone word 'activity' but rather the construction of the claimed phrase 'monitoring activity *of a user computer*' which phrase contains the word 'activity.'") (emphasis added).)[10]

---

[10] Microsoft also cites col. 2:15-18 of the '289 Patent to suggest that it "further indicates" that "active" and "idle" are not the only possible statuses of the user's computer. (D.I. 163 at 19.) This misreads the quoted language, which provides: "the potential callee's computer activity may be monitored and *the status of the computer as active or idle* may be reported to the computer network." (Ex. 3 ('289 Patent) at 2:15-18 (emphasis added).) Even accepting Microsoft's claim that "activity" and "status" are interchangeable, this language does not suggest there are other possible states beyond "active" and "idle." Quite the opposite. This language states that the "activity" is monitored to determine whether the status of the user computer is "active *or* idle." No other possible status is suggested or implied in this language.

2.    Construction of "Receiving Information From the Telephone Network that a First Party From Whom a Call is Originating Desires to Establish Telephone Communication with a Second Party"

a.    Defendants' Construction is Consistent with the Specification

| Disputed Term | Microsoft's Proposed Construction | ALE's Proposed Construction |
|---|---|---|
| "at the computer network, receiving information from the telephone network that a first party from whom a call is originating desires to establish telephone communication with a second party"<br><br>[Claims 1, 7] | *Phrase does not require construction.*<br><br>*If construction is required:*<br><br>"receiving at the computer network information from the telephone network that a telephone call from a first party to a second party has been initiated" | "receiving at the computer network an indication from the telephone network that a first party requests to set up a telephone call with a second party prior to the time the call is placed by the first party" |

(Ex. 5 (Joint Statement (D.I. 150)) at 3.)

The '289 Patent requires that the computer network receive information, ***prior to any telephone call being placed***, that a party requests to set up a telephone call with the other party ***at a time*** when the other party is available. As claim 1 states: the system is a "method of determining ***when*** to establish telephone communication between two parties" which "us[es] the information processed at the computer network to facilitate connecting the call originated by the first party through the telephone network to the second party." (Ex. 3 ('289 Patent) at 18:40-41 and 62-65 (emphasis added).) If "receiving information" simply means "receiving a call" (as Microsoft argues), then it would be the caller, and not the claimed invention, that determines ***when*** to establish telephone communication. If the callee is available, then the call is connected because the caller happened to call at the right time. If the callee is unavailable, the caller is not connected and no call takes place. No call is facilitated by the claimed system under either scenario and the purpose of the invention is not achieved.

Hence, it is only by construing this limitation to mean that the computer network receives information **prior** to the telephone call whose connection is facilitated that the limitation is consistent with the purpose of the claimed invention. The '289 Patent is directed to the problem of avoiding the "undesirable activity" and "inefficien[cy]" of making "multiple calls" and "repeated or failed attempts to actually reach a callee." (*Id.* at 1:37-43.) Prior to the invention of the '289 Patent, the "caller ha[d] no choice but to place a call to the destination telephone and hope that the callee answer[ed]." (*Id.* at 1:33-35.) The '289 Patent purports to solve this "problem" by providing an apparatus and method for the caller to indicate to the system that he or she desires to talk to the called party and the system, using predetermined rules and monitored activity of the callee's computer, determines when the callee is actually available to take a call and sets up the call once both parties are available. (*Id.* at 2:18-26.) The '289 Patent recites:

> In step 252, the caller indicates a desire to establish a telephone communication link with the callee. ***In a conventional communication system, the caller picks up the originating telephone and dials the telephone number*** for the destination telephone 104. However, ***in accordance with this aspect of the system 100, the caller may indicate the desire to establish a telecommunication link using the caller computer 184 and placing the callee telephone number ... on a call list....***

(*Id.* at 16:23-33 (emphasis added); *see also id.* at 15:14-24 and 2:18-24.)

