**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

MICROSOFT CORPORATION,
      Plaintiff,

v.

ALCATEL-LUCENT ENTERPRISE
and
GENESYS
TELECOMMUNICATIONS
LABORATORIES, INC.,
      Defendants.

C.A. No. 07-090-SLR

**PUBLIC VERSION**

## MICROSOFT'S RESPONSE TO
## DEFENDANTS' BRIEF ON CLAIM CONSTRUCTION

**FISH & RICHARDSON P.C.**
Thomas L. Halkowski (#4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
Fax: (302) 652-0607

John E. Gartman
12390 El Camino Real
San Diego, CA 92130

Ruffin B. Cordell
Linda Liu Kordziel
Indranil Mukerji
William Sekyi
Kfir Levy
Kori Anne Bagrowski
Robert P. Courtney
1425 K Street N.W., Suite 1100
Washington D.C. 20005

**ATTORNEYS FOR PLAINTIFF**
**MICROSOFT CORPORATION**

REDACTED DATE: July 2, 2008
ORIGINAL DATE: June 25, 2008

# TABLE OF CONTENTS

**Page**

I.     NATURE AND STAGE OF THE PROCEEDING.................................................. 1

II.    SUMMARY OF THE ARGUMENT ................................................................... 1

III.   THE PROPER CONSTRUCTION OF THE '439 AND
       '289 PATENTS.......................................................................................... 2

       A.    "telephone network" and "computer network" ('439 and
             '289 Patents) ................................................................................ 2

             1.    Defendants rhetoric mischaracterize the terms'
                   scope and relationship.............................................................3

             2.    The patents reject any notion that telephone and
                   computer networks include only data "originated
                   by" specific devices. ..............................................................4

       B.    "current activity of subscribers on the computer network or
             according to current activity of the user on the computer
             network" ('439 Patent)...................................................................... 5

             1.    ALE's Construction is Counter to the Plain
                   Meaning of "Current Activity" ...............................................5

                   a.    "Presence" is Not "Activity" ........................................5

                   b.    "Presence" is Not "Current Activity" ............................7

             2.    Microsoft's Construction is Supported by the
                   Intrinsic Evidence ..................................................................8

                   a.    Microsoft's Proposed Construction is Consistent With the
                         Prosecution History........................................................9

                   b.    Microsoft's Proposed Construction Gives Full Effect to the Claim
                         Term ...........................................................................10

             3.    The ITC Commission Opinion is Based on Factual
                   and Legal Errors...................................................................11

                   a.    Activity on the Computer Network is Not Required to be Exclusive
                         of Activity on the Telephone Network ..........................11

                   b.    VoIP Softphone Calls are Not Excluded by the '439 Patent .........12

       C.    "monitoring activity of a user computer" ('289 Patent) ....................... 14

i

## TABLE OF CONTENTS (cont'd)

|  |  |  | Page |
|---|---|---|---|
| | 1. | Defendants' proposed "active/idle" construction is overly narrow | 14 |
| | 2. | Defendants' "physical proximity" argument has no basis in the specification. | 16 |
| | 3. | If explicit construction is required, Microsoft's proposal should be adopted. | 17 |
| D. | | "at the computer network, receiving information from the telephone network that a first party from whom a call is originating desires to establish telephone communication with a second party" | 18 |
| | 1. | Defendants' "prior to the call" limitation has no foundation in the claim text. | 18 |
| | 2. | Defendants' "prior to the call" limitation would read out preferred embodiments of the invention. | 19 |
| | 3. | The "prior to the call" limitation does not become part of the claims simply by statements of the invention's "purpose." | 22 |
| | 4. | If construction is required, Microsoft's proposal should be adopted. | 24 |
| IV. | | THE PROPER CONSTRUCTION OF THE '064 AND '357 PATENTS | 25 |
| | A. | "communication options" | 25 |
| | B. | "unified messaging system" | 25 |
| | C. | "[first/second] enable option for enabling or disabling the [first/second] communication service" | 26 |
| | D. | "a single graphical menu for displaying said communication options for each of said communication services at the same time" | 27 |
| | 1. | The Plain Language of the Claims Supports Microsoft's Proposed Construction | 29 |
| | 2. | The Patent Specification Supports Microsoft's Proposed Construction | 33 |
| | 3. | The Prosecution History Supports Microsoft's Proposed Construction | 34 |

## TABLE OF CONTENTS (cont'd)

|  |  | | **Page** |
|---|---|---|---|
| | 4. | The Extrinsic Evidence Supports Microsoft's Proposed Construction | 35 |
| E. | | "telephony server being configured to audibly represent said communication options . . ." | 36 |
| | 1. | The Plain Language of the Claims Supports Microsoft's Proposed Construction | 37 |
| | 2. | The Patent Specification Supports Microsoft's Proposed Construction | 38 |
| V. | CONCLUSION | | 40 |

## TABLE OF AUTHORITIES

**Page**

**Federal Cases**

Abbott Labs. v. Syntron Bioresearch, Inc.
    334 F.3d 1343 (Fed. Cir. 2003)................................................................... 15

Autogiro Co. of Am. v. United States
    384 F.2d 391 (Ct. Cl. 1967) ...................................................................... 7

Bicon, Inc. v. Straumann Co.,
    441 F.3d 945 (Fed. Cir. 2006)............................................................ 32, 35

Certain Unified Commc'n Sys.
    Inv. No. 337-TA-598, 2008 WL 317757 (USITC Jan. 28, 2008)................................ 3, 25

Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.
    424 F.3d 1293 (Fed. Cir. 2005)............................................................ 17

Dayco Prods., Inc. v. Total Containment, Inc.
    329 F.3d 1358 (Fed. Cir. 2003)............................................................. 7

E-Pass Techs., Inc. v. 3Com Corp.
    343 F.3d 1364 (Fed. Cir. 2003) (emphasis added). ..................................... 22, 23

Gillette Co. v. Energizer Holdings, Inc.
    405 F.3d 1367 (Fed. Cir. 2005)........................................................... 37

Katz v. AT&T Corp.
    63 F. Supp. 2d 583 (E. D. Pa. 1999) ...................................................... 14

Liebel-Flarsheim Co. v. Medrad, Inc.
    358 F.3d 898 (Fed. Cir. 2004)............................................................. 13

McCarty v. Lehigh Valley R.R.
    160 U.S. 110 (1895)...................................................................... 18

Microsoft Corp. v. Multi-Tech Sys., Inc.
    357 F.3d 1340 (Fed. Cir. 2004)........................................................... 24

NessCap Co. v. Maxwell Techs., Inc.
    2007 U.S. Dist. LEXIS 89450, at *19 (S.D. Cal. Dec. 5, 2007)........................... 11

NTP, Inc. v. Research in Motion, Ltd.
    418 F.3d 1282 (Fed. Cir. 2005)........................................................... 18

O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co. Ltd.
    521 F.3d 1351 (Fed. Cir. 2008)........................................................... 24

## TABLE OF AUTHORITIES

**Page**

Pfizer, Inc. v. Teva Pharms. USA, Inc.
  429 F.3d 1364 (Fed. Cir. 2005)............................................................................ 15

Phillips v. AWH Corp.
  415 F.3d 1303 (Fed. Cir. 2005) (en banc).......................................... 18, 22, 24

Renishaw PLC v. Marposs Societa' per Azioni
  158 F.3d 1243 (Fed. Cir. 1998)............................................................................ 18

Sandisk v. Memorex Products, Inc.,
  415 F.3d 1278 (Fed. Cir. 2005)............................................................................ 33

SRI Int'l v. Matsushita Elec. Corp. of Am.
  775 F.2d 1107 (Fed. Cir. 1985)................................................................ 16, 17, 23

Texas Instruments Inc. v. Int'l Trade Comm'n
  988 F.2d 1165 (Fed. Cir. 1993).............................................................................. 7

Ventana Med. Sys., Inc. v. BioGenex Labs., Inc.
  473 F.3d 1173 (Fed. Cir. 2006)...................................................................... 21, 22

Vitronics Corp. v. Conceptronic, Inc.
  90 F.3d 1576 (Fed. Cir. 1996).................................................................. 20, 21, 36

Wald v. Mudhopper Oilfield Servs.
  2006 U.S. Dist. LEXIS 51666, at *16 (W.D. Okla. July 27, 2006).................................. 11

**Cases**

Merriam-Webster, Ninth New Collegiate Dictionary 1168 (1991) .............................................. 27

## I.    NATURE AND STAGE OF THE PROCEEDING

Plaintiff Microsoft Corporation ("Microsoft") hereby submits its responsive claim construction brief regarding disputed terms from the claims of U.S. Patent Nos. 6,421,439 ("the '439 patent"), 6,430,289 ("the '289 patent"), 6,263,064 ("the '064 patent") and 6,728,357 ("the '357 patent") asserted by Microsoft against Defendants Alcatel-Lucent Enterprise ("ALE") and Genesys Telecommunications Laboratories, Inc. ("Genesys").[1]

## II.    SUMMARY OF THE ARGUMENT

As discussed in Microsoft's opening claim construction brief, Microsoft's proposed constructions are consistent with and supported by the intrinsic evidence and thus, should be adopted by the Court. This brief sets forth Microsoft's rebuttal to the points raised by Defendants regarding the construction of the disputed terms.