By requesting to set up a call when both parties are available, rather than placing a call without knowing whether the called party is available (thereby being left at the mercy of the unknown availability of the callee), the '289 Patent purports to avoid a waste of resources in the form of repeated messages and unsuccessful call attempts. (*Id.* at 2:58-3:9, 14:50-15.7, 15:13-24, and 15:35-46.) As a result, Defendants' construction is correct in view of the stated objective of the '289 Patent's specification. *See Energizer Holdings, Inc. v. ITC*, 2008 U.S. App. LEXIS

8593, at *43 (Fed. Cir. April 21, 2008) (when construing claims it is necessary "to reflect the purpose of the invention"); *Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1347 (Fed. Cir. 2004) ("[C]laims must be interpreted in light of the specification.").

Microsoft argues that Defendants' construction that a "…a first party requests to *set up* a telephone call with a second party" imports an extraneous limitation. (*See* D.I. 163 at 23.)  Microsoft is incorrect because the method described in the specification, along with the stated purpose of the invention, establishes that a party indicates a desire to set up (*i.e.*, initiate, establish, place, etc.) a call with a second party prior to such call being connected (facilitated). (*See* Ex. 3 ('289 Patent) at 18:40-41 ("a method of determining *when to establish* telephone communication between two parties…") (emphasis added), 18:45-47 ("… a first party from whom a call is originating *desires to establish* telephone communication with a second party") (emphasis added).)  The term "set up" merely *construes* the language of this limitation; it does *not* import an extraneous limitation.

### b.    Microsoft's Construction Finds No Support in the Specification and Belies the Stated Purpose of the '289 Patent

Although Microsoft again proposes that no construction is needed for this limitation (despite recent Federal Circuit precedent (*see O2 Micro Intl*, 2008 U.S. App. LEXIS 7053, at *18-27)), Microsoft's fall-back position ignores the plain language of the claim by rewriting "desires to establish telephone communication" to "has been initiated" and disregards the teaching of the specification underscoring that the entire purpose of the claimed invention is to eliminate the need to place calls in the hope that a called party will be available.

The '439 and '289 Patents share identical specifications – except that the '289 Patent contains additional specification language describing the unique "monitored activity of the user computer" aspect of that invention.  In support of its proposed construction, however,

Microsoft relies exclusively on discussion in the specification that describes what is claimed in the '439 Patent – processing calls based on certain user-selectable criteria. (*See* D.I. 163 at 22-23 (citing Ex. 3 ('289 Patent) at 5:7-14, 12:11-50 and Fig. 8); *see also* Ex. 4 ('439 Patent) at 4:66-5:6, 12:6-45 and Fig. 8 (all same).)   Microsoft ignores the '289 Patent specification's subsequent description of routing calls according to "monitoring activity of the user computer" to determine when a party is available. (*See* Ex. 3 ('289 Patent) at 14:7-10 ("The system 100 has been previously described with respect to callee status monitoring and processing of incoming calls in accordance with the user-selected (i.e., the callee-selected) call processing criteria."), 14:1-7 ("In addition to filtering incoming calls to the destination telephone 104, the system 100 can monitor the status or activity of both the caller and the callee and establish a communication link … when … both the caller and callee are available for a telephone conversation.").)   In describing the '289 Patent's method, the specification further states:

> In operation, ***the system allows a caller to indicate a desire to establish a telephone communication link with a specified callee***. The caller can use the originating telephone 102 or the caller computer 184 to initiate the call processing by the system 100. The system 100 monitors the caller and callee activities and call processing rules and, ***when appropriate for both parties, establishes a telephone communication link by sending signals*** from the central office switch 116 ***to the originating telephone to generate a ring signal***. The central office switch 116 ***also generates appropriate signals to generate ring signal at the destination telephone*** 104.

(*Id.* at 15:14-24 (emphasis added); *see also id.* at 2:18-24 ("***The caller indicates a desire to establish a communication link with the callee***….The call processing criteria for both the caller and callee are analyzed and when all conditions are met, a telephone communication link is established….") (emphasis added).)  This description of the '289 Patent's claimed method undermines Microsoft's construction.