With respect to the Liffick patents ('439 and '289 patents), the terms "telephone network" and "computer network" are properly defined by the information carried over those networks. Defendants improperly seek to import limitations into those terms by requiring the information to be originated by a particular source. Neither the ordinary meanings of those terms nor the patents-at-issue require the telephone and computer networks to be limited in such a manner. Next, Defendants seek to rewrite the Liffick patent claims by construing the term "activity" as "presence" in the '439 patent and as "active or idle" in the '289 patent. Both constructions are contrary to the plain and ordinary meaning of the word "activity." There is simply no support for Defendants' attempt to define "activity" as a state of being "present."

---

[1] The Microsoft patents-in-suit are attached as exhibits 2-5 to the Declaration of Thomas Halkowski filed on May 9, 2008 with Microsoft's opening claim construction brief [D.I. 164.] Exhibits 1-14 to the Declaration of Thomas Halkowski are referenced herein as TLH Ex.(number) Exhibits 15-20 are attached to the Declaration of Kyle Wagner Compton, filed concurrently with this brief, and are referenced as Ex. (number).

Moreover, the term "activity" can include, and is described in the Liffick patents to include, much more than the two states of "active or idle." Finally, Defendants' attempt to import into the '289 patent claims a requirement that information be exchanged between the caller's network and the callee's network even before the caller has placed the call should be rejected. The '289 patent plainly describes processing incoming calls and thus, Defendants' construction improperly excludes a preferred embodiment.

In the O'Neal patents ('064 and '357 patents), Defendants' proposed construction for "unified messaging system" contradicts the specification, as well as the understanding of those skilled in the art. With respect to the "enable option" limitation, Defendants improperly disregard examples in the specifications that do not comport with their construction. Defendants' construction for the "single graphical menu" limitation contradicts the intrinsic evidence, including even the plain language of the claims themselves, by requiring all communication services and options to be displayed. Defendants take a similar position for the "telephony server" limitation. Again, Defendants ignore the claim language and examples in the specification that are not in line with their position.

For these reasons, and those provided in greater detail below, this Court should reject Defendants' proposed constructions and adopt Microsoft's constructions.

## III.    THE PROPER CONSTRUCTION OF THE '439 AND '289 PATENTS

### A.    "telephone network" and "computer network" ('439 and '289 Patents)

| Disputed Term | Microsoft's Construction | Defendants' Construction |
|---|---|---|
| "telephone network" | "network for carrying telephony information" | "network for carrying telephony information originated by telephones" |
| "computer network" | "network for carrying digital data" | "network for carrying digital data originated by computers" |

Defendants offer no support from the patents, file history, or any extrinsic source for their additional requirement of the "originated by telephones" and "originated by computers"

language to the terms "telephone network" and "computer network." [D.I. 162] Defendants'

Claim Construction Opening Brief ("Defs. Br.").] They never explain why the construction here

proposed by Microsoft—with which ALE agreed at the ITC—no longer reflects the proper

construction of those terms.[2] And they fail to address the divergences between their proposed

construction and the ordinary meaning of the terms "telephone network" and "computer

network."

### 1. Defendants rhetoric mischaracterize the terms' scope and relationship.

Without citing any evidence, Defendants simply assert that all data must be "either

computer data on the computer network or telephony data on the telephone network, but not

both." [Defs. Br. 27.] Not only does this restriction have no support in the claims, but it also has

no support anywhere in the patents. Contrary to Defendants' assertions, both the '439 and '289

patents disclose that data can be digital data, as well as telephony information. For example, the

'439 and '289 patents describe the use of modems—devices with the express purpose of

transmitting digital data over the telephone network. [TLH Ex. 2, '439 patent col.4:16–21; TLH

Ex. 3, '289 patent col.4:23–25.] Both patents also expressly discuss technology "such as fiber

optics," which can be used to carry digital data over the telephone network. [TLH Ex. 2 '439

patent col.4:40; TLH  Ex. 3 '289 patent col.4:47.]

Moreover, Defendants' objection that, under the construction proposed by Microsoft and

used at the ITC, "if the same data were simultaneously on both the computer and telephony

networks, the networks would be one and the same, at least at certain points in time" is no

---

[2] See Certain Unified Commc'n Sys., Inv. No. 337-TA-598, 2008 WL 317757 (USITC Jan. 28, 2008) (final initial and recommended determination) (noting Microsoft and ALE's agreement to construe "telephone network" to mean "network for carrying telephony information," and "computer network" to mean "network for carrying digital data). These agreed constructions were accepted by the ALJ and not disturbed by the ITC. Certain Unified Commc'n Sys., Inv. No. 337-TA-598 (USITC June 6, 2008) (Commission opinion) (attached as Ex. 17).

objection at all.  [Defs. Br. 27.]



the same set of physical pathways?  A: Absolutely.").]

contradiction between their experts' testimony and the arguments made by their attorneys.

**2.     The patents reject any notion that telephone and computer networks include only data "originated by" specific devices.**

As already discussed, the patents explicitly teach telephone networks carrying data originated by devices other than telephones.  [TLH Ex. 2 '439 patent col. 16–21; TLH Ex. 3 '289 patent col.4:23–25 (discussing telephone networks carrying data originated by computers, via a modem).]  As discussed in Microsoft's opening brief, the patentee went out of his way to confirm that his invention could be practiced with any number of devices that do not fit into Defendants' proposed simplistic "telephone/computer" dichotomy.  [D.I. 163, Microsoft's Opening Brief on Claim Construction ("MS Br.").]  For example, both patents contemplate practicing the invention with "microprocessor-based or programmable consumer electronics." [TLH Ex. 2 '439 patent col. 3:14–24; TLH Ex. 3 '289 patent col. 3:19–29.]  "Consumer electronics" can include any number of devices from cellular telephones to DVD players to home audio systems.  Such devices are not limited to either "telephones" or "computers" and frequently have features of both.  Nowhere do the '439 and '289 patents define "telephone network" or "computer network" on the basis of the particular device that originated the data being carried on the networks.

Microsoft's proposed constructions were accepted by the ITC, and by ALE during those proceedings. For the reasons discussed in Microsoft's opening brief, the Court should adopt Microsoft's constructions because they are straightforward, comport with the terms' ordinary meanings, and embrace the specifications. [MS Br. 11–12.]

**B.** **"current activity of subscribers on the computer network or according to current activity of the user on the computer network" ('439 Patent)**

| Microsoft's Construction | Defendants' Construction |
|---|---|
| "current status of subscribers on the computer network or according to current status of the user on the computer network" | "whether the calling party is present on the computer network or the called party is present on the computer network" |

With its proposed construction, ALE attempts to complicate what is a straightforward claim limitation. All of the asserted claims of the '439 patent require that calls be filtered or processed according to the activity of the user or subscriber on the computer network. As discussed in Microsoft's opening brief, the '439 patent teaches processing incoming calls in accordance with the user's or subscriber's state of activity – or status – on the computer network. [MS Br. 12, 13]. Microsoft's construction embodies this concept and is consistent with the claims, specification, and prosecution history of the '439 patent. ALE's proposed construction, on the other hand, finds no support in the intrinsic evidence. Rather, ALE, in an apparent effort to read prior art into the '439 patent, seeks to unnecessarily complicate this straightforward concept with the notion that "presence" is "activity." It is not.

**1.** **ALE's Construction is Counter to the Plain Meaning of "Current Activity"**

**a.** **"Presence" is Not "Activity"**

ALE's entire position hinges on equating "presence" with "activity." With its proposal, ALE reads out the very claim language being construed – "current activity." ALE's construction ignores the patent's express requirement that filtering be based on attributes <u>related to the user's</u>

5

activity.  ALE then further complicates the issue by equating logging on to a computer network

with being logged on to a computer network.  First, logging on cannot be activity on a computer

network because it is a precursor to activity on a computer network.  Second, after logging onto

the computer network, the mere fact of being logged on requires no action whatsoever from the

user or subscriber.  Indeed, a user can be logged on for ten hours without taking a single action –

on or off the computer network.  During such a ten hour period of inactivity, the user cannot be

described as active.  Yet, ALE's proposed construction would do precisely that.  Such a

construction would negate the point of the asserted claims – to filter incoming calls based on the

user's activity (i.e., what the user is doing) at the time the call is received.

   ALE seems to misunderstand this problem.  In its brief, ALE provides what it describes

to be an example of filtering calls based on presence – filtering a telephone call "based on

whether a user is present on the computer network, such as whether a user is logged into an

Internet messaging program."  [Defs. Br. 37.]  ALE's own example shows the flaw in its

construction.  In ALE's example, the call is filtered based not on whether the user is logged onto

a computer network (as ALE contends), but on whether the user is active on that computer

network – the activity being the running of an Internet messaging program.  The "logging on to

the network" would necessarily have already taken place before running the Internet messaging

program.  Therefore, the filtering in this example is based on current actions of the user (i.e.,

running the Internet messaging program) and not based on whether the user logged on to the

computer network some undetermined amount of time before running the application.

   With its own example, ALE acknowledges the obvious – that there is a difference

between a party's presence on a network and a party's activity on a network.  ▮▮▮▮▮

**b.     "Presence" is Not "Current Activity"**

ALE's proposed construction would also eliminate the temporal aspect of the claim term

at issue.  The asserted claims of the '439 patent require filtering based not only on activity, but

on <u>current</u> activity of the user.  It is well settled that a construction that reads out express claim

language is wrong.  <u>Dayco Prods., Inc. v. Total Containment, Inc.</u>, 329 F.3d 1358, 1370 (Fed.