Furthermore, the '289 Patent is directed to the problem of avoiding the caller having "no choice but to place a call to the destination telephone and hope that the callee answers" because the prior art systems were incapable of determining *when* a particular callee was actually available to take a call. (*Id.* at 1:31-35.) Indeed, Defendants' construction is confirmed by the system's generating ring tones to each party ***only when*** both parties are available to take a call. (*Id.* at 15:14-24, Fig. 9.) This is the method by which the claimed invention avoids needless and wasteful telephone calls. Placing a telephone call to determine *whether* the other party is available to take a call, as Microsoft's construction requires, would undercut the entire stated purpose of the invention – to avoid such needless and wasteful calls when a party is unavailable to take a call. *See Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societá Per Azion*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.")).

### 3.     Constructions of "Telephone Network" and "Computer Network"

Section IV.C.2 below is incorporated herein with respect to the claim limitations "telephone network" and "computer network" in the '289 Patent.

### C.     Disputed Claim Constructions of the '439 Patent

The parties have narrowed the claim construction disputes with respect to the '439 Patent to two issues. The first is whether filtering the incoming call "according to current activity of the user on the computer network" requires filtering based on user presence on the network (such as logged on) or, alternatively, requires filtering based on conditional rules stored on the user's computer, such as time of day, that are independent of and have no connection to the user's activity on the computer network. The second issue concerns the distinction between the "telephone network" and the "computer network."

1.    **"Current Activity of the User on the Computer Network" Construction**

| Disputed Term | Microsoft's Proposed Construction | ALE's Proposed Construction |
|---|---|---|
| "current activity of subscribers on the computer network or according to current activity of the user on the computer network"<br><br>[Claims 1, 21, 28, and 38] | "current status of subscribers on the computer network or according to current status of the user on the computer network" | "whether the calling party is present on the computer network or the called party is present on the computer network" |

(Ex. 5 (Joint Statement (D.I. 150)) at 2.)

Instead of construing the language of the claim, Microsoft *rewrites* the claim by replacing "activity" with "status" to try to cover what Microsoft argues are "two disclosed embodiments" from the specification – conditional status stored on the computer network and dynamic activity on the computer network. (D.I. 163 at 15.) That approach, however, stands the claim construction process on its head (and was rejected by the Commission in the related ITC action). (Ex. 7 (Commission Decision (June 6, 2008)) at 7-16.) Claim construction starts with the claim language and construes that language in light of the specification. *Vitronics*, 90 F.3d at 1582. It does not start with the specification then construe the language to cover the specification. *Id.*

There is no requirement that all claims of a patent cover all of the disclosed embodiments. *See PSN Illinois v. Ivoclar Vivadent*, No. 2007-1512, 2008 WL 1946550, at *5 (Fed. Cir. 2008) (holding that "courts must recognize that disclosed embodiments may be within the scope of other allowed but unasserted claims. Likewise, during prosecution, an applicant may have cancelled pending claims but not amended the specification to delete disclosure relevant only to the cancelled claims.") Here, Microsoft attempts to import "two disclosed

embodiments" from the specification into its construction of a limitation that was added during the prosecution of the '439 Patent in order to write the added limitation out of the claims.[11]

          **a.**        **The "User's Dynamic Activity on a Computer Network" is Vague and Does Not Provide Any Meaning to the Disputed Term**

The first "disclosed embodiment" that Microsoft uses to support its construction is "one based on the user's dynamic activity on a computer network." (D.I. 163 at 15.) It is not completely clear what type of activity Microsoft includes in the "user's dynamic activity on a computer network." Given the quotes that Microsoft uses from the '439 specification, it appears to be claiming that logging onto the Internet satisfies the "current activity of the user on the computer network" limitation. (*See id.* at 17 ("The monitoring of this activity can also occur in reverse, with others being able to detect the user's Internet activity as soon as he accesses the Internet using his computer.").) If "activity" under the first embodiment is simply logging onto the network and establishing presence on the computer network, then such activity is more clearly described in ALE's proposed construction: "whether the calling party is present on the computer network or the called party is present on the computer network." Microsoft's construction using "status" has the additional problem of claiming descriptions from the '439 Patent specification that were explicitly disclaimed during the prosecution of the '439 Patent.