Cir. 2003) ("Thus, the hose is expressly recited in the body of the claim and was improperly read

out of the claim by the district court."); <u>Texas Instruments Inc. v. Int'l Trade Comm'n</u>, 988 F.2d

1165, 1171 (Fed. Cir. 1993) ("[T]o construe the claims in the manner suggested by TI would

read an express limitation out of the claims.  This we will not do because '[c]ourts can neither

broaden nor narrow claims to give the patentee something different than what he has set forth.'")

(quoting <u>Autogiro Co. of Am. v. United States</u>, 384 F.2d 391, 396 (Ct. Cl. 1967)).

The temporal requirement is supported by the specification of the '439 patent.  As

explained in the specification, the system works in "real time:"

> However, a common feature of the system 100 is that the telecommunication
> system (e.g., the central office switch 116) determines calling party status on the
> basis of information stored on the Internet and processes the incoming call in
> accordance with the user-specified criteria.  Moreover, the <u>system 100 operates in
> real-time</u> to process the incoming call in accordance with the user-specified
> criteria.

[TLH Ex. 2, '439 patent at col. 10:36-42. (emphasis added).]  As noted above, ALE's

construction describes a system that routes calls based on whether the user is present on the

system – not based on the user's <u>current</u> activity or status on the computer network.  Under

ALE's proposal, once a user is logged on the computer network and thus "present" on the

computer network, the system's analysis regarding whether and how to route incoming calls for

that user is complete. ALE's proposal fails to take into account, however the fact that during the time the user is logged on the computer network, the user may be otherwise active on the network, thereby changing whether and how incoming calls to the user should be routed. By contrast, the system described in the '439 patent must be capable of determining, in real time, whether and how incoming calls are routed based on the user's current activity. ALE's proposal eliminates this capability, and thus, ignores an important aspect of the '439 patent's invention.

ALE's use of the word "present" has no basis in the ordinary meaning of "current activity." Moreover, nowhere in the '439 patent specification is the word "activity" defined to mean "present" on the computer network. Nor does the '439 patent specification disclose any filtering or routing of incoming calls based on the user's presence on the computer network. For at least these reasons, the Court should reject ALE's proposed construction.

### 2. Microsoft's Construction is Supported by the Intrinsic Evidence

Despite ALE's contentions, Microsoft's proposed construction is supported by, and consistent with, the intrinsic evidence. ALE tries to divert the Court's attention from the legitimate basis for Microsoft's construction by arguing that the only basis for "user activity" to mean "user status" is the fact that a user's status may be underlined stored on the computer network. [Defs. Br. 31.] After setting up this strawman argument, ALE then asserts that information stored on the computer network is not activity on a computer network. [Id.] ALE's arguments are completely irrelevant to this claim term's construction. For example, claim 1 of the '439 patent requires a data structure on the computer network for storing user-selectable criteria for processing incoming calls. Thus, ALE's suggestion for the basis of Microsoft's proposal is nonsensical because all the criteria are required to be stored on the computer network.

However, claim 1 also requires that the data structure stores the user-selectable criteria in one or more lists, wherein some of the lists are used to filter the incoming call according to

current activity on the computer network.  Thus, the true basis for Microsoft's proposed

construction, as set forth in its opening brief, is the fact that a user's activity on the computer

network is described by the user's state or "status" on the computer network.  For example, the

user's activity or status as "busy" indicates that the user is currently active or busy on the

computer network.  Microsoft's proposed construction of "status" as "activity" is supported by

the way the '439 patent specification ties the words "activity" and "status" closely and

repeatedly, using both terms interchangeably to convey the same idea.  [MS Br. 15-16.]

Moreover, one can substitute "status" for "activity," and vice-versa, in the specification of the

'439 patent without losing or changing the meaning of either term.  [Id.; e.g., TLH Ex. 2, '439

patent col.7:57–8:34].  For example, in the sentence "[w]ith the system 100, it is possible to

determine who is monitoring the user's Internet activity," the meaning of the sentence is

preserved when stated: "[w]ith the system 100, it is possible to determine who is monitoring the

user's Internet status."  ALE does not counter this argument.

### a.    Microsoft's Proposed Construction is Consistent With the Prosecution History

Also contrary to ALE's contention, Microsoft's proposed construction is supported by the

prosecution history of the '439 patent.  ALE argues that in distinguishing Brennan during the

prosecution history, the patentee disclaimed routing calls based on any criteria described in

Brennan.  [Defs. Br. 32-35.]  The patentee mad no disclaimer.  Rather, the patentee distinguished

Brennan without disclaiming any particular functionality.  During the prosecution history, the

patentee distinguished Brennan by noting a capability, described in the '439 patent, that was not

taught in Brennan – processing calls based on the user's status or activity on the computer

network.  As the patentee stated: "Brennan teaches that the flow of information is fixed and is

**not dependent** on any particular **status or activity** of the user or of the caller and that the flow

of information is determined by the user's requirement for that particular caller." [TLH Ex. 14; Ex. 14, U.S. Patent App'n No. 09/275,689, Amendment A, 13 (Dec. 28, 2001) (emphasis added).] The patentee did not, however, disclaim the criteria taught in Brennan. Rather, the patentee explained that the '439 patent teaches additional criteria. That Brennan and the '439 patent may have some functions in common has no bearing on this issue.

**b.      Microsoft's Proposed Construction Gives Full Effect to the Claim Term**

ALE also diverts the Court's attention by arguing that Microsoft's construction would render the word "some" in the claims superfluous. [Defs. Br. 36-37.] ALE seems to argue that because all user-selectable criteria are stored on the computer network, Microsoft's construction for "activity" would encompass all possible user-selectable criteria, thereby rendering the language "wherein some of the one or more lists are used to filter the incoming call according to . . . current activity of the user on the computer network" superfluous. Again, this is incorrect. As explained above, Microsoft's proposed claim construction does not expand the meaning of "current activity of the user on the computer network." Because the words "activity" and "status" can be used interchangeably in the '439 patent without changing the meaning of the terms or the specification, Microsoft's construction does not expand the scope of the patent.

Microsoft's proposed construction does not include "user activity" that does not reflect the user's activity or status on the computer network. For example, call filtering according to whether the user is busy on a VoIP softphone call is based on the user's activity or status (i.e., busy) on the computer network. ALE is incorrect in arguing that Microsoft's construction would bring all rules stored on a computer network into "user activity." Rather, as this example shows, Microsoft's construction brings call filtering according to the user's activity on the computer network into the scope of the claims. ALE's construction, on the other hand, would entirely

eliminate the key aspects of the claimed invention and ignore the very words for which the parties seek a construction – "current activity". [See sections III.B.1.a – III.B.1.b.]

### 3.     The ITC Commission Opinion is Based on Factual and Legal Errors

The ITC recently issued its opinion in the parallel ITC proceeding. [Ex. 17, ITC Commission Opinion.] Although the ITC construed "current activity of the user on the computer network" to mean "current status of the user on the computer network," the ITC erred in finding that a VoIP softphone call cannot constitute "current activity of a user on the computer network." [Id. at 7-16.] In making its determination, the ITC based its finding primarily on two points – that a VoIP call is telephone activity and therefore cannot be activity on a computer network, and that VoIP calls cannot be computer activity because the specification and prosecution history of the '439 patent do not refer to VoIP phone calls.[3] [Id. at 10-16.]

### a.     Activity on the Computer Network is Not Required to be Exclusive of Activity on the Telephone Network

With regard to the first point, the ITC seemed to require that activity on a computer network must be entirely exclusive of activity on a telephone network. This requirement contradicts the plain language of the '439 patent. There is no requirement in the '439 patent, or in the patent's prosecution history, that "activity" that takes place on a computer network cannot also take place on a telephone network.[4] Nor is there a requirement that the computer network be distinct and separate from the telephone network. Rather, the '439 patent contemplates and expressly describes the overlap of computer networks and telephone networks:

---

[3] Like ALE's proposed construction, the ITC's analysis also ignored the "current" aspect of the claim term. For this reason, too, the ITC's construction is contrary to Federal Circuit law. [See section III.B.1.b.]

[4] See also NessCap Co. v. Maxwell Techs., Inc., 2007 U.S. Dist. LEXIS 89450, at *19 (S.D. Cal. Dec. 5, 2007) (noting that "a single physical structure can satisfy two claim limitations"); Wald v. Mudhopper Oilfield Servs., 2006 U.S. Dist. LEXIS 51666, at *16 (W.D. Okla. July 27, 2006) ("A single structure in the accused device may perform the functions of two or more claim limitations.").

> The communication between the user computer 154 and the Internet 134 is a conventional communication link used by millions of computers throughout the world. For example, the user computer 154 may be a personal computer (PC) containing a communication interface, such as a modem (not shown). <u>The network link 156 may be a simple telephone communication link using the modem to communicate with the Internet 134.</u> The Internet controller 152 functions in a conventional manner to communicate with the user computer 154 via the network link 156. <u>Although the communication link 132 and the network link 156 are both communication links to the Internet, the network link 156 is a conventional computer connection established over a telephone line</u>, a network connection, such as an Ethernet link, or the like.

[TLH Ex. 2, '439 patent at col. 6:31-45.] Thus, nothing in the '439 patent precludes VoIP softphone calls from being activity on the telephone network, as well as activity on the computer network.