          **b.**        **The "User's Conditional Activity on the Computer Network" is Not a Disclosed Embodiment, and was Expressly Disclaimed During the Prosecution of the '439 Patent**

The second "disclosed embodiment" that Microsoft argues is covered by "status" in its construction is filtering calls based on "various 'conditional statuses, 'such as the time of

---

[11]    Microsoft's attempt to import the "two disclosed embodiments" from the specification into the asserted claims was specifically rejected by the U.S. International Trade Commission in the related ITC matter. (Ex. 7 (Commission Decision (June 6, 2008)) at 7-16.)

day, current availability of the user, work status, or the like.'" (D.I. 163 at 17.) As explained in Defendants' opening brief, these "conditional statuses," are disclosed in the prior art Brennan patent, which the examiner used to reject the original claims of the '439 Patent application. (D.I. 162 at 33-35.) The limitation being construed was added by the applicant to overcome the rejection of the pending claims in light of the Brennan prior art patent.

Microsoft again attempts to rewrite the claim language by construing it to cover embodiments that were surrendered during prosecution. Microsoft states that the '439 Patent discloses "conditional status" with two types of rules: (1) "[f]iltering based on dynamic alternation of affiliation list based on time of day" and (2) "[c]onditional blocking, or do-not-disturb, based on status of individual callers." (D.I. 163 at 17-18.) But, the language to be construed is "current activity of the user on the computer network." None of these "conditional status" rules noted by Microsoft have anything to do with the current *activity of the user on the computer network*. Rather, they are conditioned upon (1) time of day and (2) the identity of the caller. The Commission in the related ITC action recognized this logical break in rejecting Microsoft's proposed construction in that action. (*See* Ex. 7 (Commission Decision (June 6, 2008)) at 11-12.)

It is irrelevant that the specification may devote more discussion to the "conditional statuses" criteria than it does to the description of monitoring the current activity of the user on the computer network. The claims of a patent are not required to cover all embodiments described in a specification. *See, e.g., Rheox*, 276 F.3d at 1327; *PSN Illinois*, 2008 WL 1946550, at *5. In fact, they often will not. *Rheox*, 276 F.3d at 1327. The process of obtaining a patent dictates such a result. An applicant files an application that includes a specification and a set of original claims. Seldom will this original set of claims be granted.

Instead, the normal process is for the PTO to reject the claims and for the applicant to add limitations in order to distinguish the pending claims from prior art cited by the examiner. It is for this reason that the Federal Circuit has repeatedly stated that the prosecution history must be consulted to see what the applicant originally claimed and what the applicant gave up to get the claims allowed. *See, e.g., Lemelson v. General Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1992).

The surrender of coverage sought by the original claims during prosecution is exactly what happened with the '439 Patent application. (D.I. 162 at 32-35; *see also* Ex. 7 (Commission Decision (June 6, 2008)) at 11-12.) The applicant originally sought claims that simply required "user-selectable criteria." (*Id.* at 33.) These original claims would have permitted, *but not required*, criteria used to filter calls based upon the current activity of the user on the computer network. These claims were not allowed, however. (*Id.*) Instead, the claims were amended to explicitly require the presence of a very specific type of user-selectable criteria used to filter calls – one that filtered calls "according to the current activity of the user on the computer network." (*Id.*) To meet this limitation of the claims, a system *may* have all of the call processing rules identified by Microsoft. But the system *must* have at least one user-selectable criterion that processes calls "according to current activity of the user on the computer network." (Ex. 4 ('439 Patent) at 14:18-26.) Microsoft's construction would eliminate this express requirement.