~~This is consistent with the '439 patent's prosecution history as well.~~ In distinguishing the prior art reference (Brennan) during prosecution, the patentee explained that the '439 patent teaches processing an incoming call according to <u>activity on a computer network</u>. [TLH, Ex. 14; '439 Prosecution History at MSAL 00695 (emphasis added)] While the patentee noted that this activity on the computer network "does not <u>typically</u> occur on the telephone network," the patentee did not disclaim the possibility that activity on a computer network could also occur on the telephone network. [<u>Id.</u> (emphasis added)] The only actual <u>requirement</u> in the asserted claims is that the activity take place on the computer network. The fact that it may <u>also</u> take place on the telephone network is therefore consistent with the prosecution history. The ITC's ruling, on the other hand, contradicts both the prosecution history and patent specification and imports a new limitation into the asserted claims.

> b.     **VoIP Softphone Calls are Not Excluded by the '439 Patent**

With regard to the second point, the ITC erroneously found that VoIP calls cannot be computer activity on the basis that the specification and prosecution history of the '439 patent do not refer to VoIP phone calls. It is established Federal Circuit law that a claim's scope is <u>not</u>

12

limited to the systems or embodiments expressly called out in the specification.  As the Federal

Circuit explained:

> [T]his court has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.  See ACTV, Inc. v. Walt Disney Co., 346 F.3d 1082, 1091 (Fed. Cir. 2003); Apex Inc. v. Raritan Computer, Inc., 325 F.3d 1364, 1377 (Fed. Cir. 2003); Altiris, Inc. v. Symantec Corp., 318 F.3d 1363, 1373 (Fed. Cir. 2003); Tex. Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1204-05 (Fed. Cir. 2002); Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002); SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985) (en banc).  Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using "words or expressions of manifest exclusion or restriction."  Teleflex, 299 F.3d at 1327.
>
> For example, in Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc., 334 F.3d 1294, 1301 (Fed. Cir. 2003), the court interpreted the term "remote" broadly to include surgical procedures performed with the surgeon present in the same room as the patient, although the written description only described performing the surgical procedure without the surgeon present in the same room as the patient, because "no statement in the written description constituted a limitation on the scope of the invention."  Likewise, in Altiris, Inc. v. Symantec Corp., 318 F.3d 1363, 1371 (Fed. Cir. 2003), despite the fact that the specification discussed only a single embodiment, we held that it was improper to read a specific order of steps into method claims because the specification "nowhere [included] any disclaimer of any other order of steps, or any prosecution history indicating a surrender of any other order of steps."

Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004).  Similarly, the ITC's

preclusion of VoIP calls from being computer activity was improper.  Although softphone VoIP

calls are not expressly described as activity on a computer network in the '439 patent, it was well

known in 1999 that software applications could run on a computer network.  A softphone VoIP

call is just that – a software application running on a computer network.  A softphone application

runs on the user's computer and sends and receives digital data over the computer network, much

like any other software application or web browser.  Indeed, a softphone VoIP call constitutes

user activity on a computer network.  Moreover, neither softphone VoIP calls particularly, nor

software applications generally, were expressly excluded in the '439 patent as activity on a

computer network.

In sum, ALE's proposed construction is counter to Federal Circuit law and has no basis in the intrinsic evidence. Microsoft's construction, on the other hand, is consistent with both the specification and prosecution history and gives the claim language its full meaning for the reasons discussed both here and in Microsoft's opening brief. Accordingly, the Court should adopt Microsoft's proposed construction as the proper construction.

### C.     "monitoring activity of a user computer" ('289 Patent)

| Microsoft's Construction | Defendants' Construction |
|---|---|
| Term does not require explicit construction. If construction necessary: "monitoring the status of a user computer" | "determining whether a called party's computer is active or idle" |

Defendants' proposal to limit the general term "activity" to simply being either "active" or "idle" would force an inappropriate restriction on intentionally broad language. And their repeated references to "physical proximity" lack any foundation in either the description or the claims. In construing this term, the Court should reject Defendants' litigation-inspired arguments and should instead rely on the claims' simple phrasing and plain meaning.

### 1.     Defendants' proposed "active/idle" construction is overly narrow

The abbreviation "e.g." has a straightforward meaning that Defendants ignore: it means "for example" (from the Latin, exempli gratia). Ex.23 Black's Law Dictionary 533 (7th ed. 1999). When used in a sentence, "e.g." signals a list that is not intended to be comprehensive. It is just as if the patentee had written "for example"—some, but not all, members of a given set are listed. See Katz v. AT&T Corp., 63 F. Supp. 2d 583, 632–33 (E. D. Pa. 1999) (interpreting a passage using e.g. as not limited to the identified elements). As previously discussed by Microsoft in its opening brief, the patentee described the monitored activity of a user computer with the parenthetical note "e.g., idle or active." [MS Br. 20 (citing '289 patent col.16:18–19,

14

col.17:59–62),; TLH Ex. 3.]  Such disclosures demonstrate that the patentee did not intend to

limit the "activity" monitored by his invention to whether a computer was "active" or "idle."

Other qualitative states of computer activity are encompassed by the claims.

Defendants dismiss any discussion of the patentee's use of "e.g." to signal an expansive

definition of "activity."  [Defs. Br. 24 n.8.]  Instead, they cite sentences using "i.e.", and from

there contend that "activity" should be construed to have no possible meaning other than "active"

or "idle."  Nevertheless, the claims use the general term "activity"—not the specific terms

"active" or "idle"—and the patentee's use of "e.g." further suggests a general meaning.

Defendants further argue that the patentee's intermittent use of "i.e." shows that he acted

as his own lexicographer, redefining the term "activity" to have a more limited definition than

would normally be accorded.  [Defs. Br. 24 n.8.]  But a patentee acts as his own lexicographer

only where he sets forth his lexicography "with reasonable clarity, deliberateness, and

precision."  Abbott Labs. v. Syntron Bioresearch, Inc., 334 F.3d 1343, 1354 (Fed. Cir. 2003)

(internal citations omitted).  That is not the case here, where the patentee intermixed expansive

and specific language, and never stated any positive definition for "activity."  See id. at 1355

(holding that the patentee did not act as own lexicographer where two sentences provided

different definitions for disputed term).  Moreover, the Federal Circuit has explicitly rejected

Defendants' argument that mere use of the abbreviation "i.e." establishes that a patentee is his

own lexicographer, especially when other parts of the specification teach differently.  Pfizer, Inc.

v. Teva Pharms. USA, Inc., 429 F.3d 1364, 1373 (Fed. Cir. 2005).

In sum, Defendants' proposal to reduce all descriptions of "activity" to the binary

"active/idle" is overly narrow and does not reflect the term's usage in the '289 patent.

2.     **Defendants' "physical proximity" argument has no basis in the specification.**

Defendants' opening brief introduces for the first time the notion that the claims should be construed so that a computer's "activity" becomes a stand-in for the user's "physical proximity" to his telephone. [Defs. Br. 23–24.] Neither the claim language nor the specification require any "physical proximity" limitation; Defendants apparently extrapolate its existence by a selective reading of the disclosed embodiments.

Defendants' importation of a "physical proximity" limitation, however, contradicts the law of claim construction. The scope of the invention is determined by the claims, and the skilled artisan's understanding thereof—not by the specification. <u>SRI Int'l v. Matsushita Elec. Corp. of Am.</u>, 775 F.2d 1107, 1121 (Fed. Cir. 1985). A skilled practitioner would understand that computer activity can take many forms, and that part of the inventive concept of the '289 patent is to permit finer-grained control over call routing by permitting users to set up routing rules that key off of the different forms of computer activity. ['289 patent col.16:48–50 (claiming an invention that routes calls based in part on computer "activity" generally, not limited to "physical proximity" of a user).]

Even if the '289 patent taught a simple rule where an "active" computer was taken as an indication of an "available" (and, possibly, "physically proximate") user, a skilled artisan would use that disclosure as a starting point, not a finish line. The skilled artisan would appreciate that the claims contemplate routing based on "activity" <u>generally</u>. Hypothetically, this could include embodiments where activity was taken as an indicator of "unavailability," or where some types of activity signaled "availability" while others signaled "unavailability." The claims have broad reach in this area.

16

"Specifications teach.  Claims claim. . . .  That a specification describes only one embodiment does not require that each claim be limited to that one embodiment."  SRI Int'l, 775 F.2d at 1121 n.14.  There is no requirement that a patentee must teach every possible embodiment of his invention.  Absent explicit disavowal in the claims or the specification, claims should be given their full and ordinary scope.  Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1309 (Fed. Cir. 2005) (finding error where claims were construed as limited to the disclosed embodiment).  Since Defendants do not point to anything in the claims or the specification that limits the invention to requiring "physical proximity," this line of argument should be rejected.

### 3.    If explicit construction is required, Microsoft's proposal should be adopted.

Microsoft believes that this phrase requires no explicit construction—the ordinary meaning of the words is beyond dispute, and a fact-finder would have no difficulty applying them.  Defendants are asking the Court to go beyond the ordinary meaning of the claim language and import limitations from the specification, but they can cite no explicit disavowals of the broad subject matter contemplated by the word "activity."  Because their argument relies on innuendo, not clear statements, it should be rejected in favor of the plain meaning of the term "activity."