Microsoft argues that its construction must be correct because a construction that does not cover a preferred embodiment is rarely correct. (D.I. 163 at 18 (citing *Sandisk v. Memorex Products, Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005).) As the Federal Circuit held in *Rheox*, the preferred embodiment guideline is overcome where the prosecution history shows that the applicants excluded some, but not all, of the preferred embodiments described in the

specification. *Rheox*, 276 F.3d at 1327. This case falls squarely within the Federal Circuit's directive in *Rheox* because the correct construction excludes only those embodiments surrendered to overcome the prior art. *Id.* Specifically, a system that processes incoming calls based only upon conditional status (such as time of day), but that does not include criteria for processing calls according to the current activity of the user on the computer network, is outside the scope of the claims of the '439 Patent and was explicitly disclaimed during prosecution. But, such a system is exactly what Microsoft seeks to recapture.

### 2. "Telephone Network" and "Computer Network" Constructions

| Disputed Term | Microsoft's Proposed Construction | ALE's Proposed Construction |
|---|---|---|
| "telephone network" [Claims 1, 21, 28, 38] | "network for carrying telephony information" | "network for carrying telephony information originated by telephones" |
| "computer network" [Claims 1, 21, 28, 38] | "network for carrying digital data" | "network for carrying digital data originated by computers" |

(Ex. 5 (Joint Statement (D.I. 150)) at 2.)

### a. The Asserted Claims Require a "Telephone Network" That is Distinct From the "Computer Network"

The parties agree that the terms "telephone network" and "computer network" are defined by the type of information that is carried on the network. The "originated by telephones" and "originated by computers" language keeps the proposed constructions consistent with the intrinsic evidence in the '439 Patent. Microsoft's proposed construction, on the other hand, renders the scope of the patent ambiguous and indefinite by blurring the distinction between the telephone network and the computer network. As disclosed in the '439 Patent (and as admitted by Microsoft), however, the "telephone network" is logically distinct from the "computer

35

network." Therefore, although the two networks may share some of the same physical infrastructure, information must either be on the "telephone network" *or* the "computer network." As explained in Defendants' opening brief, the consequence of Microsoft's construction is that all digital telephony information would be simultaneously on the "telephone network" **and** the "computer network." (D.I. 162 at 27.) This consequence was specifically rejected by the Commission in the related ITC matter. (Ex. 7 (Commission Decision (June 6, 2008)) at 12-13.) Citing testimony from both Microsoft and ALE experts, the Commission concluded that "a phone call over a traditional computer network (*e.g.*, LAN) is considered a telephone call on a telephone network based on the data that is carried." (*Id.* at 13.)

Microsoft's construction is inconsistent with the claim language and the specification of the '439 Patent. Asserted claims 28 and 38, for example, specifically recite two different types of networks, requiring "a computer network that is independent of the telephone network." (Ex. 4 ('439 Patent) at 16:64-65, 18:9-10.) Asserted claims 1 and 21 require a "computer network access port" such that the telephone network has access to the user-selectable criteria stored on the computer network. (*Id.* at 14:27-30, 16:12-15.)

The specification of the '439 Patent confirms that these two networks are distinct and use specific protocols for transmitting information. The '439 Patent explains that the "specific telecommunications protocol used to establish a telephone communication link between the originating telephone 102 and the destination telephone 104 is well known in the art." (*Id.* at 5:14-17; *see also* Ex. 3 ('289 Patent) at 5:21-24.) Likewise, the patent explains that "the Internet is a vast multi-computer network coupled together by data links having various communication speeds. Although the Internet 134 may use a variety of different communication protocols, a well-

known communication protocol used by the Internet is a Transmission Control Protocol/Internet Protocol (TCP/IP)." (Ex. 4 ('439 Patent) at 5:30-34; *see also* Ex. 3 ('289 Patent) at 5:37-40.)

The '439 Patent further explains that because the telephone network and computer network are distinct networks that use different protocols, "[t]he system 100 includes a communication interface to translate data between the two communication protocols." (Ex. 4 ('439 Patent) at 5:40-42; *see also* Ex. 3 ('289 Patent) at 4:47-49.) The use of a communication interface between the telephone network and computer network only makes sense if these two networks are distinct and separate, each using a different protocol.