Nevertheless, if an explicit construction is necessary, Microsoft's proposal —"monitoring the status of a user computer"— captures the skilled artisan's interpretation of the phrase, in light of the specification, for the reasons discussed in Microsoft's opening brief.  [See MS Br. 19.] Defendants do not discuss, let alone dispute, that the '289 patent frequently uses the term "status" interchangeably with "activity."

**D.** **"at the computer network, receiving information from the telephone network that a first party from whom a call is originating desires to establish telephone communication with a second party"**

| Microsoft's Construction | Defendants' Construction |
|---|---|
| <u>Term does not require explicit construction.</u> If construction necessary: "receiving at the computer network information from the telephone network that a telephone call from a first party to a second party has been initiated" | "receiving at the computer network an indication from the telephone network that a first party requests to set up a telephone call with a second party prior to the time the call is placed by the first party" |

The wording of this limitation is clear. Defendants' proposal that the information must be received "prior to the time the call is placed by the first party" has no support. Defendants' construction runs counter to both the claim's plain meaning and the specification and thus, should be rejected.

    **1.** **Defendants' "prior to the call" limitation has no foundation in the claim text.**

It is well settled that claims are interpreted <u>in light of</u> the specification. Claim construction is not an opportunity for a party to change the claims' plain meaning by importing limitations from the various disclosed embodiments. <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc). A claim's scope <u>comes first from the claims itself</u>:

> [A] party wishing to use statements in the written description to confine or otherwise affect a patent's scope <u>must, at the very least, point to a term or terms in the claim with which to draw in those statements</u>. Without any claim term that is susceptible of clarification by the written description, there is no legitimate way to narrow the property right. The Supreme Court has clearly stated the rationale for this requirement[.]

<u>Renishaw PLC v. Marposs Societa' per Azioni</u>, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (citing <u>McCarty v. Lehigh Valley R.R.</u>, 160 U.S. 110, 116 (1895)) (quotation omitted) (emphasis added). The Federal Circuit has referred to this as the "textual 'hook'" requirement. <u>NTP, Inc. v. Research in Motion, Ltd.</u>, 418 F.3d 1282, 1310 (Fed. Cir. 2005).

18

There is no textual "hook" for the "prior to the call" language proposed by Defendants. Neither the words "prior to the call," nor any words of similar meaning, appear in the term proposed for construction, or anywhere else in the claim. Nothing about the text of any asserted claim indicates an exchange of information "prior to the call."

Defendants attempt, by distorting the meaning of claim 1's preamble, to manufacture such a "hook." [Defs. Br. 22 (emphasizing the word "when" in the preamble to claim 1).] But determining "when to establish telephone communication" simply means determining—in line with the invention—when a telephone communication should or should not be established to the callee and, if it should not be established, what to do with the incoming call. [See, e.g., TLH Ex. 3, '289 patent fig.8 (describing a series of steps, beginning with an incoming telephone call, for determining when a call should or should not be routed to a callee.] The written description uses "when" to denote determining availability:

> The potential callee can specify . . . conditional criteria, such as accepting or blocking calls during certain times of day or during certain activity, **such as when the user may be otherwise occupied and unwilling to accept an incoming call.**

[Id. col.2:8–15 (emphasis added).] Both here and in the asserted claims, the purpose of the phrase "when to establish telephone communication" is to determine whether the callee is available to receive such communication, and route the communication accordingly. Nothing about its use suggests that this can only take place "prior to the call" being initiated. Accordingly, Defendants' proposal should be rejected for lack of any textual "hook" in the claims.

### 2. Defendants' "prior to the call" limitation would read out preferred embodiments of the invention.

As discussed in Microsoft's opening brief, in the preferred embodiments of the invention the "information received" by the telephone network is an indication of an incoming telephone

call. [See MS Br. 22–23.] If adopted, Defendants' "prior to the call" limitation would rewrite the claims so that they exclude these preferred embodiments; such would be improper as a matter of law. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996) (rejecting claim construction excluding a preferred embodiment as "rarely, if ever, correct").

The '289 patent, [TLH Ex. 3 figure 8 and accompanying text (col.12:11–col.13:45)], describe a preferred embodiment that does not include any receipt of information from the telephone network "prior to the time the call is placed by the first party." Indeed, the very first element of figure 8 is labeled "Receive call data from originating telephone":



[TLH Ex. 3, '289 patent, fig.8.] The call data in element 202 is received from an "originating telephone"; the associated disclosure identifies an originating telephone as one that has made a telephone call. [Id. col.12:13–16 ("At a start 200, the calling party has placed a call from the originating telephone . . . ."). (emphasis added).] Defendants' proposed construction would exclude this disclosure, since it would require receipt of call data "prior to the time the call is placed." [Defs. Br. 22.] Because Defendants' proposed construction would exclude a preferred

embodiment from the scope of the claims, it is necessarily incorrect, except in the presence of

"highly persuasive evidentiary support." Vitronics, 90 F.3d at 1583. Defendants' selective

quotation from the '289's written description falls severely short of this high bar.

Defendants' reliance on the '289 patent's "BACKGROUND OF THE INVENTION" section

is misplaced. [See Defs. Br. 21 (quoting '289 patent, col.1:33–35).] A patentee's statements

distinguishing his invention from the prior art are not to be taken as hard limits on the claims.

Ventana Med. Sys., Inc. v. BioGenex Labs., Inc., 473 F.3d 1173, 1180 (Fed. Cir. 2006) (finding

general statements of an invention's goals in the "BACKGROUND ART" section of a patent

insufficient to limit the claims). And as discussed infra, there is no requirement that every one of

a patent's claims include limits addressing every advantage of the invention.

Defendants next offer the following to support their "prior to the call" limitation:

> In step 252, the caller indicates a desire to establish a telephone communication link with the callee. In a conventional communication system, the caller picks up the originating telephone and dials the telephone number for the destination telephone 104. However, in accordance with this aspect of the system 100, the caller may indicate the desire to establish a telecommunication link using the caller computer 184 and placing the callee telephone number . . . on a call list . . . .

[Defs. Br. 21 (quoting '289 patent col.16:23–33); TLH Ex. 3) (emphasis Defendants').]

Defendants misunderstand this excerpt's meaning. In a preferred embodiment of the invention,

a caller indicates his desire to establish a telephone communication with a callee by "pick[ing]

up the originating telephone and dial[ing] the telephone number." [TLH Ex. 3, '289 patent,

col.16:25–27.] Because the desire to communicate is signaled by making a telephone call, the

"prior to the call" limitation would exclude this embodiment.[5]

---

[5] The patent states that a desire to communicate is signaled by picking up an originating telephone where the invention is implemented as part of "a conventional communication system." [TLH Ex. 3, '289 patent col.16:24–28.] The patent goes on to discuss alternate implementation, in unconventional systems, as well. [Id. col.16:28–35.]

The patentee expressly noted that <u>either</u> an initial telephone call or use of a computer could signal a desire to communicate within his invention:

> In operation, the system allows a caller to indicate a desire to establish a telephone link with a specified callee. <u>The caller can use the originating telephone 102 **or** the caller computer 184 to initiate the call processing by the system 100.</u>

[<u>Id.</u> col.15:14–18 (emphasis added).] Because the desire to communicate can <u>explicitly</u> be expressed through use of an "originating telephone," Defendants' "prior to the call" limitation is contradicted.[6]

In sum, Defendants' "prior to the call" limitation is not supported by the intrinsic evidence and would, in fact, read out preferred embodiments of the invention.

### 3.    The "prior to the call" limitation does not become part of the claims simply by statements of the invention's "purpose."

Discussion in the written description of the purposes of an invention, or of the invention's perceived advantages over the prior art, will not by itself serve to limit the claims:

> The court's task is not to limit claim language to exclude particular devices because they do not serve a perceived "purpose" of the invention. . . .   An invention may possess a number of advantages or purposes, and <u>there is no requirement that every claim directed to that invention be limited to encompass all of them.</u>

<u>E-Pass Techs., Inc. v. 3Com Corp.</u>, 343 F.3d 1364, 1370 (emphasis added).  (Fed. Cir. 2003); <u>see also</u> <u>Ventana Med. Sys., Inc. v. BioGenex Labs., Inc.</u> 473 F.3d 1173, 1181–82 (Fed. Cir. 2006); <u>Phillips</u>, 415 F.3d at 1325.  Defendants' contention—that because the patentee said he set out to

---

[6] Defendants quote, but do not discuss, a statement in the written description that "when appropriate for both parties, [the system] establishes a telephone communication link by sending signals from the central office switch 116 to the originating telephone to generate a ring signal. The central office switch 116 also generates appropriate signals to generate ring signal at the destination telephone 104." [ TLH Ex. 3, '289 patent, col.15:19–22.] Because central office switch 116 is the <u>called</u> party's central office, one of ordinary skill in the art would have understood that this could refer to the phone system signals that lead to the callee's phone ringing, and the caller hearing a "ringing" tone on the line.

achieve a number of purposes with his invention, his claims should be limited to require all such

purposes — is supported by Federal Circuit law.