Microsoft admits that there is at least a logical distinction between the telephone network and the computer network as disclosed in the '439 Patent. (*See* D.I. 163 at 13 ("Even though the telephone and computer networks came to share the physical lines ... both networks nonetheless remained logically and functionally separate, and continued using their independently-developed protocols and technology platforms.").) Microsoft explains that "voice and data" using "telephonic protocols" does not "easily cross over the computer networks" and that this "inability of the telephone networks and computer networks to operate well together is an issue addressed in the patents in suit." (*Id.* at 3.) Microsoft claims that the purpose of the '439 Patent was to "mediate" between the two networks.

> **b.    Microsoft's Proposed Construction Fails to Distinguish Between the "Computer Network" and the "Telephone Network"**

The parties have agreed that the networks are distinguished by the type of information they carry. Microsoft's application of the construction, however, underscores an ambiguity in the agreed portion of the construction that requires clarification, as it affects claim scope. Microsoft identifies the soft phone in the accused system as the user telephone coupled ***to the telephone network*** required by the '439 Patent. (Ex. 14 (Beckmann Dep. Tr.) at 150:22-

151:6.)  Microsoft also identifies the soft phone as the user activity *on the computer network* required by the '439 Patent.  (*Id.* at 158:22-159:23.)  Consider a single packet containing Voice over Internet Protocol (VoIP) information originating from a VoIP soft phone.  Under Microsoft's proposed construction and application of the claim limitation, the VoIP information would be considered "telephony information" as well as "digital data" and would thus simultaneously be on both the telephone network and the computer network.[12]  (*See id.* at 168:24-170:21.)  This is inconsistent with the '439 Patent's claim language and specification, which require that the two networks be distinct.  If the VoIP packet of information is simultaneously telephone data on the telephone network and computer data on the computer network, there would be no distinction between the networks.

      **c.**       **ALE's Expert's Testimony is Consistent With ALE's Construction**



---

[12]    In the related ITC matter, the Commission found that a VoIP soft phone call is activity *on the telephone network*, not the computer network:

> Therefore, a phone call over a traditional computer network (*e.g.*, LAN) is considered a telephone call on a telephone network based on the data that is carried.  Similarly, a VoIP phone call constitutes activity on the telephone network.  Given the narrow claim construction that the prosecution history requires and the constructions of "telephone network" and "computer network" agreed upon by the parties' experts, we determine that the proper claim construction of "current activity of the user on the computer network" cannot include "engaged in a VoIP phone call."

(Ex. 7 (Commission Decision (June 6, 2008)) at 13.)



## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants ALE and Genesys respectfully request that the Court adopt Defendants' claim constructions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Defendants*
*Alcatel-Lucent Enterprise and*
*Genesys Telecommunications Laboratories, Inc.*

39

*Of Counsel*:

Steven C. Cherny
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY  10022-4834
(212) 906-1200

David A. Nelson
LATHAM & WATKINS LLP
233 South Wacker Drive
Suite 5800
Chicago IL 60606
(312) 876-7700

Date:   June 25, 2008

2380955

<u>CERTIFICATE OF SERVICE</u>

I, Maryellen Noreika, hereby certify that on July 1, 2008 I electronically filed the foregoing document, which will send notification of such filing(s) to the following:

Thomas L. Halkowski, Esquire
FISH & RICHARDSON P.C.

I also certify that copies were caused to be served on July 1, 2008 upon the following in the manner indicated:

**BY ELECTRONIC MAIL**

Thomas L. Halkowski, Esquire
FISH & RICHARDSON P.C..
919 N. Market Street
Suite 1100
Wilmington, DE  19801

Ruffin B. Cordell, Esquire
Linda Liu Kordziel, Esquire
FISH & RICHARDSON P.C.
1425 K. Street, N.W.
11th Floor
Washington, DC 20005

John E. Gartman, Esquire
FISH & RICHARDSON P.C.
12390 EL Camino Real
San Diego, CA  92130

*/s/ Maryellen Noreika*
_____
Maryellen Noreika (#3208)