The invention of the '289 patent has numerous advantages over the prior art, including

the ability to use the monitored activity of a user computer as a factor in determining user

availability [TLH Ex. 3, '289 patent col.17:19–25]; the ability to use "forwarding," "reverse,"

"block," and "allow" lists for call processing [id., col.8:65–col.9:55]; the ability to set up

"conditional processing" rules for call handling [id, col.9:52–62]; the ability to perform call

processing based on the individual characteristics of a given call [id., col.10:22–50]; and the

ability to process calls based on the monitored activity of not just the callee's computer, but also

the caller's [id, col.14:1–20].  But there is no requirement that the claims be limited to require all

those purposes/advantages.[7]  E-Pass, 343 F.3d at 1370.  The patentee is entitled to be selective in

his claiming, covering some features here, others there, and it is the claims that define the

patentee's rights.  SRI Int'l, 775 F.2d at 1121 n.14 ("Specifications teach.  Claims claim.").

By arguing that the '289 patent claims must be construed to include the "prior to the call"

limitation, Defendants essentially propose that the patentee's rights be limited by his statements

of purpose, not his claims.  [See Defs. Br. 22 (arguing that the "prior to the call" limitation is

necessary because "[t]he '289 patent purports to avoid a waste of resources in the form of

repeated messages and unsuccessful call attempts").]  It is not disputed that the patented

invention promotes resource-saving.  But that is only one purpose and function of the patent.

Limiting the invention, not based on the claims, but on one of the stated purposes, would

---

[7] A number of the '289 patent's claims have not been asserted in this case.  Microsoft takes no position on whether or how those claims are directed to the various advantages discussed in the specification.  But the mere presence of unasserted, unanalyzed claims undermines Defendants' plea that the asserted claims be limited to require all disclosed features.

wrongfully distort the patentee's rights.[8]  Defendants' attempt to import the "prior to the call"

limitation into the claim is litigation-driven; it lacks support in the law, the claim text, and the

written description.

       **4.**        **If construction is required, Microsoft's proposal should be adopted.**

Microsoft believes that this phrase requires no explicit construction because the ordinary

meaning of the words is beyond dispute, and a fact-finder would have no difficulty applying

them.  "In some cases, the ordinary meaning of claim language . . . may be readily apparent even

to lay judges, and claim construction in such cases involves little more than the application of the

widely accepted meaning of commonly understood words."  Phillips, 415 F.3d at 1314.

(emphasis added).  This is such a case.

Nothing in the authority cited by Defendants compels the Court to explicitly construe any

term whose ordinary meaning suffices.  O2 Micro teaches that claim construction should go

beyond "ordinary meaning" when "a term has more than one 'ordinary' meaning or when

reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."  O2 Micro Int'l

Ltd. v. Beyond Innovation Tech. Co. Ltd., 521 F.3d 1351, 1361 (Fed. Cir. 2008).  This case

presents neither situation.  Application of the claim's ordinary meaning would resolve the

parties' dispute, since the parties' dispute is whether Defendants' additional limitation of "prior

to the call" should be imported from the specification.  As discussed supra, such addition is

unjustified; a determination that the term has its ordinary meaning is all that is necessary.

---

[8] Defendants imply that limiting claims based on a "clearly stated objective" in the specification
has legal support, but their cited authority fails.  [See Defs. Br. 23.]  The dispute in Multi-Tech
concerned whether the claim term "communication line" should be construed to include a
packet-switched network, or limited to a "telephone line"; in the specification the court found
two dozen disclosures of a "telephone line," but none discussing a packet-switched network.
Microsoft Corp. v. Multi-Tech Sys., Inc., 357 F.3d 1340, 1348 (Fed. Cir. 2004).  Thus, the
court's limitation of the term to "telephone line" was based on the entire specification—not the
patentee's mere statement of purpose.

Nevertheless, if an explicit construction is necessary, Microsoft's proposal—"receiving at the computer network information from the telephone network that a telephone call from a first party to a second party has been initiated"— captures the skilled artisan's interpretation of the phrase, in light of the specification, for the reasons discussed in Microsoft's opening brief. [See MS Br. 23.]

## IV.    THE PROPER CONSTRUCTION OF THE '064 AND '357 PATENTS

### A.    "communication options"

In its opening claim construction brief, ALE offers no construction for the term "communication options" and, therefore, concedes that the term is properly construed in view of the intrinsic record to mean "settings that control how communication services will be handled," as proposed by Microsoft. [Defs. Br. 4–18.]

### B.    "unified messaging system"

The parties' dispute with respect to the phrase "unified messaging system" centers on whether the system allows messages to be received, stored, retrieved, and forwarded without regard to the communication devices or networks employed for the transmission of the messages (i.e., in a coordinated manner). In the related ITC action, ALE adopted Microsoft's construction, which was substantially the same as Microsoft's presently proposed construction and included the clause "without regard to the communication devices or networks employed for the transmission of the messages." See Certain Unified Commc'n Sys., Inv. No. 337-TA-598, 2008 WL 683369, 25 (USITC Jan. 28, 2008) previously explained . While Microsoft's presently proposed instruction includes the additional phrase "i.e., in a coordinated manner" to clarify the meaning of the "without regard" clause, ALE, without explanation, has rewritten its construction in this case to exclude the clause.

In rewriting its construction, ALE does not address the fact that the unified messaging system of the O'Neal patents requires the coordinated receipt, storage, retrieval and forwarding of messages. ALE also ignores the fact that the "without regard" clause finds direct support in the specifications of the '357 and '064 patents (see, e.g., TLH Ex. 4, '064 patent col.6:59–65 ) and mistakenly contends that "nowhere in the specification is there any discussion that the retrieval of messages in a unified messaging system must be done in a 'coordinated manner.'" [Defs. Br. 18.] For at least this reason, ALE's propose construction is flawed and should be rejected.

C.     "[first/second] enable option for enabling or disabling the [first/second] communication service"

The dispute between the parties concerning the construction of the phrase "enable option for enabling or disabling the . . . communication service" is whether the terms enable and disable should be narrowly construed to mean to turn on or off (as proposed by ALE), or to control the extent to which a communication service is implemented (as proposed by Microsoft).

To support its position, ALE points to several places in the '064 patent that provide examples of enabling or disabling communication options, but none of the text ALE cites limits the terms enable or disable to mean on or off. [Defs. Br. 16.] ALE fails to cite portions of the '064 patent that show that certain features of a service can continue to function even though communication options for that service have been disabled. For example, at the '064 patent explains that faxes may still be received when the facsimile option is not enabled. [TLH Ex. 4, '064 patent col. 13:55-60]. The '064 and '357 patents use the terms "enable" and "disable" more broadly than in the binary sense of switching a service on or off. The patent specifications do not equate the term "enable" with switching on, or the term "disable" with switching off a service. For example, Figures 3 and 4 of the '064 and '357 patents illustrate several ways of

26

enabling and disabling a service, including selecting an ON or OFF radio button and entering or

deleting a telephone number in an appropriate field. In a more specific example, the paging

service shown in Figure 4 of the patents will not be enabled if an appropriate PIN number is not

entered in addition to a paging number. As yet another example, irrespective of whether the fax

receiving service depicted in Figure 4 (shown as 319) is on or off, the included fax forwarding

service can be independently enabled or disabled. Therefore, it is clear from the patents that

certain features of a service can continue to function even though other features have been

disabled, and they can also control the extent to which communication services are implemented,

thereby supporting Microsoft's construction of this limitation. [See TLH Ex. 4, '064 patent

col.13:40–60.]

    ALE resorts to extrinsic evidence to support its narrow construction. But even this

evidence shows that ALE's construction is wrong. According to ALE, the Microsoft Computer

Dictionary explains that the meaning of "disable" is "**to suppress something or** prevent it from

happening." [Defs. Br. 17 (emphasis added).] As the dictionary definition suggests, to

"suppress" is different from to "prevent" and connotes that a particular activity is reduced

without being switched off altogether.[9] Thus the Microsoft Dictionary definition supports

Microsoft's proposed construction and shows that ALE's proposed construction is flawed.

### D.    "a single graphical menu for displaying said communication options for each of said communication services at the same time"

    The dispute between the parties concerning the construction of the GUI limitation relates

to how much information the claims require to be displayed via the "single graphical menu"

recited in the claims—options for a "plurality of services" (Microsoft) versus all options for "all

---

[9] See, e.g., Merriam-Webster, Ninth New Collegiate Dictionary 1168 (1991) ("Suppress . . . to restrain from a usual course or action . . . to inhibit the growth or development of") (attached as Ex. 18).

services" (ALE). Microsoft proposes that the GUI limitation is properly construed to require a computer server that is configured to generate a single graphical menu for displaying at least a first communication service and option, and a second communication service and option at the same time. As set forth in Microsoft's opening brief, this construction is supported by the intrinsic evidence, including the language of the claims themselves, which define the single graphical menu as having at least two display areas for simultaneously displaying at least first and second communications services and associated options. [MS Br. 30–32.]

Other intrinsic evidence, including the specification and the prosecution history of the patents, also supports Microsoft's construction. [Id. at 32–36.] During prosecution, the original claim, which lacked recitation of the simultaneous display of first and second communication services, was rejected and subsequently allowed by the Examiner only after language reciting the display of first and second communication services was expressly incorporated into the claim. [Ex. 19, '064 Prosecution History MSAL01150–51; Id. at MSAL01163–65.] The Examiner's Notice of Allowability further confirms that the allowed claims require only the simultaneous display of first and second communication services, not all services. [Id.] Tellingly, there is not a single embodiment in the common '064/'357 patent specification that shows a single graphical menu displaying all of the communication services and options; rather, each of the embodiments describe a graphical interface that displays fewer than all of the services and options.

Contrary to the intrinsic evidence, ALE contends that the GUI limitation requires one graphical menu that simultaneously displays all of the communication options associated with all of a subscriber's communication services. [Defs. Br. 6–8.] According to ALE, the claims exclude systems in which a subscribers' communication options and services are displayed on multiple graphical menus. [Id.] ALE's argument cannot be correct because it ignores the

28

graphical menus disclosed in the O'Neal patents that each embody the invention even though they do not display all options for all of a subscriber's services. [See, e.g., '064 patent, Figures 3, 4.] ALE also criticizes Microsoft's construction for purportedly reading the terms "single," "each," and "at the same time" out of the claims. [Defs. Br. 5.] However, Microsoft's proposed construction explicitly includes the terms "single" and "at the same time" and calls for the display of options for each of a plurality of communication services.

ALE's flawed analysis contradicts the very claim language it purports to construe, and fails to consider the import of the surrounding claim language. ALE improperly construes this claim phrase out of context, ignoring or misconstruing the intrinsic evidence including the surrounding words of the claim, the patent specifications, and the prosecution history. Microsoft's rebuttal to the arguments raised by ALE in support of its erroneous construction of the GUI limitation is set forth below.

## 1.     The Plain Language of the Claims Supports Microsoft's Proposed Construction

In proposing to construe the GUI limitation to mean "one graphical menu that shows all the communication options associated with the subscriber's communication services," ALE ignores the explicit words of the claims that confirm that the GUI limitation does not require the display of all communication options associated with the subscriber's communication services. For example, claim 1 of the '064 patent is directed to a computer implemented control center that permits a subscriber of a plurality of communication services to customize associated communication options "through **either** a telephony-centric network using a telephone **or** a data-centric network using a display terminal." [TLH Ex. 4, '064 patent col.18:22–27.] The claim plainly contemplates that some communication options may be available only through a telephone or only through a display terminal (i.e., visually displayed), while others may be

29

available through both a display terminal and a telephone.  The GUI limitation cannot require the display of all communication options for a subscriber's communication services, because the claim provides that some communication options are not available on a display terminal.

The GUI limitation calls only for a computer server that is configured to display some communication options for each of a plurality of communication services, in other words, for each of at least two communication services.  The GUI limitation further requires that the computer server be configured to display the options and services in a single graphical menu.  As the claims plainly state a single graphical menu is a menu for displaying communication options for each of the plurality of communication services at the same time.  This means that some communication options associated with two or more communication services must be displayed on the display screen at the same time in order for the display to meet the single graphical menu limitation.  This is what Microsoft's proposed construction reflects.

ALE alleges that Microsoft's construction of the GUI limitation "reads the words 'single' and 'each' out of the claim."  [Defs. Br. 5.]  ALE's arguments are misplaced.  ALE contends that because the word "single" has been interpreted in other, unrelated contexts to mean "one and only one," Microsoft's construction of the GUI limitation somehow "eliminates" this word from the claim because multiple screens may be used to display various communication services and options.  [Defs. Br. 5–7.]  To the contrary, Microsoft's construction gives ample import to the word "single" because it requires one (single) screen to display the two services and options.  ALE correctly notes that the GUI limitation was added to the claims by amendment after a rejection by the examiner during prosecution in view of the Pepe prior art patent.  [Defs. Br. 9.]  What ALE failed to note in its brief is that the Pepe reference does not disclose a single screen that displays two or more services at the same time (i.e., all of the screenshots disclosed in

the Pepe reference show at most a single communication service).  [See, e.g., Ex. 20, [U.S.

Patent No. 5,742,905, Figs. 28–45.]  The recitation in the '064/'357 claims of a <u>single</u> graphical

menu that displays at least two communication services and associated options thus distinguishes

over the prior art and thereby gives import to the term "single" (because Pepe does not show a

single screen as claimed).  Pepe discloses "graphical menus" for displaying at least two

communication services and associated options (a series of menus shown in Figs. 28–45 of Pepe

(Ex. 20)); but not a <u>single</u> graphical menu for this purpose.  Thus, Microsoft's construction of the

GUI limitation fully considers and gives import to the term "single" in the asserted claims.

     ALE similarly misses the mark regarding the term "each."  The term "each of said

communication services" in the GUI limitation refers back to the original recitation of "a

plurality of communication services" in the preamble of the claim.  ALE would interpret the

phrase "plurality of communication services" recited in the preamble to mean "plurality of

communication services to which the user has subscribed" (i.e., "all" of the available services).

[Defs. Br. 7–8.]  But the preamble of the claim does not require the display of options associated

with <u>all</u> of the services; instead it merely recites "a plurality of communication services," which

can be any two services.  The later recitation in the claims of "each" of the communication

services in the GUI limitation refers back to <u>each</u> of "a plurality" of services—any two

services—recited in the preamble.  Microsoft's construction requires that options for "each" of

the plurality of services be displayed via the single graphical menu, thus giving ample import to

the term "each."

     Further, the recitation of "each" of the communication services in the GUI limitation

must necessarily be consistent with the "wherein" clause later in the claim that further describes

the "single graphical menu" and makes clear that the single graphical menu requires only two

communication services and a communication option associated with each service:

> wherein said single graphical menu comprises at least a first display area for
> showing a first communication service and a first communication option
> associated with a first communication service, and a second display area for
> showing a second communication service and a second communication option
> associated with a second communication service."

[TLH Ex. 4, '064 patent col.18:39–58 (emphasis added).] This claim language is clear and

unambiguous that "said communication options" displayed in the single graphical menu need

only include the recited "first communication option" and "second communication option," not

all the communication options associated with all of the communication services. ALE's

proposed construction requiring the simultaneous display of all communication options for all

communication services renders this "wherein" clause superfluous and thus either (1)

impermissibly reads this limitation out of the claims, or (2) renders the claim nonsensical since

there would be no need to separately recite the display of options associated with at least two

services if the claim already recited the display of all services and options, as ALE contends.

Thus, Microsoft's construction gives due import to the term "each," requiring that the

communication options for each of the recited first and second communication services be

displayed via the single graphical menu. Microsoft's construction considers and reconciles all of

the language in the claim, including the term "each" and the "wherein" clause, while ALE's

construction would read the "wherein" clause out of the claim. Bicon, Inc. v. Straumann Co.,

441 F.3d 945, 950–951 (Fed. Cir. 2006) (holding that it is improper to render meaningless

express claim limitations).

32

### 2.    The Patent Specification Supports Microsoft's Proposed Construction

ALE mischaracterizes the specification of the '064 and '357 patents.  Specifically, ALE contends that Figure 4 of the O'Neal patents shows a graphical user interface that displays all of the communication options for all of the services.  [Defs. Br. 11.]  As evidence for this, ALE relies on the fact that the '064/'357 patent specification describes Figure 4 as a "full view."  [Id.] The evidence refutes ALE's position.

The graphical interface of Figure 4 does not display all communication options for all communication services because it omits the options included in several drop down menus (e.g., the "Follow Me call routing" option, the "Fax Sending Send attempts" option, and item 318 all include drop down menus for displaying additional options).  Indeed, there is no embodiment in the common '064/'357 patent specification that shows a single graphical menu displaying all of the communication services and options.  The specification simply characterizes Figure 4 as showing the communication options of Figure 3 "in greater detail."  [TLH Ex. 4, '064 Patent col.11:51–58.]  Neither graphical interface shown in Figure 3 or 4 displays services for processing incoming voicemail messages for placing an outgoing call, both of which are described in the specification as available services.  Thus, ALE's "all services and options" construction of the "single graphical menu" limitation excludes the preferred embodiments shown in Figures 3 and 4 because the embodiments do not display all communication options for all communication services at the same time.  As a result, ALE's construction runs contrary to a long line of established cases.  See, e.g., Sandisk v. Memorex Products, Inc., 415 F.3d 1278, 1285 (Fed. Cir. 2005) ("[a] claim construction that excludes a preferred embodiment, moreover, is rarely, if ever, correct.").

3.    **The Prosecution History Supports Microsoft's Proposed Construction**

ALE's reliance on the prosecution history of the '064 patent is misplaced.  According to ALE, in response to the Patent Office's rejection of pending claims in view of Pepe, the patentees argued that the claimed single graphical menu shows all of the subscriber's options for each of the communication services on a single screen at the same time.  [Defs. Br. 9 (quoting '064 Patent Prosecution History, 7/24/2000 Amendment, at MSAL01001) (Ex. 19).]  But nowhere in the quoted text do the patentees refer to all communication options or all of a subscriber's options.  Indeed, reading "all of a subscriber's options" into the patentees' remarks and into the construction of single graphical menu directly contradicts the claims, which the patentees had amended in the same response to recite that the communication options can be customized "through **either** a telephony-centric network using a telephone **or** a data-centric network using a display terminal."  [Id. at MSAL00993.]  The claims the patentees' remarks refer to clearly contemplate that some options may be available only via a telephone and not visually displayed.  The only reasonable conclusion that a person of ordinary skill could have drawn from the patentees' remarks, taking into account the intrinsic evidence as a whole, is that "the communication options" referenced at MSAL 01001 refer to some communication options, not all.

ALE's proposed construction further contradicts the intrinsic evidence.  The Patent Office allowed claim 1 of the '064 patent only after the following language was incorporated into the claim in a subsequent amendment:

> [W]herein said single graphical menu comprises at least a first display area for showing a first communication service and a first communication option associated with a first communication service, and a second display area for showing a second communication service and a second communication option associated with a second communication service.

['064 patent at 18:39–58.] This claim language is clear that the single graphical menu need only display at least two communication services and options in at least a first and second window, not all options for a subscriber's services, as ALE proposes. The Examiner confirmed this by correctly concluding in his Reasons for Allowability that only a plurality (at least two) communication services and options are required to be displayed via the single graphical menu. [Ex. 19, '064 Patent Prosecution History, Notice of Allowability at MSAL01165.] Far from being the clear disavowal required to support ALE's construction, the prosecution history provides compelling evidence that ALE's "all services and options" construction is wrong. ALE's construction of the GUI limitation contradicts the preamble of the '064 patent claims and renders the "wherein" clause superfluous. ALE's construction disregards this claim language and focuses only on isolated language in the claim to support a construction that "all" services and options must be displayed via the single graphical menu. By contrast, Microsoft's construction takes into account this added claim language and reconciles it with the remainder of the language in the claims to arrive at a construction that is consistent with the entirety of the claim language. All of the language of the claims must be considered when performing a construction analysis, a well-accepted principle of claim construction that Microsoft has adhered to and ALE has not. Bicon, 441 F.3d at 950 ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim."). For these reasons, ALE's proposed construction should be rejected.

### 4.　　The Extrinsic Evidence Supports Microsoft's Proposed Construction

[Defs. Br. 12.]  Moreover, inventor testimony constitutes a form of extrinsic evidence that has traditionally been given little to no weight as it relates to claim construction.  <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1584 (Fed. Cir. 1996) ("Nor may the inventor's subjective intent as to claim scope, when unexpressed in the patent documents, have any effect. Such testimony cannot guide the court to a proper interpretation when the patent documents themselves do so clearly.")

### E.    "telephony server being configured to audibly represent said communication options . . ."

The dispute among the parties concerning the construction of the phrase "said telephony server being configured to audibly represent said communication options to said telephone when said subscriber employs said telephone to access the computer implemented control center" boils down to whether the claimed telephony server must audibly represent <u>all</u> of the available communication options of the system.  ALE contends that the claims require the audible representation via the telephony server of the exact same communication options that are displayed by the single graphical menu, and that the single graphical menu must display "all" of the available communication services and options.  But nowhere does the claim language recite or require that "all" options be presented to a user via the telephony server.  And the common specification of the O'Neal patents explicitly discloses communication options that are available via the TUI that are <u>not</u> displayed via the GUI, further undermining the construction proposed by ALE.  Microsoft proposes that this claim language should be interpreted to mean what it says: that at least some of the communication options of the computer-implemented control center need be audibly represented via the telephony server.[10]

---

[10] Moreover, ALE's proposed constructions simply require a telephony server that represents the

Set forth below is Microsoft's rebuttal to the points raised by ALE regarding the construction of the TUI limitation.  Microsoft's proposed construction is consistent with, and supported by, the intrinsic evidence and should be adopted.

### 1.    The Plain Language of the Claims Supports Microsoft's Proposed Construction

The phrase "said communication options" is at the center of the dispute between the parties relating to the construction of the TUI limitation:  "said telephony server being configured to audibly represent said communication options..."  As explained above with respect to the GUI limitation, nothing in the intrinsic record limits the recited "communication options" to "all" of the available options as ALE proposes.  The claim language does not state that "all" communication options must be audibly represented via the telephony server.  The claims are directed to a "computer-implemented control center . . . **comprising** . . . [a] telephony server being configured to audibly represent said communication options."  [TLH Ex. 4, '064 patent at col.18:22–19:2 (emphasis added).]  As such, the computer implemented control center is required to include communication options that can be audibly represented but, in addition, the system may include communication services that are not audibly represented.  Gillette Co. v. Energizer Holdings, Inc., 405 F.3d 1367, 1372 (Fed. Cir. 2005) ("The transition 'comprising' creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements.").  The claims further reinforce the fact that some of the system's communications options may not be audibly represented by stating that communication options may be customized "through **either** a telephony-centric network using a telephone **or** a data-centric network using a display terminal."  [TLH Ex. 4, '064 patent

---

same communication options that are available through the single graphical menu.  [See Defs. Br. at 13.]  ALE's constructions do not require the telephony server to represent all the same communication options that are available through the single graphical menu.

col.18:22–27.] The claims make clear that certain communication options may be available using a display terminal, but not using a telephone.

ALE contends that "said communication options" recited in the TUI limitation refers to the exact universe of communication options displayed via the single graphical menu (which means all communication options under ALE's construction). [Defs. Br. 13–15.] But the plain language of the claim merely recites the audible representation of "said communication options," which refers back to the "communication options pertaining to said plurality of communication services" first identified in the claim preamble. The claim does not recite or require that "all" options be audibly represented via the telephony server; just that some of the communication options associated with the plurality (at least two) communication services recited in the preamble be audibly represented. [TLH Ex. 4, '064 patent col.18:22–19:4.]

ALE's argument relies on the same flawed reasoning it used to argue that "said communication services" and "said communication options" displayed in the single graphical menu requires all communication services and options of the computer-implemented control center. The claim language requires the telephony server to audibly represent at least some of the communication options pertaining to the plurality of communication services recited in the preamble of the claim, not "all" of the options.

### 2.     The Patent Specification Supports Microsoft's Proposed Construction

The common specification of the O'Neal patents fully supports Microsoft's proposed construction that the claimed telephony server need not audibly represent all communication options. As correctly pointed out by ALE, the specification provides only that it "should be apparent to those skilled in the art that the same control panel may be presented to the subscriber through the telephone interface if the subscriber wishes to review and/or change communication

options using a telephone connected to the telephony-centric network." [Defs. Br. 15–16

(quoting TLH Ex. 4, '064 patent at col.14:62–67) (emphasis added).] Importantly, the quoted

language does not require the same menu items that are displayed to be audibly represented, but

rather makes clear that the communication options and services shown in the graphical user

interfaces of Figures 3 and 4 may be audibly represented. When viewed in the context of the

immediately preceding sentence, it is clear that the specification merely provides an exemplary

description of communication services and options available through the single graphical display

and audibly represented through the telephony server:

> It should be appreciated that the communication services and option discussed in connection with FIGS. 3 and 4 are only illustrative of the capabilities of the inventive computer-implemented control center.

[TLH Ex. 4, '064 patent at 14:59-62 (emphasis added).]

Moreover, the specification identifies at least one option (the option to place a phone call)

that is disclosed as being available to a user via the telephony server but does not appear on

either graphical user interface shown in Figures 3 or 4. [TLH Ex. 4, '064 patent at 16:16–26.]

Thus, ALE's proposal for strict correspondence between the options that are displayed via the

single graphical menu (all available options, under ALE's constructions) and those that are

audibly represented via the telephony server is contradicted by the express teachings of the

patent specification. In sum, the TUI limitation is properly construed to require only that a

subset of available communication options pertaining to a plurality (at least two) of the

communication services be audibly represented. There is no requirement that all communication

options of the computer-implemented control center, or even the same communication options

that are displayed in the single graphical menu, must be audibly represented by the telephony

server.

## V.     CONCLUSION

For the reasons discussed above and in its opening brief, Microsoft respectfully requests that the Court to adopt its proposed constructions for the disputed claim terms of the patents-in-suit.

Dated: June 25, 2008

Respectfully submitted,

**FISH & RICHARDSON P.C.**

/s/ *Thomas L. Halkowski*
Thomas L. Halkowski (#4099)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
Tel: (302) 652-5070
Fax: (302) 652-0607
halkowski@fr.com

John E. Gartman
12390 El Camino Real
San Diego, CA 92130
Tel: (858) 678-5070
Fax: (858) 678-5099
gartman@fr.com

Ruffin B. Cordell
Linda Liu Kordziel
Indranil Mukerji
William Sekyi
Kfir Levy
Kori Anne Bagrowski
Robert Courtney
1425 K Street NW, Suite 1100
Washington, D.C. 20005
Tel: (202) 783-5070
Fax: (202) 783-2331
cordell@fr.com
kordziel@fr.com
mukerji@fr.com
sekyi@fr.com
kylevy@fr.com
bagrowski@fr.com
courtney@fr.com

**ATTORNEYS FOR PLAINTIFF
MICROSOFT CORPORATION**

41

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2008, the attached **PUBLIC VERSION – OF**

**MICROSOFT'S RESPONSE TO DEFENDANTS' CLAIM CONSTRUCTION BRIEF** was

served on the following via electronic mail:

Jack B. Blumenfeld
Maryellen Noreika
MORRIS, NICHOLS, ARSHT & TUNNEL LLP
1201 North Market Street
Wilmington, DE 19899-1347
jblumenfeld@mnat.com
mnoreika@mnat.com
*(Also served via hand delivery)*

Steven C. Cherny
Karen Y. Tu
Clement J. Naples
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY 10022
steven.cherny@lw.com
karen.tu@lw.com
clement.naples@lw.com

David A. Nelson
Alan Devlin
Brett M. Doran
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
Chicago, IL 60606
david.nelson@lw.com
alan.devlin@lw.com
brett.doran@lw.com

Michael J. Schallop
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
michael.schallop@lw.com

Susan S. Azad
LATHAM & WATKINS LLP
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071
susan.azad@lw.com

/s/ Thomas L. Halkowski
Thomas L. Halkowski
halkowski@fr.com